# Transcript of the Testimony of
# **Laura Greer**

**Date:** May 23, 2018

**Case:** Laura Greer v. Universtity Hospitals Health Systems Inc., et al.



**Cleveland Reporting Partners, LLC**
(216) 459-7880
scheduling@clereporting.com
clereporting.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

LAURA GREER,                    )
                                )
          Plaintiff,            )
                                )
     vs.                        ) Case No. 1:17-CV-001438
                                )
UNIVERSITY HOSPITALS            ) Judge Solomon Oliver, Jr.
HEALTH SYSTEMS INC, et al.,)
                                )
          Defendants.           )

- - -

DEPOSITION OF LAURA GREER

DATE:      May 23, 2018 at 10:08 a.m.

PLACE:     Wasserman, Bryan, Landry & Honold
           1090 West South Boundary, Suite 500
           Perrysburg, Ohio 43551

REPORTER:  Robert W. Scheid, Jr., RPR
           Notary Public

- - -

**Laura Greer**
**5/23/2018**

Page 10

```
 1          Q.    Okay.  And is that why the chemotherapy
 2   and the liquid antibiotic?
 3          A.    Yes.
 4          Q.    Okay.  Okay.  And then the Neu --
 5          A.    Neurontin.
 6          Q.    Neurontin.  Was that also related to
 7   that?
 8          A.    I've been on the Neurontin --
 9          Q.    Prior to?
10          A.    -- prior to.
11          Q.    Okay.  And what is that for?
12          A.    It's to help nerve pain and fibromyalgia.
13          Q.    Okay.
14          A.    And then the issues with my back.
15          Q.    Okay.  What are the issues with your
16   back?
17          A.    I've had two back surgeries.
18          Q.    Okay.  My wife has had a fusion and then
19   I think they scraped some of her spinal -- the spine
20   at first.
21                What, in general, was the nature of your
22   surgeries?
23          A.    I had a fusion in my cervical and then
24   the thoracic.
25          Q.    Okay.  When was your last surgery
```

**Laura Greer**
**5/23/2018**

Page 11

1    approximately?

2           A.    I believe 2008.

3           Q.    2008, okay.

4                 Were you on pain medication following

5    those surgeries?

6           A.    Yes.

7           Q.    Because we will go into, like, 2015

8    and '16 with the pain medication.

9                 Is that due to the back injury?

10          A.    Yes.

11          Q.    Okay.  Are you on any pain medications

12   now?

13          A.    No.

14          Q.    Okay.  Let me just -- and I don't need to

15   go into great detail about it.

16                Well, just before I do that, how long

17   have you been prescribed Xanax?

18          A.    For the last two years.

19          Q.    Two years, okay.  And is that when

20   needed, you take it, or is that a daily?

21          A.    Daily.

22          Q.    Okay.  And is that, again, to help the

23   sleeping and eating?

24          A.    No.  It's to help with the anxiety.

25          Q.    Okay.  And, I guess, let me just ask you,

**Laura Greer**
**5/23/2018**

Page 12

1  was the anxiety the first time you experienced it two

2  years ago?  Was that the first time you started a

3  prescription for it or had you been prescribed

4  something for anxiety prior to that?

5          A.    I believe four -- it's been about five

6  years when my mother was dying.  My family doctor gave

7  me a short prescription of it to get through.

8          Q.    Okay.  Then it came back two years ago?

9          A.    Yes.

10          Q.    Okay.  So when we say, "two years ago,"

11  is this two years ago, like -- when would you put that

12  in?  Tell me approximately when in the year.

13          A.    July of 2016.

14          Q.    July 2016, okay.

15                And then just so I'm clear on the current

16  diagnosis, do you have any work restrictions at this

17  point?  Like if you were going to be working at UH,

18  would you have any restrictions?

19          A.    Right now, I cannot work due to I had an

20  auto accident December 1st.

21          Q.    Okay.

22          A.    So I actually have about nine fractures

23  starting in my cervical down to my lower back.

24          Q.    Okay.  So that was December 1st, 2017.

25          A.    Yes.

**Laura Greer**
**5/23/2018**

Page 14

1          Q.     Okay.  Do you have any restrictions at

2    this time, work restrictions, due to that diagnosis?

3          A.     Yes, probably so.  I would probably not

4    be able to work at this time.

5          Q.     Okay.  Even without the car accident?

6          A.     Correct.

7          Q.     Okay.  And I guess, let me ask you this.

8                 Well, first of all, on the car accident,

9    just so I can understand the two issues, the car

10   accident, you have fractures in your spine or where

11   are the fractures?

12         A.     They start in my cervical and go all the

13   way down my back.

14         Q.     Okay.  Okay.  And as of right now, I take

15   that it you would not be allowed -- you wouldn't be

16   medically able to work since December 1 of 2017?

17         A.     Correct.

18         Q.     Okay.  At this time, you don't know when

19   those fractures are going to heal and permit you to

20   return, take the other diagnosis out.

21         A.     Correct.

22         Q.     And the other diagnosis with your

23   restrictions, the January 2018 diagnosis, are those

24   going to improve with your medications or do you see

25   that as an ongoing disability-type filing, like where

**Laura Greer**
**5/23/2018**

Page 15

1   you'll go to SSDI and file?

2          A.    Yes.

3          Q.    "Yes," being the SSDI?

4          A.    Yes.

5          Q.    Okay.  So let me ask this.  Let's say

6   that your leave would have been granted.  And we'll

7   get into it, but the leave when you went to, I think,

8   San Antonio.

9          A.    Yes.

10         Q.    And say that you were still employed by

11  UH, because you got back from San Antonio shortly

12  before December 1, right?

13         A.    Right.

14         Q.    Would you be on a leave of absence today?

15         A.    Yes.  I would be on -- I would probably

16  have flipped to long-term disability.

17         Q.    Okay.  And that's where you would have

18  stayed on long-term disability as long as it would

19  have been providing you benefits?

20         A.    Correct.

21         Q.    Okay.  So I take it, with that, you

22  haven't sought long-term employment since leaving UH.

23         A.    Could you repeat that?

24         Q.    Since leaving UH or separating, you

25  haven't sought alternative employment yet.

**Laura Greer**
**5/23/2018**

Page 16

1          A.     I started to.

2          Q.     Okay.

3          A.     And then I had the car accident.

4          Q.     Okay.

5          A.     So no.

6          Q.     Okay.  So as of right now, have you made

7     your filing for SSDI?

8          A.     Yes.

9          Q.     You have.

10          A.     Yes.

11          Q.     Okay.  When was that?

12          A.     I filed it at the end of February.

13                    MR. CAMPBELL:  Frank, did we get

14               that?  I guess it would be relevant to

15               the lost-wage claim.

16                    MR. LANDRY:  I don't think we

17               have a copy of that.  We're not handling

18               that.

19                    MR. CAMPBELL:  I guess we'll

20               have to see.  I don't know if I

21               necessarily need to see it if this

22               changes some of what you're seeking.

23     BY MR. CAMPBELL:

24          Q.     So I take it that as of your filing at

25     the end of February, you're taking the position with

**Laura Greer**
**5/23/2018**

Page 17

1    the government that, for the foreseeable future,

2    you're unable to work, you're disabled according to

3    the law.

4           A.    Yes.

5           Q.    Okay.  So if we are together at this time

6    next year, you would assume at that point you would be

7    on disability?  Hopefully you're recovering, but for

8    right now, you would say you'd be on disability

9    receiving those benefits at this time next year, would

10   be your expectation?

11          I mean, you tell me.  What's your

12   expectation, I guess, at the end of this year?  Do you

13   expect to be back to work or what's your expectation?

14          A.    I would like to.  Disability has been

15   approved as of last week.

16          Q.    Oh, it has been approved.

17          A.    Yes.

18          Q.    Okay.  So you weren't initially denied.

19   It was granted immediately.

20          A.    Correct.

21          Q.    Okay.  So as of right now, you're on

22   SSDI?

23          A.    I have not started receiving any

24   benefits.

25          Q.    Okay.  But it has been approved.

**Laura Greer**
**5/23/2018**

Page 18

1          A.     Yes.

2          Q.     And when I say, "on," it's been approved

3    and you'll start receiving benefits, I guess,

4    retroactive to your disability date in February?

5          A.     No.  Actually, you have a five-month

6    waiting period.

7          Q.     Okay.  Okay.  Okay.  Thank you for that.

8    So I don't think I need to go into a lot of the

9    job-seeking at this point.

10         But just so we're clear, then, like I

11   said, if the leave of absence would have been approved

12   and you were still employed, today you would be on

13   medical leave of absence from UH?

14         A.     Yes.

15         Q.     Okay.  And you would have applied for

16   long-term disability, I guess, in connection with your

17   SSDI?

18         A.     Yes.

19         Q.     Okay.  Thank you for that.  So let me ask

20   you about other litigation or other claims that you

21   may have had.

22         So on the car accident, was that just

23   your car?

24         A.     Yes.

25         Q.     Okay.  Were you in an accident earlier

**Laura Greer**
**5/23/2018**

Page 22

```
 1    suffered during 2016 and 2017 concerning back issues.
 2              Is that a true statement?
 3         A.    Yes.
 4         Q.    Okay.  And let me ask you, in 2016 and
 5    2017, did you have any work restrictions at UH?  And
 6    I'm going to use "UH."
 7              Are we on the same page with that, when I
 8    talk about your employment?
 9         A.    That's fine.
10         Q.    Okay.  Did you have any work restrictions
11    due to your back issues?
12         A.    I had FMLA papers.
13         Q.    Okay.  For absences?
14         A.    Yes.
15         Q.    Okay.  When you were at work, did you
16    have any work restrictions that said, hey, you can
17    only work so many hours a day or a week or anything
18    like that?
19         A.    No.  But I believe they put -- if I had
20    to stop and, say, lay down for a while, I could do
21    that.
22         Q.    Okay.
23         A.    And then usually finish working or made
24    up the time.
25         Q.    Okay.  So, yeah, like, my wife will be
```

**Laura Greer**
**5/23/2018**

Page 23

1    working at home and she might be sitting at her chair

2    for too long and need to walk or to lay down or

3    something.

4              Is that a fair statement, like what you

5    had?

6         A.   Yes.

7         Q.   Did you ever have any -- I guess, did

8    that ever impact your job performance at UH?

9         A.   No.

10        Q.   Was it ever stopped?  Did you ever have

11   UH say, "You're not allowed to go lay down" or

12   anything?

13        A.   No.

14        Q.   Okay.  So that was one ailment.

15             Is there any other -- in 2016 and 2017,

16   before December 1, before your car accident, is there

17   any other, I guess, physical impairments or mental

18   impairments that you suffered in those two years?

19        A.   Migraines.

20        Q.   Migraines, okay.  I guess, first of all,

21   let me ask you, is there anything else?  Then I'll go

22   back to migraines and ask you like the back injury.

23             Anything else?

24        A.   No.

25        Q.   Okay.  So with the migraines -- so I

**Laura Greer**
**5/23/2018**

Page 24

1   guess just to be clear, so 2016 and 2017 up till

2   December 1, your car accident at UH, the physical and

3   mental impairment you had during that time were

4   continuing back issues and migraines?

5           A.    Yes.  They went back way before.

6           Q.    I understand.  But in those two years,

7   was there anything else?  Did you have any other work

8   restrictions aside from some FMLA or attendance?  Any

9   other work restrictions?

10          A.    No.

11          Q.    Okay.  So tell me about the migraines.

12  Was that just FMLA and sometimes you might have to

13  take a break?

14          A.    Yes.

15          Q.    Okay.  Did UH ever stop you from taking

16  those breaks?

17          A.    No.

18          Q.    Okay.  Did it impact your work

19  performance?

20          A.    No.

21          Q.    Okay.  So it sounds like in 2016 and 2017

22  at UH, you had FMLA intermittent leave and sometimes

23  you would have to take some extended leave for

24  treatment, I assume, right?

25          A.    Yes.

**Laura Greer**
**5/23/2018**

Page 25

```
 1          Q.    And aside from that, while you were at
 2    work, you were able to perform all the essential
 3    functions of your job.
 4                Is that a fair statement?
 5          A.    Yes.
 6          Q.    And the only restrictions you had were, I
 7    would, I guess, say it was minimal, as needed, you
 8    might need to lay down either for a migraine or a back
 9    injury?
10          A.    Yes.
11          Q.    Did that happen a lot or was that just
12    something you had the ability to do?
13          A.    There was a cluster of time, probably
14    starting in August, where the migraines and the
15    back --
16          Q.    August 2017?
17          A.    Yes.
18          Q.    Okay.  Were flaring up, so to speak?
19          A.    Yes.
20          Q.    Okay.  And how did it impact you?  More
21    time off or what was the issue?
22          A.    Yes.
23          Q.    Okay.  Okay.  But in terms of when you
24    were at work, it was just simply there were times when
25    you needed to lay down or turn off the lights for a
```

**Laura Greer**
**5/23/2018**

                                                    Page 26

1    migraine or something like that?

2         A.    Yes.

3         Q.    And let's take out attendance right now.

4    Let's take out the attendance issues and let's just

5    talk about your work performance in 2016 and 2017.

6              Did anybody tell you that your work

7    performance when you were there at work was poor?

8         A.    No.

9         Q.    Okay.  Did anybody raise any issues about

10   you taking maybe a short break to make sure your back

11   was okay or a migraine?  Did any UH supervisors raise

12   any issues with that?

13        A.    I was told I was missing too much work

14   when I was getting injections in my back.

15        Q.    Okay.

16        A.    And I had been approved for vacation, and

17   they took it back and said because of having

18   injections and stuff, there was too much work that was

19   needed done.

20        Q.    Okay.  And we'll get into the attendance

21   issues.  But aside from attendance, where they might

22   say, hey, you've used up your vacation or you got

23   attendance points, let's take attendance out.

24              When you were at work, did any UH

25   supervisors raise issues or managers raise any issues

**Laura Greer**
**5/23/2018**

Page 27

1    about you needing to take short breaks for backaches

2    when you were at work doing your duties?

3              A.    Yes.

4              Q.    They did.

5              A.    At times, yes.

6              Q.    At times.  Who?  Who or when?  Do you

7    have any --

8              A.    Cindi Roberts.

9              Q.    Okay.  Do you have any specific dates or

10   issues?

11             A.    No.  Just because of the backlog of

12   claims and stuff needed done.

13             Q.    Okay.

14             A.    I was, you know, cutting work at that

15   time.

16                   MR. CAMPBELL:  Okay.  Let me see

17                   if I understand.  I guess maybe we can

18                   take one step back.  Let me see if I have

19                   a document here.

20                   (Court Reporter marked

21                   Defendants' Exhibit 1.)

22   BY MR. CAMPBELL:

23             Q.    You've been handed what's been marked as

24   Exhibit 1.  And we were talking about 2016 and 2017.

25                   Did you hold the claims processor

**Laura Greer**
**5/23/2018**

Page 28

1    position?

2         A.    Yes.

3         Q.    Okay.  And why don't you take a second to

4    look through this document and let me know if you

5    would consider this document an accurate

6    representation of your roles and responsibilities.

7         A.    (Witness complies.)  Yes.

8         Q.    And so how long did you hold the claims

9    processor position?

10        A.    16 years and 20 months [sic].

11        Q.    Okay.  And so at all times during your

12   employment -- and I'm going to call it UH, but I think

13   there was a predecessor employer which became UH.

14             Is that a fair statement?

15        A.    Health Design Plus is what was started.

16        Q.    Okay.  And then UH came in sometime

17   during your 16 years and 20 months?

18        A.    Yes.

19        Q.    Okay.  I'm just going to call it "UH" for

20   ease of this.

21        A.    That's fine.

22        Q.    Were you always a claims processor during

23   your employment?

24        A.    Yes.  I got promoted to senior claims

25   examiner.

**Laura Greer**
**5/23/2018**

Page 29

1    Q.    Okay.  And when did you get that

2    promotion approximately?

3    A.    I'm unsure.

4    Q.    Okay.  Were you a senior claims examiner

5    when you were discharged?

6    A.    Yes.

7    Q.    Okay.  So for 2016 and 2017, you were a

8    senior claims examiner?

9    A.    Yes.

10    Q.    Okay.  Well, is there anything that when

11    we look at this claims processor, is there anything

12    that "senior" would add to this or is it just that pay

13    increase?

14    A.    Yes.  I would get, say, problem claims or

15    claims that needed more attention or e-mails from

16    clients.

17    Q.    Okay.  When did you start working from

18    home?

19    A.    It was shortly after I started.  I was

20    the first one they tested.  I would say 2003 possibly.

21    Q.    Okay.

22    A.    I'm unclear.

23    Q.    Okay.  And you said, "tested," meaning

24    what?

25    A.    They wanted to see how it would work out.

Laura Greer
5/23/2018

Page 31

1    production (22 to 25) claims per hour," not

2    necessarily "What were you doing 15 minutes ago?"

3            A.    I exceeded what they --

4            Q.    Okay.  So what would Cindi raise with

5    you?  When I asked you about did anybody ever raise

6    anything with you about breaks or anything, were you

7    saying that you had a backlog of claims?

8            A.    There was always a backlog of claims.

9            Q.    Okay.  Okay.  Well, let me just -- I

10   guess just to explain a little bit to me, then, what

11   is Health Design Plus?  Are they a claims

12   administrator or what do they do?

13           A.    They're our TPA.

14           Q.    Okay.  Third-party administrator.

15           A.    Yes.

16           Q.    Okay.  For health plans, for various

17   health plans?

18           A.    For various companies.

19           Q.    Various companies, okay.  So pick a

20   company, they have health insurance for their

21   employees, and they will contract with Health Design

22   Plus to be a third-party administrator.

23           A.    Yes.

24           Q.    So what you were doing was reviewing

25   health claims to determine -- I guess it says medical,

**Laura Greer**
**5/23/2018**

Page 32

1   dental, and vision -- to determine whether the plan

2   covered that, right?

3          A.     Yes.  You know, whether we released a

4   claim to be paid or denied the claim for various,

5   whatever the company's policies were.

6          Q.     Okay.  Did you have certain employers

7   that you were responsible for?

8          A.     Yes.

9          Q.     Okay.  So those employers, those claims

10  would be coming and you would review those.

11               Were you the only representative, the

12  claims processor, on certain employers or were there

13  multiple?

14          A.     I had just a few that was my own and then

15  we had other employees that did the same plans.

16          Q.     Okay.  Okay.  And so if you were on one

17  of the plans that would be your own, I assume that if

18  you were behind, then that employer might say, hey,

19  there's a backlog.  Whether you were the cause of it

20  or not, there's a backlog.

21               They might be getting complaints from

22  their employees about, "Hey, why isn't my claim

23  approved"?

24          A.     I would not hear that.

25          Q.     Okay.  Is that what Cindi was hearing?

**Laura Greer**
**5/23/2018**

Page 36

1    your workday start?  Do you actually log in on your

2    computer?

3            A.    Yes.

4            Q.    That's how you clocked in.

5            A.    Yes.

6            Q.    Okay.  And when you log in to your

7    computer, then, did you just start performing your

8    task at that time?

9            A.    Yes.

10           Q.    Okay.  Did you have to phone in or were

11   the claims right there to review?

12           A.    The claims were right there.

13           Q.    Okay.  And so when would you have contact

14   with your supervisors or managers?  Tell us, like, was

15   it regular or only if an issue arose?

16           A.    Only if an issue arose or they would,

17   say, e-mail me if they needed something done or had a

18   question.

19           Q.    Okay.  How did you typically -- I guess

20   the e-mail brings up a good point.

21               How did you typically communicate with

22   your managers and supervisors?

23           A.    E-mails.

24           Q.    Okay.  How often were, like, phone calls

25   or in person?

**Laura Greer**
**5/23/2018**

Page 37

1        A.      Rare.

2        Q.      Okay.

3        A.      The only time we did phone calls is when

4    we would have, say, a meeting.

5        Q.      Okay.  Then in person?

6        A.      No.  It would be -- say we're sitting

7    here.  And whoever's in the main office, they would

8    have the phone, conference phone on, and all of us

9    processors that are working from home call in.

10       Q.      Okay.  Sounds good, I understand.  So

11   then, in general, it sounds like your workday was

12   pretty self-reliant.

13       A.      Yes.

14       Q.      You got the claims.  You processed the

15   claims.  If you had an issue, you would e-mail or if

16   your managers or supervisors had an issue, they would

17   e-mail you?

18       A.      Correct.

19       Q.      Okay.  Okay.  So let me just ask you, as

20   to the -- at some point, I guess, in time on the -- in

21   2016, did you -- or was it 2015 -- did you go into a

22   drug treatment program or rehab program?

23       A.      Yes, I did.  January of 2016.

24       Q.      January of 2016, okay.  So tell me, I

25   guess, what led to that?

**Laura Greer**
**5/23/2018**

Page 38

```
 1           A.    I had been a patient with pain management
 2    for over ten years with my back.  They had prescribed
 3    me 187-1/2-milligram Percocets every month.
 4           Q.    Okay.
 5           A.    I had just finally decided I had enough
 6    of taking them.
 7           Q.    Okay.
 8           A.    And I was unsure about how to go about
 9    getting off of them.
10           Q.    Okay.
11           A.    So I went to Arrowhead to get help.
12           Q.    Okay.  What is Arrowhead?
13           A.    A rehab place.
14           Q.    Okay.  Did you find that on your own or
15    were you directed?
16           A.    No, I found that on my own.
17           Q.    Okay.  So you went to the rehab at that
18    time.
19                 And prior to entering rehab, did it
20    impact your work at UH, the Percocet use?
21           A.    No.
22           Q.    Okay.  Did anybody at UH, I guess, raise
23    issues with you about it?
24           A.    No.
25           Q.    Okay.  How long did you go into
```

**Laura Greer**
**5/23/2018**

Page 39

1  Arrowhead?

2  　　　　A.　　I was there, I think, three days, if

3  that.

4  　　　　Q.　　Okay.  Did you advise -- I saw in the

5  complaint about, did you let your -- I guess, first of

6  all, were the three days during workdays or a weekend?

7  　　　　A.　　Let me think.  I believe -- I think I

8  went in on a Thursday, maybe.

9  　　　　Q.　　Okay.  And did you release yourself or

10  were you released by the physician?

11  　　　　A.　　I was released by the physician.

12  　　　　Q.　　Okay.  Did you let UH know that you were

13  going into rehab, or how did that come about?

14  　　　　A.　　Yes, I did.

15  　　　　Q.　　You did, okay.

16  　　　　　　　Did you let your supervisors and managers

17  know or when you say you let them know --

18  　　　　A.　　HR.

19  　　　　Q.　　Okay.

20  　　　　A.　　And Cindi Roberts.

21  　　　　Q.　　Okay.  I thought I read something where

22  you claimed that UH learned of that by mistake or UH

23  shouldn't have learned that you were in rehab.

24  　　　　　　　Am I reading something wrong?

25  　　　　A.　　When I filed for short-term disability.

**Laura Greer**
**5/23/2018**

Page 40

1          Q.     Okay.

2          A.     Aetna -- I believe that was our

3    short-term disability company -- thought -- excuse me.

4                 The nurse, director of nursing, Elizabeth

5    at Arrowhead, thought she was talking to my disability

6    company.

7          Q.     Okay.

8          A.     You know, and then at that point, they

9    are allowed to release my medical, you know,

10   information.  And she was, in fact, talking to Angela

11   Kuhlman, the HR manager at Health Design Plus.  And

12   Angela never stopped her and advised her that she was

13   talking to the wrong company.

14         Q.     Okay.  Let me -- I guess let me just try

15   to understand this a little bit.

16                You went into rehab in January of 2016,

17   right?

18         A.     Yes.

19         Q.     Why would you be applying for short-term

20   disability if it was only going to be three days?

21         A.     Because when I got -- was released, I had

22   a return-to-work release and they would not let me go

23   back.

24         Q.     Okay.  Okay.  So let's take a step back.

25                So this started with, you had been on

**Laura Greer**
**5/23/2018**

Page 41

1    pain medications for a decade.

2         A.    Correct.

3         Q.    You ultimately concluded that, "Hey, this

4    is too much, I don't want to continue to take these

5    every day."

6         A.    Yes.

7         Q.    You voluntarily check yourself into

8    Arrowhead?

9         A.    Yes.

10        Q.    And I thought that you said that when you

11   were checking into Arrowhead, because you're going to

12   miss work, that you let UH know that you were going to

13   Arrowhead.

14              Or did I hear that wrong?

15        A.    No, I advised them what I was doing.

16        Q.    Okay.  So you did advise Arrowhead, "I'm

17   going into rehab."

18              Did you tell them that you were, "I'm

19   trying to" -- I guess, wean yourself off the pain

20   medication?  Did you let them know?

21        A.    Yes.

22        Q.    Okay.  So you went to Arrowhead.

23              And then, I guess, you didn't apply for

24   short-term until after you were out of Arrowhead,

25   right?

**Laura Greer**
**5/23/2018**

Page 42

1        A.    I believe I was -- I had started

2    short-term disability, because my understanding or

3    what I thought rehab was would have been longer than a

4    three-day stay.

5        Q.    Okay.  So when you went in, you thought

6    it was going to be more than three days?

7        A.    Yes.

8        Q.    Okay.  That's when you applied for

9    short-term disability?

10       A.    Yes.

11       Q.    Okay.  So let me ask you, when you had

12   already told, when you thought you were going to miss

13   a lot of work, I guess, or more than three days, you

14   called HR and you told Cindi Roberts, "I'm going into

15   Arrowhead," right?

16       A.    Angela Kuhlman was the HR and Cindi

17   Roberts was my manager.

18       Q.    Okay.  So you let them both know, "I'm

19   able to do my job, but I'd like to get off these pain

20   medications.  I think I need help to do that, and I'm

21   going to go into Arrowhead."

22       A.    Yes.

23       Q.    Okay.  Is that a fair statement?  I guess

24   you probably had a longer conversation, but you

25   basically told them, "I'm going into rehab

**Laura Greer**
**5/23/2018**

Page 43

1  voluntarily," number one, right?

2         A.    Yes.

3         Q.    "I've been on pain medications and I'd

4  like to get off them," right?

5         A.    They were aware that I was on them.

6         Q.    Okay.  But you were hoping to get off

7  them through rehab.

8         A.    Yes.

9         Q.    You told them that you were able to do

10  your work, it didn't cause you problems with

11  processing claims, right?

12         A.    Correct.

13         Q.    But you wanted off.  And I guess at that

14  point, you told them that you thought you might be in

15  for longer than three days.

16               Did you have any idea how long you

17  thought you might be in?

18         A.    Well, I mean, my perception of going to

19  rehab is, you know, maybe a 30-day stay of how do you

20  get from Point A to Point B.

21         Q.    Yes.

22         A.    You go through counseling.  And it was

23  nothing that I ever thought it was.

24         Q.    Okay.  And when you talked to Cindi and

25  Angela, I take it that you said to them, because you

**Laura Greer**
**5/23/2018**

Page 47

1              wanted to understand.

2                        Let me mark Exhibit 2.

3                        (Court Reporter marked

4              Defendants' Exhibit 2.)

5    BY MR. CAMPBELL:

6              Q.    Have you ever seen Exhibit 2 before

7    today?

8              A.    No.  But number 10 is absolutely

9    incorrect.

10             Q.    Number 10 is incorrect?  And it says,

11   "Patient states reason for admission is," and it

12   states, quote, "to get off heroin."

13             A.    Correct.

14             Q.    Okay.  So you're saying you weren't --

15   did you ever take heroin?

16             A.    Absolutely not.

17             Q.    Okay.  So I guess the things that are

18   correct are the date.

19                   Do you have any reason to disagree that

20   it was on January 14th, 2016, that you were admitted

21   into Arrowhead?

22             A.    No.

23             Q.    Okay.  It does say, "Fall risk" and

24   "Chronic pain."

25                   When it says, "fall risk," was that an

**Laura Greer**
**5/23/2018**

Page 48

1 accurate statement?

2         A.    I believe, just estimating, they put

3 "fall risk" for patients.

4         Q.    Okay.  Okay.  So then they must have

5 misunderstood or misheard when they put this quote to

6 get off heroin?

7         A.    Correct.

8         Q.    Okay.  Was there ever a time that the

9 pain medication that the pain management company had

10 prescribed to you wasn't enough each day and you

11 somehow got more?

12         A.    No.  I never took heroin.

13         Q.    Okay.  Did you buy prescriptions to take

14 more prescriptions than what they prescribed?

15         A.    A few times I did, yes.

16         Q.    Okay.  Meaning that you just took more

17 that day or that you bought them through some other

18 source?

19         A.    Both.

20         Q.    Both, okay.  How would you, I guess, buy

21 them?  Did somebody have another prescription or how

22 were you able to --

23         A.    Yes.

24         Q.    Okay.  A friend?

25         A.    Yes.

**Laura Greer**
**5/23/2018**

Page 50

1    there's a hole there, what that word is.

2         Q.    Okay.  I get it.  I think it's something

3    risk factors, you're saying?

4         A.    I understand that.  But I don't know what

5    the first word is, because they've marked "impaired

6    judgment," so I'm unclear as to what the first word

7    is.

8         Q.    Okay.  Yeah.  I'm having trouble seeing

9    that, as well.

10         So did you have impaired judgment at the

11   time or no?

12        A.    No, I do not believe so.

13        Q.    Okay.

14        A.    Also, it said I thought -- or tried to

15   commit suicide is not -- do you have -- let's see

16   where that is.

17         284, "Have you had any thoughts of death

18   or suicide in the past" and they marked it "yes" and

19   put "years ago."

20         I don't ever remember making that

21   statement.

22        Q.    Okay.  That's fair.  I read in here, let

23   me just ask you, that at this time the Xanax you were

24   taking was not prescribed and you were getting it

25   through some other source.

**Laura Greer**
**5/23/2018**

Page 51

```
 1                    Is that accurate?
 2          A.    At that time, correct.
 3          Q.    Okay.  Was that through a friend, or how
 4   were you getting the Xanax?
 5          A.    Yes.
 6          Q.    And did you get prescribed that after the
 7   rehab, the Xanax?
 8          A.    The Xanax didn't start until July of
 9   2016.
10          Q.    Okay.
11          A.    When all this stuff started.
12          Q.    Okay.  Okay.  And we'll take a break here
13   in a moment.  Let me just conclude this part.
14                So you went into Arrowhead voluntarily?
15          A.    Yes.
16          Q.    You did advise UH of the fact that you
17   were going into Arrowhead and of the pain medication,
18   I guess.
19                Did you describe it then as an addiction
20   or what did you say?
21          A.    No.  I just told them I'd had enough.  I
22   wanted to get off of it.  I probably told them I
23   didn't know how to do it and I was going to get some
24   help.
25          Q.    Okay.  And then when you were released
```

**Laura Greer**
**5/23/2018**

Page 55

1   what the insurance company approves for you to -- your

2   stay.

3          Q.    Okay.  Well, let me ask you one final

4   question on it, then.

5                If somebody called you up on a Thursday

6   and said, "I'm going into rehab because I've been on

7   pain medication for ten years and I don't know how to

8   get off of it," right?

9                That's what you called and said to HR at

10  UH, right?

11         A.    Correct.

12         Q.    And then three days later or four days

13  later, you're saying, "I now know how to get off of it

14  and I'm fine and I'm getting ready to return to work,"

15  would you not potentially have a few doubts about that

16  if you were the person receiving those two

17  communications?

18         A.    I would -- in my opinion?

19         Q.    Yes.  Yeah.

20         A.    I would look at how their work history

21  has been and base it off of that.  And if you have

22  gone to this facility and this doctor has said okay,

23  she is now fine, she is clean, she does not need the

24  Suboxone, you know, to stop the cravings -- you know,

25  that's what I learned being there -- no, I wouldn't.

**Laura Greer**
**5/23/2018**

Page 58

1          A.     Correct.

2          Q.     And it was individualized, not group

3    therapy, at Arrowhead.

4               Is that an accurate statement?

5          A.     It was all group.

6          Q.     It was all group, okay.  But it was

7    supposed to be, you thought it was going to be

8    individualized.

9          A.     Correct.

10         Q.     Okay.  And what they were telling you is

11   that your insurance only paid for three days of

12   Arrowhead.

13         A.     Yes.

14         Q.     Okay.  And then they were suggesting

15   that, I guess there was a couple options that you

16   could go to, either an outpatient that your insurance

17   would pay, they would verify that your insurance would

18   pay, and I think you said no to that.

19         A.     That is untrue.

20         Q.     Okay.  What's untrue about it?

21         A.     I never denied that I would, you know,

22   not follow up.  When the provider discharged me, I

23   actually asked him, I said, "I take it my insurance

24   denied your IOP and PHP program."

25               And he said, "How do you know that?"

**Laura Greer**
**5/23/2018**

Page 64

1    treatment.

2                   And I said, "Who are we going to believe?

3    A nurse or the doctor?"

4        Q.     Okay.  Okay.  All I'm asking you right

5    now is:  You come to UH, you say, "Here's my release,

6    I want to start working at home again."

7                   You said UH said no to that initially in

8    January of 2016, right?

9        A.     Yes.  And that's also when Cindi Roberts

10   said, "I don't think I can trust you anymore."

11       Q.     Okay.  As soon as we get through this

12   timeline, I'm going to say you can fire away and say

13   whatever you want.  Just give me this.  I'm just

14   trying to get through this.

15                  You come back, "Here's my release to

16   return to work."

17                  UH says, "No, you're not returning,"

18   right?  Yes or no?

19       A.     Yes.

20       Q.     Okay.  What did UH do?  What did you have

21   to do to get back to work?

22       A.     I faxed Angela Kuhlman this.  I faxed

23   her --

24       Q.     "This" being Exhibit 4?

25       A.     This paper here, the nursing discharge

**Laura Greer**
**5/23/2018**

Page 65

1     note only.

2              Q.    Okay.

3              A.    And the doctor's discharge paper.

4              Q.    Okay.  How long did it take before they

5     put you back to work?

6              A.    I cannot recall how long.

7              Q.    A day?  Weeks?  Month?

8              A.    It might have been a week.  I cannot

9     recall when.

10             Q.    Okay.  So a week you're out -- let's say

11    it's a week.  You return to work.

12                   And when you return to work, that's when

13    they say the EAP program is going to be put in?

14             A.    No.

15             Q.    No, okay.  What happens?  You return to

16    work and nothing?  You're just back?

17             A.    I returned to work.  Everything was fine.

18             Q.    Okay.  When did they let you know the EAP

19    program was going to be applicable?

20             A.    July.

21             Q.    July, okay.  So you're saying that the

22    EAP program, you went into rehab, they asked you --

23    did you do outpatient from January until July?  Did

24    you do outpatient treatment for your addiction?

25             A.    I, on my own, saw a counselor.  And it

**Laura Greer**
**5/23/2018**

Page 66

1   wasn't necessarily to talk about addiction.  It was,

2   you know --

3          Q.    Okay.  Did you go to any actual

4   outpatient or inpatient rehabilitation?

5          A.    No.

6          Q.    Okay.  And then what is your

7   understanding of why the EAP program was triggered?

8          A.    I got a call.  I was on vacation the week

9   of July 4th.  I worked that following Monday.  That

10  following Tuesday, I worked four hours and received a

11  phone call from Angela Kuhlman and Robby Kordish

12  stating I was being put on administrative paid leave,

13  that EAP would be contacting me.

14               That is when EAP contacted me and stated

15  I was put on administrative paid leave due to an

16  accusation of slurred speech.

17         Q.    Okay.  So you're saying that at some

18  point in time, somebody reported that there was cause

19  for you to go into the EAP program?

20         A.    I had to go, obviously, through the fit

21  for duty, which ended up being a chemical-dependency

22  evaluation.

23         Q.    In July?

24         A.    In July.

25               MR. CAMPBELL:  Okay.  Let me

**Laura Greer**
**5/23/2018**

Page 69

1          I mean, that would be something she

2    should do, right?

3          A.    She would.  But I already had a

4    return-to-work note.

5                      MR. CAMPBELL:  Mark this.

6                      (Court Reporter marked

7                  Defendants' Exhibit 6.)

8    BY MR. CAMPBELL:

9          Q.    I'll show you what's been marked as

10   Exhibit 6.  Let me just take you through it, just so

11   we can move through.  And you're welcome to read it.

12          Page 1, I read there, if you look at Page

13   1 on the handwriting, it says, "12 steps meeting, did

14   not attend."

15          Is that an accurate statement?

16          A.    Yes.

17          Q.    Okay.  I take it that you decided, what,

18   they weren't helpful or you didn't like them?  What

19   was the problem?

20          A.    I felt like people were just hugging into

21   each other.  And that's not what I wanted, you know.

22          Q.    Okay.  Let's go to the last page of this

23   exhibit first.  They're in reverse chronological order

24   there.  So if we look at the last page, this one is

25   your follow-up appointment with your therapist on

**Laura Greer**
**5/23/2018**

Page 70

1    February 26, 2016.

2              Do you see that at the top?  Last page of

3    this.  I know it's confusing.  Last page says February

4    26, 2016.

5              Do you see that?

6         A.    Yes.

7         Q.    Okay.  At this point, it says stressful

8    workday, so I assume by this time, you're back to work

9    at UH.

10        A.    Yes.

11        Q.    Okay.  And it goes through and it does

12   state there at the end of the first sentence, the

13   "Summary of Session", "She states she went to four of

14   six 12-step meetings but missed two due to a bad cold

15   this week."

16             Did I read that right?

17        A.    Yes.

18        Q.    Okay.  And then the book with signatures

19   would be to verify that you were there.

20        A.    Yes.

21        Q.    Okay.  And then it looks like if you go

22   onto that through the summary, "She checked into drug

23   store UAs and she found a 4 panel with opiate screen

24   for $24."

25             Did I read that right?

**Laura Greer**
**5/23/2018**

Page 71

1        A.    She wanted to drug screen me and I had to
2   pay for the drug screens.  I had no problems with her
3   drug screening me.
4        Q.    Okay.  And "We discussed her taking
5   this," the drug screen, "to her doctor's office to use
6   that there."
7               Did I read that right?
8        A.    Yes.  And I did that.
9        Q.    Okay.  Because she wanted not just for
10  you to do it at home --
11       A.    Right.
12       Q.    -- but for you to do it at your doctor's
13  office?
14       A.    Correct.
15       Q.    Okay.  Okay.  So at that point in time,
16  February, your counselor is still saying, hey, you
17  should be going to AA.
18               It looks like at that point you were
19  going to AA and that you were supposed to be doing
20  drug tests?
21       A.    I did the drug testing.
22       Q.    Okay.  Let's look at the next page, 315.
23  If you turn the next page from the back.
24               No, no.  It goes reverse, I'm sorry.
25  You've got to go to the second page.  Turn to

**Laura Greer**
**5/23/2018**

Page 74

1    support group meetings.  ('I forgot my proof slips at

2    home.')  Also, she seemed uncomfortable talking about

3    her use, the consequences of same."

4              And then it says, "She missed two

5    appointments and was sent the letter to notify her was

6    leaving to let us know she wanted a different

7    provider.  She did not respond."

8              So you missed two appointments.  And then

9    when they're saying, "Hey, do you want to go with

10   somebody else," you ignored the letter.

11        A.   I did not ignore the letter.  And the

12   reasoning I missed the appointments, my aunt was dying

13   of cancer.

14        Q.   Okay, understood.  But, I mean, this was

15   important, as well.  And they're saying you dropped

16   out of treatment and they sent that notice to you on

17   June 21, 2016, right?

18        A.   I didn't necessarily drop out of

19   treatment.  Like I said, my aunt was dying.

20        Q.   Okay.  Well, they considered it dropping

21   out of treatment.  And then as it goes on, we look at

22   the discharge plan, and this is what you were getting

23   at.

24              "EAP contacted me to say the patient had

25   been pulled off work on reasonable cause (slurring

**Laura Greer**
**5/23/2018**

Page 75

1   words, long delays in responding) so she most likely

2   has relapsed.  The EAP states that her toxicology now

3   will be mandatory and I gave her the name of Century

4   Health, as they have the most options for AoD."

5              Did I read that right?

6        A.    I don't know how she can say I probably

7   relapsed when she hadn't seen me.

8        Q.    Well, but you understand that she hadn't

9   seen you enough because she says, "You're doing great

10  and I don't need to see you."  You didn't go back.

11       A.    I had the reason why I didn't go back.

12       Q.    Okay.  And then she kept saying to you --

13  I mean, you realize, it's kind of like if I go to

14  school and I don't have my homework and I say that the

15  dog ate it.

16              If every day you show up and say, "I went

17  to AA but I don't have my signatures," she starts

18  saying, "Maybe she didn't go to AA," right?

19       A.    She could say that, yeah.

20       Q.    She saw one drug test, from what we see.

21       A.    No.  There was more than that.

22       Q.    Okay.  Well, from her notes that we just

23  went through, she saw one drug test.

24       A.    Yes.

25       Q.    And then she ultimately is saying, even

**Laura Greer**
**5/23/2018**

Page 76

1    in her words, she thinks that because -- and I

2    understand life happens and things happen, but

3    obviously from this counselor's view, she believes

4    that there's an indication that, due to your conduct,

5    the objective factor is you relapsed, right?

6         A.    If that's what she said.  But we had

7    sessions with my husband, and she never brought up any

8    concerns about saying me -- that she felt that I

9    needed more treatment than she could provide for me.

10   That was never, ever said.

11        Q.    Okay.  Well, I don't think she's saying

12   that you needed more than what she could provide.  I

13   think she's saying that you weren't taking the

14   treatment that she wanted to provide to you.

15        A.    It was told to me by EAP that she

16   verbally stated that over the telephone.

17        Q.    Okay.  Look, I'm just reading that.  It's

18   certainly on those points.  But I guess what I also

19   read there is that the EAP program said that they

20   would not make you go through the EAP program if you

21   were going to see a counselor and undergoing the drug

22   testing with a counselor.

23        A.    When they made me go do the

24   fitness-for-duty --

25        Q.    Yes.  We'll get there.

**Laura Greer**
**5/23/2018**

Page 82

1    do our, what was called call logs.

2             Q.    Okay.

3             A.    And my system was not cooperating.

4             Q.    Okay.  Let me just ask you:  Had you seen

5    this document before today?

6             A.    This?

7             Q.    Yes.

8             A.    No.

9             Q.    Okay.  I know that you say that the

10   slurred speech was one of the reasons why they sent

11   you to EAP, right?

12            A.    That was the only accusation Georgena

13   Kohlbacher said that's why I was put on paid

14   administrative leave.

15            Q.    As part of the EAP.

16                  Did they tell you also that they believed

17   that you had -- that you were having a difficult time

18   how to understand and follow instructions?

19            A.    No.

20            Q.    Did they tell you that they believed you

21   were having a difficult time in performing the tasks

22   that were requested of you?

23            A.    No.

24            Q.    That e-mail, I'll represent to you, was

25   one of the e-mails that go to them.  And I understand

**Laura Greer**
**5/23/2018**

Page 83

1  your position on Salesforce and I'm sure you have

2  explanations.  But from their standpoint, it appeared

3  that you were having difficulties that you normally

4  would not have had.

5          Is that a fair statement?

6      A.    I had not been on Salesforce yet.

7      Q.    Okay.  I understand.  But obviously

8  there's different viewpoints.  And when somebody hears

9  "slurred speech," up to this point, I guess, up to the

10  point of July 2016, had anybody at UH ever said to

11  you, "Hey, your speech is slurred"?

12      A.    No.

13      Q.    Okay.  And you're saying your speech was

14  slurred not due to drug use but due to a medical

15  problem?

16      A.    Correct.

17      Q.    Okay.  So you're admitting your speech

18  was slurred?

19      A.    I do not know.

20      Q.    Okay.

21      A.    Because the medical issue is, when I had

22  my right thyroid removed, the doctor injured my vocal

23  cords.

24      Q.    Okay.  When was that?  When was that

25  thyroid removed?

**Laura Greer**
**5/23/2018**

Page 84

1          A.    I cannot recall the actual year.  It was

2    while I was working for Health Design Plus.

3          Q.    Okay.  Was it ten years ago?

4          A.    Probably longer, yes.

5          Q.    Okay.  So you had the medical condition

6    for the last ten years plus of your employment at UH,

7    right?

8          A.    Yes.

9          Q.    It didn't impact your ability to perform

10   your work aside from, you say, on one occasion maybe

11   or a couple of occasions in 2016, somebody thought

12   that maybe you were on drugs because your speech was

13   slurred.

14               Is that what you're saying?

15         A.    Correct.

16         Q.    Okay.  So did anybody even know you had

17   this medical condition until they raised with you that

18   your speech was slurred?

19         A.    I did not know I had this medical

20   condition until my thyroid became -- the left one

21   became enlarged and I was choking on food and went to

22   my thyroid doctor.

23         Q.    Okay.  But I thought you said that when

24   you went to your thyroid doctor, like, a decade ago,

25   they did something wrong that caused you to have

**Laura Greer**
**5/23/2018**

Page 85

1    slurred speech at times?

2           A.    We did not discover that until my thyroid

3    doctor sent me in 2017, or '16, to the ENT doctor to

4    make sure there was not an obstruction.  Because if

5    there was not an obstruction, then this would have to

6    be removed.

7           Q.    Okay.  Okay.

8           A.    And then at that point is when it was

9    discovered that my vocal cords had been damaged.

10          Q.    Okay.  So UH, up to this point, had no

11   idea about the vocal cord damage, right, up until July

12   2016?

13          A.    And I did not either.

14          Q.    Okay.  They knew you had been in rehab,

15   right?

16          A.    EAP?

17          Q.    No.  UH, your managers and supervisors,

18   knew you had been in rehab?

19          A.    Yes.

20          Q.    Knew you had abused, at some point,

21   Percocet, pain medications?

22          A.    Yes.

23          Q.    And then they believed they had heard a

24   slur in your speech on at least one occasion, right?

25          A.    If that's what they're saying.

**Laura Greer**
**5/23/2018**

Page 86

1          Q.    Okay.  I guess your response isn't "I
2    never had slurred speech."  Your response to them is
3    "It's not due to drug use.  It's due to something
4    else," right?
5          A.    It is a medical condition that it changes
6    my voice.
7          Q.    Okay.  At that point in time, though,
8    they don't know if it's drug use or a medical
9    condition, and they say, "Hey, we think we have cause
10   to have her go through the EAP program."
11              Is that a fair statement?
12         A.    If I was told I was being sent for a
13   chemical dependency evaluation and not for a
14   fit-for-duty evaluation.
15         Q.    Okay.  So your concern was what they
16   called it, you're saying.
17         A.    Yes.
18         Q.    Okay.
19         A.    They're two different --
20         Q.    Okay.  But I guess I would say if they
21   believed -- I look at it in this case -- I guess let
22   me ask you this.
23              It seems to me the two are one and the
24   same, when somebody believes that this isn't due to a
25   medical condition.  This is due to drug use that had

**Laura Greer**
**5/23/2018**

Page 87

1    occurred over the past decade.

2              When they send you for fitness for duty,

3    they're not having a -- I mean, if you came in to see

4    a doctor and the doctor looked at you, the doctor is

5    probably going to say, "I need to send her out for a

6    toxicology test" anyway, right?

7              Just like your counselor said the first

8    time you visited her, right?

9         A.    I guess -- well, it depends on what the

10   definition of "fit-for-duty evaluation" is versus

11   "chemical dependency."

12        Q.    Right.

13        A.    They could have said, "Your thyroid's

14   enlarged," which my family doctor knew.

15        Q.    Okay.  Well, I guess I would say when we

16   see your discharge -- and I'm going back to Exhibit 6,

17   on that July 14th, I mean, the discharge plan says

18   there that "EAP contacted me to say the patient had

19   been pulled off work on reasonable cause (slurring

20   words, long delays in responding) so she most likely

21   has relapsed."

22             They believed it was due to drug use, and

23   so therefore they did it.  So I guess I just have to

24   say to you they had a lot of facts at this point that

25   potentially it's there.

**Laura Greer**
**5/23/2018**

Page 88

```
 1                I mean, number one, you were paid during
 2      the leave, right?
 3                A.    Partially.
 4                Q.    In 2016?  I thought we saw in everything
 5      on the complaint that this was a paid leave they put
 6      you out on.
 7                A.    Not fully.
 8                Q.    "Not fully," meaning what?
 9                A.    I was only paid full pay for, say, two
10      weeks.
11                Q.    Okay.  And then short-term disability
12      after that.
13                A.    And then I also had to pay my health
14      insurance.
15                Q.    Okay.
16                A.    When I'm getting 60 percent of my pay.
17                Q.    Okay.  And then at that point, you then
18      went into the EAP program.  You returned to work at
19      the end of your leave and you went into the EAP
20      program with testing on a regular basis.
21                A.    Yes.  I had no choice.  Yes.
22                Q.    Okay.  Okay.  But you came back to work
23      and your work was fine, you said, right?
24                A.    Yes.
25                Q.    You had FMLA time.  But aside from that,
```

**Laura Greer**
**5/23/2018**

Page 89

1    your work was fine and you didn't have --

2           A.    Are you talking January --

3           Q.    I'm talking now in August or September

4    2016 until the --

5           A.    Yes.

6           Q.    Okay.  And you were in the EAP program

7    undergoing testing throughout that time period, from

8    September 2016 until your discharge.

9           A.    It was sooner.  Well, yeah.  When I was

10   forced to go to IOP, I had drug testing, also.

11                        MR. CAMPBELL:  Okay.  Why don't

12               we take a break.

13                        MR. LANDRY:  All right.

14                        MR. CAMPBELL:  I think it's a

15               good time to take a break for our lunch.

16                        (A lunch recess was taken.)

17                        MR. CAMPBELL:  I want to show

18               you just a couple policies in place so we

19               can have it.

20                        Frank we don't have a copy of

21               this.  Maybe after the deposition, we can

22               get a copy.

23                        (Court Reporter marked

24               Defendants' Exhibit 8.)

25   BY MR. CAMPBELL:

**Laura Greer**
**5/23/2018**

Page 93

```
1              That's fair.  And, like I said, I'm not

2              saying that you violated it.  I'm just

3              showing it to you.

4                   (Court Reporter marked

5              Defendants' Exhibit 10.)

6    BY MR. CAMPBELL:

7         Q.    I'm handing you what's been marked a

8    "Fitness-For-Duty Examination."

9              Have you seen that policy?

10        A.    No, sir.

11        Q.    You did go through at least one fitness

12   for duty?

13        A.    Two.

14        Q.    Two, okay.

15        A.    And the second one, I went to at St.

16   Rita's Hospital.

17        Q.    Okay.

18        A.    The lady that performed it stated she

19   didn't know why I was here, that I did not need IOP.

20   She actually walked me and the person that was with me

21   next door and told the lady that they would not be

22   treating me.

23        Q.    Okay.  That's fine.  I just simply asked

24   you if you had gone through fitness-for-duty exams.

25        A.    No, I did not get this.
```

**Laura Greer**
**5/23/2018**

Page 94

1    Q.    You didn't get the policy, but you went

2    through fitness-for-duty exams.

3    A.    Well, I would have to say no.  I had to

4    go through chemical dependence evaluations.

5              (Court Reporter marked

6              Defendants' Exhibit 11.)

7    BY MR. CAMPBELL:

8    Q.    I'm handing you the attendance policy.

9              Were you aware of the attendance policy

10   at UH?

11   A.    Not particularly.  We were very confused

12   as to how their stuff worked because it was not really

13   explained.  It was -- when we were told about the

14   merge or sell, nothing was really explained to us.

15             You know, we had four weeks' vacation.

16   We were told we were keeping our benefits, four weeks'

17   vacation, ten sick days, one personal day, all the

18   holidays.

19   Q.    Uh-huh.

20   A.    So a lot of us did not even understand

21   about PTO.

22   Q.    Okay.

23   A.    We thought, hey, we still had our four

24   weeks, we had our ten days, we had our personal day.

25   Q.    Okay.  Understood.  Obviously we're going

**Laura Greer**
**5/23/2018**

Page 96

1    as a policy.  You know, she handwrote --

2              Q.    Okay.

3              A.    -- "2 years."

4              Q.    Okay.  Understood.  But she had wrote it

5    before you signed it.

6              A.    I questioned her about that.

7              Q.    Okay.  That's fair.

8                    Page 2 goes through some of the other,

9    what your requirements were in the EAP program.

10             A.    And I did so every -- I followed and

11   she -- I asked Mr. McGrady [sic] if she'd ever called

12   to see if I followed up on me going to my appointments

13   and he said no.

14             Q.    Okay.  And then Page 3 looks like this is

15   that original referral form for the Tier 1 mandatory

16   referral to the EAP.

17             A.    Yes.  This is what I was referring to.

18             Q.    Okay.  So I just wanted to show you that.

19   That was the EAP program.  Now, from that point on,

20   you were back to work, but you had to participate in

21   some requirements for the EAP program, right?

22             A.    Yes.

23             Q.    Okay.  One of those were that you had

24   random drug testing.

25             A.    Yes.

**Laura Greer**
**5/23/2018**

Page 97

1          Q.     Is it fair to say that you missed -- you

2     were absent on the number of the days you had random

3     testing?

4          A.     Those days were either migraines, because

5     I got a phone call from Georgena one day, I could

6     barely lift my head off the pillow.  And she said,

7     "You have to go test."

8               I told her, "If you want my urine, come

9     and get it.  I'm not going to jeopardize my life and

10    somebody else's life."

11              I had to call in three days a week,

12    Monday, Wednesday, and Friday.  This was probably,

13    say, a Monday.

14         Q.     Uh-huh.

15         A.     So I called in on a Wednesday and a

16    Friday.  They had two other days that week to have me

17    go test and they waited until the following week.

18         Q.     Okay.  My only question to you was, you

19    missed -- on a number of days when they said this is

20    your day to test, you missed, I would say, five or ten

21    of those days.

22         A.     Those were probably covered under the

23    FMLA.

24         Q.     I'm not questioning whether they were

25    FMLA.  But you were notified of a drug test and then

**Laura Greer**
**5/23/2018**

Page 98

1 you would miss, whether you were FMLA, absence,

2 vacation, or whatnot.

3     A.    Well, I can't go drug test somewhere if

4 I'm on vacation, sir.

5     Q.    Well, you're saying that every one of

6 those tests they called you on, you were on vacation,

7 that you missed?

8     A.    No.

9     Q.    Okay.

10     A.    But what I am saying was they still had

11 two other days to have me go test and waited till the

12 following week.

13     Q.    Okay. Well, I guess I just have to say,

14 just show the process. Because you're saying the

15 process may not have been fair.

16          If you got a call that, "Hey, you have a

17 drug test today," you could just simply call in and

18 say, "I have a migraine and I'm going to be out on

19 FMLA today," right, and not go to your drug test?

20          I'm not saying you didn't have a

21 migraine, but you were allowed to miss it if you said

22 you had an FMLA reason or were sick or anything like

23 that, right?

24     A.    Correct.

25     Q.    Okay. I'm just saying, you had to go to

**Laura Greer**
**5/23/2018**

Page 99

1    the testing, but there were many days where they said,

2    "Hey, we'd like you to be tested" and you said it was

3    migraines or back or some issue that you had to miss.

4        A.    But I still never failed none of their

5    tests.

6        Q.    Okay.  Let me ask you.  Were you aware

7    that a number of the tests came back that, although

8    you were on the prescription, that your use was far

9    above the prescription use?

10       A.    Yes.  And the last test I got, the MRO

11   doctor called me.  It was a different doctor.  And he

12   was talking to me about that, and I said, "You are the

13   first one," because it was usually a female, "that has

14   ever called me and advised me of that."

15            And he said, "We are supposed to advise

16   you before we advise your employer."  I talked to my

17   psychologist who prescribed the medication.

18       Q.    What medication --

19       A.    Xanax.

20       Q.    --  were you being prescribed during the

21   course -- okay.

22            And you're saying that the Xanax -- how

23   did you -- I mean, from what I'm seeing -- and I'm

24   going to give you the records before -- from what I

25   saw, it wasn't just once.  It was a number of times

**Laura Greer**
**5/23/2018**

Page 105

1  Q.  Now, did you advise -- who prescribed the

2  Xanax at some point?  Because --

3  A.  Dr. Rana.  Well, originally, it was my --

4  it was a doctor filling in for my C&P because of due

5  to everything that started in July of 2016, I was an

6  emotional wreck.

7  Q.  Okay.

8  A.  So he put me on all this medication.  And

9  then my nurse practitioner had me go have a

10  psychiatrist, which is Dr. Rana, manage my medication.

11  Q.  Okay.  Let me ask you this way.  When you

12  went into rehab in January of 2016 -- remember that

13  testimony of that event?

14  A.  Yes.

15  Q.  Your intake documents showed you were

16  taking Xanax but you didn't have a prescription then,

17  right?

18  A.  Correct.

19  Q.  So I have to say, if it was your

20  physician who prescribed it to you post-rehab, was he

21  or she aware that you were taking it without a

22  prescription prior to your rehab?

23  A.  Yes.

24  Q.  Okay.  And that did not raise any concern

25  for that physician?

**Laura Greer**
**5/23/2018**

Page 106

1          A.     No.

2          Q.     Okay.  Because I will say when I look at

3     these documents and consider the fact that that was a

4     prescrip -- I mean, you realize that taking a

5     prescription without a prescription from a physician,

6     that's a crime, right?

7          A.     Correct.

8          Q.     Okay.  I mean, that was a serious issue

9     to be taking Xanax without it.  That's no different

10    than if you were going to buy an illegal drug off the

11    street, right?  Right?

12         A.     I'm not sure of the laws.

13         Q.     Okay.  It just raised my eyebrow, I

14    guess.  Again, if I was the EAP program, had I seen

15    all those documents, I would have raised a concern

16    about that.  Okay.  And this is a positive drug

17    screen.

18                Were you ever told about this?

19         A.     Yes.  I told the truth about this to her

20    and to the MRO -- or, excuse me, the first person I

21    had the chemical dependency evaluation with.

22         Q.     Okay.  So I guess I would say this one

23    was positive as to Oxycontin, right?

24         A.     Yes.  And I stated why.

25         Q.     Okay.  And why?

**Laura Greer**
**5/23/2018**

Page 107

1      A.      Because I had a 13-hour migraine.

2      Q.      Okay.

3      A.      And instead of going out to Blanchard

4   Valley Hospital due to the last incident when I had a

5   migraine and took my migraine meds, you know, the max

6   you can take, they told me I had an aneurysm and put

7   me in a Life Flight helicopter, and I did not have

8   one.

9      Q.      Okay.  Well, let's look at this --

10     A.      So I had my husband get one Percocet from

11  his sister and try that instead of going to the

12  emergency room and ending up in another helicopter.

13     Q.      Okay.  Let's see what this says.  So this

14  is right at the beginning of this EAP, right?  This is

15  when you were telling me how wrong it was that they

16  would send you out to EAP, right?

17     A.      Excuse me?

18     Q.      This is in July of 2016 and this is when

19  you were telling me how wrong it was for them to send

20  you to the EAP program, right, to put you on that paid

21  leave?

22     A.      This is the date when everything started

23  and I didn't know what was going on.

24     Q.      Okay.

25     A.      And I actually vomited all over their

**Laura Greer**
**5/23/2018**

Page 108

1    place because I was so upset.

2          Q.    Okay.  This is what you've been telling

3    me about the fitness-for-duty drug screen, right?

4          A.    Correct.

5          Q.    So this is when your counselors were

6    saying she might have relapsed.  This is when your

7    supervisors were saying she doesn't seem to be

8    following tasks and her voice is slurred.  So let's

9    see what this Well At Work says at this time.

10         So the first paragraph says that this

11   drug screen took place on July 12th, 2016, right?

12         A.    Yes.

13         Q.    Okay.  And then as we go through this, it

14   says -- this is from Well At Work -- "She appeared

15   obviously sedated, slurring her words, sleepy, atoxic,

16   bending forward, leaning on the walls to support

17   herself walking, and vomited in the office while

18   speaking to the receptionist."

19         Did I read that right?

20         A.    Yes.

21         Q.    And you admit to all of that or some of

22   that?

23         A.    Some of that.

24         Q.    Okay.  I mean, obviously that's

25   consistent with what UH was saying as to why you're

**Laura Greer**
**5/23/2018**

Page 109

1     going on the EAP program, right?

2             A.     Not necessarily.  I was so upset.  You're

3     left alone for six months.  You're doing everything,

4     you know, you're supposed to be doing and living life.

5             And then all of a sudden, you're slammed

6     with accusations of this and all of this stuff I

7     didn't even understand and couldn't figure out why it

8     was happening and nobody would tell me anything.

9             Q.     Okay.  Let's continue on here.  It does

10    say about this 13-hour migraine and that you took two

11    Limitrex [sic] tablets.

12            A.     Imitrex.

13            Q.     Okay.  And then as it goes on, it was

14    after you were notified, then you claim that you got a

15    pill bottle where there were some old medications for

16    traveling, including a few old left over.  It looks

17    like those were the pills --

18            A.     Xanax, yes.

19            Q.     -- that had the -- well, at that point,

20    it says the alprazolam tablets.

21            A.     That's, yeah, the same thing.

22            Q.     Okay.  You're saying that's Xanax?

23            A.     Xanax.  Alprazolam is a generic name for

24    Xanax.

25            Q.     Okay.  And then they found there was the

**Laura Greer**
**5/23/2018**

Page 110

1   presence of several prescriptions, weaning doses in

2   quantity over several months.

3              So I guess at this point, they're saying

4   that even what you reported is different than what

5   you're telling me now.  At that time, you were

6   reporting something different than what you're telling

7   me now.

8              A.    I don't know what you're saying.

9              Q.    You told me initially that you just took

10  a tablet for a 13-hour migraine.  This one is going

11  into that you had an old travel --

12             A.    Yes.  I admitted to them that I took a

13  Xanax and also I admitted to them that I got a

14  Percocet from my sister-in-law, which is the

15  oxycodone.

16             Q.    Okay.  Then it says that, at a later

17  appointment on October 25th, that you weren't slurring

18  your words.

19             A.    There's a medical reason for this.  It's

20  called laryngeal nerve palsy.

21             Q.    And it just happens every now and then?

22             A.    Yes.

23             Q.    It just appears to be a drug test.  So in

24  this case, you have a positive drug test and they're

25  reporting that you are slurring your speech and that

**Laura Greer**
**5/23/2018**

Page 115

1    when they're above therapeutic levels, you missed

2    many, many appointments.

3            A.    How many?

4            Q.    I went through the admissions and we had

5    it.  It was not one day.  It was three and four weeks

6    in a row where you missed.

7            A.    Do you want to understand why?

8            Q.    Absolutely.

9            A.    Probably at that time I was having

10   injections in my back.  So I had them in my neck and

11   my lower back.

12           Q.    Okay.

13           A.    Those are each different times.  Then I

14   had the nerves burnt.  So there are eight different

15   times.  And like I said, once again, they had two

16   other days during that week to drug test me.

17           Q.    Okay.  Well, I will say this:  Had you

18   submitted your paperwork, if it was truly for those

19   reasons, those days would have already been off for

20   FMLA and they wouldn't have been calling you to drug

21   test on those days.  They would have known you were

22   out.

23           A.    I called every day, Mondays, Wednesdays,

24   and Fridays, and I let Carrie -- she was the first

25   person who worked there -- know.

**Laura Greer**
**5/23/2018**

Page 119

1   permitted to continue to work during that time.  If I

2   were the decision-maker, I'm telling you I would have

3   handled it differently.

4               Number two, I think it's absolutely

5   appropriate, everything they did from the records that

6   we went through.  But we're here today not because she

7   didn't call your doctor.  We're here because you've

8   sued saying that somehow that EAP program is

9   inappropriate.

10              And I'm asking you how in the world this

11  EAP program, you undergoing the testing each week, and

12  you being sent to that EAP program, under these facts

13  that we just went through, how in the world is that

14  EAP program at all inappropriate?

15       A.     Because she told -- falsified information

16  and got me put into an IOP program that my counselor

17  told her I did not need.

18       Q.     What is the IOP program?

19       A.     Okay.  Do you not understand?

20       Q.     No, no.  Tell me what this is so I

21  understand.

22       A.     Depending on how many people show up for

23  the day, okay?  You're all split into two rooms.

24  You're going to sit there and say this is my problem

25  for the day.  I want to jump off the roof.

**Laura Greer**
**5/23/2018**

Page 120

1    Q.    This is something in addition to the

2  testing?

3    A.    No.  This was IOP.

4    Q.    Okay.  When did it occur?

5    A.    I had to go three times a week, five

6  weeks.

7    Q.    Okay.  When?  In 2016?

8    A.    Yes.  That I was forced to go do or I

9  would have been fired.

10   Q.    Okay.

11   A.    And everybody goes around the room and

12  gives them advice or we'd go color or we'd have a

13  talent thing.

14   Q.    Okay.  Is there anything other than you

15  not liking the IOP program for these five weeks that

16  you think was done inappropriately to you with respect

17  to this EAP?

18   A.    Yes.

19   Q.    What?

20   A.    Her telling that I left Arrowhead early,

21  I refused their IOP and EAP programs.

22   Q.    Okay.  Anything else?

23   A.    And the violation of my HIPAA practices.

24   Q.    Okay.  So we just went through all these

25  things, and I'm going to abbreviate.

**Laura Greer**
**5/23/2018**

Page 126

1          So as we talked about at the beginning, I

2     just wanted to confirm that it's not as if you had

3     work restrictions during your employment at UH.

4          You just had FMLA absences, right?

5          A.     In prior years, I had work restrictions.

6          Q.     Well, your last two years of employment,

7     you didn't have any work restrictions.

8          A.     Because I wasn't having a big issue with

9     my back, sir.

10         Q.     Okay.  Ma'am, you're alleging disability

11    discrimination in this case as somehow UH treated you

12    differently of did something as to your disability.

13         So I have to ask you, what is the

14    disability that you're alleging UH somehow treated you

15    differently based upon?

16         Do you need to speak with your counsel?

17    I want to have your answer, so if you need to take a

18    break to speak with your counsel, I'm fine with giving

19    you guys the opportunity to do that.

20         A.     Yes.

21              MR. CAMPBELL:  All right.  We'll

22              take a break.  We'll let the record

23              reflect that we have the question posed,

24              and when we come back, she can answer it.

25              MR. LANDRY:  Can you read me

**Laura Greer**
**5/23/2018**

Page 127

1         back that question, please?

2                (Court Reporter read back the

3         previous question.)

4                (A brief recess was taken.)

5                THE WITNESS:  Can you repeat the

6         question?

7                (Court Reporter read back the

8         previous question.)

9                THE WITNESS:  Well, once they,

10       with my back, the migraines, they used

11       that I got myself help.  That was used

12       against me.

13             Not only once, but twice did I

14       have to go through a chemical dependency

15       evaluation again in October and was told

16       I do not have a chemical-dependency

17       problem.  It is mental health,

18       depression, anxiety, and PSTD by my

19       counselor, Mike McGrady.

20   BY MR. CAMPBELL:

21       Q.    Okay.  Anything else?

22       A.    I don't believe so.

23       Q.    Okay.  Just to follow up briefly with it,

24   the back issues we talked about, you had that for at

25   least a decade.  I'm not minimizing them, but you had

**Laura Greer**
**5/23/2018**

Page 128

1    them for a decade over your last ten years of

2    employment, right?

3              A.    Longer than that.

4              Q.    Okay.  And you had no work restrictions

5    over your last two years, aside from you said every

6    now and then, you might need to lay down for your

7    back.

8              A.    I've had injections.

9              Q.    Okay.

10             A.    Nerves burnt.

11             Q.    Okay.  Didn't have restrictions when you

12   were working over your last two years?

13             A.    No.

14             Q.    Okay.

15             A.    I do not believe so.

16             Q.    Okay.

17             A.    Unless I see the FMLA papers.

18             Q.    Okay.  And then as to the migraines, you

19   had migraines for a number of years during your

20   employment?

21             A.    Yes.

22             Q.    You had FMLA paperwork and you took those

23   days off for your migraines, right?

24             A.    Sir, if you can't hold your head up or

25   look at a computer, you have to go in a dark room.

Laura Greer
5/23/2018

Page 129

1          Q.    I agree with you.  You asked for and were
2    approved for FMLA because of your migraines, right?
3          A.    Yes.
4          Q.    And then on the chemical dependency, they
5    found out you were using the pain medication, couldn't
6    get off them.  They let you go to rehab.  They didn't
7    discharge you, right?
8          A.    It's not that I couldn't get off of them.
9    I just didn't know how to properly do it without
10   harming myself.
11         Q.    When you told them that in January of
12   2016, they did not discharge you at that time, right?
13         A.    No.
14         Q.    They didn't even put you in the EAP
15   program for six months thereafter, right?
16         A.    Correct.
17         Q.    Okay.  And when they did, you tested
18   positive when you first went in, right?
19         A.    Yes.  And I told them why.
20         Q.    Well, I guess I would say, if somebody
21   has -- I guess my question to you, and I have to ask
22   my own client this, but if I thought an employee, if I
23   was here and Don was acting erratically, and I thought
24   Don was acting erratically because he was on drugs and
25   I said, "Don, I'm going to make you go do a drug

Page 133

1   because I didn't sign it.

2          Q.     You didn't sign it.  Well, are you saying

3   they didn't talk to you about the final warning?

4          A.     Not this one, sir.

5          Q.     Not this one, okay.  And this one, again,

6   this is one of those where you failed to report to

7   your scheduled EAP test, right?

8          A.     Unless I can see the dates, I can't tell

9   you if I was supposed to have went on that date.

10         Q.     Okay.  So you disagree with that?

11         A.     But like I've said multiple times, they

12  had three days a week to test me.

13         Q.     Okay.  I understand.  But when they say

14  we're testing you on this day, you realize that some

15  people may not go to that test because it will come

16  out of their system for the later test, correct?

17         A.     In two days?

18         Q.     Well, I don't know what you're taking.

19  They don't know what you're taking.

20                It could be a variety of things, right?

21         A.     They test for all kinds of stuff, so they

22  had ample time.

23         Q.     Okay.  I guess just to be clear on the

24  discharge, ultimately, you were aware that if FMLA

25  time wasn't approved for your San Antonio trip, that

**Laura Greer**
**5/23/2018**

Page 134

1   you didn't have any PTO time available, right?

2        A.     My vacation was approved.  It was

3   approved without pay.  I have an e-mail that I

4   e-mailed David Ferko on October the 5th when we were

5   advised on when the graduation was.  He approved it.

6             Then when my back went out of whack, he

7   said I can't -- I'll have to disallow it because we

8   have too much work to do.  Go through military FMLA.

9        Q.     Okay.

10        A.     I submitted all the stuff.  It was a

11  Friday at 4:00 when Stephanie Hodgkins called me.  I

12  was leaving Monday.

13                     (Court Reporter marked

14                     Defendants' Exhibit 21.)

15  BY MR. CAMPBELL:

16        Q.     Have you seen this e-mail before today?

17  It looks like something you produced.

18        A.     Yes.  That's when he took it out there.

19        Q.     Okay.  Well, this is when he's telling

20  you you don't have a vacation request on file and

21  you --

22        A.     But it was already approved October 5th.

23        Q.     Okay.  Well, you were saying you found

24  out -- at this point, it's Monday the 6th.

25        A.     This was from him.  He said fill out

**Laura Greer**
**5/23/2018**

Page 135

1   through UH, FMLA and medical-- excuse me, military

2   leave.

3           Q.    Okay.  And ultimately, that leave was

4   denied, right?

5           A.    Yeah, exactly.

6           Q.    Okay.  Right.  And what was it that

7   they -- was it both sons or just one son was

8   graduating?

9           A.    One.  But the other one was coming, too.

10          Q.    I understand.  But what was he graduating

11  from?

12          A.    Boot camp.

13          Q.    Okay.

14          A.    They tried to say he was not active duty

15  is why they denied it.  He is active duty.

16          Q.    They were saying he wasn't deployed,

17  correct?

18          A.    On their forms, it says active duty or

19  called to active duty.  And to go down there and be

20  part of military events, that is on their front page

21  of their military FMLA papers.

22          Q.    Like I said, I think everybody respects

23  what your boys have done and they've done it with your

24  guidance.  That's a great thing.  But in this case,

25  you do understand -- and you may disagree with it, but



GREER, LAURA    046
M# 000025465 01/12/1970
NURSING ADMISSION A# 10103030010 01/14/2016
ANTHEM BC/BS
DR. S. YECHOOR   F IDL

LOC __V__ INPATIENT _____ PHP

Patient: _Laura Greer_____ Date: _1-14-16_ Time: _1840_

1. _46_ Year Old _F_ admitted to Room _213-1_ by Dr. _Yechoor_

     With a diagnosis of _opiate dependence_

2. Patient is: _Pt alert & oriented. Mood is stable. Denies_
_SI/HI. Vitals WNL. Gait is steady. Cooperative_
_during assessment._

3. Detox Protocol _COW, Benzo_

4. PSA- o Completed by _assessment_ o To be done _____

5. Nursing Assessment Completed by _Amy_

6. Problem areas Identified:
     a. _Fall Risk_
     b. _Chronic pain_
     c. _____

7. Admission Labs Ordered _Yes_

8. EKG ordered _No_

9. Personal Belongings search and body search done by _Amanda & Amy_

10. Patient states reason for admission is: _"To get off heroin"_

11. Oriented to the unit, encouraged to approach staff with questions or concerns by _Amy_

12. Other pertinent information

Signature: _Hallworn_

DEFENDANT'S
EXHIBIT
2
5/22/18 AW
COLLINS REPORTING

GREER 000235

**Arrowhead**
BEHAVIORAL HEALTH
*Life is Waiting...*

GREER, LAURA    046
M# 000025465 01/12/1970
A# 10103030010 01/14/2016
ANTHEM BC/BS
DR. S. YECHOOR   F IDL

## Intake/Psychosocial Assessment

| Pat Name (First, MI, Last): | DOB and Age: | Date: | Time: |
|---|---|---|---|
| Laura Greer | 46  1-12-70 | 1-14-16 | 1320 |

| Pt accompanied by: | Referral Source: | Legal Status: ☐ Voluntary ☐ Involuntary | ☐ Wanding Completed Items obtained? ☐ Yes ☐ No If yes, | ☐ Belongings secured |
|---|---|---|---|---|
| Husband | | | | |

**Legal Guardian/Custodian/POA** ☐ No ☐ Yes
If yes, Name of Legal Guardian/Custodian/POA _____
Phone # _____

**Family Involvement:**
☐ Patient wishes to involve_____ In treatment_____ (relation)
☐ Release of Information completed  ☑ None Reported

**PRESENTING PROBLEM** (Noting Precipitating Incident, Major Symptoms, Stressors; Family, Job, School, Relationships ,Health , Financial, Disruptions of Lifestyle, Legal)  Pt reports addiction to percocet.
Pt reports using 10-20 pills daily.

### Alcohol/Drug History

**AUDIT-C**
How often do you have a drink containing alcohol?
☐ Never (0) ☐ Monthly or less (1) ☐ 2-4 times a month (2) ☐ 2-3 times a week (3) ☐ 4 or more times a week (4)

How many drinks containing alcohol do you have on a typical day when drinking?
☐ 1 or 2 (0) ☐ 3 or 4 (1) ☐ 5 or 6 (2) ☐ 7 to 9 (3) ☐ 10 or more (4)

How often do you have six or more drinks on one occasion?
☑ Never (0) ☐ Less than monthly (1) ☐ Monthly (2) ☐ Weekly (3) ☐ Daily or almost daily (4)

**Total Score:** _____0_____
The AUDIT-C is scored on a scale of 0-12. Each question above is scored from 0 to 4(the scores are in parentheses next to each response).
In men, a score of 4 or more is considered positive for identifying hazardous drinking or active alcohol use disorders. In women, a score of 3 or more is considered positive.
If all of the points are from the first question and the second and third question score 0, the patient's intake over the past few months should be reviewed to confirm accuracy.

| Illegal drug use/abuse past 12 months? | ☐ No ☑ Yes | Alcohol abuse past 12 months? | ☑ No ☐ Yes |
|---|---|---|---|
| Prescription drug abuse past 12 months? | ☐ No ☐ Yes | | |

**Toxicology screen/ breathalyzer completed?**
☐ No  ☑ Yes  If yes, results:

|  |  |  |  |
|---|---|---|---|
| Cocaine | ☐ Negative | ☐ Positive | ☐ Patient unable to provide at time of assessment |
| THC | ☐ Negative | ☐ Positive | |
| Methamphetamines | ☐ Negative | ☐ Positive | BAL: 0.0 |
| Opiate | ☐ Negative | ☐ Positive | |
| Oxycodone | ☐ Negative | ☐ Positive | |
| MDMA | ☐ Negative | ☐ Positive | |
| Amphetamines | ☐ Negative | ☐ Positive | |
| Benzodiazepines | ☐ Negative | ☐ Positive | |
| Buprenorphine | ☐ Negative | ☐ Positive | |
| Methadone | ☐ Negative | ☐ Positive | |

**Presenting with detox symptoms**  ☑ No  ☐ Yes   If yes, check all symptoms that apply:

☐ Tremors ☐ Vomiting ☐ Runny nose ☐ Nausea ☐ Diarrhea ☐ Chills ☐ Headache ☐ Restless ☐ Unsteady gait

☐ Body aches ☐ Fever ☐ Abdominal pain ☐ Sweats ☐ Dizziness ☐ Elevated vital signs ☐ Other (specify)_____

DEFENDANT'S EXHIBIT 3
5/23/18
COLLINS REPORTING

GREER 000281

| Drug/Substance/Alcohol/Tobacco | | Age of First Use | Date of Last Use | Amount | Frequency of Use | Pattern of use (Time of day) | How long using at reported rate | Metho (oral, inhale Inject |
|---|---|---|---|---|---|---|---|---|
| Tobacco | ☑ yes ☐ no | 14 | today | 1/2 pk | daily | Varies | years | inha |
| Alc. | ☐ yes ☑ no | | | | | | | |
| Marijuana | ☐ yes ☑ no | | | | | | | |
| Cocaine/crack | ☐ yes ☑ no | | | | | | | |
| Opiates: Heroin | ☐ yes ☑ no | | | | | | | |
| Oxycontin | ☐ yes ☑ no | | | | | | | |
| Percocet | ☐ yes ☐ no | 38 | 1-14-16 | 10.20 mg pills | daily | Varies | 8 yrs | Ora |
| Vicodin | ☐ yes ☐ no | | | | | | | |
| Morphine | ☐ yes ☐ no | | | | | | | |
| Methadone | ☐ yes ☑ no | | | | | | | |
| Fentanyl | ☐ yes ☑ no | | | | | | | |
| Opana | ☐ yes ☑ no | | | | | | | |
| Suboxone | ☐ yes ☑ no | | | | | | | |
| Other | ☐ yes ☑ no | | | | | | | |
| Inhalants | ☐ yes ☑ no | | | | | | | |
| Benzodiazepines: | ☑ yes ☐ no | | | | | | | |
| Xanax | ☑ yes ☐ no | unsure | today | 3-4 | daily | Varies | When I have it | Ora |
| Valium | ☐ yes ☐ no | | | | | | | |
| Ativan | ☐ yes ☐ no | | | | | | | |
| Klonopin | ☐ yes ☐ no | | | | | | | |
| Other | ☐ yes ☐ no | | | | | | | |
| Amphetamines | ☐ yes ☐ no | | | | | | | |
| Barbiturates | ☐ yes ☐ no | | | | | | | |
| Hallucinogens | ☐ yes ☑ no | | | | | | | |
| Other (i.e. K2/K4/Bath salts) | ☐ yes ☑ no | | | | | | | |

History of overdose?  ☑ No  ☐ yes if yes;  ☐ accidental  ☐ intentional  When:          On what:

Drug of Choice: _Percocet_          Longest Sobriety _None_          When _____

Has patient ever tried to quit using on their own? ☑ No ☐ Yes # of times _____

History of Black outs: ☑ No ☐ Yes  How Often?_____          History of withdrawal seizures: ☑ No ☐ Yes  When? _____

History of DT's: ☑ No ☐ Yes

History of relapse with the past 6 months ☑ No ☐ Yes If Yes, please describe:

GREER, LAURA    046
M# 000025465 01/12/1970
A# 10103030010 01/14/2016
ANTHEM BC/BS
DR. S. YECHOOR

GREER 000282

## Alcohol/Drug Treatment History

☐ None Repo..

| Name of Provider Agency | Date of Service | Type of Service | Successful or Unsuccessful Discharge |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

## Consequences of AoD use:

Has patient's use impacted MH, medical conditions; family relationships (concern shown, expressed) and/or employment?

☐ No consequences ☑ Family problems ☐ Martial problems/stress ☐ Loss of employment ☐ Work attendance ☐ Job performance
☐ Problems functioning ☑ Poor motivation ☐ Legal charges ☐ Custody issues ☐ Medical ☐ Hospitalization ☐ Mental health

If yes, describe:

Community Supports/Self Help Groups: (AA, NA, NAMIO, etc.) Sponsor: YES ☐ NO ☑

## Mental Health Treatment History

Mental Health Treatment    ☐ None Reported

| Agency | Check if Current | Past (Date) | Clinician Name/Psychiatrist |
|---|---|---|---|
| | ☐ | | |
| | ☐ | | |
| | ☐ | | |

Psychiatric Hospitalizations: ☑ None Reported    Number of Psychiatric hospitalizations : 0

| Hospital (list most recent) | Date of Service | Reason (suicidal, depressed, etc.) |
|---|---|---|
| | | |
| | | |
| | | |

Previous or Current Diagnoses (if known) ☐ None Reported

☐ None Reported              Past Psychotropic Medications

| Psychotropic Medications | Reason for Discontinuation |
|---|---|
| _Wilbutrin_ | _— Quit taking —_ |
| | |

GREER, LAURA    046
M# 000025465 01/12/1970
A# 10103030010 01/14/2016
ANTHEM BC/BS
DR. S. ....

GREER 000283

## Suicide Risk Assessment

Do you currently have thoughts of death or suicide? ☐ Yes ☒ No

If yes, Description of positive findings: _____

_____

_____

How strong is your desire to die? ☐ Strong ☐ Moderate ☐ Weak ☒ None

How strong is your desire to live? ☐ None ☐ Weak ☐ Moderate ☒ Strong

Have you had any thoughts of death or suicide in the past? ☒ Yes ☐ No If yes, how long ago? _*years ago*_

Are your thoughts ☐ Increasing ☐ Decreasing ☐ Staying constant ☒ N/A

Do you have current intent to act? ☐ Yes ☒ No

Do you have a current plan? ☐ Yes ☒ No If yes, specify:

When: _____ Where _____

Method: _____ Current access to means ☐ Yes ☒ No

Have you had rehearsal behaviors? ☐ Yes ☒ No If yes, specify (i.e. putting a gun to h

neck, etc)_____

Have you had any prior attempts ☐ Yes ☒ No

If yes, specify method: ☐ Overdose ☐ Cutting ☐ Hanging ☐ MVA ☐ Shooting

Level of Risk: ☐ High ☐ Moderate ☒ Low

```
GREER, LAURA       046
M# 000025465 01/12/1970
A# 10103030010 01/14/2016
ANTHEM BC/BS
DR. S. YECHOOR  F IDL
```

| DANGER TO OTHERS: (Current and History) | Homicidal Ideation or threats? ☐ Yes ☒ No | History of homicide attempts? ☐ Yes ☒ No |
|---|---|---|
| | Who is threatened? _____ | When: _____ |
| | | Method: _____ |
| | Specific Plan? ☐ Yes ☐ No | Towards whom: _____ |
| | Plan _____ | |
| | Thoughts of aggression? ☐ Yes ☒ No | History of aggression: ☐ Yes ☒ No |
| | Describe: _____ | Method: _____ |
| | _____ | Towards whom: _____ |
| | Towards whom: _____ | |

| ACCESS TO GUN OR IDENTIFIED MEANS OF SELF HARM | Does the patient have access to lethal means (meds or weapons) of self harm? ☐ Yes ☐ No (If so, go to the next box and mark risk factor below. If no, go to next session.) |
|---|---|
| | Is there someone we can contact to remove or secure the above? ☐ Yes ☐ No |
| | Name: _____ Phone: _____ |
| | Contact made date/time: _____ Staff Signature: _____ |

### PRESENCE OF RISK FACTORS

| | | |
|---|---|---|
| ☐ Psych admits in last yr | ☐ Severe Insomnia | ☐ Vegetative symptoms |
| ☐ Current drug/alcohol abuse withdrawal | ☐ History of reckless or self-destructive | ☐ Command Hallucinations |
| ☐ Family history of completed or attempted suicide | ☐ Rapid mood shifts | |
| | ☐ Joylessness, hopelessness, anhedonia | ☐ Early marriage |
| | ☐ Serious medical illness or persistent pain | ☒ Recent or impending loss of social, emotional, physical, or financial security | ☐ Other |

Elopement Risk Factors: ☐ History of Elopement ☐ Involuntary Status ☐ Impulsivity ☒ Impaired Judgment ☐ None

GREER 000284

## PROTECTIVE FACTORS

Can you verbalize reasons for living? ___ Dependent children ___ Social Supports ___ Active religious faith
Other (specify) _Family_

Do you have proven problem solving and coping skill? ☐ Yes ☐ No If yes describe

GR___, LAURA    046
M# 000025465 01/12/1970
A# 1010303001Ø 01/14/2016
ANTHEM BC/BS
DR. S. YECHOOR   F IDL

Do you have cultural or religious prohibitions against suicide? ☑ Yes ☐ No If yes describe

Can you tell me some positive plans for the future? ☑ Yes ☐ No If yes describe:

Can you visualize or conceive of life improving? ☑ Yes ☐ No

Can you think of actions you can take to improve your current situation? ☑ Yes ☐ No Please describe:

Have you been able to establish a working alliance with a treating professional(s) ☐ Yes ☑ No
If yes please describe:

## Trauma History(describe in comments section each element checked)

Have you ever been in a serious car accident or fire related event? ☐ YES ☑ NO
Have you or someone close to you, ever been seriously injured or gravely ill? ☐ YES ☐ NO
Have you ever experienced a natural disaster? ☐ YES ☑ NO
Have you ever had someone close to you die? ☑ YES ☐ NO  _3 yrs ago grandwil_
Do you have trauma related symptoms? ☐ YES ☐ NO
  If yes, ☐Flashbacks ☐Nightmares ☐obsessive thoughts related to trauma ☐sleep disturbances ☐Other:_____

☐ None Reported

If yes, please describe

## Abuse History (describe in comments section each element checked)

| No Self Reported History of Abuse/Violence | ☑ Physical Abuse ☐ Emotional Abuse | ☐ Domestic Violence/Abuse ☐ Elder Abuse | ☐ Community Violence ☐ Sexual Abuse/ Molestation |
| ☐ Other: | ☑ Victim ☐ Perpetrator | ☐ Victim ☐ Perpetrator | ☐ Victim ☐ Perpetrator |
| | ☐ Current ☐ History of, date_____ | ☐ Current ☐ History of, date_____ | ☐ Current ☐ History of, date |

Describe (Identify if client was/is a victim of abuse or a perpetrator or both)

_Ex husband - Verbal / physical abuse_

**SEXUAL ACTING OUT RISK FACTORS** *(Explain any "yes" responses)*

Have you ever forced sex on another person, touched others sexually without their permission, or exposed yourself? ☐ Yes ☑ No
(if yes, describe the circumstances):

Have you ever been investigated for, charged with, or convicted of a sexual offense? ☐ Yes ☑ No
(if yes, nature of offense and what year offense occurred):

## Psychosocial Assessment

**Living Situation**
My Home: ☐ Rent ☑ Own ☐ Relative's/Guardian's Home ☐ Transitional housing/ halfway house ☐ Homeless Living with Friend
☐ Homeless in Shelter/No Residence ☐ Other:

| Household Members | Relationship | Current Substance Use (i.e. etoh, THC, opiates) | | Previous Substance Use (i.e. etoh, THC, opiates) |
|---|---|---|---|---|
| ( | _Husband_ | _NH_ | _NO_ | _Husband Takes_ |
| | _Son_ | _NO_ | _NO_ | _Percocets_ |

GREER 000285

## Social Information

**Primary/Family/Marital/Significant Other Support Systems:**

Marital Status: ☑ Married ☐ Single ☐ Divorced ☐ Separated ☐ Widowed

Current partners name: _Paul_ _____ Length of current relationship _____ ☐ N/A

Co___ __al relationship ☐Stable relationship☐Significant other supportive of treatment? ☐Yes ☐No☐ N/A

Are you a caretaker for anyone? ☐Yes ☑No
If yes who:_____ is anyone taking care of that individual while you are here? ☐Yes ☐No☐ N/A
# of children _2_ ☐Biological____ ☐Step____ ☐Adopted____
Comments _____

Primary supportive family member or friend: _Boys & Husband_ _____

**Pertinent Family History:** (to include family MH and AoD history)
_Father - ETOH , Oldest Brother ETOH._

**Childhood History:**
Father figure: ☐Biological ☐Step ☐Adoptive ☐Foster
Describe your current relationship: _don't have a relationship_

Mother figure: ☐Biological ☐Step ☐Adoptive ☐Foster
Describe your current relationship: _passed away 3 yrs ago_

Siblings: Biological _2_ Half ____ Step ____ Adopted ____ Foster ____
How do you get along with your siblings? (impact use has on relationships):
_good_

**Education History** (check all that apply) ☐ GED ☑ HS Grad

☐ Other -if neither state last year completed: _____ if dropped out, why _____

☐ College /Degree: _____ ☐ Vocational/Trade Completed ☐ Other Degree:

**History of Learning Difficulties** ☑ None Reported ☐ Learning Disability/Type: _____ ☐ Mental Retardation
☐ ADD/ADH ☐ Reading / Writing ☐ Other: _____

**Employment** (check all that apply)
☐ Full Time (35 hrs. or more per week) ☐ Part Time (<35 hrs. per week) ☐ Unemployed/Other:_____

**Not in Labor Force**
☐ Disabled , reason _____
☐ Retired ☐ Homemaker ☐ Student ( ☐ F/T ☐ P/T) ☐ Living in Institution
☐ Other: _____
If employed, name of employer: _Health Ossega Plus_ ☐ Length of Current Employment: _15 yrs_
Job Title: _Senior Claims Examen_ Any Professional Licensure: _____
(If Licensed with Ohio Medical Board; notify Clinical Director immediately)
Clinical Director Notified: YES ☐ NO ☐

**Attendance**
☐ Above Average ☑ Normal ☐ Tardiness ☐ Absenteeism
**Performance**
☐ Exemplary ☑ Good ☐ Average ☐ Below Average

**Occupational Stressors:** ☑No problems ☐Problems functioning ☐supervisor conflict ☐peer conflict ☐employment in jeopardy
☐loss of license

GREER, LAURA    046
M# 000025465 01/12/1970
A# 10103030010 01/14/2016
ANTHEM BC/BS

GREER 000286

**Military History:**

☐ Yes ☑ No  If yes, has the patient served in combat? _____
☐ Active Duty ☐ Reservist; Branch: _____

**Current Legal Status**

☑ __e Reported ☐ Court Ordered to Treatment ☐ Awaiting Charge ☐ AoD  GREER, LAURA  046
☐ On Probation ; If yes county: _____ Probation Offic M# 000025465  01/12/1970
☐ Phone Number: _____  A# 10103030010  01/14/2016
                                          ANTHEM BC/BS
                                          S. YECHOOR  F IDL

**Friendships/Social Support Relationships:**
☐ Forms Relationships ☐ Maintains friendships ☐ Supportive Friends ☐ Attends DR ___ ___
☐ Needs social interaction ☐ Limited Support System ☑ No close friends ☐ Socially isolated ☐ Sober support
Comments:

**Religion/Spirituality:** (include any customs or practices staff may need to assist with)
Spiritual Preference: _____ *N/n* _____ ☐ Attends services regularly ☐ Source of Support ☐ Actively Involved
☐ Source of Concern ☐ Does not attend ☐ Request clergy visit

**Meaningful Activities:** (community involvement, volunteer activities, leisure/recreation, other interests)
*denis*

**Limitations of Activities of Daily Living:** (include information relating to financial status, transportation issues, anxiety, etc.) (name at least 2)
*Poor motivation, depression*

**Strengths/Capabilities:** (name at least two)
1. *Hard worker*  2. _____

**Problems Checklist Including Functional Domains**

**Nutritional/Eating Pattern Changes/Disorders** ☐ No problems
Typ__ diet ☐ Regular ☐ Other: _____ ☐ No changes ☐ Increased appetite ☑ Decreased appetite
☐ Loss/gain of 10 lbs or more in last month History of eating disorder: ☐ Anorexia ☐ Bulimia ☐ Binging ☐ Compulsive eating.
Use of ☐ Laxatives ☐ Diet Pills ☐ Diuretics
Describe:

**Sleep Problems** ☐ No problems
☐ Not sleeping ☑ Trouble sleeping ☐ Frequent awakening ☐ Sleeping more often ☐ Restless ☐ Night mares ☐ Night terrors
Describe:

**Depressed Mood/Sad:** ☐ None reported
☐ Suicidal ☐ Frequent crying ☑ Loss of energy ☑ Loss of motivation ☑ Changes in appetite ☐ Recurrent thoughts of death
☐ Agitated/irritable mood ☐ Poor self-care ☐ Hopeless/helpless ☑ Sad mood ☐ Self injurious behaviors ☐ Excessive guilt ☑ Grieving
Duration:
Describe:

**Anxiety:** ☐ None reported
☐ Panic attacks-how often _____ ☐ Sweating ☐ Nausea ☐ Trembling ☐ Dizziness ☐ Chest pain/discomfort
☐ Fear of losing control ☐ Poor concentration
Duration:
Describe: *"daily"*

**Manic Episode:** ☑ None reported
☐ Elevated, expansive mood ☐ Racing thoughts ☐ Inflated self-esteem/grandiose ☐ Excessive involvement in pleasurable activities
☐ Psychomotor agitation
Duration:
Describe:

**Pain Management:**
Any pain related issues: ☐ No ☑ Yes If yes explain: *Back/neck, legs*
How do you address your pain?

**Bereavement Issues** ☐ none reported
☐ No ☑ Yes If yes explain: *"Mom died 3 yrs ago"*

GREER 000287

**Fall history** ☑ yes ☐ no
If yes, date of last fall: _Med Clear_ _Foster Cpt Seell_

**Medical History:** ☐ No ☐ Yes If yes, describe: _Vit B12 deficiency_

**Allergies:** ☐ No ☑ Yes If yes, describe: _PCN Sulfa_ _Vital Deficiency_

**Use Oxygen:** ☑ No ☐ Yes If yes, patient is on ____ liters of Oxygen

**Assistive devices:** ☑ No ☐ Yes If yes, ☐ Walker ☐ Cane ☐ Wheelchair ☐ Crutches ☐ Motorized Wheelchair ☐ Other:

**Compliant with prescribed medications:** ☐ Yes ☑ No

**List of home medications brought:** ☑ Yes ☐ No

**Pharmacy:** _Walgreens_ _Tuesday_ _pm 230_    **Primary Care Physician:** ☐ Yes ☐ No If yes, Date of last visit: _Dr Nancy Martin William Dr an MH man_

## Clinical Interpretive Summary

This Clinical Interpretive Summary is based upon information provided by (check all that apply):
☐ Physician ☐ Guardian ☐ Family/Friend ☑ Patient/Client ☐ Other:
☐ Service Provider ☐ Records

| Initial Medical Screen | |
|---|---|
| **Assess Vital Signs** | **Unstable Values (medical consult required)** |
| Temperature | _CRY 4_ | ☐ Temp> 101 | |
| Blood Pressure | _90/41_ | ☐ Systolic <90 or >180 | ☐ Diastolic >100 |
| Pulse | _10_ | ☐ Irregular pulse ☐ Pulse <50 or >140 | ☐ Patient in active withdrawal |
| Gait | _WNL_ | ☐ Unbalanced while standing/walking | ☐ Swaying while sitting |
| Respirations | _WNL_ | ☐ Labored breathing ☐ Shallow Breathing | ☐ Shortness of breath |
| Current Pain (1-10) | _10_ | ☐ Notify physician if patient reports any pain _Back it Leg_ |

☐ Pregnant
☐ Lactating
☐ Any likelihood you might be pregnant
☐ Currently/recently been treated for an infection or treated with an antibiotic

_NO_

☐ Recent head injury
☐ Recent loss of consciousness
☐ Recent or active seizures
☐ Sudden onset of psychosis
☐ Overdose without medical clearance

_NO_

**Tuberculosis Screen**
☐ History of active TB
☐ Persistent cough>3 weeks
☐ Afternoon or night sweats
☐ Fever in afternoon

_NO_

☐ History of contagious infection, if marked; specify date and infection if known: _NO_
☐ History of bed bugs, if marked; specify date: _NO_
☐ History of MRSA or Staph infection, if marked; specify date: _NO_
☐ No reports of above mentioned concerns

GREER, LAURA      046
M# 000025465 01/12/1970
A# 10103030010 01/14/2016
ANTHEM BC/BS
DR    YECHOOR   F IDL

GREER 000288

**Narrative Summary – Include etiology of presenting problem and maintenance of the problem; mental health history; AoD history; severity of problem:**

Pt reports addiction to Percocet using up to 20 pills daily. States she also takes multiple Xanex daily that are not Rx'd to her. She reports family concern et poor energy et motivation et realized now that she has a problem et is seeking tx for first time. Dr. Yechoor admitting for detox.

| Signatures | | Date/Time |
|---|---|---|
| **Provider Signature/Credentials:** | | 1-14-16 |
| **Supervisor Signature/Credentials:** | | Date/Time |

| Complete below only if inpatient admit is ordered by physician | | | |
|---|---|---|---|
| **Nurse given report to** | Amy | **Nurses Signature** Patterson RN | **Date/Time** 1-14-16  1425 |
| **Physician consulted:** | Yechoor | | **Date/Time** 1-14-16  1401 |
| **Physician Signature/Credentials:** | | | **Date/Time** |
| **Assigned Therapist Signature:** | D. Smith LISW | | **Date/Time** 1/16/16  1731 |

GREER, LAURA        046
M# 000025465 01/12/1970
A# 10103030010 01/14/2016
ANTHEM BC/BS
DR. S. YECHOOR   F IDL

GREER 000289

## Mental Status Examination

| | | | | |
|---|---|---|---|---|
| Appearance: | ☐ Well Groomed | ☐ Unkempt | ☑ Disheveled | ☐ Malodorous |
| Eye Contact: | ☐ Average | ☑ Avoidant | ☐ Intense | |
| Speech: | ☐ Clear | ☑ Slurred | ☐ Pressured | ☐ Rapid |
| Thought Process: | ☑ Logical | ☐ Loose | ☐ Blocked | ☐ Disorganized |
| Behavior: | ☐ Cooperative | ☐ Resistant | ☐ Agitated | ☑ Sedated |
| Mood: | ☐ Euthymic | ☑ Depressed | ☐ Anxious | ☐ Irritable ☐ Labile |
| Affect: | ☐ Full | ☐ Constricted | ☑ Flat | ☐ Labile |
| Insight: | ☐ Good | ☑ Fair | ☐ Poor | |
| Responses | ☐ Verbalizes understanding | ☑ Verbalizes Partially | ☐ Difficulty staying on task | |

| Transfer/ Clearance at Medical Surgical Hospital: | Acute Inpatient: | Partial Hospitalization: | Intensive Outpatient: |
|---|---|---|---|
| ☐ Unstable Medical condition, which requires immediate treatment<br>☐ Medical clearance required before psychiatric or AoD treatment can proceed | ☐ Acute psychiatric condition requires 24 hr oversight<br>☐ Potential danger to self or others<br>☑ Less intensive treatment not safe or feasible<br>☑ Grave disability with severe deterioration in functioning<br>☑ Condition requires medically monitored detoxification | ☐ Requires physician-led, multidisciplinary treatment interventions<br>☐ Condition would worsen without PHP structured treatment | ☐ Requires structured multidisciplinary interventions<br><br>☐ Outpatient/ community referral: _____ |

Preliminary Diagnosis ☒ DSM-V Codes (or successor)

Principle diagnosis (formerly Axis I, II, and III): *F1120 Opiate Use Disorder Severe F1300 Sedative/Hypnotic/anxiolytic Use Disorder Moderate*

Phsychosocial Contextual Factors (formerly Axis IV): *Severe*

GREER, LAURA 046
M# 000025465 01/12/1970
A# 1010303010 01/14/2016
ANTHEM BC/BS
DR. S. YECHOOR F IDL

GREER 000290

## _Social Services Therapy Note_

| | |
|---|---|
| atient Name: Laura Greer | |

| | |
|---|---|
| Date: 1/17/16 | Time: 1500-1509 |

**Type of Note:** ☒1:1 ☒Treatment Plan Update ☐Treatment Plan ☐Crisis Intervention
☐Discharge Note ☐Family Session ☐ Narrative Note ☐Other:

## Individual Patient Observations

| | | | | |
|---|---|---|---|---|
| **Behavior:** | ☐Active<br>☐Limited<br>☐Minimal<br>☐Attentive | ☐Resistant<br>☐Intrusive<br>☑Monopolizing<br>☐Drowsy | ☑Anxious<br>☑Inappropriate<br>☐Spontaneous<br>☐Withdrawn | ☐Agitated<br>☐Guarded<br>☐Tearful<br>☐Responsive With Prompting |
| **Affect:** | ☐Full Range<br>☐Alert<br>☐Flat | ☑Elated<br>☑Superficial<br>☐Labile | ☐Blunted<br>☐Bright | ☐Incongruent<br>☐Restricted |
| **Cognition:** | ☐Logical<br>☐Insightful<br>☐Coherent | ☐Preoccupied<br>☐Blocking<br>☐Confused | ☐Loose Associations<br>☐Delusional<br>☐Distracted | ☑Tangential<br>☐Circumstantial<br>☐Hallucinating |

☐ No observations if Narrative Note

**Treatment Goals Addressed (if applicable):** ☒Substance Abuse ☐Mental Health
☐Other:

**Response/ Progress:** Writer met with client to review and complete discharge plan and reviewed aftercare options, client reported she doesn't need to "rack up a large bill, doesn't need medication, has no aftercare plan" Staff attempted to provide support, recommended aftercare / follow up, client declined, reported she will follow up with her pain management provider and tell them "No more pills" Displayed rapid speech and tangential thought process, difficult to redirect.

Facilitator's Signature and Credentials: _K Smith LSW_ Date/Time: _1/17/16 1600_

Co-Facilitator's Signature and Credentials: _____ Date/Time: _____

DEFENDANT'S EXHIBIT
5/23/8
COLLINS REPORTING

*Form Title: Social Services Individual Note*
*Revised:12/2015*
*Arrowhead Behavioral Health*

GREER, LAURA    046
M# 000025465 01/12/1970
A# 10103030010 01/14/2016
ANTHEM BC/BS

GREER 000249

## NURSING DISCHARGE NOTE

Discharge Type: _Laura G._ (Routine) Medical, AMA, Administrative)

Patient: _Laura Greer_ Date: _1-17-16_ Time: _1400_

1. Patient Discharged to: _home_

2. Discharge Placement: _Decline oupt_

3. Discharge Summary Instructions completed, reviewed, and signed.
   Copy given to the Patient: _MM_

4. Belongings returned to patient                    Returned to ABH:
                                                      Xtenex Shoe Laces_____ (initials)
   a. Safe _N/a_ (initials)
   b. Locked Cupboard: _mm_ (initials)
   c. Patient Bin: _mm_ (initials)
   d. Storage: _mm_ (initials)

5. Medications returned by _MMaig RN_

6. Releases signed:
   a. _med rec_
   b. _crisis plan_
   c. _pk plan_

7. Copies of Labs, EKG reviewed and given to patient _Labs_

8. Other pertinent information / Progress Summary
   _AA/NA followup -TRUE_
   _Nancy Martin MD followup -TRUE_
   _Decline OP -FALSE_

Discharge Nurse Signature: _mmc RN_

9. Escorted to the door by _____ Date: _1-17-16_ Time: _____

Signature: _____

Form Title: NursingDischarge Form
Revised:8/2015
File In: Progress notes/Nursing
Arrowhead Behavioral Health

GREER, LAURA    046
M# 000025465 01/12/1970
A# 10103030010 01/14/2016
ANTHEM BC/BS
DR. S. YECHOOR  F IDL

**Arrowhead** BEHAVIORAL HEALTH *Life is Waiting...*

Date Completed __1/17/16__  Date/Time of Scheduled Discharge_____

Reason for D/C: ☐ Successfully completed treatment ☐ Against Medical Advice ☐Medical ☐Administrative
Other_____

| Contact/Reason for Appointment | Address | Phone # | Appt. Time & Date | Releases signed | Refused Release | Appt. Refused |
|---|---|---|---|---|---|---|
| Psychiatrist: | | | | ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No |
| Therapist: | | | | ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No |
| Outpatient Program: Declines Outpt AA + NA in area | | | | ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No |
| Primary Care Physician Nancy Martin Reason: PCP | 7595 CoRd. 236 Findlay OH 45840 | 419. 427. 1984 | | ☐ Yes ☐ No | ☐ Yes ☑ No | ☐ Yes ☑ No |
| Suboxone Support: N/A | | | | ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No |
| Additional Referral Source: | | | | ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No |

Arrowhead Behavioral Health Crisis Hotline: 1-800-547-5695     Suicide Hotline: 1-800-273-TALK (8255)
www.toledoaa.com  A.A. Central Office 419-380-9862

Signature indicates discharge plans have been completed and agreed upon and acknowledgement of receipt of suicide prevention information:

_~signature~_ LSW  1/17/16         _~signature~ Laura Greer_  1/17/16
Therapist   Date      Time  1503    Patient/Guardian Signature   Date  1506

**To be completed at time of Discharge:**

Patient and/or POA have demonstrated understanding and knowledge of:

| | Yes | No |
|---|---|---|
| Referrals and Appointments | ☑Yes | ☐ No |
| When and how to seek further treatment | ☑Yes | ☐ No |
| Importance of communicating with physician regarding side effects and other concerns | ☑Yes | ☐ No |
| Nutritional intervention or diet | ☑Yes | ☐ No |
| Medications have been explained to patient's satisfaction (potential food/drug interactions) | ☑Yes | ☐ No |
| Copy of labs and EKG reviewed and given to patient | ☑Yes | ☐ No |
| Safety plan reviewed and patient provided a copy | ☑Yes | ☐ No |

Signature of patient/guardian indicates that their questions have been satisfactorily answered and they understand and agree with the instructions.

_~Laura Greer signature~_  1-17-16     _~nurse signature~_  1-17-16 18:15
Patient/Guardian Signature and Date      Nurse Signature  Date/Time

Form Title: Discharge Plan
Revised: June 9, 2015
File In: Discharge
Arrowhead Behavioral Health

GREER, LAURA   046
M# 000025465 01/12/1970
A# 10103030010 01/14/2016
ANTHEM BC/BS
DR. S. YECHOOR  F IDL

\_\_Psychiatric Evaluation
\_\_Plus Program services in response to identified health care needs
\_\_Vocational Rehabilitation in response to identified employment needs
\_\_N/A No further recommendations

COPY

If symptoms do not improve or worsen, client may be referred to the following services in the future:
X Assessment: X MH \_\_AoD
\_\_Individual Counseling: \_\_mental health \_\_AoD
X Group Counseling: \_\_Anger Management \_\_Coping Skills \_\_STEPPS \_\_Survivor Group
              \_\_USG  X SIR \_\_IOP \_\_ BIP \_\_CC  Other
(specify):_____
\_\_CPST (MH)
\_\_CM (AoD)
\_\_Psychiatric Evaluation
\_\_Plus Program services in response to identified health care needs
\_\_Vocational Rehabilitation in response to identified employment needs
\_\_N/A No further recommendations

Client is also being referred to the following external services: follow up with her EAP.

Client's response to recommendations:
\_\_agreed
X declined the following: At the conclusion of the assessment BHP began to discuss with the client the treatment course that she would take and that we would verify IOP was covered by her insurance prior to putting her into the group to prevent a major bill. BHP discussed with the client that she would be seen individually until insurance authorized treatment. Client reports she did not want to complete treatment at Firelands and would like to go to a private practice. Client reports she does not feel comfortable in the groups and would only like to do individual therapy. BHP provided the client with referrals to three area agencies to assist her in getting treatment. BHP discussed with the client her history of treatment with her previous provider and the client reports it was a misunderstanding that led to her case being closed. BHP inquired if the client would like her case closed and the client stated yes. BHP received a call from the client's EAP and provided them the information that the client declined services and stated she would be going elsewhere and requested her case be closed. Client's EAP requested that BHP not close the client's case currently as they were going to call her and inform her that she would have to complete treatment recommendations. BHP informed EAP that we could not force someone to engage in treatment and client's EAP stated they would let the client know if she did not come in to treatment she would be terminated. BHP agreed to keep the client open temporarily until she could come in for treatment.

X Emergency services, resources and hotline number were provided to the client

Client reports the following treatment preferences:
\_\_ Needs assistance reading forms
\_\_ Need an interpreter for: \_\_ language \_\_ hearing impairment \_
X Prefers appointments\_\_before noon \_\_afternoon X after 4 p.m. \_\_specific day of the week: _____
\_\_ Other (please clarify):

Preferences will be:
X honored

**Patient Chart**
GREER, LAURA
Patient ID: 10924849
DOB: 01/12/1970
Age: 46 years  Gender: F

## Progress Notes

.D: 01/26/16 : 01:36pm
.T: Therapist - Progress Note

**GREER, LAURA**
**01/12/70**

**01/26/16  START TIME: 9:05 am  END TIME: 10:15 am  LENGTH:  70 min**

SUMMARY OF SESSION: Ct is a 46 year old MWF who is referred by her insurance company after getting out of an inpt program after 5 days there for opioid addiction. Ct states she hit "rock bottom". Ct tended to ramble quite a bit today and it was tough to keep her on task. She was disgruntled with the program she went to, frustrated they wanted to put her on Suboxone, she then went on the be blaming of her pain management program that they only urine tested her once in 8 years. Ct does admit that she was using more of her prescribed Percocet than what she could get from the pain management doctors and she was using about 20 pills per day of varying dosages. She came with FMLA papers but I told her I could not fill those out as I was not sure if her employer would recognize a LPCC, and also I was not sure she was ready to go back.

GOALS WORKED ON THIS SESSION: tying to get information, build a therapeutic rapport

CLIENT PROGRESS:  Ct appeared a bit sedated. States she has not used since going to Arrowhead but this is not verified. Would want a tox screen.

MSE:

**Affective:**
    Predominant Mood:  Pleasant Calm  Sad Overwhelmed Tearful Frustrated
    Range of Affect:  congruent

**Behavioral:**
    Appearance:  very thin, 107 pounds.seemed slightly sedated,
    Movement/Behavior:  overelaborate speech, poor boundaries
    Speech:  Understandable
    Attention/Manner:  Attentive  Cooperative

**Cognitive:**
    Thought Process:  Coherent  Rambling  denies any S/HI at present, is future oriented about return to work.
    Orientation:  Person Place Time
    Memory:  Adequate
    Judgment/Insight:  Limited

Printed On: 07/27/2016

DEFENDANT'S EXHIBIT
5
5/23/18
COLLINS REPORTING

Page: 12 of 20

did not attend

12 step Mtgs



Next appt. Wed 2/3/16
2pm

1/29/16



DEFENDANT'S
EXHIBIT
6
5/23/18
COLLINS REPORTING

DEFENDANT 001136

CONFIDENTIAL

**Patient Chart**
GREER, LAURA
Patient ID: 10924849
DOB: 01/12/1970
Age: 46 years  Gender: F

## Discharge Summary

.D: 07/14/16 : 12:45pm
.T: DISCHARGE SUMMARY
Providers: Jayne Williams, MA, LPCC, LICDC, SAP

Date of Admission: 01/26/16 Date of Discharge: 07/14/16
Date of Last Contact: 03/14/16
Others involved in treatment: Ct's spouse attended one appt.

1. Services Provided:  Assessment. individual therapy

2. Summary of Progress:  Ct attended a few sessions and seemed to understand why she needed to be clean but underestimated what it would take to stay clean. This was evidenced by her not following through with going to support group meeting ("I forgot my proof slips at home"). Also she seemed uncomfortable talking about her use, the consequences of same. She missed two appointments and was sent the letter to notify her I was leaving and to let us know if she wanted a different provider. She did not respond.

Treatment Outcomes: Client dropped out of treatment; correspondence sent 6/21/16

3. Pertinent unresolved problems including symptoms which may indicated the need for future services:  Ct needs a higher level of care.

4. Summary of Medication Record:
Current Medications:
Rx: AMBIEN CR 12.5mg 1  AT BEDTIME - days, , Ref: 0
 Rx: B-12 INJECTION     - days, , Ref: 0
 Rx: BACLOFEN 10mg 1  TWICE DAILY - days, , Ref: 0
 Rx: CLYMOLOMYCIN    EVERY OTHER DAY - days, , Ref: 0
 Rx: IMITREX 100mg 1  - days, , Ref: 0
 Rx: TOPAMAX 50mg 1  AT BEDTIME - days, , Ref: 0
 Rx: VITAMIN D     - days, , Ref: 0
 Rx: WELLBUTRIN 300mg 1  DAILY - days, , Ref: 0

5. Client Response to Discharge/Comments:  Ct did not respond

6. Discharge Plan: Other,  Ct's EAP contacted me to say ct had been pulled off work on reasonable cause (slurring words, long delays in responding) so she most likely has relapsed. The EAP states her tx will now be mandatory and I gave her the name of Century Health as the have the most options for AoD.

Discharge Diagnosis:
Axis I F11.20 Opioid Use D/O

**Patient Chart**
GREER, LAURA
Patient ID: 10924849
DOB: 01/12/1970
Age: 46 years  Gender: F

## Progress Notes

.D: 03/15/16 : 09:39am
.T: Therapist - **Progress Note**

**GREER, LAURA**
**01/12/70**

**03/14/16  START TIME: 1:00 pm  END TIME:2:00 pm  LENGTH:  60 min**

---

**SUMMARY OF SESSION:** Ct brought to session a drug screen signed by Nancy Martin, CNP that was negative for cannabis, cocaine, opiates. She states she "forgot" again to bring her slips for AA/NA meetings. Asked her if she was really attending and she states yes but this forgetting twice seems questionable. She states she is gaining weight and does look much healthier. Her eyes are more clear. She got her son into counseling with a referral from Dunn Therapies as they are booking out until June. He goes this Friday. She is concerned about his being bullied and depression. He is aware she went to tx for drugs. Encouraged her to bring this out when she takes him as he may or may not. Ct states he is like her, "he holds a lot in". Asked if she feels she is holding things in or back. She states for years she held back how angry she was at her mom for how her mom treated them  but when mom was sick and dying, she let that go. Asked ct if she feels she is still impacted by some of these things and she said yes. We agreed to talk about this topic next time. Ct continues to deny any cravings. She polished her hardwood floor on her knees and stated next day she was in pain so used a lidocaine pain patch which she states is non narcotic.

**GOALS WORKED ON THIS SESSION:**  abstinence, coping skills to stay in recovery.

**CLIENT PROGRESS:**  :I don't want to go back to that. I feel so much better."

**MSE:**

**Affective:**
     Predominant Mood:  Pleasant Calm
     Range of Affect:  congruent

**Behavioral:**
     Appearance: Neat  healthier
     Movement/Behavior: Unremarkable
     Speech: Understandable
     Attention/Manner: Attentive  Cooperative Open

**Cognitive:**
     Thought Process:  Coherent Goal-oriented  No S/HI. CT is future oriented, and has her own faith.

**Patient Chart**
GREER, LAURA
Patient ID: 10924849
DOB: 01/12/1970
Age: 46 years  Gender: F

## Progress Notes

.D: 02/26/16 : 05:23pm
.T: Therapist - Progress Note

GREER, LAURA
01/12/70

02/26/16  START TIME: 3:05 pm  END TIME: 4:00 pm  LENGTH:  55 min

**SUMMARY OF SESSION:** Ct states she is doing okay. Had a stressful work day. She states she went to 4 of 6 12 step meetings but missed 2 due to a bad cold this week. She forgot her book with signatures. Ct states she feels more comfortable at AA. She states the people at NA have less clean time and seems a bit sketchy which she admits she should not judge but she just feels that way. She states she has not spoken yet at a meeting but she has gotten some numbers from other members. Ct states her marriage seems to be better. She feels better. She checked into drug store UA's and she found a 4 panel with opiate screen for 24.00. We discussed her taking this to her doctors office to use that there. If it is unopened and they have some security measures in place that could be something to try. Ct shared she feels her 17 year old son is being bullied. He has asked her if he can go to counseling. She asked if I know any Tricare providers. Let her know to call Dunntherapy to see.

**GOALS WORKED ON THIS SESSION:**  abstinence, building recovery networks

**CLIENT PROGRESS:**  Ct seems to look healthier. She states she will be coming up on 60 days.

**MSE:**

**Affective:**
   Predominant Mood:  Pleasant  Anxious
   Range of Affect:  congruent

**Behavioral:**
   Appearance:  Neat
   Movement/Behavior:  Unremarkable
   Speech:  Understandable
   Attention/Manner:  Attentive  Cooperative

**Cognitive:**
   Thought Process:  Coherent  Goal-oriented  Denies S/HI. Ct states she is future oriented and does not want to go back.     Orientation:  Person Place Time
   Memory:  Adequate
   Judgment/Insight:  fair

Printed On: 07/27/2016

## Robby Kordish

| | |
|---|---|
| From: | Angela Kuhlman |
| Sent: | Tuesday, July 12, 2016 5:20 PM |
| To: | Fulton-Royer, Jill; Kohlbacher, Georgene (gkohlba2) |
| Cc: | Robby Kordish |
| Subject: | RE: Screening for UH employee |
| Attachments: | Incidents Laura Greer.docx |

Attached is a summary written by Angela Washington, Claims Supervisor.

From: Fulton-Royer, Jill [mailto:Jill.Fulton@UHhospitals.org]
Sent: Tuesday, July 12, 2016 12:06 PM
To: Kohlbacher, Georgene (gkohlba2) <Georgene.Kohlbacher@UHhospitals.org>; Angela Kuhlman
<AKuhlman@hdplus.com>
Subject: FW: Screening for UH employee

Angela,
Thanks for the update. Can you also send us a summary of your concerns? Thanks.

Jill Fulton, LISW-S, LICDC
Employee Assistance Manager
University Hospitals Case Medical Center
MCCO 6th Floor, Mail Stop 6035 B
11100 Euclid Ave
Cleveland, Ohio 44106
Phone-216-844-1982; Fax-216-983-3038;
Pager-30788; Cell Phone-216-408-9059

 

THE OFFICIAL HEALTH CARE PARTNER OF THE
CLEVELAND BROWNS

From: Angela Kuhlman [mailto:AKuhlman@hdplus.com]
Sent: Tuesday, July 12, 2016 11:01 AM
To: Fulton-Royer, Jill; Robby Kordish
Cc: Kohlbacher, Georgene (gkohlba2); Harmon, Heather (HR); Fernandez, Laura
Subject: RE: Screening for UH employee

DEFENDANT'S
EXHIBIT
7
5 | 23 | 18
COLLINS REPORTING

Hello All,
Robby and I just spoke with Laura Greer. She will be waiting for Georgene's call at noon today. Please call her at 419-424-9291.

I've had a very hard time finding a cab company that will take a credit card over the phone and uber is not available in her area. At noon I will be having a conversation with a car service to hopefully arrange transportation. If I am able then I will call and let Laura know that she will be picked up. In our conversation with Laura we asked if she had someone

1

CONFIDENTIAL

DEFENDANT 001323

**6/29/2016**

LAURA SENT AN EMAIL THAT SHE WILL NEED TO GET OFF ONCE SHE IS DONE WITH A CLAIM SHE HAD FEMALE LASER SURGERY THAT SHE WOULD MAKE HER TIME UP, TO ASSURE SHE WOULD HAVE HER 8HRS, OTHERWISE THIS IS CONSIDERED A DEVIATION OF TIME, HER REPLY WAS WHAT IF I GET A NOTE FROM MY DOCTOR, IT WAS ADVISED THAT SHE TALK TO HR IF THIS WOULD BE CONSIDERED A FMLA CONDITION. SHE WENT ON TO EXPLAIN HOW UNFAIR THIS IS AND THE EMAIL WENT ON FROM 1:03 TO 2:46.

**6/21/2016**

I SPOKE TO LAURA ON WHERE SHE EMAILED ME ON A DIFFERENT CLAIM THAT WE STILL NEED TO RESOLVE THE ABOVE MENTIONED CLAIMS THAT I HAD PROCESSED ACCORDINGLY. SHE MAKES MENTION THAT SHE BELIEVES SHE DELETED THE CLAIMS BECAUSE THEY WERE INCORRECT. I ADVISED HER TO PULL UP THE EMAIL ALONG WITH THE CLAIM, SO THAT SHE CAN RECREATE AND FOLLOW THE INSTRUCTIONS. THE CONVERSATION WAS VERY BROKEN; SHE HAD WENT ON TO ANOTHER TOPIC SEVERAL TIMES. ONCE I INTERUPTED THE CONVERSATION ASKING HOW FAR WAS SHE WITH THE HANDKEY, SHE SAID OH! YOUR CLAIMS ARE RIGHT HERE, THEY WEREN'T DELETED AND SHE BEGIN TO MODIFY THE CLAIMS, (SHE SAYS) EXPLAINING HOW SHE WAS SPLITING THE PAYMENT LIKE THEY USE TO DO. I EXPLAINED AGAIN THAT SHE WILL NEED TO FOLLOW THE INSTRUCTIONS AS CINDI PROVIDED, AND AGAIN SHE MENTIONS HOW IT USE TO BE DONE AND SHE DOES NOT UNDERSTAND WHY SHE CAN NO LONGER DO IT THAT WAY. I AS A FINAL POINT EXPLAINED, THAT SHE IS TO RECREATE THE CLAIMS I CREATED IF SHE DELETED THEM, FOLLOWING CINDI'S INSTRUCTION AND TO NOTIFY ME ONCE SHE HAD COMPLETED. I REITERATED CINDI'S INSTRUCTIONS, AND ENDED THE CALL.

**6/15/2016**

PROCESSING –LAURA WAS ASKED TO PROCESS TWO CLAIMS, MANUALLY ENTERING THE CLAIMS, AND SPLITTING THE PAYMENT. (SPECIFIC CLAIM INSTRUCTION WAS PROVIDED). LAURA WAS UNABLE TO FOLLOW THOSE INSTRUCTIONS, SO I MANUALLY ENTERED THE CLAIMS AND PROCESED THEM AND ADVISED LAURA TO REVIEW FOR FUTURE USE. (6/16/2016) ON 6/17/2016 LAURA EMAILED ME AND CONVEYED THE CLAIMS WERE INCORRECT AND THAT WE NEED TO SETUP TIME TO REVIEW. (PHONE CALL)

**6/13/2016**

I was informed by Cindi Roberts on 6/13/2016 @ 1:07 pm that Laura Greer was experiencing issues with her Salesforce screen. Based on the "screen shot" that she sent, I immediately saw that her Salesforce screen was "maximized". I emailed Laura at that time and advised her to use her "back" button. She did not reply my assumption was that this advised worked for her, and she was able to proceed with processing. At 1:30 I received the below screen shot accompanied by an email stating "Once I start working sales force will pop back over and Salesforce will not allow me to anything- I've logged out 3 times and signed in but Salesforce is still there?" Again I advised her to use her "back button".



Shortly before 3:00 pm Janet Goubeaux came over to my cubicle and advised she has been on the phone with Laura and has logged into her system to assist. She believes Laura's system is "dying/crashing" due to the error she is getting.  (Please see below).



DEFENDANT 001325

CONFIDENTIAL

I then advised Janet that this was an issue that Laura had earlier although the screen looks different now than before this could be a result of having too many sessions open due to her multiple attempts to log-in.

When I called Laura she was in the process of logging into her son's PC, I asked if the she believed this PC was safe and secure and she replied yes. She then began to talk off topic and with haziness about the UH discount program and how the military does not offer competitive discounts to the Kalahari Park, and that she had chest pain and took one of her husband's Nitro pills and that it did help and that the neighbor lady helped her yesterday and she would make it through. I interrupted and asked if she had logged into the PC successfully and she replied no, that she is getting the same screen she got on her screen, I replied then your system is not dying.



After further review of her screen Janet agreed. I advised Laura to log out of her son's PC and go back to her PC to log back in.

She than expressed she was unsure on how to log in. I took a picture of the remote log in instructions b and sent them to her via text message. (Please see instructions) After several unsuccessful attempts, Laura successfully logged into HealthPac. I mentioned that should she experience issue such as this moving forward she is not to go through another processor for resolution, that she will need to alert Cindi Roberts or myself, she replied she did not know any of our numbers, that she had texted Cindi and Cindi advised her to contact Angela (me), that she called three times to the front desk and ask to be "patched" to Angela Kuhlman. I told her that she was to call me Angela Washington in urgencies such as this.

DEFENDANT 001326

CONFIDENTIAL

We continued to discuss what she saw once she logged in, and she said that her Salesforce screen was still up. I advised her to use her Alt+tab to view the many sessions she had open and when she came to each session to "x" out of them. She could not comply. I advised her to put her thumb on the Alt button and her index finger on the tab button and slowly tap the Tab button to review each session. She could not comply, Janet advised that since we now know the issue that we go to Michaels office and he log into her system to minimize her Sales force screen. I advised Laura that we would call her right back.

Janet and I went into Michael's office he logged into her system and advised reviewed how to minimized and advised to use function key F11, I asked since he was signed in her system if he would simply do it while logged in. I came back to my cubicle and called Laura, she was logged in, I again reiterate the instruction provided earlier regarding immediate contact with Cindi or me, along with a follow up email.

CONFIDENTIAL

 **University Hospitals™**

**Employee Assistance Program**
**Drug/Alcohol Screening Procedures**

The Employee Assistance Counselors will determine whether an employee must participate in the drug and/or alcohol screening program. Once the decision is made, all employees (mandatory and/or self-referred) must follow the guidelines as stated below.

1.  Upon acceptance into the program, the employee must meet with the EAP Secretary. The EAP Secretary will provide information about the drug and/or alcohol screening program and verify the employee's information:
    Name _Laina Greer_
    Home phone number _R. 419-454-9291 ~ 419-957-2459_
    Work phone number _____
    Pager number _____
    (This information must be given in order for Employee Assistance to contact employees.)

2.  The employee is required to take a drug and/or alcohol screening weekly. _2 yrs effective_

3.  The drug and/or alcohol screening is done randomly; therefore, the employee must contact the EAP Secretary at 844-4948 every Monday, Wednesday and Friday between the hours of 8:00 A.M. to 4:30 P.M.  At that time, the EAP Secretary will inform the employee if the screen is due that day.  In the event the EAP Secretary is unavailable, please leave a phone mail message and she will return your call if your screening is due that day, otherwise your call-in will be documented. _9/26/16 - 9/26/18_

4.  The employee is required to call every Monday, Wednesday and Friday even when the employee has had a drug/alcohol screening for the week.  This step is essential and must be adhered to because an employee may be asked to retake a drug/alcohol screening at the request of an Employee Assistance Counselor.

5.  The employee is requested to show up for the screening as soon as possible that same day.  If an employee fails to fulfill that obligation the Employee Assistance Secretary must turn that employee's name over to the Employee Assistance Counselor assigned to that case.

6.  The employee must contact the Employee Assistance Secretary before taking time off for vacation, etc. if he/she is to be excused from the drug and/or alcohol screening for the week.

7.  The employee should contact the Counselor assigned to his/her case when the EAP Secretary is out on vacation to confirm call-in and/or whether or not to come in for screening.

_Laina Greer_
Employee

_09-26-2016_
Date

_____
Employee Assistance Counselor

_____
Date


DEFENDANT'S EXHIBIT
12
5/23/18 AV
COLLINS REPORTING

GREER 000467

 **University Hospitals™**

**Employee Assistance Program**
**Conditions of Employment**

**Compliance Contract**

between

_Laura    Greer_

**Employee**

and the

**Employee Assistance Program Counselor**

I understand that my supervisor referred me to the Employee Assistance Program (EAP) as a Mandatory Referral.  I understand that my EAP assessment resulted in certain recommendations and I must comply with them.

I understand that my compliance with the EAP attendance recommendation and treatment plan must be monitored as determined by the EAP counselor.  If I do not comply with the recommendation and/or treatment plan within __1__ week (s) my supervisor and /or HR will be informed.  Non-compliance may result in corrective action up to and including discharge.

The EAP recommendation/treatment plan requirements are as follows: _____ _per_

D/C instructions per St. Rita's
1) F/u c Dr Rala + his recommendations
2) F/u c Mike McGregor Wyandot Counseling + his recommendations
3) F/u Family Practice, Nancy Williams CNP + recommendations

I understand and agree to comply with the conditions of this Contract.

_Laura Greer_                                      _09-26-2016_
**Employee**                                              **Date**

_____                 _____
**EAP Counselor**                                        **Date**

GREER 000460

# ATTACHMENT A

## UNIVERSITY HOSPITALS HEALTH SYSTEM
### EMPLOYEE ASSISTANCE PROGRAM
### REFERRAL FORM

Employee: **Laura Greer**   Position: **Claims Processor**   Date: **7-12-16**   Phone: **419 424-9291**

You are being referred to the EMPLOYEE ASSISTANCE PROGRAM (EAP) because of the concerns noted below. EAP services are confidential, in compliance with the law. Your supervisor will be told only whether you kept the appointment, and whether you complied with the EAP recommendations. Your supervisor will not be told what was discussed unless you specifically authorize it and sign a release of information specifying the information to be released. Information from EA may be shared without a release and authorization in response to state or federal statute/regulation (e.g. Homicidal/suicidal ideation; child and elder abuse/neglect), a court ordered subpoena or an official investigation by a government agency.

☒ A Tier 1 Mandatory Referral has been made to EAP for the following reason:

 ☒ **Fitness for Duty**
 ☐ Violent, hostile, or reckless behavior that endangers the safety of others or that causes others to fear for their safety
 ☐ Reasonable suspicion of drug/alcohol use including evidence of drug diversion.

Please phone EAP at 216-844-4948 to confirm your scheduled appointment on **7-12-16 @ 12 pm**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

☐ A Tier 2 Mandatory Referral has been made to EAP for the following job performance concern(s):
 ☐ Attendance issues
 ☐ Conflictive work relationship
 ☐ Deteriorating job performance
 ☐ Other _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Please phone EAP at 216-844-4948 within 5 business days of today's date, to schedule an appointment.

Explanation of counseling, anecdotal, corrective actions or other concerns relative to the above-checked concerns:

My supervisor has explained the reason for this EAP referral. I understand that my supervisor will be notified whether I keep my appointment and whether I comply with the EAP recommendations. I have been given a copy of this form.

Employee Signature: _____   Date: _____

Supervisor Signature: *Angela Kuhl*   Dept: **HR**   Phone: **330 463 1135**

EAP Counselor Signature: _____   Date: _____

☐ Employee attended EAP session    ☐ Employee did not attend EAP session

☐ Employee complied        ☐ Employee did not comply

DEFENDANT 001316

CONFIDENTIAL

*Neg to EAP*
*10/28/16*



3949 N. Main St. Suite D
Findlay, OH 45840
Phone: 419-425-5121
Fax: 419-425-5738

Date: 10/5/2016

Re:  Laura Greer
SSN:  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

DER:  Laura Fernandez
Employer:  University Hospitals Case Med Center

This letter is in regard to the random urine drug screen collected on 9/28/2016 from Laura Greer. This test is reported as "Negative." The specimen was also Dilute.

As the Medical Review Officer for this test, I was able to confirm that there is a legitimate medical prescription in use, consistent with the chemical detected in the specimen.  Because there is a legitimate medical explanation for the presence of this substance, this drug test is declared as "Negative." I would like you to be aware that use of this medication may have side effects that could present safety-sensitive issues. The employee's personal physician may be a better judge of how the individual reacts to the medication with respect to job duties.

Please feel free to contact me if you have any further questions or concerns.

Sincerely,

Stephanie A. Matuszak MD, MRO
Well at Work

DEFENDANT'S
EXHIBIT
13
5/23/18
COLLINS REPORTING

GREER 000680

# Alcohol Testing Form (Non-DOT)
*(The instructions for completing this form are on the back of Copy 3)*

## STEP 1: TO BE COMPLETED BY ALCOHOL TECHNICIAN

**A:** Employee Name — *Laura Greer*
(Print)   (First, M.I., Last)

**B:** SSN or Employee ID No. — 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

**C:** Employer Name — *University Hospitals Case M.C.*

Street — *MCCO 6th Floor, 11100 Euclid Ave*

*Mail stop 6035B*

City, State, Zip — *Cleveland, OH 44106*

DER Name and Telephone No. — *Laura Fernandez 216-844-4822*
DER Name     DER (Area Code & Phone Number)

**D:** Reason for Test: ☐ Reasonable Susp. ☐ Post-Accident ☐ Return to Duty ☐ Follow-up ☐ Pre-employment ☐ Random (meets the Job related and consistent with business necessity requirements)

```
ALCOMONITOR CC  001224
09/28/16
TEST NO.  218

SBJ: 300603228.......

SCREENING TEST
6/210L       TIME
.000 AUTO    09:16
```

## STEP 2: TO BE COMPLETED BY EMPLOYEE
I certify that I am about to submit to alcohol testing and that the identifying information provided on the form is true and correct.

*Laura Greer*
Signature of Employee

Date — 09  28  2016
Month  Day  Year

## STEP 3: TO BE COMPLETED BY ALCOHOL TECHNICIAN
(If the technician conducting the screening test is not the same technician who will be conducting the confirmation test, each technician must complete their own form.) I certify that I have conducted alcohol testing on the above named individual, that I am qualified to operate the testing device(s) identified, and that the results are as recorded.

TECHNICIAN: ☑ BAT ☐ STT   DEVICE: ☐ SALIVA ☑ BREATH*   15-Minute Wait: ☐ Yes ☐ No

SCREENING TEST: (For BREATH DEVICE* write in the space below *only* if the testing device is *not* designed to *print*.)

| Test # | Testing Device Name | Device Serial # OR Lot # & Exp. Date | Activation Time | Reading Time | Result |
|--------|---------------------|--------------------------------------|-----------------|--------------|--------|
|        |                     |                                      |                 |              |        |

CONFIRMATION TEST: Results *MUST* be affixed to each copy of this form or printed directly onto the form.

REMARKS: _____

Alcohol Technician's Company
*EDITH GRINE*
(PRINT) Alcohol Technician's Name (First, M.I., Last)

*Edith Grine*
Signature of Alcohol Technician

**Well at Work**
Company Street Address 3949 N. Main St.
Findlay, OH 45840
Company City, State, Zip 419-425-5121
Fax 419-425-5738
Phone Number (Area Code & Number)

Date — 9  28  16
Month  Day  Year

## STEP 4: TO BE COMPLETED BY EMPLOYEE IF TEST RESULT IS POSITIVE
I certify that I have submitted to the alcohol test, the results of which are accurately recorded on this form. I understand that I must not drive, perform safety-sensitive duties, or operate heavy equipment because the results are positive.

Signature of Employee

Date  Month  Day  Year

COPY 1 - ORIGINAL - FORWARD TO THE EMPLOYER                    8363 (Rev. 2/14)

Affix Or Print Screening Results Here ▽
Affix With Tamper Evident Tape ▽

Affix Or Print Confirmation Results Here ▽
Affix With Tamper Evident Tape ▽

Affix Or Print Additional Test Results Here ▽
△ Affix With Tamper Evident Tape ▽

GREER 000681

Well at Work

## MRO Analysis Form

| Name: | Patient ID: | Birthdate: | Phone: |
|---|---|---|---|
| Laura Greer | 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 | 01-12-1970 | 419-957-2459 |

| Contact: | | Contact Name: | Phone: | |
|---|---|---|---|---|
| Employer: | University Hospitals Case M. C | Laura Fernandez | 216-844-4828 | 216-844-3990 |
| Collector: | Well at Work | April Vandenberg | 419-425-5121 | 419-425-5738 |
| Lab: | MEDTOX | | 800-832-3244 | |

| Collection ID: | Test Type: | SpecimenID: | Collection Protocol: |
|---|---|---|---|
| 9/28/2016 | RT | Z31611034 | COLLPROT |

Lab Results:

| Substance | Lab Result | Lab Level | Finding |
|---|---|---|---|
| Amp Exp | Negative | 0 | |
| Barbiturates (Urine)5620 | Negative | 0 | |
| Benzodiazepines 5630 | Positive | 232.0000 | alprazolam |
| Cocaine Metabolite 5640 | Negative | 0.205 | alpha - hydroxy alprazolam |
| Marijuana Metabolite 5671 | Negative | 0 | |
| Meperidine 5730 | Negative | 0 | |
| Methadone 5680 | Negative | 0 | |
| Opiates (Urine) 5650 | Negative | 0 | |
| Oxycodone - Urine 5653 | Negative | 0 | |
| Phencyclidine 5660 | Negative | 0 | |
| Propoxyphene 5700 | Negative | 0 | |
| TRAMADOL 5720 | | | |

☑ Review Chain of Custody Documents:
   ✓ Acceptable   ☐ Unacceptable (explain:) _____

Employee Notification Phone Log:

| Phone | Date/Time |
|---|---|
| 419-957-2459 | 10/3/16 4:35 |
| | 10/5/16 12:28 |

Response

Voicemail not set up.
Sounds tired, slightly
congested/drugged?

Works from home on comput
ORDRS: Alprazolam 0.25 #30
9/13/2016 #65-99920
(Also zolpidem)

☐ If unable to notify employee, company's Drug Test Program Coordinator
   notified.  Date: __/__/__   Name: _____

☑ Notify employee of positive results

☑ Review possible legitimate reasons for a positive result
   Employee's Reason(s) given for Positive Test:
   Prescription Medicine(s) being taken:    _____ Waives    _____ Requests Split

☐ Notify right to request split sample within 72 hours   ☐ Canceled   ☐ Dilute   ☐ Refused-Adulterated   ☐ Refused-Substituted

Final Result:   ☐ Positive   ☑ Negative

_S. Matuszak MD_

Stephanie A. Matuszak, MD
Medical Review Officer

Verified On: 10/5/2016
216-844-4828

Contact: LAURA FERNANDEZ   Date: 10-6-16   Time: 9:01

☐ Notify employer of results

Comments:

Page

GREER 000682

0/03/2016  09:45:21                  Medtox Laboratories  -   AG:FAXHELLAT   BT: 64194084                    Page:01 of

MEDTOX LABORATORIES INC.                              Jennifer A. Collins, Ph.D.
402 WEST COUNTY ROAD D
ST PAUL, MN 55112
651-636-7466
                                    LABORATORY REPORT

Account #: 4746912                  Accession #:  G4197040
BLANCHARD VALLEY HEALTH SYSTEM       Specimen I.D.:  Z31611034
HRO: STEPHANIE NATUSZAK, MD          Donor Name/ID:  GREER,LAURA
WELL AT WORK                         SSN:            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
3949 N MAIN ST STE D                 Age:    Sex:
FINDLAY, OH 45840                    Reason for test: Random

                                    Date          Date          Date
                                    Collected     Received      Reported
General Information                  09/28/2016    09/29/2016    10/03/2016
                                    10:00                       9:43AM

     TEST(S) REQUESTED              RESULTS       UNITS THERAPEUTIC RANGE

DRUGS OF ABUSE SCREEN               POSITIVE
   DRUG TEST RESULT                 NEGATIVE      ng/ml
   AMPHETAMINES                     NEGATIVE      ng/ml
   BARBITURATES                     +++POSITIVE+++ ng/ml
   BENZODIAZEPINES                  NEGATIVE      ng/ml
   COCAINE METABOLITE               NEGATIVE      ng/ml
   OPIATES                          NEGATIVE      ng/ml
   OXYCODONE                        NEGATIVE      ng/ml
   PHENCYCLIDINE (PCP)              NEGATIVE      ng/ml
   MARIJUANA METABOLITE (THC)       NEGATIVE      ng/ml
   METHADONE                        NEGATIVE      ng/ml
   PROPOXYPHENE                     NEGATIVE      ng/ml
   TRAMADOL                         NEGATIVE      ng/ml
   MEPERIDINE                       15.4    (L)   mg/dl    > = 20
   CREATININE                       NEGATIVE      mcg/ml   < 200
   NITRITES

THIS SPECIMEN WAS SCREENED BY IMMUNOASSAY. ANY POSITIVE RESULT
HAS BEEN CONFIRMED BY CHROMATOGRAPHY WITH MASS SPECTROMETRY.
THE FOLLOWING THRESHOLD CONCENTRATIONS WERE USED FOR THIS ANALYSIS

DRUG                    SCREENING THRESHOLD      CONFIRMATION THRESHOLD
AMPHETAMINES            1000 NG/ML
   AMPHETAMINE                                   500 NG/ML
   METHAMPHETAMINE                               500 NG/ML
   MDMA                                          500 NG/ML
   MDA                                           500 NG/ML
   MDEA                                          200 NG/ML
BARBITURATES            300 NG/ML                100 NG/ML
BENZODIAZEPINES         300 NG/ML
   DIAZEPAM, DESMETHYLDIAZEPAM
   OXAZEPAM, TEMAZEPAM
   ALPRAZOLAM, ALPHA-OH-ALPRAZOLAM
   LORAZEPAM, ALPHA-HYDROXYTRIAZOLAM
   HYDROXYETHYLFLURAZEPAM,
   ALPHA-HYDROXYMIDAZOLAM,  7-AMINOCLONAZEPAM    150 NG/ML
COCAINE METABOLITE      300 NG/ML
OPIATES                 300 NG/ML                300 NG/ML
   CODEINE                                       300 NG/ML
   NORPHINE                                      300 NG/ML
   HYDROCODONE                                   300 NG/ML
   HYDROMORPHONE                                 100 NG/ML
OXYCODONE               100 NG/ML
                        REPORT CONTINUED ON NEXT FORM

GREER 000683

0/03/2016  09:46:21          Medtox Laboratories -  AB:FROZELLAT  BT: G4194004          Page:02 of

CONTINUED REPORT
MEDTOX LABORATORIES INC.                    Jennifer A. Collins, Ph.D.
  402 WEST COUNTY ROAD D
  ST PAUL, MN 55112
  651-636-7466

                           LABORATORY REPORT

Account #: 4746912                  Accession #:   G4197040
BLANCHARD VALLEY HEALTH SYSTEM       Specimen I.D.: 231611034
MRO: STEPHANIE MATUSZAK, MD          Donor Name/ID: GREER, LAURA
WELL AT WORK                         SSN:           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
3949 N MAIN ST STE D                 Age:     Sex:
FINDLAY, OH 45840                    Reason for test: Random

                                    Date        Date        Date
                                    Collected    Received    Reported
General Information                 09/28/2016   09/29/2016  10/03/2016
                                   10:00                     9:43AM

        TEST(S) REQUESTED          RESULTS         UNITS THERAPEUTIC RANGE

     PHENCYCLIDINE            25 NG/ML                25 NG/ML
     MARIJUANA METABOLITE     50 NG/ML                15 NG/ML
     METHADONE               300 NG/ML               300 NG/ML
     PROPOXYPHENE            300 NG/ML               300 NG/ML
     TRAMADOL                200 NG/ML               100 NG/ML
     MEPERIDINE              200 NG/ML               100 NG/ML

ALTERNATIVE EXPLANATIONS SHOULD BE EXPLORED FOR POSITIVE RESULTS.
THIS PANEL INCLUDES TESTING FOR SPECIMEN VALIDITY.

**SOME COMPONENTS OF THE TEST PANEL WERE DEVELOPED AND PERFORMANCE
CHARACTERISTICS DETERMINED BY LABCORP. THEY HAVE NOT BEEN CLEARED
OR APPROVED BY THE FOOD AND DRUG ADMINISTRATION.

  Certified by: GREEN, LEAH
SPECIFIC GRAVITY                   1.003      ✓

  Certified by: GREEN, LEAH
EXPANDED BENZODIAZEPINE CONFIRM
  ALPRAZOLAM                       232   ✓ ✓     ng/ml
  ALPHA-HYDROXYALPRAZOLAM          208   ✓        ng/ml


QUANTITATIVE BENZODIAZEPINE CONFIRMATION INCLUDES DIAZEPAM,
DESMETHYLDIAZEPAM, OXAZEPAM, TEMAZEPAM, ALPRAZOLAM,
ALPHA-HYDROXYALPRAZOLAM, HYDROXYETHYLFLURAZEPAM, LORAZEPAM,
ALPHA-HYDROXYTRIAZOLAM, ALPHA-HYDROXYMIDAZOLAM, 7-AMINOCLONAZEPAM
AT A THRESHOLD OF 100 ng/mL.
ANALYSIS PERFORMED BY LIQUID CHROMATOGRAPHY/TANDEM MASS
SPECTROMETRY (LC/MS/MS).

                      ** FINAL REPORT **

          Collected at 4194255121  MEDTOX collection site #607
          WELL AT WORK - FINDLAY
          FINDLAY, OR

GREER 000684





3949 N. Main St. Suite D
Findlay, OH 45840
Phone: 419-425-5121
Fax: 419-425-5738

Date: 4/24/2017

Re: Laura Greer
SSN: 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

DER: Laura Fernandez
Employer: University Hospitals Case Medical Center

This letter is in regard to the latest in a series of weekly random follow-up drug screens collected on 4/19/2017 from Laura Greer. This test is reported as "Negative."

As the Medical Review Officer for this test, I was able to confirm that there is a legitimate medical prescription in use, consistent with the chemical detected in the specimen. Because there is a legitimate medical explanation for the presence of this substance, this drug test is declared as "Negative." I would like you to be aware that use of this medication may have side effects that could present safety-sensitive issues. The employee's personal physician may be a better judge of how the individual reacts to the medication with respect to job duties.

Please feel free to contact me if you have any further questions or concerns.

Sincerely,

Stephanie A. Matuszak MD, MRO
Well at Work

DEFENDANT'S
EXHIBIT
14
5/23/18
COLLINS REPORTING

GREER 000805

Page:02 of

14/14/2017  23:32:19          Medtox Laboratories  -  AG:FROZELLAT  BT: 64387007

CONTINUED REPORT                              Jennifer A. Collins, Ph.D.
MEDTOX LABORATORIES INC.
  402 WEST COUNTY ROAD D
  ST PAUL, MN 55112
  651-636-7466                      LABORATORY REPORT

  Account #: 47469                    Accession #:  GS529273
  EMPLOYER:                           Specimen I.D.:  233458657
  MRO: STEPHANIE MATUSZAK, MD         Donor Name/ID:  GREER, LAURA
  WELL AT WORK                        SSN:          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
  3949 N MAIN ST STE D                Age:    Sex:
  FINDLAY, OH 45840                   Reason for test: Random

                                        Date      Date       Date
                                      Collected  Received   Reported
  General Information                 04/10/2017 04/11/2017 04/14/2017
  47469                                 13:23               11:30PM

       TEST(S) REQUESTED               RESULTS        UNITS THERAPEUTIC RANGE

  OXYCODONE                   100 NG/ML              100 NG/ML
  PHENCYCLIDINE                25 NG/ML               25 NG/ML
  MARIJUANA METABOLITE         50 NG/ML               15 NG/ML
  METHADONE                   300 NG/ML              300 NG/ML
  PROPOXYPHENE                300 NG/ML              300 NG/ML
  TRAMADOL                    200 NG/ML              100 NG/ML
  MEPERIDINE                  200 NG/ML              100 NG/ML

  ALTERNATIVE EXPLANATIONS SHOULD BE EXPLORED FOR POSITIVE RESULTS.
  THIS PANEL INCLUDES TESTING FOR SPECIMEN VALIDITY.

  **SOME COMPONENTS OF THE TEST PANEL WERE DEVELOPED AND PERFORMANCE
  CHARACTERISTICS DETERMINED BY LABCORP. THEY HAVE NOT BEEN CLEARED
  OR APPROVED BY THE FOOD AND DRUG ADMINISTRATION.

  Certified by: LANGER, CRAIG        1.002         ✓
  SPECIFIC GRAVITY

  Certified by: LANGER, CRAIG
  EXPANDED BENZODIAZEPINE CONFIRM
    ALPRAZOLAM                         270     ✓    ng/ml
    ALPHA-HYDROXYALPRAZOLAM            397     ✓    ng/ml

  QUANTITATIVE BENZODIAZEPINE CONFIRMATION INCLUDES DIAZEPAM,
  DESMETHYLDIAZEPAM, OXAZEPAM, TEMAZEPAM, ALPRAZOLAM,
  ALPHA-HYDROXYALPRAZOLAM, HYDROXYETHYLFLURAZEPAM, LORAZEPAM,
  ALPHA-HYDROXYTRIAZOLAM, ALPHA-HYDROXYMIDAZOLAM, 7-AMINOCLONAZEPAM
  AT A THRESHOLD OF 100 ng/mL.
  ANALYSIS PERFORMED BY LIQUID CHROMATOGRAPHY/TANDEM MASS
  SPECTROMETRY (LC/MS/MS).

                    ** FINAL REPORT **

        Collected at 4194255121  MEDTOX collection site 8607
        WELL AT WORK - FINDLAY
        FINDLAY, OH

04/14/2017  23:32:18          Medtox Laboratories -   AG:FAXHELLAT   BY: 64387897

Jennifer A. Collins, Ph.D.

MEDTOX LABORATORIES INC.
402 WEST COUNTY ROAD D
ST PAUL, MN 55112
651-636-7466

LABORATORY REPORT

Account #: 47469
EMPLOYER:
MRO: STEPHANIE MATUSZAK, MD
WELL AT WORK
3949 N MAIN ST STE D
FINDLAY, OH 45840

Accession #:   G5529273
Specimen I.D.:  Z33458657
Donor Name/ID:  GREER,LAURA
SSN:            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
Age:      Sex:
Reason for test: Random

General Information
47469

| Date Collected | Date Received | Date Reported |
|---|---|---|
| 04/10/2017 13:23 | 04/11/2017 | 04/14/2017 11:30PM |

| TEST(S) REQUESTED | RESULTS | UNITS | THERAPEUTIC RANGE |
|---|---|---|---|
| DRUGS OF ABUSE SCREEN 96042 | POSITIVE | | |
| DRUG TEST RESULT | DILUTE | | |
| REMARKS | NEGATIVE | ng/ml | |
| AMPHETAMINES | NEGATIVE | ng/ml | |
| BARBITURATES | +++POSITIVE+++ | ng/ml | |
| BENZODIAZEPINES | NEGATIVE | ng/ml | |
| COCAINE METABOLITE | NEGATIVE | ng/ml | |
| OPIATES | NEGATIVE | ng/ml | |
| OXYCODONE | NEGATIVE | ng/ml | |
| PHENCYCLIDINE (PCP) | NEGATIVE | ng/ml | |
| MARIJUANA METABOLITE (THC) | NEGATIVE | ng/ml | |
| METHADONE | NEGATIVE | ng/ml | |
| PROPOXYPHENE | NEGATIVE | ng/ml | |
| TRAMADOL | NEGATIVE | ng/ml | |
| MEPERIDINE | 14.8    (L) | mg/dl | >= 20 |
| CREATININE | NEGATIVE | mcg/ml | < 200 |
| NITRITES | | | |

THIS SPECIMEN WAS SCREENED BY IMMUNOASSAY. ANY POSITIVE RESULT
HAS BEEN CONFIRMED BY CHROMATOGRAPHY WITH MASS SPECTROMETRY.
THE FOLLOWING THRESHOLD CONCENTRATIONS WERE USED FOR THIS ANALYSIS

| DRUG | SCREENING THRESHOLD | CONFIRMATION THRESHOLD |
|---|---|---|
| AMPHETAMINES | 1000 NG/ML | |
| AMPHETAMINE | | 500 NG/ML |
| METHAMPHETAMINE | | 500 NG/ML |
| MDMA | | 500 NG/ML |
| MDA | | 500 NG/ML |
| MDEA | | 200 NG/ML |
| BARBITURATES | 300 NG/ML | 100 NG/ML |
| BENZODIAZEPINES | 300 NG/ML | |
| DIAZEPAM, DESMETHYLDIAZEPAM | | |
| OXAZEPAM, TEMAZEPAM | | |
| ALPRAZOLAM, ALPHA-OH-ALPRAZOLAM | | |
| LORAZEPAM, ALPHA-HYDROXYTRIAZOLAM | | |
| HYDROXYETHYLFLURAZEPAM, | | |
| ALPHA-HYDROXYMIDAZOLAM, 7-AMINOCLONAZEPAM | | 150 NG/ML |
| COCAINE METABOLITE | 300 NG/ML | 300 NG/ML |
| OPIATES | 300 NG/ML | 300 NG/ML |
| CODEINE | | 300 NG/ML |
| MORPHINE | | 300 NG/ML |
| HYDROCODONE | | 300 NG/ML |
| HYDROMORPHONE | REPORT CONTINUED ON NEXT FORM | |

Called results _____

Entered _____

Faxed/Mailed _____

GREER 00080

# Alcohol Testing Form (Non-DOT)

*(The instructions for completing this form are on the back of Copy 3)*

**STEP 1: TO BE COMPLETED BY ALCOHOL TECHNICIAN**

A: Employee Name (Print) *(First, M.I., Last)* — Laura Greer

B: SSN or Employee ID No. — 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

C: Employer Name — University Hospitals

Street — MCCD 6th Floor 11100 Euclid A
Mail Stop 6035B

City, State, Zip — Cleveland OH 44106

DER Name and — Laura Fernandez 216-844-4828
Telephone No.

DER Name — DER (Area Code & Phone Number)

D: Reason for Test: ☐ Reasonable Susp. ☐ Post-Accident ☐ Return to Duty ☐ Follow-up ☐ Pre-employment
☑ Random (meets the job related and consistent with business necessity requirements)

**STEP 2: TO BE COMPLETED BY EMPLOYEE**

I certify that I am about to submit to alcohol testing and that the identifying information provided on the form is true and correct.

Date — 04/10/17

Signature of Employee

**STEP 3: TO BE COMPLETED BY ALCOHOL TECHNICIAN**

(If the technician conducting the screening test is not the same technician who will be conducting the confirmation test, each technician must complete their own form.) I certify that I have conducted alcohol testing on the above named individual, that I am qualified to operate the testing device(s) identified, and that the results are as recorded.

TECHNICIAN: ☑ BAT ☐ STT   DEVICE: ☐ SALIVA ☑ BREATH*   15-Minute Wait: ☐ Yes ☐ No

SCREENING TEST: *(For BREATH DEVICE* write in the space below only if the testing device is not designed to print)*

| Test # | Testing Device Name | Device Serial # OR Lot # & Exp. Date | Activation Time | Reading Time | Result |
|---|---|---|---|---|---|

CONFIRMATION TEST: Results MUST be affixed to each copy of this form or printed directly onto the form.

REMARKS:

Well at Work
3949 N. Main St.
Findlay, OH 45840
P(419) 425-5121
F(419) 425-5738

Alcohol Technician's Company — Company Street Address

PRINT Alcohol Technician's Name (First, M.I., Last) — Company City, State, Zip

Signature of Alcohol Technician — Phone Number (Area Code & Number)

Date — 4/10/17

**STEP 4: TO BE COMPLETED BY EMPLOYEE IF TEST RESULT IS POSITIVE**

I certify that I have submitted to the alcohol test, the results of which are accurately recorded on this form. I understand that I must not drive, perform safety-sensitive duties, or operate heavy equipment because the results are positive.

Date — Month / Day / Year

Signature of Employee

6363 (Rev. 2/14)

COPY 1 - ORIGINAL - FORWARD TO THE EMPLOYER

---

ALCOMONITOR CC 001224
04/10/17
TEST NO. 235

SBJ: 300603228......

SCREENING TEST
G/210L          TIME
XXXX VOID  6 13:25
INSUFF. BREATH

---

ALCOMONITOR CC 001224
04/10/17
TEST NO. 236

SBJ: 300603228......

SCREENING TEST
G/210L          TIME
.000 AUTO      13:26

▲ Affix Or Print Screening Results Here
▲ Affix With Tamper Evident Tape
▲ Affix Or Print Confirmation Results Here
▲ Affix With Tamper Evident Tape
▲ Affix Or Print Additional Test Results Here
▲ Affix With Tamper Evident Tape

Well at Work

## MRO Analysis Form

| Name | Emp ID | Birth Date | Phone |
|---|---|---|---|
| Laura A. Greer | 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 | 01-12-1970 | 419-557-2459 |

| Contact | | Contact Name | Phone | |
|---|---|---|---|---|
| Employer: | University Hospitals Case M. C | Laura Fernandez | 216-844-4828 | 216-844-3990 |
| Collector: | Well at work | Stephanie Stauffer | 419-425-5121 | 419-425-5738 |
| Lab: | MEDTOX | | 800-832-3244 | |

| Collection Date | | Specimen ID | Collection Protocol |
|---|---|---|---|
| 4/19/2017 | RT | Z33458686 | COLLPROT |

Lab Results:

| Substance | Lab Result | Lab Level | Finding |
|---|---|---|---|
| Amp Exp | Negative | 0 | |
| Barbiturates (Urine) 5620 | Negative | 0 | |
| Benzodiazepines 5630 | Positive | 453.0000 | ✓ |
| Cocaine Metabolite 5640 | Negative | 0 | |
| Marijuana Metabolite 5671 | Negative | 0 | |
| Meperidine 5730 | Negative | 0 | |
| Methadone 5680 | Negative | 0 | |
| Opiates (Urine) 5650 | Negative | 0 | |
| Oxycodone - Urine 5653 | Negative | 0 | |
| Phencyclidine 5660 | Negative | 0 | |
| Propoxyphene 5700 | Negative | 0 | |
| TRAMADOL 5720 | Negative | 0 | |

☐ Review Chain of Custody Documents:
___ Acceptable ___ Unacceptable (explain:) _____

Employee Notification Phone Log:

Phone _____ Date/Time _____

Response: *latest in series of weekly random Flu tests with same fact pattern*

☐ If unable to notify employee, company's Drug Test Program Coordinator
notified. Date: _/_/_ Name: *OATRS Alprazolam 0.25 #60 Skava 4/12/2017 #69861*

☐ Notify employee of positive results

☐ Review possible legitimate reasons for a positive result
Employee's Reason(s) given for Positive Test: _____

Prescription Medicine(s) being taken: _____

___ Waives ___ Requests Split

☐ Notify right to request split sample within 72 hours

Final Result: ☐ Positive ☑ Negative ☐ Canceled ☐ Dilute ☐ Refused-Adulterated ☐ Refused-Substituted

Verified On: 4/24/2017

*Signature*
Stephanie A. Matuszak, MD
Medical Review Officer

Phone: _____ Date: _____ Time: _____

☐ Notify employer of results Contact: _____

Comments:

14/24/2017  07:33:38         Medtox Laboratories  -  AG:FROUELLAT   BT: 64397981

Jennifer A. Collins, Ph.D.

MEDTOX LABORATORIES INC.
402 WEST COUNTY ROAD D
ST PAUL, MN 55112
651-636-7466

LABORATORY REPORT

Account #: 47469
EMPLOYER:
MRO: STEPHANIE MATUSZAK, MD
WELL AT WORK
3949 N MAIN ST STE D
FINDLAY, OH 45840

Accession #: GS600535
Specimen I.D.: Z3345B686
Donor Name/ID: GREER,LAURA
              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
SSN:
Age:      Sex:
Reason for test: Random

General Information
47469

| Date Collected | Date Received | Date Reported |
|---|---|---|
| 04/19/2017 10:12 | 04/20/2017 | 04/24/2017 7:33AM |

| TEST(S) REQUESTED | RESULTS | UNITS | THERAPEUTIC RANGE |
|---|---|---|---|
| DRUGS OF ABUSE SCREEN 96042 | POSITIVE | ng/ml | |
| DRUG TEST RESULT | NEGATIVE | ng/ml | |
| AMPHETAMINES | NEGATIVE | ng/ml | |
| BARBITURATES | +++POSITIVE+++ | ng/ml | |
| BENZODIAZEPINES | NEGATIVE | ng/ml | |
| COCAINE METABOLITE | NEGATIVE | ng/ml | |
| OPIATES | NEGATIVE | ng/ml | |
| OXYCODONE | NEGATIVE | ng/ml | |
| PHENCYCLIDINE (PCP) | NEGATIVE | ng/ml | |
| MARIJUANA METABOLITE (THC) | NEGATIVE | ng/ml | |
| METHADONE | NEGATIVE | ng/ml | |
| PROPOXYPHENE | NEGATIVE | ng/ml | |
| TRAMADOL | NEGATIVE | ng/dl | > = 20 |
| MEPERIDINE | 21.3 | mcg/ml | < 200 |
| CREATININE | NEGATIVE | | |
| NITRITES | | | |

THIS SPECIMEN WAS SCREENED BY IMMUNOASSAY. ANY POSITIVE RESULT
HAS BEEN CONFIRMED BY CHROMATOGRAPHY WITH MASS SPECTROMETRY.
THE FOLLOWING THRESHOLD CONCENTRATIONS WERE USED FOR THIS ANALYSIS

| DRUG | SCREENING THRESHOLD | CONFIRMATION THRESHOLD |
|---|---|---|
| AMPHETAMINES | 1000 NG/ML | |
| AMPHETAMINE | | 500 NG/ML |
| METHAMPHETAMINE | | 500 NG/ML |
| MDMA | | 500 NG/ML |
| MDA | | 500 NG/ML |
| MDEA | | 200 NG/ML |
| BARBITURATES | 300 NG/ML | 100 NG/ML |
| BENZODIAZEPINES | 300 NG/ML | |
| DIAZEPAM, DESMETHYLDIAZEPAM | | |
| OXAZEPAM, TEMAZEPAM | | |
| ALPRAZOLAM, ALPHA-OH-ALPRAZOLAM | | |
| LORAZEPAM, ALPHA-HYDROXYTRIAZOLAM | | |
| HYDROXYETHYLFLURAZEPAM | | |
| ALPHA-HYDROXYMIDAZOLAM, 7-AMINOCLONAZEPAM | | 150 NG/ML |
| COCAINE METABOLITE | 300 NG/ML | |
| OPIATES | 300 NG/ML | 300 NG/ML |
| CODEINE | | 300 NG/ML |
| MORPHINE | | 300 NG/ML |
| HYDROCODONE | | 300 NG/ML |
| HYDROMORPHONE | | 100 NG/ML |
| OXYCODONE | 100 NG/ML | |

REPORT CONTINUED ON NEXT FORM

Page:02 of

14/24/2017 07:33:39

Medtox Laboratories - AC:FROXELLAT BT: 64397001

CONTINUED REPORT
MEDTOX LABORATORIES INC.
  402 WEST COUNTY ROAD D
  ST PAUL, MN 55112
  651-636-7466

Jennifer A. Collins, Ph.D.

LABORATORY REPORT

Account #: 47469
EMPLOYER:
MRO: STEPHANIE MATUSZAK, MD
WELL AT WORK
3949 N MAIN ST STE D
FINDLAY, OH 45840

  General Information
47469

Accession #: G5600535
Specimen I.D.: Z33458686
Donor Name/ID: GREER, LAURA
                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
SSN:
Age:    Sex:
Reason for test: Random

| Date Collected | Date Received | Date Reported |
|---|---|---|
| 04/19/2017 10:12 | 04/20/2017 | 04/24/2017 7:31:04 |

| TEST(S) REQUESTED | RESULTS | UNITS THERAPEUTIC RANGE |
|---|---|---|
| PHENCYCLIDINE | 25 NG/ML | 25 NG/ML |
| MARIJUANA METABOLITE | 50 NG/ML | 15 NG/ML |
| METHADONE | 300 NG/ML | 300 NG/ML |
| PROPOXYPHENE | 300 NG/ML | 300 NG/ML |
| TRAMADOL | 200 NG/ML | 100 NG/ML |
| MEPERIDINE | 200 NG/ML | 100 NG/ML |

ALTERNATIVE EXPLANATIONS SHOULD BE EXPLORED FOR POSITIVE RESULTS.
THIS PANEL INCLUDES TESTING FOR SPECIMEN VALIDITY.

**SOME COMPONENTS OF THE TEST PANEL WERE DEVELOPED AND PERFORMANCE
CHARACTERISTICS DETERMINED BY LABCORP. THEY HAVE NOT BEEN CLEARED
OR APPROVED BY THE FOOD AND DRUG ADMINISTRATION.

Certified by: GREEN,LEAH
EXPANDED BENZODIAZEPINE CONFIRM
| | | |
|---|---|---|
| ALPRAZOLAM | 385 | ng/ml |
| ALPHA-HYDROXYALPRAZOLAM | 453 | ng/ml |

QUANTITATIVE BENZODIAZEPINE CONFIRMATION INCLUDES DIAZEPAM,
DESMETHYLDIAZEPAM, OXAZEPAM, TEMAZEPAM, ALPRAZOLAM,
ALPHA-HYDROXYALPRAZOLAM, HYDROXYETHYLFLURAZEPAM, LORAZEPAM,
ALPHA-HYDROXYTRIAZOLAM, ALPHA-HYDROXYMIDAZOLAN, 7-AMINOCLONAZEPAM
AT A THRESHOLD OF 100 ng/mL.
ANALYSIS PERFORMED BY LIQUID CHROMATOGRAPHY/TANDEM MASS
SPECTROMETRY (LC/MS/MS).

** FINAL REPORT **

Collected at 4194255121   MEDTOX collection site #607
WELL AT WORK — FINDLAY
FINDLAY, OH

GREER 00081



# Alcohol Testing Form (Non-DOT)

*(The instructions for completing this form are on the back of Copy 3)*

**STEP 1: TO BE COMPLETED BY ALCOHOL TECHNICIAN**

A: Employee Name (Print) (First, M.I., Last): Laura Greer

B: SSN or Employee ID No.: 300-100-3228

C: Employer Name: University Hospitals

Street: MCCO 10th Floor 11100 Euclid Av, Mail Stop 10035B

City, State, Zip: Cleveland, OH 44106

DER Name and Telephone No.: Laura Fernandez
DER Name / DER (Area Code & Phone Number)

D: Reason for Test: ☐ Pre-employment ☐ Follow-up ☐ Return to Duty ☐ Post-Accident ☐ Reasonable Susp. ☒ Random (meets the job related and consistent with business necessity requirements)

**STEP 2: TO BE COMPLETED BY EMPLOYEE**

I certify that I am about to submit to alcohol testing and that the identifying information provided on the form is true and correct.

Signature of Employee: Laura Greer    Date: Month 04 / Day 19 / Year 2017

**STEP 3: TO BE COMPLETED BY ALCOHOL TECHNICIAN**

(If the technician conducting the screening test is not the same technician who will be conducting the confirmation test, each technician must complete their own form.) I certify that I have conducted alcohol testing on the above named individual, that I am qualified to operate the testing device(s) identified, and that the results are as recorded.

TECHNICIAN: ☒ BAT ☐ STT  DEVICE: ☐ SALIVA ☒ BREATH*  15-Minute Wait: ☐ Yes ☐ No

SCREENING TEST: *(For BREATH DEVICE* write in the space below only if the testing device is not designed to print.)*

| Test # | Testing Device Name | Device Serial # OR Lot # & Exp. Date | Activation Time | Reading Time | Result |
|---|---|---|---|---|---|
| | | | | | |

CONFIRMATION TEST: *Results MUST be affixed to each copy of this form or printed directly onto the form.*

REMARKS:

Well at Work
3949 N. Main St
~~Findlay, OH 45840~~
P(419) 425-5121
F(419) 425-5738

Alcohol Technician's Company
Stephanie Trewitt
(PRINT) Alcohol Technician's Name (First, M.I., Last)

Company Street Address

Company City, State, Zip

Phone Number (Area Code & Number)

Signature of Alcohol Technician: Stephanie Trewitt    Date: 4/19/17 (Month / Day / Year)

**STEP 4: TO BE COMPLETED BY EMPLOYEE IF TEST RESULT IS POSITIVE**

I certify that I have submitted to the alcohol test, the results of which are accurately recorded on this form. I understand that I must not drive, perform safety-sensitive duties, or operate heavy equipment because the results are positive.

Signature of Employee    Date: Month / Day / Year

COPY 1 - ORIGINAL - FORWARD TO THE EMPLOYER    6363 (Rev. 2/14)

Affix Or Print Screening Results Here ▼ Affix With Tamper Evident Tape

ALCOMONITOR CC 001224
04/19/17
TEST NO. 265

SBJ: 300603228.......

SCREENING TEST
G/210L TIME
.000 AUTO 10:14

Affix Or Print Confirmation Results Here ▼ Affix With Tamper Evident Tape

Affix Or Print Additional Test Results Here ▼ Affix With Tamper Evident Tape

SCANNED

GREER 0008

*signature* 8/28/17

August 16, 2017

University Hospitals Case M.C
Attn: Laura Fernandez
MCCO 6th Floor, 11100 Euclid A
Mail Stop 6035B
Cleveland, OH 44106

RE: Laura Greer
SSN 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

Dear Laura,

This letter is in regards to the drug screen collected by Well at Work on August 4, 2017 from Laura Greer. As the Medical Review Officer for this test, a legitimate medical prescription was found to be in use containing the compounds found in the urine specimen. This prescription has been confirmed. Because there is a legitimate medical reason for the presence of this compound, this drug test is declared negative. However, I would like you to be aware that the medication may have side effects that may represent a Safety-Sensitive issue. The employee's personal physician may be a better judge of how the individual will react to the medications.

Please feel free to contact me if you have any further questions or concerns.

Sincerely,

*signature*

Lawrence Kale, MD, MRO
Well at Work
LK/sss

3949 North Main Street, Suite D • Findlay, Ohio 45840 • 419-425-5121 • FAX 419-425-5738

DEFENDANT'S
EXHIBIT
15
5/23/18
COLLINS REPORTING

GREER 00

Medtox Laboratories - AG:FRXWELLAT  BT:64507009

08/12/2017  14:42:02

Jennifer A. Collins, Ph.D.

MEDTOX LABORATORIES INC.
402 WEST COUNTY ROAD D
ST PAUL, MN 55112
651-636-7466

LABORATORY REPORT

Account #: 47469
EMPLOYER:
LAWRENCE A KALE, MD
WELL AT WORK
3949 N MAIN ST STE D
FINDLAY, OH 45840

Accession #:   G6367642
Specimen I.D.: R33926002
Donor Name/ID: GREER, LAURA
               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
SSN:
Age:      Sex:
Reason for test: Random

| Date Collected | Date Received | Date Reported |
|---|---|---|
| 08/04/2017 | 08/05/2017 | 08/12/2017 |
| 10:58 | | 2:39PM |

General Information
47469

| TEST(S) REQUESTED | RESULTS | UNITS | THERAPEUTIC RANGE |
|---|---|---|---|
| DRUGS OF ABUSE SCREEN 96042 | POSITIVE | ng/ml | |
| DRUG TEST RESULT | NEGATIVE | ng/ml | |
| AMPHETAMINES | NEGATIVE | ng/ml | |
| BARBITURATES | +++POSITIVE+++ | ng/ml | |
| BENZODIAZEPINES | NEGATIVE | ng/ml | |
| COCAINE METABOLITE | NEGATIVE | ng/ml | |
| OPIATES | NEGATIVE | ng/ml | |
| OXYCODONE | NEGATIVE | ng/ml | |
| PHENCYCLIDINE (PCP) | NEGATIVE | ng/ml | |
| MARIJUANA METABOLITE (THC) | NEGATIVE | ng/ml | |
| METHADONE | NEGATIVE | ng/ml | |
| PROPOXYPHENE | NEGATIVE | ng/ml | |
| TRAMADOL | NEGATIVE | mg/dl | > = 20 |
| MEPERIDINE | 63.7 | mcg/ml | < 200 |
| CREATININE | | | |
| NITRITES | NEGATIVE | | |

THIS SPECIMEN WAS SCREENED BY IMMUNOASSAY. ANY POSITIVE RESULT
HAS BEEN CONFIRMED BY CHROMATOGRAPHY WITH MASS SPECTROMETRY.
THE FOLLOWING THRESHOLD CONCENTRATIONS WERE USED FOR THIS ANALYSIS

| DRUG | SCREENING THRESHOLD | CONFIRMATION THRESHOLD |
|---|---|---|
| AMPHETAMINES | 1000 NG/ML | 500 NG/ML |
| AMPHETAMINE | | 500 NG/ML |
| METHAMPHETAMINE | | 500 NG/ML |
| MDMA | | 500 NG/ML |
| MDA | | 500 NG/ML |
| MDEA | | 200 NG/ML |
| BARBITURATES | 300 NG/ML | 100 NG/ML |
| BENZODIAZEPINES | 300 NG/ML | |
| DIAZEPAM, DESMETHYLDIAZEPAM | | |
| OXAZEPAM, TEMAZEPAM | | |
| ALPRAZOLAM, ALPHA-OH-ALPRAZOLAM | | |
| LORAZEPAM, ALPHA-HYDROXYTRIAZOLAM | | |
| HYDROXYETHYLFLURAZEPAM, | 7-AMINOCLONAZEPAM | 150 NG/ML |
| ALPHA-HYDROXYMIDAZOLAM, | 300 NG/ML | |
| COCAINE METABOLITE | 300 NG/ML | 300 NG/ML |
| OPIATES | | 300 NG/ML |
| CODEINE | | 300 NG/ML |
| MORPHINE | | 300 NG/ML |
| HYDROCODONE | | 100 NG/ML |
| HYDROMORPHONE | 100 NG/ML | |
| OXYCODONE | REPORT CONTINUED ON NEXT FORM | |

Called results_____

Entered_____

Faxed/Mailed_____

GREER 000

Medtox Laboratories  -  RG:FAX4ELLAT  BT: 64597689

08/12/2017  14:42:02

Jennifer A. Collins, Ph.D.

CONTINUED REPORT
MEDTOX LABORATORIES INC.
402 WEST COUNTY ROAD D
ST PAUL, MN 55112
651-636-7466

LABORATORY REPORT

Account #: 47469
EMPLOYER:
LAWRENCE A KALE, MD
WELL AT WORK
3949 N MAIN ST STE D
FINDLAY, OH 45840

Accession #:  G6367642
Specimen I.D.: Z33926002
Donor Name/ID: GREER, LAURA
SSN:                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
Age:     Sex:
Reason for test: Random

General Information
47469

| | Date Collected 08/04/2017 10:58 | Date Received 08/05/2017 | Date Reported 08/12/2017 2:39PM |
|---|---|---|---|

| TEST(S) REQUESTED | RESULTS | UNITS | THERAPEUTIC RANGE |
|---|---|---|---|
| PHENCYCLIDINE | 25 NG/ML | 25 NG/ML | |
| MARIJUANA METABOLITE | 50 NG/ML | 15 NG/ML | |
| METHADONE | 300 NG/ML | 300 NG/ML | |
| PROPOXYPHENE | 300 NG/ML | 300 NG/ML | |
| TRAMADOL | 200 NG/ML | 100 NG/ML | |
| MEPERIDINE | 200 NG/ML | 100 NG/ML | |

ALTERNATIVE EXPLANATIONS SHOULD BE EXPLORED FOR POSITIVE RESULTS.
THIS PANEL INCLUDES TESTING FOR SPECIMEN VALIDITY.

**SOME COMPONENTS OF THE TEST PANEL WERE DEVELOPED AND PERFORMANCE
CHARACTERISTICS DETERMINED BY LABCORP. THEY HAVE NOT BEEN CLEARED
OR APPROVED BY THE FOOD AND DRUG ADMINISTRATION.

Certified by: FAGEL, BECKY

| EXPANDED BENZODIAZEPINE CONFIRM | | ng/ml |
|---|---|---|
| ALPRAZOLAM | 1140 | ng/ml |
| ALPHA-HYDROXYALPRAZOLAM | 2182 | |

QUANTITATIVE BENZODIAZEPINE CONFIRMATION INCLUDES DIAZEPAM,
DESMETHYLDIAZEPAM, OXAZEPAM, TEMAZEPAM, ALPRAZOLAM,
ALPHA-HYDROXYALPRAZOLAM, HYDROXYETHYLFLURAZEPAM, LORAZEPAM,
ALPHA-HYDROXYTRIAZOLAM, ALPHA-HYDROXYMIDAZOLAM, 7-AMINOCLONAZEPAM
AT A THRESHOLD OF 100 ng/mL.
ANALYSIS PERFORMED BY LIQUID CHROMATOGRAPHY/TANDEM MASS
SPECTROMETRY (LC/MS/MS).

** FINAL REPORT **

Collected at 4194255121  MEDTOX collection site #607
WELL AT WORK - FINDLAY
FINDLAY, OH

GREER 0006

Well at Work

## MRO Analysis Form

| | | | |
|---|---|---|---|
| **Name** | **SSN ID**: 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 | **BirthDate**: 01-12-1970 | **Phone**: 419-957-2459 |
| Laura A. Greer | | | |

| | | **Contact Name** | **Phone** | **Fax** |
|---|---|---|---|---|
| **Contacts:** | | Mary ARmao | 216-844-4828 | 216-844-3990 |
| Employer: University Hospitals Case M. C | | Amber Young | 419-425-5121 | 419-425-5738 |
| Collector: Weil At Work | | | 800-832-3244 | |
| Lab: MEDTOX | | | | |

| | | | |
|---|---|---|---|
| **Collection Date** | **Test Type** | **Specimen ID**: Z33926002 | **Collection Protocol**: COLLPROT |
| 8/4/2017 | RT | | |

Lab Results:

| Substance | Lab Result | Lab Level | Finding |
|---|---|---|---|
| Amp Exp | Negative | 0 | |
| Barbiturates (Urine)5620 | Negative | 0 | |
| Benzodiazepines 5630 | Positive | 2,182.0000 | |
| Cocaine Metabolite 5640 | Negative | 0 | |
| Marijuana Metabolite 5671 | Negative | 0 | |
| Meperidine 5730 | Negative | 0 | |
| Methadone 5680 | Negative | 0 | |
| Opiates (Urine) 5650 | Negative | 0 | |
| Oxycodone - Urine 5653 | Negative | 0 | |
| Phencyclidine 5660 | Negative | 0 | |
| Propoxyphene 5700 | Negative | 0 | |
| TRAMADOL 5720 | Negative | | |

☐ Review Chain of Custody Documents:
___ Acceptable ___ Unacceptable (explain): _____

Employee Notification Phone Log:

Phone _____ Date/Time _____ Response _____

_____ _____ _____

_____ _____ _____

_____ _____ _____

☐ If unable to notify employee, company's Drug Test Program Coordinator
notified. Date: _/_/_ Name: _____

☐ Notify employee of positive results

☐ Review possible legitimate reasons for a positive result
Employee's Reason(s) given for Positive Test:  *OPANS @ alprazolan*

Prescription Medicine(s) being taken: _____
___ Waives ___ Requests Split

☐ Notify right to request split sample within 72 hours

Final Result: ☐ Positive ☑ Negative ☐ Canceled ☐ Dilute ☐ Refused-Adulterated ☐ Refused-Substituted

_signature_  Verified On: 8/15/17

LAWRENCE KALE, MD
Medical Review Officer  Contact: Mary  Phone: ___ Date: 8/15/17 Time: ___

☐ Notify employer of results

Comments:

Page 1

GREER 0006

Page:01 of

18/14/2017  14:13:11

Medtox Laboratories  -  RG:FAXHELLAT  BT: 64589804

Jennifer A. Collins, Ph.D.

MEDTOX LABORATORIES INC.
402 WEST COUNTY ROAD D
ST PAUL, MN 55112
651-636-7466

LABORATORY REPORT

Account #: 47469
EMPLOYER:
LAWRENCE A KALE, MD
WELL AT WORK
3949 N MAIN ST STE D
FINDLAY, OH 45840

Accession #:  G6382185
Specimen I.D.: 233925821
Donor Name/ID:  GREER, LAURA
                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
SSN:
Age:        Sex:
Reason for test: Random

| Date Collected | Date Received | Date Reported |
|---|---|---|
| 08/07/2017 11:18 | 08/08/2017 | 08/14/2017 2:10PM |

General Information

| TEST(S) REQUESTED | RESULTS | UNITS | THERAPEUTIC RANGE |
|---|---|---|---|
| DRUGS OF ABUSE SCREEN 96042 | POSITIVE | ng/ml | |
| DRUG TEST RESULT | NEGATIVE | ng/ml | |
| AMPHETAMINES | NEGATIVE | ng/ml | |
| BARBITURATES | +++POSITIVE+++ | ng/ml | |
| BENZODIAZEPINES | NEGATIVE | ng/ml | |
| COCAINE METABOLITE | NEGATIVE | ng/ml | |
| OPIATES | NEGATIVE | ng/ml | |
| OXYCODONE | NEGATIVE | ng/ml | |
| PHENCYCLIDINE (PCP) | NEGATIVE | ng/ml | |
| MARIJUANA METABOLITE (THC) | NEGATIVE | ng/ml | |
| METHADONE | NEGATIVE | ng/ml | |
| PROPOXYPHENE | NEGATIVE | ng/ml | |
| TRAMADOL | NEGATIVE | mg/dl | > = 20 |
| MEPERIDINE | 133.2 | mcg/ml | < 200 |
| CREATININE | NEGATIVE | | |
| NITRITES | | | |

THIS SPECIMEN WAS SCREENED BY IMMUNOASSAY. ANY POSITIVE RESULT
HAS BEEN CONFIRMED BY CHROMATOGRAPHY WITH MASS SPECTROMETRY.
THE FOLLOWING THRESHOLD CONCENTRATIONS WERE USED FOR THIS ANALYSIS

| DRUG | SCREENING THRESHOLD | CONFIRMATION THRESHOLD |
|---|---|---|
| AMPHETAMINES | 1000 NG/ML | 500 NG/ML |
| AMPHETAMINE | | 500 NG/ML |
| METHAMPHETAMINE | | 500 NG/ML |
| MDMA | | 500 NG/ML |
| MDA | | 200 NG/ML |
| MDEA | | 100 NG/ML |
| BARBITURATES | 300 NG/ML | |
| BENZODIAZEPINES | 300 NG/ML | |
| DIAZEPAM, DESMETHYLDIAZEPAM | | |
| OXAZEPAM, TEMAZEPAM | | |
| ALPRAZOLAM, ALPHA-OH-ALPRAZOLAM | | |
| LORAZEPAM, ALPHA-HYDROXYTRIAZOLAM | | |
| HYDROXYETHYLFLURAZEPAM, | | |
| ALPHA-HYDROXYMIDAZOLAM, 7-AMINOCLONAZEPAM | | 150 NG/ML |
| COCAINE METABOLITE | 300 NG/ML | 300 NG/ML |
| OPIATES | 300 NG/ML | 300 NG/ML |
| CODEINE | | 300 NG/ML |
| MORPHINE | | 300 NG/ML |
| HYDROCODONE | | 300 NG/ML |
| HYDROMORPHONE | | 100 NG/ML |
| OXYCODONE | 100 NG/ML | |

REPORT CONTINUED ON NEXT FORM

GREER 0006

Medtox Laboratories  -  AG:FROGELLAT  BT: G4589884

08/14/2017  14:13:12

Jennifer A. Collins, Ph.D.

CONTINUED REPORT
MEDTOX LABORATORIES INC.
402 WEST COUNTY ROAD D
ST PAUL, MN 55112
651-636-7466

LABORATORY REPORT

Account #: 47469
EMPLOYER:
LAWRENCE A KALE, MD
WELL AT WORK
3949 N MAIN ST STE D
FINDLAY, OH 45840

Accession #: G6382185
Specimen I.D.: Z33925821
Donor Name/ID: GREER, LAURA
SSM:                  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
Age:        Sex:
Reason for test: Random

General Information

| Date Collected | Date Received | Date Reported |
|---|---|---|
| 08/07/2017 11:18 | 08/08/2017 | 08/14/2017 2:10PM |

| TEST(S) REQUESTED | RESULTS | UNITS THERAPEUTIC RANGE |
|---|---|---|
| PHENCYCLIDINE | 25 NG/ML | 25 NG/ML |
| MARIJUANA METABOLITE | 50 NG/ML | 15 NG/ML |
| METHADONE | 300 NG/ML | 300 NG/ML |
| PROPOXYPHENE | 300 NG/ML | 300 NG/ML |
| TRAMADOL | 200 NG/ML | 100 NG/ML |
| MEPERIDINE | 200 NG/ML | 100 NG/ML |

ALTERNATIVE EXPLANATIONS SHOULD BE EXPLORED FOR POSITIVE RESULTS.
THIS PANEL INCLUDES TESTING FOR SPECIMEN VALIDITY.

**SOME COMPONENTS OF THE TEST PANEL WERE DEVELOPED AND PERFORMANCE
CHARACTERISTICS DETERMINED BY LABCORP. THEY HAVE NOT BEEN CLEARED
OR APPROVED BY THE FOOD AND DRUG ADMINISTRATION.

Certified by: MARZITELLI,SUSULA
EXPANDED BENZODIAZEPINE CONFIRM          1621          ng/ml
ALPRAZOLAM

QUANTITATIVE BENZODIAZEPINE CONFIRMATION INCLUDES DIAZEPAM,
DESMETHYLDIAZEPAM, OXAZEPAM, TEMAZEPAM, ALPRAZOLAM,
ALPHA-HYDROXYALPRAZOLAM, HYDROXYETHYLFLURAZEPAM, LORAZEPAM,
ALPHA-HYDROXYTRIAZOLAM, ALPHA-HYDROXYMIDAZOLAM, 7-AMINOCLONAZEPAM
AT A THRESHOLD OF 100 ng/mL.
ANALYSIS PERFORMED BY LIQUID CHROMATOGRAPHY/TANDEM MASS
SPECTROMETRY (LC/MS/MS).

** FINAL REPORT **

Collection Site Phone Number NOT PROVIDED

Well at Work

## MRO Analysis Form

| Name | Patient ID | Birth Date | Phone | |
|---|---|---|---|---|
| Laura A. Greer | 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 | 01-12-1970 | 419-957-2459 | |
| | | Contact Name | Phone | Fax |
| Employer: University Hospitals Case M. C | | Mary ARmao | 216-844-4828 | 216-844-3990 |
| Collector: Well At Work | | Amber Young | 419-425-5121 | 419-425-5738 |
| Lab: MEDTOX | | | 800-832-3244 | |
| Collection Date | Testing | Specimen ID | | Collection Reason |
| 8/4/2017 | RT | Z33926002 | | COLLPROT |

Lab Results:

| Substance | Lab Result | Lab Level | Finding |
|---|---|---|---|
| Amp Exp | Negative | 0 | |
| Barbiturates (Urine) 5620 | Negative | 0 | |
| Benzodiazepines 5630 | Positive | 2,182.0000 | |
| Cocaine Metabolite 5640 | Negative | 0 | |
| Marijuana Metabolite 5671 | Negative | 0 | |
| Meperidine 5730 | Negative | 0 | |
| Methadone 5680 | Negative | 0 | |
| Opiates (Urine) 5650 | Negative | 0 | |
| Oxycodone - Urine 5653 | Negative | 0 | |
| Phencyclidine 5660 | Negative | 0 | |
| Propoxyphene 5700 | Negative | 0 | |
| TRAMADOL 5720 | | | |

☐ Review Chain of Custody Documents:
___ Acceptable   ___ Unacceptable   (explain): _____

Employee Notification Phone Log:
Phone _____   Date/Time _____   Response _____

☐ If unable to notify employee, company's Drug Test Program Coordinator
notified.  Date: _/_/_   Name: _____

☐ Notify employee of positive results

☐ Review possible legitimate reasons for a positive result          *Oanns P*
Employee's Reason(s) given for Positive Test:

Prescription Medicine(s) being taken: _____   ___ Waives   ___ Requests Split

☐ Notify right to request split sample within 72 hours   ☐ Canceled   ☐ Dilute   ☐ Refused-Adulterated
                                                                                    ☐ Refused-Substituted

Final Result:  ☐ Positive  ☐ Negative

_signature_   Verified On: _KALE_

LAWRENCE KALE, MD
Medical Review Officer        Contact: *Mry*   Phone: _____   Date 8/16/17   Time: _____

☐ Notify employer of results

Comments:

Page 1





3949 N. Main St. Suite D
Findlay, OH 45840
Phone: 419-425-5121
Fax: 419-425-5738

Date: 7/25/2016

Re: MRO Verification for Donor: Laura Greer   SSN: 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

Information for EAP / SAP regarding Positive Drug Screen

Dear SAP Provider:

A Reasonable Suspicion drug screen was collected at our office for Laura Greer on 7-12-2016, and I performed the MRO verification for this test. The drug levels found on the test are attached.

When Ms. Greer came to our office for collection on 7-12-2016, she appeared obviously sedated, slurring her words, sleepy, ataxic, bending forward, leaning on the walls to support herself walking, and vomited in the office while speaking to the receptionist. When I spoke to her on the phone at 12:21 pm on 7-20-2016, she sounded similarly sleepy, slurring her words and repeating herself. She reported at that time that on July 10ᵗʰ she had a 13 hour migraine not responsive to 2 Imitrex tablets, and as she had no oxycodone left from a December 2015 prescription, she took one belonging to her sister-in-law. She stated she had taken some cough syrup and her usual prescription of sleeping medication. Then she states she was notified on July 12ᵗʰ that she was on administrative leave due to slurring her speech. She states she was very upset, so upset that she dug through her old travel medications and found a pill bottle into which she had put some old medications for travel, including a few old leftover alprazolam tablets, and took one because she was so upset. She states she was then notified that she had to present for a drug screen. We were able to establish the presence of several prescriptions for alprazolam 0.5 and 0.25 mg from late 2013, as late as 11/1/2013, with a weaning dosage and quantity over several months. Ms. Greer presented to the office again in person on 7-25-2016 with a note from an ENT physician stating that she has a "mild weakness of the right vocal cord due to superior laryngeal nerve palsy. This would be an effect of the previous thyroid surgery on the right side. This will cause a weak or more breathy voice." The note does not mention slurring. On presentation today, the donor appeared alert and oriented. She did have a slightly breathy or hoarse and deliberate speech pattern, but was not slurring her words, ambulated without difficulty, and did not appear to be confused. She did repeat herself a few times, but appeared to be in an attempt to make a point about the facts of her case. She produced an old pill bottle from late 2013 with several old-appearing tablets in it, including what resembles 2 different doses of alprazolam.

I explained to the donor that I need to report the oxycodone as Positive, because she took another person's medication. The alprazolam can be reported as Negative due to the identified legitimate prescription, although it is



DEFENDANT'S EXHIBIT
16
5/22/18
COLLINS REPORTING

GREER 0006





3949 N. Main St. Suite D
Findlay, OH 45840
Phone: 419-425-5121
Fax: 419-425-5738

Date: 7/25/2016

Re: Laura Greer
SSN: 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

DER: Laura Fernandez
Employer: University Hospitals Case Medical Center

This letter is in regard to the Reasonable Suspicion drug screen collected on 7/12/2016 from Laura Greer. It is my unfortunate duty to report that the test was "Positive" for Oxycodone. The donor had a prescription for oxycodone in the past, but admits that she was out of this medication, had acute pain on the day prior to her drug screen and took an oxycodone belonging to her sister-in-law. The test is "Negative" for another scheduled and potentially sedating medication, for which the donor can produce a more remote prescription.

As the Medical Review Officer for this test, I was not able to confirm the existence of a legitimate medical prescription in use for the chemical detected in the specimen based upon the donor's verbal report of using medication prescribed for someone else. The donor has been successfully contacted for notification of the results and discussion of the implications. For urine drug screens, the donor was offered an opportunity to request retesting by an alternate lab of the "split specimen" collected at the same time as the original drug test, and the donor waives this reconfirmation test.

Please keep this letter and a copy of the chain of custody record in a confidential file, separate from your employee's personnel file, to verify that the collection procedure was proper, and that your employee's specimen was secured throughout the testing and reporting process.

Please feel free to contact me if you have any further questions or concerns.

Sincerely,

Stephanie A. Matuszak, MD, MRO

08/27/2017  10:05:58

Medtox  Laboratories -  RG:FAXHELLAY  BT: 64522883

CONTINUED REPORT
MEDTOX LABORATORIES INC.                    Jennifer A. Collins, Ph.D.    COPY
402 WEST COUNTY ROAD D
ST PAUL, MN 55112
651-636-7466
                                    LABORATORY REPORT

Account #: 47469                     Accession #: G6479342
EMPLOYER:                            Specimen I.D.: Z34537225
LAWRENCE A KALE, MD                  Donor Name/ID: GREER, LAURA
WELL AT WORK                         SSN:           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
3949 N MAIN ST STE D                 Age:     Sex:
FINDLAY, OH 45840                    Reason for test: Random

General Information                   Date        Date        Date
                                    Collected    Received    Reported
                                    08/21/2017   08/22/2017  08/27/2017
                                    10:38                    10:03AM

    TEST(S) REQUESTED              RESULTS      UNITS THERAPEUTIC RANGE

PHENCYCLIDINE                    25 NG/ML          25 NG/ML
MARIJUANA METABOLITE            50 NG/ML          15 NG/ML
METHADONE                      300 NG/ML         300 NG/ML
PROPOXYPHENE                   300 NG/ML         300 NG/ML
TRAMADOL                       200 NG/ML         100 NG/ML
MEPERIDINE                     200 NG/ML         100 NG/ML

ALTERNATIVE EXPLANATIONS SHOULD BE EXPLORED FOR POSITIVE RESULTS.
THIS PANEL INCLUDES TESTING FOR SPECIMEN VALIDITY.

**SOME COMPONENTS OF THE TEST PANEL WERE DEVELOPED AND PERFORMANCE
CHARACTERISTICS DETERMINED BY LABCORP. THEY HAVE NOT BEEN CLEARED
OR APPROVED BY THE FOOD AND DRUG ADMINISTRATION.

Certified by: FALKOFSKE,JENNIFER
EXPANDED BENZODIAZEPINE CONFIRM
ALPRAZOLAM                       2074            ng/ml
ALPHA-HYDROXYALPRAZOLAM          3588            ng/ml

QUANTITATIVE BENZODIAZEPINE CONFIRMATION INCLUDES DIAZEPAM,
DESMETHYLDIAZEPAM, OXAZEPAM, TEMAZEPAM, ALPRAZOLAM,
ALPHA-HYDROXYALPRAZOLAM, HYDROXYETHYLFLURAZEPAM, LORAZEPAM,
ALPHA-HYDROXYTRIAZOLAM, ALPHA-HYDROXYMIDAZOLAM, 7-AMINOCLONAZEPAM
AT A THRESHOLD OF 100 ng/mL.
ANALYSIS PERFORMED BY LIQUID CHROMATOGRAPHY/TANDEM MASS
SPECTROMETRY (LC/MS/MS).

** FINAL REPORT **

Collected at 4194255121  MEDTOX collection site #607
WELL AT WORK - FINDLAY
FINDLAY, OH

Page:01 of

18/27/2017  19:05:49

Medtox  Laboratories - RG:FAXHELLAT  BT: 64522883

**COPY**

Jennifer A. Collins, Ph.D.

MEDTOX LABORATORIES INC.
402 WEST COUNTY ROAD D
ST PAUL, MN 55112
651-636-7466

**LABORATORY REPORT**

Account #: 47469
EMPLOYER:
LAWRENCE A KALE, MD
WELL AT WORK
3949 N MAIN ST STE D
FINDLAY, OH 45840

Ascension #:  G6479342
Specimen I.D.: 234537225
Donor Name/ID: GREER,LAURA
SSN:            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
Age:    Sex:
Reason for test: Random

General Information

| Date Collected | Date Received | Date Reported |
|---|---|---|
| 08/21/2017 10:38 | 08/22/2017 | 08/27/2017 10:03AM |

| TEST(S) REQUESTED | RESULTS | UNITS | THERAPEUTIC RANGE |
|---|---|---|---|
| DRUGS OF ABUSE SCREEN 96042 | | | |
| DRUG TEST RESULT | POSITIVE | | |
| AMPHETAMINES | NEGATIVE | ng/ml | |
| BARBITURATES | NEGATIVE | ng/ml | |
| BENZODIAZEPINES | +++POSITIVE+++ | ng/ml | |
| COCAINE METABOLITE | NEGATIVE | ng/ml | |
| OPIATES | NEGATIVE | ng/ml | |
| OXYCODONE | NEGATIVE | ng/ml | |
| PHENCYCLIDINE (PCP) | NEGATIVE | ng/ml | |
| MARIJUANA METABOLITE (THC) | NEGATIVE | ng/ml | |
| METHADONE | NEGATIVE | ng/ml | |
| PROPOXYPHENE | NEGATIVE | ng/ml | |
| TRAMADOL | NEGATIVE | ng/ml | |
| MEPERIDINE | 82.8 | ng/dl | > = 20 |
| CREATININE | NEGATIVE | mcg/ml | < 200 |
| NITRITES | | | |

THIS SPECIMEN WAS SCREENED BY IMMUNOASSAY. ANY POSITIVE RESULT
HAS BEEN CONFIRMED BY CHROMATOGRAPHY WITH MASS SPECTROMETRY.
THE FOLLOWING THRESHOLD CONCENTRATIONS WERE USED FOR THIS ANALYSIS

| DRUG | SCREENING THRESHOLD | CONFIRMATION THRESHOLD |
|---|---|---|
| AMPHETAMINES | 1000 NG/ML | |
| AMPHETAMINE | | 500 NG/ML |
| METHAMPHETAMINE | | 500 NG/ML |
| MDMA | | 500 NG/ML |
| MDA | | 500 NG/ML |
| MDEA | | 200 NG/ML |
| BARBITURATES | 300 NG/ML | 100 NG/ML |
| BENZODIAZEPINES | 300 NG/ML | |
| DIAZEPAM, DESMETHYLDIAZEPAM | | |
| OXAZEPAM, TEMAZEPAM | | |
| ALPRAZOLAM, ALPHA-OH-ALPRAZOLAM | | |
| LORAZEPAM, ALPHA-HYDROXYTRIAZOLAM | | |
| HYDROXYETHYLFLURAZEPAM, | | |
| ALPHA-HYDROXYMIDAZOLAM, 7-AMINOCLONAZEPAM | | 150 NG/ML |
| COCAINE METABOLITE | 300 NG/ML | |
| OPIATES | 300 NG/ML | |
| CODEINE | | 300 NG/ML |
| MORPHINE | | 300 NG/ML |
| HYDROCODONE | | 300 NG/ML |
| HYDROMORPHONE | | 100 NG/ML |
| OXYCODONE | 100 NG/ML | |

REPORT CONTINUED ON NEXT FORM

COPY

CONTINUED REPORT
MEDTOX LABORATORIES INC.                        Jennifer A. Collins, Ph.D.
402 WEST COUNTY ROAD D
ST PAUL, MN 55112
651-636-7466

LABORATORY REPORT

Account #: 47469                    Accession #:   G3606881
EMPLOYER:                          Specimen I.D.:  Z32049168
MRO: STEPHANIE MATUSZAK, MD        Donor Name/ID: GREER, LAURA
WELL AT WORK                       SSN:           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
3949 N MAIN ST STE D               Age:    Sex:
FINDLAY, OH 45840                  Reason for test: Reasonable Suspicion/Cause

                                   Date          Data          Data
General Information                Collected     Received      Reported
47469                             07/12/2016    07/14/2016    07/19/2016
                                  16:18                       6:38PM

| TEST(S) REQUESTED | | RESULTS | UNITS | THERAPEUTIC RANGE |
|---|---|---|---|---|
| PHENCYCLIDINE | 25 NG/ML | | 25 NG/ML | |
| MARIJUANA METABOLITE | 50 NG/ML | | 15 NG/ML | |
| METHADONE | 300 NG/ML | | 300 NG/ML | |
| PROPOXYPHENE | 300 NG/ML | | 300 NG/ML | |
| TRAMADOL | 200 NG/ML | | 100 NG/ML | |
| MEPERIDINE | 200 NG/ML | | 100 NG/ML | |

ALTERNATIVE EXPLANATIONS SHOULD BE EXPLORED FOR POSITIVE RESULTS.
THIS PANEL INCLUDES TESTING FOR SPECIMEN VALIDITY.

Certified by: LANGER, CRAIG
EXPANDED BENZODIAZEPINE CONFIRM
ALPRAZOLAM                 1664    ✓      ng/ml
ALPHA-HYDROXYALPRAZOLAM    2497    ✓      ng/ml

QUANTITATIVE BENZODIAZEPINE CONFIRMATION INCLUDES DIAZEPAM,
DESMETHYLDIAZEPAM, OXAZEPAM, TEMAZEPAM, ALPRAZOLAM,
ALPHA-HYDROXYALPRAZOLAM, HYDROXYETHYLFLURAZEPAM, LORAZEPAM,
ALPHA-HYDROXYTRIAZOLAM, ALPHA-HYDROXYMIDAZOLAM, 7-AMINOCLONAZEPAM
AT A THRESHOLD OF 100 ng/mL.
ANALYSIS PERFORMED BY LIQUID CHROMATOGRAPHY/TANDEM MASS
SPECTROMETRY (LC/MS/MS).

OXYCODONE CONFIRMATION
OXYCODONE                  2930    ✓      ng/ml
OXYMORPHONE                 794    ✓      ng/ml

** FINAL REPORT **

Collected at 4194255121  MEDTOX collection site #607
WELL AT WORK - FINDLAY
FINDLAY, OH

GREER 000638

07/18/2016  18:43:22          Medtox Laboratories -   AG:FAXBELLAT  BT:64118810                **COPY**

Page: 1 of 2

MEDTOX LABORATORIES INC.                          Jennifer A. Collins, Ph.D.
   402 WEST COUNTY ROAD D
   ST PAUL, MN 55112
   651-636-7466

                        LABORATORY REPORT

Account #: 47469                    Accession #:  G3606881
EMPLOYER:                           Specimen I.D.: 232049168
MRO: STEPHANIE MATOSZAK, MD         Donor Name/ID: GREER, LAURA
WELL AT WORK                        SSN:           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
3949 N MAIN ST STE D                Age:  Sex:
FINDLAY, OH 45840                   Reason for test: Reasonable Suspicion/Cause

                                 Date          Date          Date
General Information              Collected     Received      Reported
47469                          07/12/2016    07/14/2016    07/19/2016
                                  16:18                      6:38PM

         TEST(S) REQUESTED              RESULTS         UNITS THERAPEUTIC RANGE

DRUGS OF ABUSE SCREEN
   DRUG TEST RESULT                     POSITIVE
   AMPHETAMINES                         NEGATIVE        ng/ml
   BARBITURATES                         NEGATIVE        ng/ml
   BENZODIAZEPINES                      +++POSITIVE+++  ng/ml
   COCAINE METABOLITE                   NEGATIVE        ng/ml
   OPIATES                              NEGATIVE        ng/ml
   OXYCODONE                            +++POSITIVE+++  ng/ml
   PHENCYCLIDINE (PCP)                  NEGATIVE        ng/ml
   MARIJUANA METABOLITE (THC)           NEGATIVE        ng/ml
   METHADONE                            NEGATIVE        ng/ml
   PROPOXYPHENE                         NEGATIVE        ng/ml
   TRAMADOL                             NEGATIVE        ng/ml
   MEPERIDINE                           NEGATIVE        ng/ml
   CREATININE                           172.0          mg/dl      > = 20
   NITRITES                             NEGATIVE        mcg/ml     < 200

THIS SPECIMEN WAS SCREENED BY IMMUNOASSAY. ANY POSITIVE RESULT
HAS BEEN CONFIRMED BY CHROMATOGRAPHY WITH MASS SPECTROMETRY.
THE FOLLOWING THRESHOLD CONCENTRATIONS WERE USED FOR THIS ANALYSIS:

DRUG             SCREENING THRESHOLD      CONFIRMATION THRESHOLD
AMPHETAMINES         1000 NG/ML
   AMPHETAMINE                               500 NG/ML
   METHAMPHETAMINE                           500 NG/ML
   MDMA                                      500 NG/ML
   MDA                                       500 NG/ML
   MDEA                                      500 NG/ML
BARBITURATES          300 NG/ML             200 NG/ML
BENZODIAZEPINES       300 NG/ML             100 NG/ML
   DIAZEPAM, DESMETHYLDIAZEPAM
   OXAZEPAM, TEMAZEPAM
   ALPRAZOLAM, ALPHA-OH-ALPRAZOLAM
   LORAZEPAM, ALPHA-HYDROXYTRIAZOLAM
   HYDROXYETHYLFLURAZEPAM,
   ALPHA-HYDROXYMIDAZOLAM, 7-AMINOCLONAZEPAM
COCAINE METABOLITE    300 NG/ML             150 NG/ML
OPIATES               300 NG/ML
   CODEINE                                   300 NG/ML
   MORPHINE                                  300 NG/ML
   HYDROCODONE                               300 NG/ML
   HYDROMORPHONE                             300 NG/ML
OXYCODONE             100 NG/ML             100 NG/ML
               REPORT CONTINUED ON NEXT FORM

GREER 000639



a sedating medication.  I hope Ms. Greer's case will have a successful outcome in her EAP / SAP assessment and treatment. If further information is needed, please contact our office.

Sincerely,

Stephanie A. Matuszak, MD, MRO

GREER 000640

 University Hospitals

# Corrective Action

**Employees Name:** Laura Greer    **Job Title:** HDP Claims Processor I

**Department:** HDP Claims-70005    **Employee ID:** 1167786

**Purpose of Report** (Check One)

☒ **Confirmation of Counseling**    ☐ **Final Warning**

☐ **Warning**    ☐ **Discharge**

---

**Describe event(s) in detail:**

As you know, the UH HR-71 Attendance policy states that any employee who accumulates 6 occurrences of unscheduled absences within any consecutive 12-month period will be subject to progressive corrective action up to and including discharge.  Each occurrence after the first 6 will progress the level of action taken depending on where the employee is in the corrective action process at the time of the attendance infraction. A recent review of your attendance shows that you were absent from work on the following dates, and in violation of UH policy.

- 12/27/16 – 8 hours
- 2/3/17 – 8 hours
- 2/10/17 – 8 hours
- 3/1/17 – 8 hours
- 5/3/17, 5/4/17, 5/5/17, 5/9/17, 5/10/17, 5/11/17 & 5/12/17- 51 hours
- 6/5/17 & 6/6/17 – 16 hours
- 6/13/17 - 8 hours
- 6/14/17 – 8 hours
- 6/15/17 - 8 hours
- 6/30/17 –7.48 hours
- 7/27/17 – 8 hours
- 7/28/17 – 6 hours
- 8/2/17 – 4.5 hours
- 8/17/17 – 8 hours

As a result of your excessive absenteeism, this corrective action is warranted.

**Describe any previous action taken, and/or action needed going forward:**

Laura, as reviewed with you on July 20, 2017, attendance is a major part of your work performance and you should report to work as scheduled so that department operations are not negatively impacted.  Today, please take a moment to review HR 71 Attendance policy in detail.  All UH policies are found on the UH Intranet. Should you have any questions regarding policy, please let me know.

Confidential

DEFENDANT'S
EXHIBIT
16
5/23/18
COLLINS REPORTING

Cc:  Manager, Human Resources, Employee File

DEFENDANT 000149

CONFIDENTIAL

I am available to offer you any assistance or guidance you may need.  It's important to note that I have applied for multiple leaves on your behalf in a genuine effort to help you get absences covered.  As we've discussed, it is imperative that you complete and submit leave paperwork to Lisa Edgehouse in a timely manner.  Going forward, I expect that you will adhere to the UH Attendance policy and work your assigned shifts.  Continued failure to adhere to the Attendance policy and/or meet performance expectations will result in corrective action up to and including discharge from University Hospitals.

Supervisor Signature: _____ Title: _Claims Manager_ Date: _9·21·17_

I have read this report and have been given an opportunity to comment.  My signature acknowledges that I have read and received a copy of this report.  I understand that I may contact Stephanie Hodgkiss, HR Manager, to discuss questions or concerns related to this document including optional complaint resolution steps.

Employee's Signature: _____ Date: _____

Employee's Comments: _____

_____

_____

_____

Confidential

 **University Hospitals**

# Corrective Action

**Employees Name:** Laura Greer      **Job Title:** HDP Claims Processor I

**Department:** HDP Claims-70005      **Employee ID:** 1167786

**Purpose of Report (Check One)**

☐  **Confirmation of Counseling**          ☒  **Final Warning**

☐  **Warning**                              ☐  **Discharge**

**Describe event(s) in detail:**
As previously discussed with you, the UH HR-71 Attendance policy states that any employee who accumulates 6 occurrences of unscheduled absences within any consecutive 12-month period will be subject to progressive corrective action up to and including discharge. Each occurrence after the first 6 will progress the level of action taken.

Laura, you failed to provide completed FMLA paperwork to cover your September absence. As a result, your FMLA request was recently denied on October 4, 2017 (see attached).
- 9-8-17 – 5 hours

You also failed to report for your scheduled EAP test on this date, which is in violation of UH EAP policy.

Laura, as reviewed with you, attendance is a major part of your work performance and you should report to work as scheduled so that department operations are not negatively impacted. It is also imperative that you complete and submit leave paperwork to Lisa Edgehouse in a timely manner and adhere to the testing protocols that you have agreed to with EAP.

I am available to offer you any assistance or guidance you may need. Please note that failure to adhere to the UH policy and/or meet performance expectations will result in corrective action up to and including discharge from University Hospitals.

**Supervisor Signature:** _____      **Title:** ___Claims Manager___      **Date:** ___10-31-17___

I have read this report and have been given an opportunity to comment. My signature acknowledges that I have read and received a copy of this report. I understand that I may contact Stephanie Hodgkiss, HR Manager, to discuss questions or concerns related to this document including optional complaint resolution steps.

**Employee's Signature:** _____      Date: _____

**Employee's Comments:** _____

_____

_____

_____

Confidential

Cc:  Manager, Human Resources, Employee File

Page 1 of 1

DEFENDANT'S
EXHIBIT
20 W
5/23/18
COLLINS REPORTING

GREER 000444

11/8/2017                                        Fw: Vacation 11-14-17 through 11-20-17

From: Laura Greer <lgreer1308@yahoo.com>
To: FLandry308 <flandry308@aol.com>
Subject: Fw: Vacation 11-14-17 through 11-20-17
Date: Tue, Nov 7, 2017 5:48 pm
Attachments: hr-71 Attendance 2017.pdf (108K)

---

Sent from Yahoo Mail on Android

------ Forwarded Message ------
From: "David Ferko" <DFerko@hdplus.com>
To: "Laura Baker" <LBaker@hdplus.com>
Cc: "lgreer1308@yahoo.com" <lgreer1308@yahoo.com>
Sent: Mon, Nov 6, 2017 at 3:01 PM
Subject: Vacation 11-14-17 through 11-20-17

Hi, Laura!

Tammy mentioned you contacted her on Sunday and referenced taking a vacation next week.  Please note we don't have a vacation request on file for you, and you've exhausted your PTO bank. Since you have missed so much time away from work, and claims need processing, you don't have approval to take a vacation.

At this time, you can only have off for approved FMLA occurrences.

If you have any questions about this, please let me know.

Thanks.

David Ferko

Manager – Claims Processing

Health Design Plus | 1755 Georgetown Road, Hudson, OH 44236

330.656.1072 x249 | dferko@hdplus.com



GREER 000412

11/8/2017                                        FW: TIME OFF

   **From:** Laura Baker <LBaker@hdplus.com>
     **To:** 'FLANDRY308@AOL.COM' <FLANDRY308@AOL.COM>
  **Subject:** FW: TIME OFF
    **Date:** Tue, Nov 7, 2017 10:30 pm

---

**From:** Laura Baker
**Sent:** Wednesday, October 04, 2017 8:22 AM
**To:** David Ferko
**Subject:** TIME OFF

I NEED TO HAVE NOV 14-20 2017 OFF TO TRAVEL TX SEE MY SON GRADUATE FROM AIR FORCE BOOT CAMP AND SPEND TIME WITH HIM. I WILL RETURN ON THE 21ST

THANKS
LAURA

THIS MESSAGE AND OR ANY ATTACHMENTS IS INTENDED ONLY FOR PERSONAL AND CONFIDENTIAL USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this message in error, please notify the sender immediately by e-mail or telephone, and delete the original message immediately. Thank you.

GREER 000413

 **University Hospitals**

# Corrective Action

**Employees Name:** Laura Greer      **Job Title:** HDP Claims Processor I

**Department:** HDP Claims-70005      **Employee ID:** 1167786

**Purpose of Report (Check One)**

☐  Confirmation of Counseling      ☐  Final Warning

☐  Warning      ☒  Discharge

**Describe event(s) in detail:**
As you know, the UH HR-71 Attendance policy states that any employee who accumulates 6 occurrences of unscheduled absences within any consecutive 12-month period will be subject to progressive corrective action up to and including discharge.   Each occurrence after the first 6 will progress the level of action taken depending on where the employee is in the corrective action process at the time of the attendance infraction. A recent review of your attendance shows that you were absent from work on the following dates, and in violation of UH policy:

- 11/13/17 – 4 hours
- 11/14/17 – 8 hours
- 11/15/17 – 8 hours
- 11/16/17 – 8 hours
- 11/17/17 – 8 hours
- 11/20/17 – 8 hours

**Describe any previous action taken, and/or action needed going forward:**
Laura, it was thoroughly explained up front to you that you were not approved to take a vacation from 11/14/17 – 11-20-17 since you have exhausted all of your PTO and have missed so much time away from work.   You were very aware that you would be terminated if you decided to travel.  Human Resources and I discussed this with you in detail.  Further, it was reviewed with you on multiple occasions that attendance is a major part of your work performance and you should report to work as scheduled so that department operations are not negatively impacted.  You were given progressive corrective action for absenteeism as follows:

- Counseling – 9/21/17
- Final Warning – 10/31/17

I have been extremely flexible and accommodating to your many requests for time off to address various personal issues, Laura.  After careful consideration, due to your willful violation of UH policy and excessive absenteeism, your employment is being terminated effective November 21, 2017.

**Manager Signature:** _____      **Date:** _11-22-17_

*Termination delivered via phone
I understand that I may contact Stephanie Hodgkiss, HR Manager, at 216.767.8475 to discuss questions or concerns related to this document including optional complaint resolution steps.  Payroll can be reached at 216.983.0500.  Benefits can be reached at 1.877.471.7522.

Confidential

Cc:  Manager, Human Resources, Employee File

Page 1 of 1

DEFENDANT'S
EXHIBIT
22
5/23/18  MC
COLLINS REPORTING

GREER 000431

Vorys Sat
Seymour Pease LLP

APR 0 2 2018

CLEVELAND OFFICE

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

LAURA GREER,

        Plaintiff,

        v.

UNIVERSITY HOSPITALS HEALTH
SYSTEM, INC., et al.

        Defendants.

)
)
)
)
)
)
)
)
)
)
)

CASE NO. 1:17-cv-001438

JUDGE SOLOMON OLIVER, JR.

*RESPONSES TO:*

## DEFENDANT HEALTH DESIGN PLUS, INC.'S FIRST SET OF
## REQUESTS FOR ADMISSION DIRECTED TO PLAINTIFF LAURA GREER

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Defendant Health Design Plus, Inc. ("HDPI") propounds the following requests for admission (the "Discovery Requests") to Plaintiff Laura Greer ("Plaintiff"). Plaintiff's responses to these Discovery Requests must be provided to the undersigned counsel for HDPI within thirty (30) days of service hereof.

### DEFINITIONS

As used herein, the following words shall have the meanings indicated:

1.    "You," "your," or "Plaintiff" mean and refer to Plaintiff Laura Greer, as well as her agents, representatives, attorneys, and every other person acting or purporting to act on her behalf, individually or collectively.

2.    "Defendants" mean UHHS and Health Design Plus, Inc..

3.    "UHHS" means Defendant University Hospitals Health Systems, Inc.

4.    "HDPI" means Defendant Health Design Plus, Inc.

5.    "Second Amended Complaint" means the Second Amended Complaint filed by Plaintiff in this action on or around February 13, 2018 against Defendants in the United States District Court, Northern District of Ohio captioned *Laura Greer v. University Hospitals Health*

1



DEFENDANT'S
EXHIBIT
23
5/23/18
COLLINS REPORTING

*System, Inc. et al.*, Case No. 1:17-CV-01438. "Second Amended Complaint" also includes Plaintiff's Complaint, which was filed on or around August 23, 2017, and Plaintiff's First Amended Complaint, which was filed on or around November 16, 2017.

6.  "Litigation" means the captioned-lawsuit that you filed against Defendants.

7.  "EAP" means Defendants' Employee Assistance Program.

8.  "EAP Time Period" means the time period during your employment with Defendants when you were required to submit to the EAP.

9.  "Drug Screen" means the EAP testing that you were required to submit to during the EAP Time Period.

10. "Counselor" means the EAP counselor assigned to Plaintiff during the EAP Time Period.

11. "Collection Site" means the location where Plaintiff was directed to submit to Drug Screens during the EAP Time Period.

12. "Collection Site Employees" mean the employees and contractors who worked at the Collection Site during the EAP Time Period.

13. "Absence or Absent" mean missing work, for any reason, on a day you were required to submit to a Drug Screen.

14. "Deployment" or "Deployed" means the Standard AEF (Air Expeditionary Force).

15. "Son" means Jonathon Allen Baker.

16. "Corrective Action" means the disciplinary notices that you received from Defendants.

17.    "E-Mail" means the e-mail that you sent to all HDP1 employees on November 13, 2017 that is attached hereto as Exhibit 1.

18.    Communications" means and includes any conversation or other oral or written contact, formal or informal, at any time or place, under any circumstances whatsoever, whereby information of any nature was transmitted or transferred, whether or not subsequently recorded in any document or ESI.  "Communications" means and includes, without limitation, meetings, telephone conversations, discussions, memoranda, correspondence, e-mail communications, reports, executive summaries, briefings, and oral requests for information.

19.    "Describe," when referring to a document or ESI, means to provide the title, subject, or file name, date, originator, addressee, and a brief description of the substance therein.

20.    "Describe," when referring to an event or transaction, means to give the date, the names of the persons participating, the time of day, the place, and a brief description of all occurrences, statements, and conversations contiguous with and pertaining to that event.

21.    "Documents and ESI" and "documents or ESI" are intended to be as comprehensive as the meaning provided in Rules 26 and 34 of the Federal Rules of Civil Procedure, and mean, without limitation, the original and any non-identical copy of any and all written, printed, typed, recorded, graphic, computer-generated, or other matter of any kind from which information can be derived, whether produced, reproduced, or stored on paper, cards, tape, film, electronic facsimile, computer-storage device, or any other medium in your possession, custody, or control.  The terms include, without limiting the generality of the foregoing, all communications, letters, memoranda (whether of visits, telephone calls, or otherwise), appointment calendars, schedules, books, indices, printed forms (whether official or unofficial), publications, press releases, notices, brochures, pamphlets, guide books, manuals, instructions,

3

minutes, summaries or abstracts, reports, files, file jackets, data-processing cards, computer tapes, printouts, information contained in, on, or retrievable from computer programs, bulletins, written questions and answers, charts, blueprints, drawings, diagrams, graphs, tables, photographs, recordings, speeches, telegraphs, cables, telex messages, e-mails, microfilm, microfiche, opinions, studies, papers, analyses, evaluations, proposals, budget materials, invoices, financial statements, contracts, specifications, applications, motions, petitions, complaints, answers, responses, replies, protests, verified statements, transcripts, exhibits, attachments, reports, filings, submissions, pleadings, contracts, agreements, and forecasts. The terms shall include each copy that is not identical to the original or any other produced copy, as well as any preliminary drafts of any document or ESI or working paper relating thereto.

22.    "ESI" means "electronically stored information," as that term is used in Rules 26 and 34 of the Federal Rules of Civil Procedure.

23.    "Identify" or to provide the "identity of" means, with respect to any natural person, to state the full name, home address, business address, employer, and position or positions within each organization employing such person at the present time and at the time in question and, with respect to any other person (as defined in these definitions), to state its full name, address, principal place of business, and state of organization.

24.    "Identify" or to provide the "identity of" means, with respect to any document, to set forth the date thereof, the title (if any), the name of the person or persons authoring such document, the name of the person or persons to whom such document was given or transmitted, the present location and custodian of such document, and the topic dealt with therein with reasonable specificity, and to describe the relevant page or pages and line or lines thereof (or

annex a copy to the responses to these Discovery Requests with appropriate designations of such page or pages and line or lines).

25. "Identify" or to provide the "identity of" means, with respect to any communication, to set forth the date and place thereof, the name of the person or persons making or issuing the communication, the name of the person or persons to whom and in whose presence such communication was made, and the substance thereof, and to identify each document in which such communication was recorded, described, or referenced.

26. "Person" means a natural person, proprietorship, corporation, partnership, limited liability company, joint venture, governmental entity, and each other form of organization or association.

27. "Pertaining to," "relating to," "pertain to," and "relate to," mean referring to, relating to, alluding to, responding to, discussing, commenting upon, showing, disclosing, analyzing, reporting about, explaining, mentioning, constituting, comprising, evidencing, setting forth, containing, summarizing, or characterizing, either directly or indirectly, in whole or in part, the given subject matter.

28. "And" and "or" as used herein are both conjunctive and disjunctive.

29. "Any" shall be construed to include "all," and "all" shall be construed to include "any."

30. "Each" shall be construed to include the word "every," and "every" shall be construed to include the word "each."

31. Where the context herein makes it appropriate, each singular word shall include its plural, and each plural word shall include its singular.

32.     The present tense shall be construed to include the past tense, and the past tense shall be construed to include the present tense.

## REQUESTS FOR ADMISSION

**REQUEST FOR ADMISSION NO. 1:**

Admit that you were required to submit to Drug Screens during the EAP Time Period.

**RESPONSE:**

*FOR ALL RESPONSES SEE EXHIBIT "A"*

**REQUEST FOR ADMISSION NO. 2:**

Admit that you were Absent from the Drug Screens from August 21, 2017 through September 11, 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 3:**

Admit that you were prescribed a Benzodiazepines in 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 4:**

Admit that your use of Benzodiazepines in 2017 exceeded your prescription.

**RESPONSE:**

6

**REQUEST FOR ADMISSION NO. 5:**

Admit that the high dose of Benzodiazepines that you were taking negatively impacted your ability to perform the essential functions of your position with HDPI.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 6:**

Admit that you did not advise the physician who prescribed you the Benzodiazepines that you were taking doses that exceeded your prescription.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 7:**

Admit that you were Absent because you did not want to fail the Drug Screen.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 8:**

Admit that you had multiple Absences during the EAP Time Period.

**RESPONSE:**

7

**REQUEST FOR ADMISSION NO. 9:**

Admit that your Son was not Deployed in 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 10:**

Admit that your Son had not received Deployment orders when you visited him in Texas in November of 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 11:**

Admit that you were Absent for all of your Drug Screens in October of 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 12:**

Admit that your Son did not receive Deployment orders in 2017.

**RESPONSE:**

8

**REQUEST FOR ADMISSION NO. 13:**

Admit that you received Corrective Actions on September 21, 2017 and October 31, 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 14:**

Admit that you were advised, prior to your Texas trip, that if you traveled to Texas in November of 2017 it would lead to your discharge.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 15:**

Admit that the Corrective Action dated October 31, 2017 was a final warning.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 16:**

Admit that following the October 31, 2017 Corrective Action that you were absent from work on November 13, 2017, November 14, 2017, November 15, 2017, November 16, 2017, November 17, 2017, and November 20, 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 17:**

Admit that you sent the E-Mail before your November of 2017 absences.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 18:**

Admit that you did not send any communications similar to the E-Mail prior to any of your other absences in 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 19:**

Admit that you sent the E-Mail at the request of your counsel.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 20:**

Admit that you sent the E-Mail in an attempt to avoid discharge.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 21:**

Admit that you were employed by HDPI from 2001 through 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 22:**

Admit that you attended Drug Screens as required from September of 2016 through August of 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 23:**

Admit that you were Absent from 2017 Drug Screens because of your abuse of Benzodiazepines.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 24:**

Admit that you did not request any accommodations in 2016 or 2017 from HDPI.

**RESPONSE:**

11

**REQUEST FOR ADMISSION NO. 25:**

Admit that you could perform the essential functions of your Senior Clams Examiner position with HDPI in 2016 and 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 26:**

Admit that you entered a rehabilitation program with Arrowhead Behavioral Health due to a Percocet addiction.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 27:**

Admit that your Percocet addiction impacted your performance with HDPI.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 28:**

Admit that you left the Arrowhead Behavioral Health rehabilitation program before you were released.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 29:**

Admit that Defendants provided you with multiple channels to complain about alleged harassment.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 30:**

Admit that you contacted the Collection Site multiple times a day during the EAP Time Period.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 31:**

Admit that you advised the Collection Site Employees of the Litigation.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 32:**

Admit that you advised the Counselor of the Litigation.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 33:**

Admit that you contacted your Counselor multiple times a day during the EAP Time Period.

**RESPONSE:**

Respectfully submitted,

*/s/ Donald G. Slezak*
David A. Campbell (0066494)
Gregory C. Scheiderer (0087103)
Donald G. Slezak (0092422)
Vorys, Sater, Seymour and Pease LLP
200 Public Square, Suite 1400
Cleveland, Ohio 44114
Phone: (216) 479-6100
Fax: (216) 479-6060
dacampbell@vorys.com
gcscheiderer@vorys.com
dgslezak@vorys.com

*Attorneys for Defendants*
*University Hospitals Health System, Inc.*
*and Health Design Plus, Inc.*

14

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 19th day of February, 2018, a copy of the

foregoing was served via electronic mail and regular US Mail to:

Francis J. Landry, Esq.
**WASSERMAN, BRYAN, LANDRY &
HONOLD, LLP**
1090 West South Boundary, Suite 500
Perrysburg, Ohio  43551
FLandry308@aol.com

*/s/ Donald G. Slezak*
Donald G. Slezak (0092422)
*One of the Attorneys for Defendants*

15

# EXHIBIT 1

**From:** Laura Baker
**Sent:** Monday, November 13, 2017 4:11 PM
**To:** ALL <ALL@hdplus.com>
**Subject:**
**Importance:** High

I WILL BE OFF FROM 11/14-11/20   TIME HAS FLOWN BY FAST AND ITS TIME TO BE THE PROUDEST
MOTHER OF 2 ACTIVE DUTY AIR FORCE GENTLEMEN☺    ATLEAST IT WILL BE 80 DEGRESS IN TEXAS

LAURA GREER

*EXHIBIT "A"*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| **LAURA A. GREER** | * | Case No. 1:17CV1438 |
| Plaintiff | * | Judge Solomon Oliver, Jr. |
| v. | * | |
| **UNIVERSITY HOSPITAL HEALTH SYSTEM, INC. et al.,** | * | **PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST REQUESTS FOR ADMISSIONS** |
| Defendants. | * | Francis J. Landry |
| | * | (0006072) |
| | | **WASSERMAN, BRYAN, LANDRY & HONOLD, LLP** |
| | * | 1090 W. South Boundary St |
| | * | Suite 500 |
| | | Perrysburg, Ohio 43551 |
| | * | Telephone: (419) 243-1239 |
| | | Facsimile: (419) 243-2719 |
| | * | Attorney for Plaintiff |
| | | Laura A. Greer |

\* \* \* \* \* \* \*

Now comes Plaintiff, Laura A. Greer, by and through undersigned counsel, and respectfully submits her responses to Defendant's First Requests for Admissions.

REQUEST NO. 1     Admit.

REQUEST NO. 2  Admit but qualified in that Plaintiff suffered from migraines at this time and any absences were covered under intermittent Family and Medical Leave.

REQUEST NO. 3  Admit.

REQUEST NO. 4  Deny.

REQUEST NO. 5  Deny.

REQUEST NO. 6  Deny.

REQUEST NO. 7  Deny.

REQUEST NO. 8  Admit but qualified in that absences were due to major increase in migraines for which Plaintiff was covered under the FMLA.

REQUEST NO. 9  Admit but qualified in that Plaintiff's son went on active duty.

REQUEST NO. 10  Admit but qualified in that Plaintiff's son had active duty orders.

REQUEST NO. 11        Plaintiff is unable to admit or deny due to a major increase at this time in

migraines. Plaintiff further states that she advised that someone could have been sent to her

house to obtain urine specimens when she could not lift head off of a pillow or see or drive.

REQUEST NO. 12        Admit but qualified in that Plaintiff's son was called to active duty.

REQUEST NO. 13        Admit.

REQUEST NO. 14        Admit but qualified to the extend that Plaintiff was not advised until

Friday at 4:00PM when she was leaving the following Monday after work.

REQUEST NO. 15        Admit but qualified to the extent that Plaintiff was under FMLA coverage.

REQUEST NO. 16        Admit.

REQUEST NO. 17        Admit.

REQUEST NO. 18        Admit.

REQUEST NO. 19        Objection. This Request seeks information that is subject to attorney

client privilege.  Without waiving objection, Deny.

REQUEST NO. 20        Deny.

REQUEST NO. 21     Admit.

REQUEST NO. 22     Admit.

REQUEST NO. 23     Deny.

REQUEST NO. 24     Deny.

REQUEST NO. 25     Admit.

REQUEST NO. 26     Admit.

REQUEST NO. 27     Deny.

REQUEST NO. 28     Deny.

REQUEST NO. 29     Deny.

REQUEST NO. 30     Deny.

REQUEST NO. 31     Admit.

REQUEST NO. 32     Admit.

REQUEST NO. 33     Admit.

Respectfully submitted,

**WASSERMAN, BRYAN, LANDRY & HONOLD, LLP**

/s/ Francis J. Landry
Francis J. Landry
Attorney for Plaintiff, Laura A. Greer

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Plaintiff's Responses to Defendant's First Requests for Admissions to Plaintiff was sent via ordinary U.S. Mail this 30th day of March, 2018 to David A. Campbell, Gregory C. Scheiderer and Donald G. Slezak, Vorys, Sater, Seymour and Pease LLP, 200 Public Square, Suite 1400, Cleveland, Ohio  44114 as well as electronically to dacampbell@vorys.com, gcscheiderer@vorys.com, and dgslezak@vorys.com.

/s/ Francis J. Landry
Francis J. Landry