# Exhibit 1

# Cited Pages from Plaintiff's Deposition

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

LAURA GREER,                    )
                                )
          Plaintiff,            )
                                )
      vs.                       ) Case No. 1:17-CV-001438
                                )
UNIVERSITY HOSPITALS            ) Judge Solomon Oliver, Jr.
HEALTH SYSTEMS INC, et al.,)
                                )
          Defendants.           )


- - -


DEPOSITION OF LAURA GREER


DATE:       May 23, 2018 at 10:08 a.m.

PLACE:      Wasserman, Bryan, Landry & Honold
            1090 West South Boundary, Suite 500
            Perrysburg, Ohio 43551

REPORTER:   Robert W. Scheid, Jr., RPR
            Notary Public


- - -

**Laura Greer**
**5/23/2018**

Page 2

```
 1    APPEARANCES:

 2
           On behalf of the Plaintiff:
 3
                       WASSERMAN, BRYAN, LANDRY & HONOLD,
 4                     LLP:
                       Francis J. Landry
 5                     1090 West South Boundary
                       Suite 500
 6                     Perrysburg, Ohio 43551
                       (419) 243-1239
 7

 8         On behalf of the Defendant University Hospitals
           Health Systems, Inc. and Health Design Plus,
 9         Inc.:

10                     VORYS, SATER, SEYMOUR & PEASE, LLP:
                       Donald G. Slezak
11                     David A. Campbell
                       200 Public Square
12                     Suite 1400
                       Cleveland, Ohio 44114
13                     (216) 479-6100

14
                               -  -  -
15

16

17

18

19

20

21

22

23

24

25
```

**Laura Greer**
**5/23/2018**

                                                          Page 22

1    suffered during 2016 and 2017 concerning back issues.

2              Is that a true statement?

3         A.    Yes.

4         Q.    Okay.  And let me ask you, in 2016 and

5    2017, did you have any work restrictions at UH?  And

6    I'm going to use "UH."

7              Are we on the same page with that, when I

8    talk about your employment?

9         A.    That's fine.

10        Q.    Okay.  Did you have any work restrictions

11   due to your back issues?

12        A.    I had FMLA papers.

13        Q.    Okay.  For absences?

14        A.    Yes.

15        Q.    Okay.  When you were at work, did you

16   have any work restrictions that said, hey, you can

17   only work so many hours a day or a week or anything

18   like that?

19        A.    No.  But I believe they put -- if I had

20   to stop and, say, lay down for a while, I could do

21   that.

22        Q.    Okay.

23        A.    And then usually finish working or made

24   up the time.

25        Q.    Okay.  So, yeah, like, my wife will be

**Laura Greer**
**5/23/2018**

                                                              Page 23

1    working at home and she might be sitting at her chair

2    for too long and need to walk or to lay down or

3    something.

4                Is that a fair statement, like what you

5    had?

6          A.    Yes.

7          Q.    Did you ever have any -- I guess, did

8    that ever impact your job performance at UH?

9          A.    No.

10         Q.    Was it ever stopped?  Did you ever have

11   UH say, "You're not allowed to go lay down" or

12   anything?

13         A.    No.

14         Q.    Okay.  So that was one ailment.

15               Is there any other -- in 2016 and 2017,

16   before December 1, before your car accident, is there

17   any other, I guess, physical impairments or mental

18   impairments that you suffered in those two years?

19         A.    Migraines.

20         Q.    Migraines, okay.  I guess, first of all,

21   let me ask you, is there anything else?  Then I'll go

22   back to migraines and ask you like the back injury.

23               Anything else?

24         A.    No.

25         Q.    Okay.  So with the migraines -- so I

**Laura Greer**
**5/23/2018**

Page 24

1      guess just to be clear, so 2016 and 2017 up till

2      December 1, your car accident at UH, the physical and

3      mental impairment you had during that time were

4      continuing back issues and migraines?

5              A.      Yes.  They went back way before.

6              Q.      I understand.  But in those two years,

7      was there anything else?  Did you have any other work

8      restrictions aside from some FMLA or attendance?  Any

9      other work restrictions?

10             A.      No.

11             Q.      Okay.  So tell me about the migraines.

12     Was that just FMLA and sometimes you might have to

13     take a break?

14             A.      Yes.

15             Q.      Okay.  Did UH ever stop you from taking

16     those breaks?

17             A.      No.

18             Q.      Okay.  Did it impact your work

19     performance?

20             A.      No.

21             Q.      Okay.  So it sounds like in 2016 and 2017

22     at UH, you had FMLA intermittent leave and sometimes

23     you would have to take some extended leave for

24     treatment, I assume, right?

25             A.      Yes.

**Laura Greer**
**5/23/2018**

Page 25

1        Q.     And aside from that, while you were at

2   work, you were able to perform all the essential

3   functions of your job.

4               Is that a fair statement?

5        A.     Yes.

6        Q.     And the only restrictions you had were, I

7   would, I guess, say it was minimal, as needed, you

8   might need to lay down either for a migraine or a back

9   injury?

10       A.     Yes.

11       Q.     Did that happen a lot or was that just

12  something you had the ability to do?

13       A.     There was a cluster of time, probably

14  starting in August, where the migraines and the

15  back --

16       Q.     August 2017?

17       A.     Yes.

18       Q.     Okay.  Were flaring up, so to speak?

19       A.     Yes.

20       Q.     Okay.  And how did it impact you?  More

21  time off or what was the issue?

22       A.     Yes.

23       Q.     Okay.  Okay.  But in terms of when you

24  were at work, it was just simply there were times when

25  you needed to lay down or turn off the lights for a

**Laura Greer**
**5/23/2018**

Page 26

1    migraine or something like that?

2        A.    Yes.

3        Q.    And let's take out attendance right now.

4    Let's take out the attendance issues and let's just

5    talk about your work performance in 2016 and 2017.

6            Did anybody tell you that your work

7    performance when you were there at work was poor?

8        A.    No.

9        Q.    Okay.  Did anybody raise any issues about

10   you taking maybe a short break to make sure your back

11   was okay or a migraine?  Did any UH supervisors raise

12   any issues with that?

13       A.    I was told I was missing too much work

14   when I was getting injections in my back.

15       Q.    Okay.

16       A.    And I had been approved for vacation, and

17   they took it back and said because of having

18   injections and stuff, there was too much work that was

19   needed done.

20       Q.    Okay.  And we'll get into the attendance

21   issues.  But aside from attendance, where they might

22   say, hey, you've used up your vacation or you got

23   attendance points, let's take attendance out.

24            When you were at work, did any UH

25   supervisors raise issues or managers raise any issues

**Laura Greer**
**5/23/2018**

Page 27

1   about you needing to take short breaks for backaches

2   when you were at work doing your duties?

3          A.    Yes.

4          Q.    They did.

5          A.    At times, yes.

6          Q.    At times.  Who?  Who or when?  Do you

7   have any --

8          A.    Cindi Roberts.

9          Q.    Okay.  Do you have any specific dates or

10  issues?

11         A.    No.  Just because of the backlog of

12  claims and stuff needed done.

13         Q.    Okay.

14         A.    I was, you know, cutting work at that

15  time.

16                 MR. CAMPBELL:  Okay.  Let me see

17                 if I understand.  I guess maybe we can

18                 take one step back.  Let me see if I have

19                 a document here.

20                      (Court Reporter marked

21                 Defendants' Exhibit 1.)

22  BY MR. CAMPBELL:

23         Q.    You've been handed what's been marked as

24  Exhibit 1.  And we were talking about 2016 and 2017.

25                 Did you hold the claims processor

**Laura Greer**
**5/23/2018**

Page 37

1          A.      Rare.

2          Q.      Okay.

3          A.      The only time we did phone calls is when

4     we would have, say, a meeting.

5          Q.      Okay.  Then in person?

6          A.      No.  It would be -- say we're sitting

7     here.  And whoever's in the main office, they would

8     have the phone, conference phone on, and all of us

9     processors that are working from home call in.

10         Q.      Okay. Sounds good, I understand.  So

11    then, in general, it sounds like your workday was

12    pretty self-reliant.

13         A.      Yes.

14         Q.      You got the claims.  You processed the

15    claims.  If you had an issue, you would e-mail or if

16    your managers or supervisors had an issue, they would

17    e-mail you?

18         A.      Correct.

19         Q.      Okay.  Okay.  So let me just ask you, as

20    to the -- at some point, I guess, in time on the -- in

21    2016, did you -- or was it 2015 -- did you go into a

22    drug treatment program or rehab program?

23         A.      Yes, I did.  January of 2016.

24         Q.      January of 2016, okay.  So tell me, I

25    guess, what led to that?

**Laura Greer**
**5/23/2018**

Page 38

1      A.    I had been a patient with pain management

2  for over ten years with my back.  They had prescribed

3  me 187-1/2-milligram Percocets every month.

4      Q.    Okay.

5      A.    I had just finally decided I had enough

6  of taking them.

7      Q.    Okay.

8      A.    And I was unsure about how to go about

9  getting off of them.

10      Q.    Okay.

11      A.    So I went to Arrowhead to get help.

12      Q.    Okay.  What is Arrowhead?

13      A.    A rehab place.

14      Q.    Okay.  Did you find that on your own or

15  were you directed?

16      A.    No, I found that on my own.

17      Q.    Okay.  So you went to the rehab at that

18  time.

19            And prior to entering rehab, did it

20  impact your work at UH, the Percocet use?

21      A.    No.

22      Q.    Okay.  Did anybody at UH, I guess, raise

23  issues with you about it?

24      A.    No.

25      Q.    Okay.  How long did you go into

**Laura Greer**
**5/23/2018**

Page 47

1          wanted to understand.

2                    Let me mark Exhibit 2.

3                    (Court Reporter marked

4          Defendants' Exhibit 2.)

5     BY MR. CAMPBELL:

6          Q.    Have you ever seen Exhibit 2 before

7     today?

8          A.    No.  But number 10 is absolutely

9     incorrect.

10         Q.    Number 10 is incorrect?  And it says,

11    "Patient states reason for admission is," and it

12    states, quote, "to get off heroin."

13         A.    Correct.

14         Q.    Okay.  So you're saying you weren't --

15    did you ever take heroin?

16         A.    Absolutely not.

17         Q.    Okay.  So I guess the things that are

18    correct are the date.

19                Do you have any reason to disagree that

20    it was on January 14th, 2016, that you were admitted

21    into Arrowhead?

22         A.    No.

23         Q.    Okay.  It does say, "Fall risk" and

24    "Chronic pain."

25                When it says, "fall risk," was that an

**Laura Greer**
**5/23/2018**

Page 48

1   accurate statement?

2          A.     I believe, just estimating, they put

3   "fall risk" for patients.

4          Q.     Okay.  Okay.  So then they must have

5   misunderstood or misheard when they put this quote to

6   get off heroin?

7          A.     Correct.

8          Q.     Okay.  Was there ever a time that the

9   pain medication that the pain management company had

10  prescribed to you wasn't enough each day and you

11  somehow got more?

12         A.     No.  I never took heroin.

13         Q.     Okay.  Did you buy prescriptions to take

14  more prescriptions than what they prescribed?

15         A.     A few times I did, yes.

16         Q.     Okay.  Meaning that you just took more

17  that day or that you bought them through some other

18  source?

19         A.     Both.

20         Q.     Both, okay.  How would you, I guess, buy

21  them?  Did somebody have another prescription or how

22  were you able to --

23         A.     Yes.

24         Q.     Okay.  A friend?

25         A.     Yes.

**Laura Greer**
**5/23/2018**

Page 50

```
 1   there's a hole there, what that word is.
 2            Q.    Okay.  I get it.  I think it's something
 3   risk factors, you're saying?
 4            A.    I understand that.  But I don't know what
 5   the first word is, because they've marked "impaired
 6   judgment," so I'm unclear as to what the first word
 7   is.
 8            Q.    Okay.  Yeah.  I'm having trouble seeing
 9   that, as well.
10            So did you have impaired judgment at the
11   time or no?
12            A.    No, I do not believe so.
13            Q.    Okay.
14            A.    Also, it said I thought -- or tried to
15   commit suicide is not -- do you have -- let's see
16   where that is.
17            284, "Have you had any thoughts of death
18   or suicide in the past" and they marked it "yes" and
19   put "years ago."
20            I don't ever remember making that
21   statement.
22            Q.    Okay.  That's fair.  I read in here, let
23   me just ask you, that at this time the Xanax you were
24   taking was not prescribed and you were getting it
25   through some other source.
```

**Laura Greer**
**5/23/2018**

Page 51

1            Is that accurate?

2        A.    At that time, correct.

3        Q.    Okay.  Was that through a friend, or how

4    were you getting the Xanax?

5        A.    Yes.

6        Q.    And did you get prescribed that after the

7    rehab, the Xanax?

8        A.    The Xanax didn't start until July of

9    2016.

10       Q.    Okay.

11       A.    When all this stuff started.

12       Q.    Okay.  Okay.  And we'll take a break here

13   in a moment.  Let me just conclude this part.

14            So you went into Arrowhead voluntarily?

15       A.    Yes.

16       Q.    You did advise UH of the fact that you

17   were going into Arrowhead and of the pain medication,

18   I guess.

19            Did you describe it then as an addiction

20   or what did you say?

21       A.    No.  I just told them I'd had enough.  I

22   wanted to get off of it.  I probably told them I

23   didn't know how to do it and I was going to get some

24   help.

25       Q.    Okay.  And then when you were released

**Laura Greer**
**5/23/2018**

                                                              Page 65

1    note only.

2              Q.    Okay.

3              A.    And the doctor's discharge paper.

4              Q.    Okay.  How long did it take before they

5    put you back to work?

6              A.    I cannot recall how long.

7              Q.    A day?  Weeks?  Month?

8              A.    It might have been a week.  I cannot

9    recall when.

10             Q.    Okay.  So a week you're out -- let's say

11   it's a week.  You return to work.

12                   And when you return to work, that's when

13   they say the EAP program is going to be put in?

14             A.    No.

15             Q.    No, okay.  What happens?  You return to

16   work and nothing?  You're just back?

17             A.    I returned to work.  Everything was fine.

18             Q.    Okay.  When did they let you know the EAP

19   program was going to be applicable?

20             A.    July.

21             Q.    July, okay.  So you're saying that the

22   EAP program, you went into rehab, they asked you --

23   did you do outpatient from January until July?  Did

24   you do outpatient treatment for your addiction?

25             A.    I, on my own, saw a counselor.  And it

**Laura Greer**
**5/23/2018**

Page 66

1   wasn't necessarily to talk about addiction.  It was,

2   you know --

3          Q.    Okay.  Did you go to any actual

4   outpatient or inpatient rehabilitation?

5          A.    No.

6          Q.    Okay.  And then what is your

7   understanding of why the EAP program was triggered?

8          A.    I got a call.  I was on vacation the week

9   of July 4th.  I worked that following Monday.  That

10  following Tuesday, I worked four hours and received a

11  phone call from Angela Kuhlman and Robby Kordish

12  stating I was being put on administrative paid leave,

13  that EAP would be contacting me.

14                That is when EAP contacted me and stated

15  I was put on administrative paid leave due to an

16  accusation of slurred speech.

17         Q.    Okay.  So you're saying that at some

18  point in time, somebody reported that there was cause

19  for you to go into the EAP program?

20         A.    I had to go, obviously, through the fit

21  for duty, which ended up being a chemical-dependency

22  evaluation.

23         Q.    In July?

24         A.    In July.

25                    MR. CAMPBELL:  Okay.  Let me

Laura Greer
5/23/2018

Page 69

1      I mean, that would be something she
2  should do, right?
3      A.   She would.  But I already had a
4  return-to-work note.
5                      MR. CAMPBELL:  Mark this.
6                      (Court Reporter marked
7                  Defendants' Exhibit 6.)
8  BY MR. CAMPBELL:
9      Q.   I'll show you what's been marked as
10 Exhibit 6.  Let me just take you through it, just so
11 we can move through.  And you're welcome to read it.
12                  Page 1, I read there, if you look at Page
13 1 on the handwriting, it says, "12 steps meeting, did
14 not attend."
15                  Is that an accurate statement?
16     A.   Yes.
17     Q.   Okay.  I take it that you decided, what,
18 they weren't helpful or you didn't like them?  What
19 was the problem?
20     A.   I felt like people were just hugging into
21 each other.  And that's not what I wanted, you know.
22     Q.   Okay.  Let's go to the last page of this
23 exhibit first.  They're in reverse chronological order
24 there.  So if we look at the last page, this one is
25 your follow-up appointment with your therapist on

**Laura Greer**
**5/23/2018**

Page 74

1    support group meetings.  ('I forgot my proof slips at

2    home.')  Also, she seemed uncomfortable talking about

3    her use, the consequences of same."

4              And then it says, "She missed two

5    appointments and was sent the letter to notify her was

6    leaving to let us know she wanted a different

7    provider.  She did not respond."

8              So you missed two appointments.  And then

9    when they're saying, "Hey, do you want to go with

10   somebody else," you ignored the letter.

11        A.   I did not ignore the letter.  And the

12   reasoning I missed the appointments, my aunt was dying

13   of cancer.

14        Q.   Okay, understood.  But, I mean, this was

15   important, as well.  And they're saying you dropped

16   out of treatment and they sent that notice to you on

17   June 21, 2016, right?

18        A.   I didn't necessarily drop out of

19   treatment.  Like I said, my aunt was dying.

20        Q.   Okay.  Well, they considered it dropping

21   out of treatment.  And then as it goes on, we look at

22   the discharge plan, and this is what you were getting

23   at.

24             "EAP contacted me to say the patient had

25   been pulled off work on reasonable cause (slurring

**Laura Greer**
**5/23/2018**

Page 75

1   words, long delays in responding) so she most likely

2   has relapsed.  The EAP states that her toxicology now

3   will be mandatory and I gave her the name of Century

4   Health, as they have the most options for AoD."

5                    Did I read that right?

6            A.    I don't know how she can say I probably

7   relapsed when she hadn't seen me.

8            Q.    Well, but you understand that she hadn't

9   seen you enough because she says, "You're doing great

10  and I don't need to see you."  You didn't go back.

11           A.    I had the reason why I didn't go back.

12           Q.    Okay.  And then she kept saying to you --

13  I mean, you realize, it's kind of like if I go to

14  school and I don't have my homework and I say that the

15  dog ate it.

16                  If every day you show up and say, "I went

17  to AA but I don't have my signatures," she starts

18  saying, "Maybe she didn't go to AA," right?

19           A.    She could say that, yeah.

20           Q.    She saw one drug test, from what we see.

21           A.    No.  There was more than that.

22           Q.    Okay.  Well, from her notes that we just

23  went through, she saw one drug test.

24           A.    Yes.

25           Q.    And then she ultimately is saying, even

**Laura Greer**
**5/23/2018**

Page 82

1    do our, what was called call logs.

2            Q.    Okay.

3            A.    And my system was not cooperating.

4            Q.    Okay.  Let me just ask you:  Had you seen

5    this document before today?

6            A.    This?

7            Q.    Yes.

8            A.    No.

9            Q.    Okay.  I know that you say that the

10   slurred speech was one of the reasons why they sent

11   you to EAP, right?

12           A.    That was the only accusation Georgena

13   Kohlbacher said that's why I was put on paid

14   administrative leave.

15           Q.    As part of the EAP.

16                 Did they tell you also that they believed

17   that you had -- that you were having a difficult time

18   how to understand and follow instructions?

19           A.    No.

20           Q.    Did they tell you that they believed you

21   were having a difficult time in performing the tasks

22   that were requested of you?

23           A.    No.

24           Q.    That e-mail, I'll represent to you, was

25   one of the e-mails that go to them.  And I understand

**Laura Greer**
**5/23/2018**

Page 83

1    your position on Salesforce and I'm sure you have

2    explanations.  But from their standpoint, it appeared

3    that you were having difficulties that you normally

4    would not have had.

5              Is that a fair statement?

6         A.   I had not been on Salesforce yet.

7         Q.   Okay.  I understand.  But obviously

8    there's different viewpoints.  And when somebody hears

9    "slurred speech," up to this point, I guess, up to the

10   point of July 2016, had anybody at UH ever said to

11   you, "Hey, your speech is slurred"?

12        A.   No.

13        Q.   Okay.  And you're saying your speech was

14   slurred not due to drug use but due to a medical

15   problem?

16        A.   Correct.

17        Q.   Okay.  So you're admitting your speech

18   was slurred?

19        A.   I do not know.

20        Q.   Okay.

21        A.   Because the medical issue is, when I had

22   my right thyroid removed, the doctor injured my vocal

23   cords.

24        Q.   Okay.  When was that?  When was that

25   thyroid removed?

**Laura Greer**
**5/23/2018**

Page 84

1          A.     I cannot recall the actual year.  It was

2     while I was working for Health Design Plus.

3          Q.     Okay.  Was it ten years ago?

4          A.     Probably longer, yes.

5          Q.     Okay.  So you had the medical condition

6     for the last ten years plus of your employment at UH,

7     right?

8          A.     Yes.

9          Q.     It didn't impact your ability to perform

10    your work aside from, you say, on one occasion maybe

11    or a couple of occasions in 2016, somebody thought

12    that maybe you were on drugs because your speech was

13    slurred.

14               Is that what you're saying?

15          A.     Correct.

16          Q.     Okay.  So did anybody even know you had

17    this medical condition until they raised with you that

18    your speech was slurred?

19          A.     I did not know I had this medical

20    condition until my thyroid became -- the left one

21    became enlarged and I was choking on food and went to

22    my thyroid doctor.

23          Q.     Okay.  But I thought you said that when

24    you went to your thyroid doctor, like, a decade ago,

25    they did something wrong that caused you to have

**Laura Greer**
**5/23/2018**

Page 85

1    slurred speech at times?

2         A.    We did not discover that until my thyroid

3    doctor sent me in 2017, or '16, to the ENT doctor to

4    make sure there was not an obstruction.  Because if

5    there was not an obstruction, then this would have to

6    be removed.

7         Q.    Okay.  Okay.

8         A.    And then at that point is when it was

9    discovered that my vocal cords had been damaged.

10         Q.    Okay.  So UH, up to this point, had no

11    idea about the vocal cord damage, right, up until July

12    2016?

13         A.    And I did not either.

14         Q.    Okay.  They knew you had been in rehab,

15    right?

16         A.    EAP?

17         Q.    No.  UH, your managers and supervisors,

18    knew you had been in rehab?

19         A.    Yes.

20         Q.    Knew you had abused, at some point,

21    Percocet, pain medications?

22         A.    Yes.

23         Q.    And then they believed they had heard a

24    slur in your speech on at least one occasion, right?

25         A.    If that's what they're saying.

**Laura Greer**
**5/23/2018**

Page 86

1      Q.   Okay.  I guess your response isn't "I
2   never had slurred speech."  Your response to them is
3   "It's not due to drug use.  It's due to something
4   else," right?
5      A.    It is a medical condition that it changes
6   my voice.
7      Q.    Okay.  At that point in time, though,
8   they don't know if it's drug use or a medical
9   condition, and they say, "Hey, we think we have cause
10  to have her go through the EAP program."
11            Is that a fair statement?
12      A.    If I was told I was being sent for a
13  chemical dependency evaluation and not for a
14  fit-for-duty evaluation.
15      Q.    Okay.  So your concern was what they
16  called it, you're saying.
17      A.    Yes.
18      Q.    Okay.
19      A.    They're two different --
20      Q.    Okay.  But I guess I would say if they
21  believed -- I look at it in this case -- I guess let
22  me ask you this.
23            It seems to me the two are one and the
24  same, when somebody believes that this isn't due to a
25  medical condition.  This is due to drug use that had

**Laura Greer**
**5/23/2018**

Page 87

1    occurred over the past decade.

2              When they send you for fitness for duty,

3    they're not having a -- I mean, if you came in to see

4    a doctor and the doctor looked at you, the doctor is

5    probably going to say, "I need to send her out for a

6    toxicology test" anyway, right?

7              Just like your counselor said the first

8    time you visited her, right?

9         A.    I guess -- well, it depends on what the

10   definition of "fit-for-duty evaluation" is versus

11   "chemical dependency."

12        Q.    Right.

13        A.    They could have said, "Your thyroid's

14   enlarged," which my family doctor knew.

15        Q.    Okay.  Well, I guess I would say when we

16   see your discharge -- and I'm going back to Exhibit 6,

17   on that July 14th, I mean, the discharge plan says

18   there that "EAP contacted me to say the patient had

19   been pulled off work on reasonable cause (slurring

20   words, long delays in responding) so she most likely

21   has relapsed."

22              They believed it was due to drug use, and

23   so therefore they did it.  So I guess I just have to

24   say to you they had a lot of facts at this point that

25   potentially it's there.

**Laura Greer**
**5/23/2018**

Page 88

1           I mean, number one, you were paid during

2      the leave, right?

3           A.     Partially.

4           Q.     In 2016?  I thought we saw in everything

5      on the complaint that this was a paid leave they put

6      you out on.

7           A.     Not fully.

8           Q.     "Not fully," meaning what?

9           A.     I was only paid full pay for, say, two

10     weeks.

11          Q.     Okay.  And then short-term disability

12     after that.

13          A.     And then I also had to pay my health

14     insurance.

15          Q.     Okay.

16          A.     When I'm getting 60 percent of my pay.

17          Q.     Okay.  And then at that point, you then

18     went into the EAP program.  You returned to work at

19     the end of your leave and you went into the EAP

20     program with testing on a regular basis.

21          A.     Yes.  I had no choice.  Yes.

22          Q.     Okay.  Okay.  But you came back to work

23     and your work was fine, you said, right?

24          A.     Yes.

25          Q.     You had FMLA time.  But aside from that,

Laura Greer
5/23/2018

Page 89

1    your work was fine and you didn't have --

2            A.    Are you talking January --

3            Q.    I'm talking now in August or September

4    2016 until the --

5            A.    Yes.

6            Q.    Okay.  And you were in the EAP program

7    undergoing testing throughout that time period, from

8    September 2016 until your discharge.

9            A.    It was sooner.  Well, yeah.  When I was

10   forced to go to IOP, I had drug testing, also.

11                        MR. CAMPBELL:  Okay.  Why don't

12               we take a break.

13                        MR. LANDRY:  All right.

14                        MR. CAMPBELL:  I think it's a

15               good time to take a break for our lunch.

16                        (A lunch recess was taken.)

17                        MR. CAMPBELL:  I want to show

18               you just a couple policies in place so we

19               can have it.

20                        Frank we don't have a copy of

21               this.  Maybe after the deposition, we can

22               get a copy.

23                        (Court Reporter marked

24               Defendants' Exhibit 8.)

25   BY MR. CAMPBELL:

**Laura Greer**
**5/23/2018**

Page 93

1              That's fair.  And, like I said, I'm not
2              saying that you violated it.  I'm just
3              showing it to you.
4                        (Court Reporter marked
5              Defendants' Exhibit 10.)
6      BY MR. CAMPBELL:
7              Q.    I'm handing you what's been marked a
8      "Fitness-For-Duty Examination."
9                    Have you seen that policy?
10             A.    No, sir.
11             Q.    You did go through at least one fitness
12     for duty?
13             A.    Two.
14             Q.    Two, okay.
15             A.    And the second one, I went to at St.
16     Rita's Hospital.
17             Q.    Okay.
18             A.    The lady that performed it stated she
19     didn't know why I was here, that I did not need IOP.
20     She actually walked me and the person that was with me
21     next door and told the lady that they would not be
22     treating me.
23             Q.    Okay.  That's fine.  I just simply asked
24     you if you had gone through fitness-for-duty exams.
25             A.    No, I did not get this.

**Laura Greer**
**5/23/2018**

Page 96

1    as a policy.  You know, she handwrote --

2              Q.    Okay.

3              A.    -- "2 years."

4              Q.    Okay.  Understood.  But she had wrote it

5    before you signed it.

6              A.    I questioned her about that.

7              Q.    Okay.  That's fair.

8                    Page 2 goes through some of the other,

9    what your requirements were in the EAP program.

10             A.    And I did so every -- I followed and

11   she -- I asked Mr. McGrady [sic] if she'd ever called

12   to see if I followed up on me going to my appointments

13   and he said no.

14             Q.    Okay.  And then Page 3 looks like this is

15   that original referral form for the Tier 1 mandatory

16   referral to the EAP.

17             A.    Yes.  This is what I was referring to.

18             Q.    Okay.  So I just wanted to show you that.

19   That was the EAP program.  Now, from that point on,

20   you were back to work, but you had to participate in

21   some requirements for the EAP program, right?

22             A.    Yes.

23             Q.    Okay.  One of those were that you had

24   random drug testing.

25             A.    Yes.

**Laura Greer**
**5/23/2018**

Page 97

1          Q.     Is it fair to say that you missed -- you

2     were absent on the number of the days you had random

3     testing?

4          A.     Those days were either migraines, because

5     I got a phone call from Georgena one day, I could

6     barely lift my head off the pillow.  And she said,

7     "You have to go test."

8                 I told her, "If you want my urine, come

9     and get it.  I'm not going to jeopardize my life and

10    somebody else's life."

11                I had to call in three days a week,

12    Monday, Wednesday, and Friday.  This was probably,

13    say, a Monday.

14         Q.     Uh-huh.

15         A.     So I called in on a Wednesday and a

16    Friday.  They had two other days that week to have me

17    go test and they waited until the following week.

18         Q.     Okay.  My only question to you was, you

19    missed -- on a number of days when they said this is

20    your day to test, you missed, I would say, five or ten

21    of those days.

22         A.     Those were probably covered under the

23    FMLA.

24         Q.     I'm not questioning whether they were

25    FMLA.  But you were notified of a drug test and then

**Laura Greer**
**5/23/2018**

Page 98

1    you would miss, whether you were FMLA, absence,

2    vacation, or whatnot.

3            A.    Well, I can't go drug test somewhere if

4    I'm on vacation, sir.

5            Q.    Well, you're saying that every one of

6    those tests they called you on, you were on vacation,

7    that you missed?

8            A.    No.

9            Q.    Okay.

10           A.    But what I am saying was they still had

11   two other days to have me go test and waited till the

12   following week.

13           Q.    Okay.  Well, I guess I just have to say,

14   just show the process.  Because you're saying the

15   process may not have been fair.

16                 If you got a call that, "Hey, you have a

17   drug test today," you could just simply call in and

18   say, "I have a migraine and I'm going to be out on

19   FMLA today," right, and not go to your drug test?

20                 I'm not saying you didn't have a

21   migraine, but you were allowed to miss it if you said

22   you had an FMLA reason or were sick or anything like

23   that, right?

24           A.    Correct.

25           Q.    Okay.  I'm just saying, you had to go to

**Laura Greer**
**5/23/2018**

Page 99

1    the testing, but there were many days where they said,

2    "Hey, we'd like you to be tested" and you said it was

3    migraines or back or some issue that you had to miss.

4         A.    But I still never failed none of their

5    tests.

6         Q.    Okay.  Let me ask you.  Were you aware

7    that a number of the tests came back that, although

8    you were on the prescription, that your use was far

9    above the prescription use?

10        A.    Yes.  And the last test I got, the MRO

11   doctor called me.  It was a different doctor.  And he

12   was talking to me about that, and I said, "You are the

13   first one," because it was usually a female, "that has

14   ever called me and advised me of that."

15             And he said, "We are supposed to advise

16   you before we advise your employer."  I talked to my

17   psychologist who prescribed the medication.

18        Q.    What medication --

19        A.    Xanax.

20        Q.    --  were you being prescribed during the

21   course -- okay.

22             And you're saying that the Xanax -- how

23   did you -- I mean, from what I'm seeing -- and I'm

24   going to give you the records before -- from what I

25   saw, it wasn't just once.  It was a number of times

**Laura Greer**
**5/23/2018**

Page 104

```
 1          A.    Well, I was never made aware of this.
 2          Q.    Okay.  Well, I've seen people who can't
 3   breathe strong enough to get a breathalyzer going,
 4   people who can't urinate despite drinking water for
 5   hours, people who all of a sudden can urinate.  So
 6   there's everything under the sun that I've seen.
 7                So I guess I would say that.  So let's
 8   look at the next one, on April 19th, 2017.  And,
 9   again, this looks like it's again a prescription
10   still.  I take it you're still taking Xanax at that
11   time.
12          A.    Yes.
13          Q.    And they're raising at that point, again,
14   that it could present safety-sensitive issues to your
15   job, right?
16          A.   `Correct.  But it never has.
17                      (Court Reporter marked
18                      Defendants' Exhibits 15 and 16.)
19   BY MR. CAMPBELL:
20          Q.    Okay.  And it looks like again they're
21   being advised in August of 2017 again of this same
22   prescription.
23                I take it at this time, it again is the
24   Xanax?
25          A.    Yes.
```

**Laura Greer**
**5/23/2018**

Page 105

1      Q.    Now, did you advise -- who prescribed the
2   Xanax at some point?  Because --
3      A.    Dr. Rana.  Well, originally, it was my --
4   it was a doctor filling in for my C&P because of due
5   to everything that started in July of 2016, I was an
6   emotional wreck.
7      Q.    Okay.
8      A.    So he put me on all this medication.  And
9   then my nurse practitioner had me go have a
10  psychiatrist, which is Dr. Rana, manage my medication.
11     Q.    Okay.  Let me ask you this way.  When you
12  went into rehab in January of 2016 -- remember that
13  testimony of that event?
14     A.    Yes.
15     Q.    Your intake documents showed you were
16  taking Xanax but you didn't have a prescription then,
17  right?
18     A.    Correct.
19     Q.    So I have to say, if it was your
20  physician who prescribed it to you post-rehab, was he
21  or she aware that you were taking it without a
22  prescription prior to your rehab?
23     A.    Yes.
24     Q.    Okay.  And that did not raise any concern
25  for that physician?

**Laura Greer**
**5/23/2018**

Page 106

```
 1              A.    No.
 2              Q.    Okay.  Because I will say when I look at
 3    these documents and consider the fact that that was a
 4    prescrip -- I mean, you realize that taking a
 5    prescription without a prescription from a physician,
 6    that's a crime, right?
 7              A.    Correct.
 8              Q.    Okay.  I mean, that was a serious issue
 9    to be taking Xanax without it.  That's no different
10    than if you were going to buy an illegal drug off the
11    street, right?  Right?
12              A.    I'm not sure of the laws.
13              Q.    Okay.  It just raised my eyebrow, I
14    guess.  Again, if I was the EAP program, had I seen
15    all those documents, I would have raised a concern
16    about that.  Okay.  And this is a positive drug
17    screen.
18                    Were you ever told about this?
19              A.    Yes.  I told the truth about this to her
20    and to the MRO -- or, excuse me, the first person I
21    had the chemical dependency evaluation with.
22              Q.    Okay.  So I guess I would say this one
23    was positive as to Oxycontin, right?
24              A.    Yes.  And I stated why.
25              Q.    Okay.  And why?
```

**Laura Greer**
**5/23/2018**

Page 107

1          A.      Because I had a 13-hour migraine.

2          Q.      Okay.

3          A.      And instead of going out to Blanchard

4     Valley Hospital due to the last incident when I had a

5     migraine and took my migraine meds, you know, the max

6     you can take, they told me I had an aneurysm and put

7     me in a Life Flight helicopter, and I did not have

8     one.

9          Q.      Okay.  Well, let's look at this --

10         A.      So I had my husband get one Percocet from

11    his sister and try that instead of going to the

12    emergency room and ending up in another helicopter.

13         Q.      Okay.  Let's see what this says.  So this

14    is right at the beginning of this EAP, right?  This is

15    when you were telling me how wrong it was that they

16    would send you out to EAP, right?

17         A.      Excuse me?

18         Q.      This is in July of 2016 and this is when

19    you were telling me how wrong it was for them to send

20    you to the EAP program, right, to put you on that paid

21    leave?

22         A.      This is the date when everything started

23    and I didn't know what was going on.

24         Q.      Okay.

25         A.      And I actually vomited all over their

**Laura Greer**
**5/23/2018**

Page 108

1  place because I was so upset.

2         Q.    Okay.  This is what you've been telling

3  me about the fitness-for-duty drug screen, right?

4         A.    Correct.

5         Q.    So this is when your counselors were

6  saying she might have relapsed.  This is when your

7  supervisors were saying she doesn't seem to be

8  following tasks and her voice is slurred.  So let's

9  see what this Well At Work says at this time.

10               So the first paragraph says that this

11  drug screen took place on July 12th, 2016, right?

12         A.    Yes.

13         Q.    Okay.  And then as we go through this, it

14  says -- this is from Well At Work -- "She appeared

15  obviously sedated, slurring her words, sleepy, atoxic,

16  bending forward, leaning on the walls to support

17  herself walking, and vomited in the office while

18  speaking to the receptionist."

19               Did I read that right?

20         A.    Yes.

21         Q.    And you admit to all of that or some of

22  that?

23         A.    Some of that.

24         Q.    Okay.  I mean, obviously that's

25  consistent with what UH was saying as to why you're

**Laura Greer**
**5/23/2018**

1  going on the EAP program, right?

2       A.    Not necessarily.  I was so upset.  You're

3  left alone for six months.  You're doing everything,

4  you know, you're supposed to be doing and living life.

5              And then all of a sudden, you're slammed

6  with accusations of this and all of this stuff I

7  didn't even understand and couldn't figure out why it

8  was happening and nobody would tell me anything.

9       Q.    Okay.  Let's continue on here.  It does

10  say about this 13-hour migraine and that you took two

11  Limitrex [sic] tablets.

12       A.    Imitrex.

13       Q.    Okay.  And then as it goes on, it was

14  after you were notified, then you claim that you got a

15  pill bottle where there were some old medications for

16  traveling, including a few old left over.  It looks

17  like those were the pills --

18       A.    Xanax, yes.

19       Q.    -- that had the -- well, at that point,

20  it says the alprazolam tablets.

21       A.    That's, yeah, the same thing.

22       Q.    Okay.  You're saying that's Xanax?

23       A.    Xanax.  Alprazolam is a generic name for

24  Xanax.

25       Q.    Okay.  And then they found there was the

**Laura Greer**
**5/23/2018**

Page 110

1  presence of several prescriptions, weaning doses in

2  quantity over several months.

3          So I guess at this point, they're saying

4  that even what you reported is different than what

5  you're telling me now.  At that time, you were

6  reporting something different than what you're telling

7  me now.

8          A.    I don't know what you're saying.

9          Q.    You told me initially that you just took

10  a tablet for a 13-hour migraine.  This one is going

11  into that you had an old travel --

12          A.    Yes.  I admitted to them that I took a

13  Xanax and also I admitted to them that I got a

14  Percocet from my sister-in-law, which is the

15  oxycodone.

16          Q.    Okay.  Then it says that, at a later

17  appointment on October 25th, that you weren't slurring

18  your words.

19          A.    There's a medical reason for this.  It's

20  called laryngeal nerve palsy.

21          Q.    And it just happens every now and then?

22          A.    Yes.

23          Q.    It just appears to be a drug test.  So in

24  this case, you have a positive drug test and they're

25  reporting that you are slurring your speech and that

**Laura Greer**
**5/23/2018**

Page 115

1  when they're above therapeutic levels, you missed

2  many, many appointments.

3        A.    How many?

4        Q.    I went through the admissions and we had

5  it.  It was not one day.  It was three and four weeks

6  in a row where you missed.

7        A.    Do you want to understand why?

8        Q.    Absolutely.

9        A.    Probably at that time I was having

10  injections in my back.  So I had them in my neck and

11  my lower back.

12        Q.    Okay.

13        A.    Those are each different times.  Then I

14  had the nerves burnt.  So there are eight different

15  times.  And like I said, once again, they had two

16  other days during that week to drug test me.

17        Q.    Okay.  Well, I will say this:  Had you

18  submitted your paperwork, if it was truly for those

19  reasons, those days would have already been off for

20  FMLA and they wouldn't have been calling you to drug

21  test on those days.  They would have known you were

22  out.

23        A.    I called every day, Mondays, Wednesdays,

24  and Fridays, and I let Carrie -- she was the first

25  person who worked there -- know.

permitted to continue to work during that time. If I were the decision-maker, I'm telling you I would have handled it differently.

Number two, I think it's absolutely appropriate, everything they did from the records that we went through. But we're here today not because she didn't call your doctor. We're here because you've sued saying that somehow that EAP program is inappropriate.

And I'm asking you how in the world this EAP program, you undergoing the testing each week, and you being sent to that EAP program, under these facts that we just went through, how in the world is that EAP program at all inappropriate?

A. Because she told -- falsified information and got me put into an IOP program that my counselor told her I did not need.

Q. What is the IOP program?

A. Okay. Do you not understand?

Q. No, no. Tell me what this is so I understand.

A. Depending on how many people show up for the day, okay? You're all split into two rooms. You're going to sit there and say this is my problem for the day. I want to jump off the roof.

**Laura Greer**
**5/23/2018**

Page 120

```
 1              Q.    This is something in addition to the
 2    testing?
 3              A.    No.  This was IOP.
 4              Q.    Okay.  When did it occur?
 5              A.    I had to go three times a week, five
 6    weeks.
 7              Q.    Okay.  When?  In 2016?
 8              A.    Yes.  That I was forced to go do or I
 9    would have been fired.
10              Q.    Okay.
11              A.    And everybody goes around the room and
12    gives them advice or we'd go color or we'd have a
13    talent thing.
14              Q.    Okay.  Is there anything other than you
15    not liking the IOP program for these five weeks that
16    you think was done inappropriately to you with respect
17    to this EAP?
18              A.    Yes.
19              Q.    What?
20              A.    Her telling that I left Arrowhead early,
21    I refused their IOP and EAP programs.
22              Q.    Okay.  Anything else?
23              A.    And the violation of my HIPAA practices.
24              Q.    Okay.  So we just went through all these
25    things, and I'm going to abbreviate.
```

**Laura Greer**
**5/23/2018**

Page 122

1       Q.    Okay.  Well, I've got news for you.  When
2    you're employed and you need time off from work, they
3    have the ability to ask why you're off of work.
4       A.    That's right.
5       Q.    So I don't know what country you live in,
6    but that's the country we're in.
7       A.    They do not have the right to know all my
8    medical information.
9       Q.    Ma'am, they didn't discharge you.  They
10    gave you a leave.  They kept you employed despite,
11    quite frankly, you had worked for them -- put yourself
12    in their shoes.
13            You'd worked the prior year after you had
14    admitted you had abused drugs for the prior year.  You
15    couldn't get off of pain pills.  You were on pain
16    pills every day processing those claims.  Think how
17    many of those people who had claims denied.
18       A.    Have you seen my medical -- or my yearly
19    reviews?
20                MR. CAMPBELL:  I'm going to be
21                honest with you.  You should have been
22                grateful for this situation, period.  Let
23                me show you the next exhibit.
24                (Court Reporter marked
25                Defendants' Exhibit 18.)

**Laura Greer**
**5/23/2018**

Page 123

1   BY MR. CAMPBELL:

2        Q.    Did you receive this corrective action?

3        A.    Yes.  And some of these were supposed to

4   have been re-adjusted.

5        Q.    Okay.  Well, from what I understand on

6   this corrective action is that, at this time, your

7   absences as we see here, there are a lot of hours

8   missed.  And your absences, there were even more.

9             And had they given you the points as they

10  should have, you would have been progressed further

11  along.  But they decided to put you at this level

12  rather than the higher level because you were not

13  given advance notice.

14       A.    Some of these were supposed to have been

15  removed off of here.  And unfortunately, as you know,

16  I do not have access to my e-mails.

17       Q.    Okay.  Well, you received this and you

18  understood at this point in time --

19       A.    Until I dug into it.

20       Q.    Well, did you take this corrective action

21  and say, "Hey, I need to improve my attendance," or

22  did you take this and say, "I disagree with everything

23  and I'm going to continue doing what I'm doing"?

24       A.    I didn't continue to call off just to

25  call off work, sir.

**Laura Greer**
**5/23/2018**

Page 128

1    them for a decade over your last ten years of

2    employment, right?

3              A.    Longer than that.

4              Q.    Okay.  And you had no work restrictions

5    over your last two years, aside from you said every

6    now and then, you might need to lay down for your

7    back.

8              A.    I've had injections.

9              Q.    Okay.

10             A.    Nerves burnt.

11             Q.    Okay.  Didn't have restrictions when you

12   were working over your last two years?

13             A.    No.

14             Q.    Okay.

15             A.    I do not believe so.

16             Q.    Okay.

17             A.    Unless I see the FMLA papers.

18             Q.    Okay.  And then as to the migraines, you

19   had migraines for a number of years during your

20   employment?

21             A.    Yes.

22             Q.    You had FMLA paperwork and you took those

23   days off for your migraines, right?

24             A.    Sir, if you can't hold your head up or

25   look at a computer, you have to go in a dark room.

**Laura Greer**
**5/23/2018**

Page 132

```
1   take that," right?  You would still want to follow up

2   and ask questions about that, right?  You're not going

3   to necessarily just accept everything they say as

4   true, right?

5           A.    I guess it depends on what I feel about

6   my child.

7                     MR. CAMPBELL:  Okay.  That's a

8                fair statement.  Let's leave it at that.

9                     (Court Reporter marked

10               Defendants' Exhibit 20.)

11  BY MR. CAMPBELL:

12          Q.    Let me show you another exhibit.

13                Have you seen this document before today?

14          A.    Let me read it, please.

15                They were requiring us to, if we missed

16  one day, get FMLA papers filled out.

17          Q.    Okay.

18          A.    Now, my family doctor does them herself.

19  She does not have her staff do them.  She was on

20  vacation.  So it bypassed the time frame that they

21  wanted, one day of FMLA paper filled out.  So that is

22  why it was denied.

23          Q.    Okay.  So you got this final warning,

24  though.

25          A.    But I did not see this final warning,
```

**Laura Greer**
**5/23/2018**

Page 133

1   because I didn't sign it.

2          Q.    You didn't sign it.  Well, are you saying

3   they didn't talk to you about the final warning?

4          A.    Not this one, sir.

5          Q.    Not this one, okay.  And this one, again,

6   this is one of those where you failed to report to

7   your scheduled EAP test, right?

8          A.    Unless I can see the dates, I can't tell

9   you if I was supposed to have went on that date.

10         Q.    Okay.  So you disagree with that?

11         A.    But like I've said multiple times, they

12  had three days a week to test me.

13         Q.    Okay.  I understand.  But when they say

14  we're testing you on this day, you realize that some

15  people may not go to that test because it will come

16  out of their system for the later test, correct?

17         A.    In two days?

18         Q.    Well, I don't know what you're taking.

19  They don't know what you're taking.

20                It could be a variety of things, right?

21         A.    They test for all kinds of stuff, so they

22  had ample time.

23         Q.    Okay.  I guess just to be clear on the

24  discharge, ultimately, you were aware that if FMLA

25  time wasn't approved for your San Antonio trip, that

**Laura Greer**
**5/23/2018**

Page 134

1    you didn't have any PTO time available, right?

2         A.    My vacation was approved.  It was

3    approved without pay.  I have an e-mail that I

4    e-mailed David Ferko on October the 5th when we were

5    advised on when the graduation was.  He approved it.

6              Then when my back went out of whack, he

7    said I can't -- I'll have to disallow it because we

8    have too much work to do.  Go through military FMLA.

9         Q.    Okay.

10        A.    I submitted all the stuff.  It was a

11   Friday at 4:00 when Stephanie Hodgkins called me.  I

12   was leaving Monday.

13                   (Court Reporter marked

14                   Defendants' Exhibit 21.)

15   BY MR. CAMPBELL:

16        Q.    Have you seen this e-mail before today?

17   It looks like something you produced.

18        A.    Yes.  That's when he took it out there.

19        Q.    Okay.  Well, this is when he's telling

20   you you don't have a vacation request on file and

21   you --

22        A.    But it was already approved October 5th.

23        Q.    Okay.  Well, you were saying you found

24   out -- at this point, it's Monday the 6th.

25        A.    This was from him.  He said fill out

**Laura Greer**
**5/23/2018**

Page 135

1  through UH, FMLA and medical-- excuse me, military

2  leave.

3       Q.   Okay.  And ultimately, that leave was

4  denied, right?

5       A.   Yeah, exactly.

6       Q.   Okay.  Right.  And what was it that

7  they -- was it both sons or just one son was

8  graduating?

9       A.   One.  But the other one was coming, too.

10      Q.   I understand.  But what was he graduating

11  from?

12      A.   Boot camp.

13      Q.   Okay.

14      A.   They tried to say he was not active duty

15  is why they denied it.  He is active duty.

16      Q.   They were saying he wasn't deployed,

17  correct?

18      A.   On their forms, it says active duty or

19  called to active duty.  And to go down there and be

20  part of military events, that is on their front page

21  of their military FMLA papers.

22      Q.   Like I said, I think everybody respects

23  what your boys have done and they've done it with your

24  guidance.  That's a great thing.  But in this case,

25  you do understand -- and you may disagree with it, but

Laura Greer
5/23/2018

Page 136

1   everybody has to have the policies in place with it.

2               And you certainly knew before you left

3   whether it was that day, a week, if it wasn't going to

4   be covered under FMLA, at that point, you'd violated

5   the attendance policy, right?

6          A.    Correct.

7                       (Court Reporter marked

8                    Defendants' Exhibit 22.)

9   BY MR. CAMPBELL:

10         Q.    And this was the final termination, the

11  corrective action notice?

12         A.    I didn't get this.  But I'm assuming.

13              MR. CAMPBELL:  Okay.  Let me

14            just show you one final exhibit.

15                       (Court Reporter marked

16                    Defendants' Exhibit 23.)

17  BY MR. CAMPBELL:

18         Q.    Let me show you one final exhibit.  I'm

19  just putting that in and you're welcome to look

20  through it.  At some point in time in this case, you

21  had some admissions that you went through -- let me

22  make sure.  Yeah, these are your responses.

23              You had Exhibit A.  If you looked at

24  this, you had Exhibit A that had your signature

25  whether you admitted or denied whether you looked



GREER, LAURA    046
M# 000025465  01/12/1970
NURSING ADMISSION A# 10103030010  01/14/2016
ANTHEM BC/BS
DR. S. YECHOOR    F IDL

LOC __V__ INPATIENT _____PHP

Patient: _Laura Greer_____ Date: _1-14-16_ Time: _1840_

1. _46_ Year Old _F_ admitted to Room _213 1_ by Dr. _Yechoor_

   With a diagnosis of _opiate dependence_

2. Patient is: _Pt alert + oriented. Mood is stable. Denies_
   _SI/HI. Vitals WNL. Gait is steady. Cooperative_
   _during assessment._

3. Detox Protocol _COW, Benzo_

4. PSA- o Completed by _assessment_____ o To be done _____

5. Nursing Assessment Completed by _Amy_

6. Problem areas Identified:
   a. _Fall Risk_____
   b. _Chronic pain_____
   c. _____

7. Admission Labs Ordered _Yes_

8. EKG ordered _no_

9. Personal Belongings search and body search done by _Amanda & Amy_

10. Patient states reason for admission is: _"To get off heroin"_

11. Oriented to the unit, encouraged to approach staff with questions or concerns by _Amy_

12. Other pertinent information
    _____
    _____

Signature: _Halloran_

DEFENDANT'S
EXHIBIT
2
5/23/18
COLLINS REPORTING

GREER 000235

*Arrowhead*
BEHAVIORAL HEALTH
*Life is Waiting...*

GREER, LAURA    046
M# 000025465 01/12/1970
A# 10103030010 01/14/2016
ANTHEM BC/BS
DR. S. YECHOOR   F IDL

**Intake/Psychosocial Assessment**

| Name (First, MI, Last): *Laura Greer* | DOB and Age: 46 1-12-70 | Date: 1-14-16 | Time: 1320 |
|---|---|---|---|

| Pt accompanied by: *Husband* | Referral Source: | Legal Status: ☐ Voluntary ☐ Involuntary | ☐ Wanding Completed Items obtained? ☐ Yes ☐ No If yes, | ☐ Belongings secured |

**Legal Guardian/Custodian/POA** ☐ No ☐ Yes
If yes, Name of Legal Guardian/Custodian/POA _____
Phone # _____

**Family Involvement:**
☐ Patient wishes to involve _____ In treatment _____ (relation)
☐ Release of Information completed ☑ None Reported

**PRESENTING PROBLEM** (Noting Precipitating Incident, Major Symptoms, Stressors; Family, Job, School, Relationships, Health, Financial, Disruptions of Lifestyle, Legal)
*Pt reports addiction to percocet. Pt reports using 10-20 pills daily.*

**Alcohol/Drug History**

**AUDIT-C**
How often do you have a drink containing alcohol?
☑ Never (0) ☐ Monthly or less (1) ☐ 2-4 times a month (2) ☐ 2-3 times a week (3) ☐ 4 or more times a week (4)

How many drinks containing alcohol do you have on a typical day when drinking?
☑ 1 or 2 (0) ☐ 3 or 4 (1) ☐ 5 or 6 (2) ☐ 7 to 9 (3) ☐ 10 or more (4)

How often do you have six or more drinks on one occasion?
☑ Never (0) ☐ Less than monthly (1) ☐ Monthly (2) ☐ Weekly (3) ☐ Daily or almost daily (4)

**Total Score:**
The AUDIT-C is scored on a scale of 0-12. Each question above is scored from 0 to 4 (the scores are in parentheses next to each response). In men, a score of 4 or more is considered positive for identifying hazardous drinking or active alcohol use disorders. In women, a score of 3 or more is considered positive. If all of the points are from the first question and the second and third question score 0, the patient's intake over the past few months should be reviewed to confirm accuracy.

| Illegal drug use/abuse past 12 months? | ☐ No ☑ Yes | Alcohol abuse past 12 months? | ☑ No ☐ Yes |
| Prescription drug abuse past 12 months? | ☐ No ☑ Yes | | |

**Toxicology screen/ breathalyzer completed?**
☐ No ☑ Yes  If yes, results:

| | | | |
|---|---|---|---|
| Cocaine | ☐ Negative | ☐ Positive | ☐ Patient unable to provide at time of assessment |
| THC | ☐ Negative | ☐ Positive | BAL: 0.0 |
| Methamphetamines | ☐ Negative | ☐ Positive | |
| Opiate | ☐ Negative | ☐ Positive | |
| Oxycodone | ☐ Negative | ☐ Positive | |
| MDMA | ☐ Negative | ☐ Positive | |
| Amphetamines | ☐ Negative | ☐ Positive | |
| Benzodiazepines | ☐ Negative | ☐ Positive | |
| Buprenorphine | ☐ Negative | ☐ Positive | |
| Methadone | ☐ Negative | ☐ Positive | |

**Presenting with detox symptoms** ☑ No ☐ Yes  If yes, check all symptoms that apply:

☐ Tremors ☐ Vomiting ☐ Runny nose ☐ Nausea ☐ Diarrhea ☐ Chills ☐ Headache ☐ Restless ☐ Unsteady gait

☐ Body aches ☐ Fever ☐ Abdominal pain ☐ Sweats ☐ Dizziness ☐ Elevated vital signs ☐ Other (specify)

DEFENDANT'S EXHIBIT 3
5/23/18
COLLINS REPORTING

GREER 000281

| Drug/Substance/Alcohol/Tobacco | | Age of First Use | Date of Last Use | Amount | Frequency of Use | Pattern of use (Time of day) | How long using at reported rate | Metho (oral, Inhale Inject |
|---|---|---|---|---|---|---|---|---|
| Tobacco | ☑ yes ☐ no | 14 | today | 1/2 pk | daily | varies | years | inhal |
| Alc. | ☐ yes ☑ no | | | | | | | |
| Marijuana | ☐ yes ☑ no | | | | | | | |
| Cocaine/crack | ☐ yes ☑ no | | | | | | | |
| Opiates: Heroin | ☐ yes ☑ no | | | | | | | |
| Oxycontin | ☐ yes ☑ no | | | | | | | |
| Percocet | ☐ yes ☐ no | 38 | 1-14-16 | 10-20 mg pills | daily | varies | 8 yrs | oral |
| Vicodin | ☐ yes ☑ no | | | | | | | |
| Morphine | ☐ yes ☑ no | | | | | | | |
| Methadone | ☐ yes ☑ no | | | | | | | |
| Fentanyl | ☐ yes ☑ no | | | | | | | |
| Opana | ☐ yes ☑ no | | | | | | | |
| Suboxone | ☐ yes ☑ no | | | | | | | |
| Other | ☐ yes ☑ no | | | | | | | |
| Inhalants | ☐ yes ☑ no | | | | | | | |
| Benzodiazepines | ☑ yes ☐ no | | | | | | | |
| Xanax | ☑ yes ☐ no | unsure | today | 3-4 | daily | varies | when I have it | oral |
| Valium | ☐ yes ☑ no | | | | | | | |
| Ativan | ☐ yes ☑ no | | | | | | | |
| Klonopin | ☐ yes ☑ no | | | | | | | |
| Other | ☐ yes ☑ no | | | | | | | |
| Amphetamines | ☐ yes ☑ no | | | | | | | |
| Barbiturates | ☐ yes ☑ no | | | | | | | |
| Hallucinogens | ☐ yes ☑ no | | | | | | | |
| Other (i.e. K2/K4/Bath salts) | ☐ yes ☑ no | | | | | | | |

History of overdose? ☑ No ☐ yes if yes; ☐ accidental ☐ intentional  When:  On what:

Drug of Choice: Percocet   Longest Sobriety: 1 mon   When
Has patient ever tried to quit using on their own? ☑ No ☐ Yes # of times

History of Black outs: ☑ No ☐ Yes How Often?_____ History of withdrawal seizures: ☑ No ☐ Yes When? _____
History of DT's: ☑ No ☐ Yes

History of relapse with the past 6 months ☑ No ☐ Yes If Yes, please describe:

GREER, LAURA    046
M# 000025465 01/12/1970
A# 10103030010 01/14/2016
ANTHEM BC/BS
DR. S. YECHOOR

GREER 000282

## Alcohol/Drug Treatment History

☐ None Report

| Name of Provider Agency | Date of Service | Type of Service | Successful or Unsuccessful Discharge |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

## Consequences of AoD use:

Has patient's use impacted MH, medical conditions; family relationships (concern shown, expressed) and/or employment?

☐ No consequences ☑ Family problems ☐ Martial problems/stress ☐ Loss of employment ☐ Work attendance ☐ Job performance
☑ Problems functioning ☑ Poor motivation ☐ Legal charges ☐ Custody issues ☐ Medical ☐ Hospitalization ☑ Mental health

If yes, describe:

Community Supports/Self Help Groups: (AA, NA, NAMIO, etc.) Sponsor: YES ☐ NO ☑

## Mental Health Treatment History

Mental Health Treatment ☑ None Reported

| Agency | Check if Current | Past (Date) | Clinician Name/Psychiatrist |
|---|---|---|---|
| | ☐ | | |
| | ☐ | | |
| | ☐ | | |

Psychiatric Hospitalizations: ☑ None Reported    Number of Psychiatric hospitalizations :

| Hospital (list most recent) | Date of Service | Reason (suicidal, depressed, etc.) |
|---|---|---|
| | | |
| | | |

Previous or Current Diagnoses  (if known) ☐ None Reported

☐ None Reported    Past Psychotropic Medications

| Psychotropic Medications | Reason for Discontinuation |
|---|---|
| Wilbutrin | — Quit taking — |

GREER, LAURA    046
M# 000025465  01/12/1970
A# 10103030010  01/14/2016
ANTHEM BC/BS
DR. S

GREER 000283

## Suicide Risk Assessment

Do you currently have thoughts of death or suicide? ☐ Yes ☑ No

     If yes, Description of positive findings: _____

_____

How strong is your desire to die? ☐ Strong ☐ Moderate ☐ Weak ☑ None

How strong is your desire to live? ☐ None ☐ Weak ☐ Moderate ☑ Strong

Have you had any thoughts of death or suicide in the past? ☑ Yes ☐ No If yes, how long ago? _*years ago*_

Are your thoughts ☐ Increasing ☐ Decreasing ☐ Staying constant ☑ N/A

Do you have current intent to act? ☐ Yes ☑ No

Do you have a current plan? ☐ Yes ☑ No If yes, specify:

When: _____ Where _____

Method: _____ Current access to means ☐ Yes ☑ No

Have you had rehearsal behaviors? ☐ Yes ☑ No If yes, specify (i.e. putting a gun to h

neck, etc)_____

GREER, LAURA          046
M# 000025465 01/12/1970
A# 10103030010 01/14/2016
ANTHEM BC/BS
DR. S. YECHOOR    F IDL

Have you had any prior attempts ☐ Yes ☑ No

    If yes, specify method: ☐Overdose ☐Cutting ☐Hanging ☐MVA ☐Shooting

    Level of Risk: ☐ High ☐ Moderate ☑ Low

| | | |
|---|---|---|
| **DANGER TO OTHERS:** <br> **(Current and History)** | Homicidal ideation or threats? <br> ☐ Yes ☑ No <br><br> Who is threatened? <br> _____ <br><br> Specific Plan? ☐ Yes ☐ No <br><br> Plan _____ | History of homicide attempts? ☐ Yes ☑ No <br><br> When: _____ <br><br> Method: _____ <br><br> Towards whom: _____ |
| | Thoughts of aggression? ☐ Yes ☑ No <br><br> Describe: <br> _____ <br><br> Towards whom: _____ | History of aggression? ☐ Yes ☑ No <br><br> Method: _____ <br><br> Towards whom: _____ |
| **ACCESS TO GUN OR IDENTIFIED MEANS OF SELF HARM** | Does the patient have access to lethal means (meds or weapons) of self harm?  ☐ Yes ☐ No <br> (If so, go to the next box and mark risk factor below. If no, go to next session.) <br><br> Is there someone we can contact to remove or secure the above? ☐ Yes ☐ No <br><br> Name: _____ Phone: _____ <br><br> Contact made date/time: _____ Staff Signature: _____ | |

### PRESENCE OF RISK FACTORS

| | | |
|---|---|---|
| ☐ Psych admits in last yr | ☐ Severe insomnia | ☐ Rapid mood shifts | ☐ Vegetative symptoms |
| ☐ Current drug/alcohol abuse withdrawal | ☐ History of reckless or self-destructive | ☐ Joylessness, hopelessness, anhedonia | ☐ Command Hallucinations |
| ☐ Family history of completed or attempted suicide | ☐ Serious medical illness or persistent pain | ☑ Recent or impending loss of social, emotional, physical, or financial security | ☐ Early marriage <br> ☐ Other |

**Elopement Risk Factors:** ☐ History of Elopement ☐ Involuntary Status ☐ Impulsivity ☑ Impaired Judgment ☐ None

GREER 000284

## PROTECTIVE FACTORS

Can you verbalize reasons for living? ___ Dependent children ___ Social Supports ___ Active religious faith
Other (specify) *Family*

Do you have proven problem solving and coping skills? ☑ Yes ☐ No If yes describe

GR__, LAURA    046
M# 000025465 01/12/1970
A# 1010303010 01/14/2016
ANTHEM BC/BS
DR. S. YECHOOR    F IDL

Do you have cultural or religious prohibitions against suicide? ☑ Yes ☐ No If yes describe

Can you tell me some positive plans for the future? ☑ Yes ☐ No If yes describe:

Can you visualize or conceive of life improving? ☑ Yes ☐ No

Can you think of actions you can take to improve your current situation? ☑ Yes ☐ No Please describe:

Have you been able to establish a working alliance with a treating professional(s) ☐ Yes ☑ No
If yes please describe:

## Trauma History (describe in comments section each element checked)

Have you ever been in a serious car accident or fire related event? ☐ YES ☑ NO
Have you or someone close to you, ever been seriously injured or gravely ill? ☐ YES ☐ NO
Have you ever experienced a natural disaster? ☐ YES ☑ NO
Have you ever had someone close to you die? ☑ YES ☐ NO  *3yrs ago mom died*
Do you have trauma related symptoms? ☐ YES ☐ NO
If yes, ☐ Flashbacks ☐ Nightmares ☑ Obsessive thoughts related to trauma ☐ sleep disturbances ☐ Other: _____

☐ None Reported

If yes, please describe

## Abuse History (describe in comments section each element checked)

☐ No Self Reported History of Abuse/Violence

☐ Other:

☑ Physical Abuse
☑ Emotional Abuse

☑ Victim ☐ Perpetrator

☐ Current
☐ History of, date _____

☐ Domestic Violence/Abuse
☐ Elder Abuse

☐ Victim ☐ Perpetrator

☐ Current
☐ History of, date _____

☐ Community Violence
☐ Sexual Abuse/Molestation

☐ Victim ☐ Perpetrator

☐ Current
☐ History of, date _____

Describe (identify if client was/is a victim of abuse or a perpetrator or both)
*Ex husband - Verbal / physical abuse*

**SEXUAL ACTING OUT RISK FACTORS** *(Explain any "yes" responses)*

Have you ever forced sex on another person, touched others sexually without their permission, or exposed yourself? ☐ Yes ☑ No

(if yes, describe the circumstances):

Have you ever been investigated for, charged with, or convicted of a sexual offense? ☐ Yes ☑ No
(if yes, nature of offense and what year offense occurred):

## Psychosocial Assessment

**Living Situation**
My Home: ☐ Rent ☑ Own ☐ Relative's/Guardian's Home ☐ Transitional housing/ halfway house ☐ Homeless Living with Friend
☐ Homeless in Shelter/No Residence ☐ Other:

| Household Members | Relationship | Current Substance Use (i.e. etoh, THC, opiates) | Previous Substance Use (i.e. etoh, THC, opiates) |
|---|---|---|---|
|  | *Husband* | *N/A* | *yes Husband take* |
|  | *Son* | *No* | *no Percocets* |

GREER 000285

## Social Information

**Primary/Family/Marital/Significant Other Support Systems:**

Marital Status: ☑Married ☐Single ☑Divorced ☐Separated ☐Widowed

Current partners name: _Paul_ _____ Length of current relationship _____ ☐ N/A

Cor~~~~ ~~~~tal relationship (Stable relationship)☐Significant other supportive of treatment? ☐Yes ☐No☐ N/A

Are you a caretaker for anyone? ☐Yes ☑No
If yes who:_____ Is anyone taking care of that individual while you are here? ☐Yes ☐No☐ N/A
# of children _2_ ☑Biological____ ☐Step___ ☐Adopted___
Comments

Primary supportive family member or friend: _Boys & Husband_

**Pertinent Family History:** (to include family MH and AoD history)
_Father - ETOH , Oldest Brother ETOH._

**Childhood History:**
Father figure: ☐Biological ☐Step ☐Adoptive ☐Foster
Describe your current relationship: _don't have a relationship_

Mother figure: ☑Biological ☐Step ☐Adoptive ☐Foster
Describe your current relationship: _Passed away 3 yrs ago_

Siblings: Biological _2_ Half____ Step____ Adopted____ Foster____
How do you get along with your siblings? (impact use has on relationships):
_good_

**Education History** (check all that apply) ☐ GED ☑ HS Grad

☐ Other -If neither state last year completed: _____ if dropped out, why _____

☐ College /Degree: _____ ☐ Vocational/Trade Completed ☐ Other Degree:

**History of Learning Difficulties** ☑ None Reported ☐ Learning Disability/Type: _____ ☐ Mental Retardation
☐ ADD/ADH ☐ Reading / Writing ☐ Other: _____

**Employment** (check all that apply)
☐ Full Time (35 hrs. or more per week) ☐ Part Time (<35 hrs. per week) ☐ Unemployed/Other:_____

Not in Labor Force
☐ Disabled , reason _____
☐ Retired ☐ Homemaker ☐ Student ( ☐ F/T ☐ P/T) ☐ Living in Institution
☐ Other: _____
If employed, name of employer: _Health Design Plus_ ☐ Length of Current Employment: _15YRS_
Job Title: _Senior Claims Examiner_ Any Professional Licensure: _____
(If Licensed with Ohio Medical Board; notify Clinical Director immediately)
Clinical Director Notified: YES ☐ NO ☐

**Attendance**
☐ Above Average ☑ Normal ☐ Tardiness ☐ Absenteeism
**Performance**
☐ Exemplary ☑ Good ☐ Average ☐ Below Average

**Occupational Stressors:** ☑No problems ☐ Problems functioning ☐supervisor conflict ☐peer conflict ☐employment in jeopardy
☐loss of license

GREER, LAURA    046
M# 000025465 01/12/1970
A# 10103030010 01/14/2016
ANTHEM BC/BS

GREER 000286

**Military History:**

☐ Yes  ☑ No  If yes, has the patient served in combat? _____
☐ Active Duty  ☐ Reservist; Branch: _____

**Current Legal Status**

☑ ___le Reported  ☐ Court Ordered to Treatment  ☐ Awaiting Charge  ☐ AoD
☐ On Probation ; If yes county: _____  Probation Offic___
Phone Number: _____

GREER, LAURA  046
M# 000025465 01/12/1970
A# 10103030010 01/14/2016
ANTHEM BC/BS
YECHOOR  F IDL

**Friendships/Social Support Relationships:**

☐ Forms Relationships  ☐ Maintains friendships  ☐ Supportive Friends  ☐ Attends ___DR . S___
☐ Needs social interaction  ☐ Limited Support System  ☑ No close friends  ☐ Socially isolated  ☐ Sober support
Comments:

**Religion/Spirituality:** (include any customs or practices staff may need to assist with)
Spiritual Preference: _NONE_  ☐ Attends services regularly  ☐ Source of Support  ☐ Actively involved
☐ Source of Concern  ☐ Does not attend  ☐ Request clergy visit

**Meaningful Activities:** (community involvement, volunteer activities, leisure/recreation, other interests)
_denis_

**Limitations of Activities of Daily Living:** (include information relating to financial status, transportation issues, anxiety, etc.) (name at least 2)
_Poor motivation, depression_

**Strengths/Capabilities:** (name at least two)
1. _Hard worker_  2. _____

---

### Problems Checklist Including Functional Domains

**Nutritional/Eating Pattern Changes/Disorders**  ☐ No problems
Typ___ diet ☐ Regular ☐ Other: _____  ☐ No changes  ☐ Increased appetite  ☑ Decreased appetite
☐ ___s/gain of 10 lbs or more in last month History of eating disorder: ☐ Anorexia ☐ Bulimia ☐ Binging ☐ Compulsive eating.
Use of ☐ Laxatives ☐ Diet Pills ☐ Diuretics
Describe:

**Sleep Problems**  ☐ No problems
☐ Not sleeping ☑ Trouble sleeping ☐ Frequent awakening ☐ Sleeping more often ☐ Restless ☐ Night mares ☐ Night terrors
Describe:

**Depressed Mood/Sad:**  ☐ None reported
☐ Suicidal ☐ Frequent crying ☑ Loss of energy ☑ Loss of motivation ☑ Changes in appetite ☐ Recurrent thoughts of death
☐ Agitated/irritable mood ☐ Poor self-care ☑ Hopeless/helpless ☑ Sad mood ☐ Self injurious behaviors ☐ Excessive guilt ☑ Grieving
Duration:
Describe:

**Anxiety:** ☐ None reported
☐ Panic attacks-how often ___ ☐ Sweating ☐ Nausea ☐ Trembling ☐ Dizziness ☐ Chest pain/discomfort
☐ Fear of losing control ☐ Poor concentration
Duration:
Describe: _"daily"_

**Manic Episode:**  ☑ None reported
☐ Elevated, expansive mood ☐ Racing thoughts ☐ Inflated self-esteem/grandiose ☐ Excessive involvement in pleasurable activities
☐ Psychomotor agitation
Duration:
Describe:

**Pain Management:**
Any pain related issues: ☐ No ☑ Yes If yes explain: _Back / Neck. Legs_
How do you address your pain?

**Bereavement Issues** ☐ none reported
☐ No ☑ Yes If yes explain: _"Mom. died 3 yes ago"_

GREER 000287

| Fall history ☑ yes ☐ no<br>If yes, date of last fall: | _Neur med clear_ _E voton Cyt Seell_ |
| medical treatment needed: | |

**Medical History:** ☐ No ☐ Yes If yes, describe: _Vit B12 deficiency_

**Allergies:** ☐ No ☑ Yes If yes, describe: _PCN Sulfa Vitd deficiency_

**Us. Oxygen:** ☑ No ☐ Yes If yes, patient is on _____ liters of Oxygen

**Assistive devices:** ☑ No ☐ Yes If yes, ☐ Walker ☐ Cane ☐ Wheelchair ☐ Crutches ☐ Motorized Wheelchair ☐ Other:

**Compliant with prescribed medications:** ☐ Yes ☐ No

**List of home medications brought:** ☐ Yes ☐ No

**Pharmacy:** _Walgreens_   **Primary Care Physician:** ☐ Yes ☐ No  If yes, Date of last visit: _Dr Nancy Martin William Dr ____ Hogan MD ___ pain_

---

## Clinical Interpretive Summary

This Clinical Interpretive Summary is based upon information provided by (check all that apply):
☐ Physician   ☐ Guardian   ☐ Family/Friend   ☑ Patient/Client   ☐ Other:
☐ Service Provider   ☐ Records

---

| Initial Medical Screen | |
|---|---|
| **Assess Vital Signs** | **Unstable Values (medical consult required)** |
| Temperature | ☐ Temp> 101 |
| Blood Pressure | ☐ Systolic <90 or >180          ☐ Diastolic >100 |
| Pulse | ☐ Irregular pulse   ☐ Pulse <50 or >140   ☐ Patient in active withdrawal |
| Gait | ☐ Unbalanced while standing/walking   ☐ Swaying while sitting |
| Respirations | ☐ Labored breathing   ☐ Shallow Breathing   ☐ Shortness of breath |
| Current Pain (1-10) | ☐ Notify physician if patient reports any pain _Rachel Reb_ |

☐ Pregnant
☐ Lactating
☐ Any likelihood you might be pregnant
☐ Currently/recently been treated for an infection or treated with an antibiotic

☐ Recent head injury
☐ Recent loss of consciousness
☐ Recent or active seizures
☐ Sudden onset of psychosis
☐ Overdose without medical clearance

**Tuberculosis Screen**
☐ History of active TB
☐ Persistent cough>3 weeks
☐ Afternoon or night sweats
☐ Fever in afternoon

☐ History of contagious infection, If marked; specify date and infection if known: _____
☐ History of bed bugs, If marked; specify date: _____
☐ History of MRSA or Staph infection, if marked; specify date: _____
☐ No reports of above mentioned concerns

GREER, LAURA      046
M#  000025465  01/12/1970
A#  10103030010  01/14/2016
ANTHEM BC/BS
DR   YECHOOR    F IDL

GREER 000288

**Narrative Summary -- Include etiology of presenting problem and maintenance of the problem; mental health history; AoD history; severity of problem:**

Pt reports addiction to percocet using up to 20 pills daily. States she also takes multiple Xanex daily that are not Rx'd to her. She reports family concern et poor energy et motivation et realized now that she has a problem et is seeking tx for first time. Dr Yechoor admitting for detox.

## Signatures

| | |
|---|---|
| **Provider Signature/Credentials:** | **Date/Time** 1-14-16 |
| **Supervisor Signature/Credentials:** | **Date/Time** |

**Complete below only if inpatient admit is ordered by physician**

| **Nurse given report to** | **Nurses Signature** Patterson RN | **Date/Time** 1-14-16 1425 |
|---|---|---|
| **Physician consulted:** Yechoor | | **Date/Time** 1-14-16 |
| **Physician Signature/Credentials:** | | **Date/Time** |
| **Assigned Therapist Signature:** Smith LISW | | **Date/Time** 1/10/16 1731 |

GREER, LAURA        046
M# 000025465 01/12/1970
A# 10103030010 01/14/2016
ANTHEM BC/BS
DR S. YECHOOR    F IDL

GREER 000289

## Mental Status Examination

| | | | | |
|---|---|---|---|---|
| Appearance: | ☐ Well Groomed | ☐ Unkempt | ☒ Disheveled | ☐ Malodorous |
| Eye Contact: | ☐ Average | ☒ Avoidant | ☐ Intense | |
| Speech: | ☐ Clear | ☒ Slurred | ☐ Pressured | ☐ Rapid |
| Thought Process: | ☒ Logical | ☐ Loose | ☐ Blocked | ☐ Disorganized |
| Behavior: | ☐ Cooperative | ☐ Resistant | ☐ Agitated | ☒ Sedated |
| Mood: | ☐ Euthymic | ☒ Depressed | ☐ Anxious | ☐ Irritable | ☐ Labile |
| Affect: | ☐ Full | ☐ Constricted | ☒ Flat | ☐ Labile |
| Insight: | ☐ Good | ☒ Fair | ☐ Poor | |
| Responses | ☐ Verbalizes understanding | ☒ Verbalizes Partially | ☐ Difficulty staying on task | |

| Transfer/ Clearance at Medical Surgical Hospital: | Acute Inpatient: | Partial Hospitalization: | Intensive Outpatient: |
|---|---|---|---|
| ☐ Unstable Medical condition, which requires immediate treatment<br>☐ Medical clearance required before psychiatric or AoD treatment can proceed | ☐ Acute psychiatric condition requires 24 hr oversight<br>☐ Potential danger to self or others<br>☒ Less intensive treatment not safe or feasible<br>☒ Grave disability with severe deterioration in functioning<br>☒ Condition requires medically monitored detoxification | ☐ Requires physician-led, multidisciplinary treatment interventions<br>☐ Condition would worsen without PHP structured treatment | ☐ Requires structured multidisciplinary interventions<br><br>☐ Outpatient/ community referral: |

**Preliminary Diagnosis**  ☒ DSM-V Codes (or successor)

Principle diagnosis (formerly Axis I, II, and III):  *F1120 Opiate Use Disorder Severe F1320 Sedative / Hypnotic/anxiolytic Use Disorder Moderate*

Phsychosocial Contextual Factors (formerly Axis IV):  *Severe*

GREER, LAURA   046
M# 000025465 01/12/1970
A# 10103030010 01/14/2016
ANTHEM BC/BS
DR. S. YECHOOR   F IDL

GREER 000290

## *Social Services Therapy Note*

| | |
|---|---|
| **atient Name:** Laura Greer | |

| | |
|---|---|
| **Date:** 1/17/16 | **Time:** 1500-1509 |

**Type of Note:**  ☒1:1  ☒Treatment Plan Update  ☐Treatment Plan  ☐Crisis Intervention
☐Discharge Note  ☐Family Session  ☐ Narrative Note  ☐Other:

## Individual Patient Observations

| | | | | |
|---|---|---|---|---|
| **Behavior:** | ☐Active<br>☐Limited<br>☐Minimal<br>☐Attentive | ☐Resistant<br>☐Intrusive<br>☑Monopolizing<br>☐Drowsy | ☑Anxious<br>☑Inappropriate<br>☐Spontaneous<br>☐Withdrawn | ☐Agitated<br>☐Guarded<br>☐Tearful<br>☐ Responsive With Prompting |
| **Affect:** | ☐Full Range<br>☐Alert<br>☐Flat | ☑Elated<br>☑Superficial<br>☐Labile | ☐Blunted<br>☐Bright | ☐Incongruent<br>☐Restricted |
| **Cognition:** | ☐Logical<br>☐Insightful<br>☐Coherent | ☐Preoccupied<br>☐Blocking<br>☐Confused | ☐Loose Associations<br>☐Delusional<br>☐Distracted | ☑Tangential<br>☐Circumstantial<br>☐Hallucinating |

☐ No observations if Narrative Note

**Treatment Goals Addressed (if applicable):** ☒Substance Abuse  ☐Mental Health
☐Other:

**Response/ Progress:** Writer met with client to review and complete discharge plan and reviewed aftercare options, client reported she doesn't need to "rack up a large bill, doesn't need medication, has no aftercare plan" Staff attempted to provide support, recommended aftercare / follow up, client declined, reported she will follow up with her pain management provider and tell them "No more pills" Displayed rapid speech and tangential thought process, difficult to redirect.

Facilitator's Signature and Credentials: _~~[signature]~~ LSW_  Date/Time: _1/17/16  1600_
Co-Facilitator's Signature and Credentials: _____  Date/Time: _____

DEFENDANT'S EXHIBIT
4
5/23/18
COLLINS REPORTING

*Form Title: Social Services Individual Note*
*Revised:12/2015*
*Arrowhead Behavioral Health*

GREER, LAURA    046
M# 000025465 01/12/1970
A# 10103030010 01/14/2016
ANTHEM BC/BS

GREER 000249

## NURSING DISCHARGE NOTE

Discharge Type: _Laura G._ ((Routine) Medical, AMA, Administrative)

Patient: _Laura Greer_  Date: _1-17-16_  Time: _1400_

1. Patient Discharged to: _home_

2. Discharge Placement: _Decline outpt_

3. Discharge Summary Instructions completed, reviewed, and signed.
   Copy given to the Patient: _mm_

4. Belongings returned to patient                Returned to ABH:
                                                  Xtenex Shoe Laces_____ (initials)

   a. Safe _N/a_ (initials)
   b. Locked Cupboard: _mm_ (initials)
   c. Patient Bin: _mm_ (initials)
   d. Storage: _mm_ (initials)

5. Medications returned by _mmc__ RN_

6. Releases signed:

   a. _med rec_
   b. _crisis plan_
   c. _pk plan_

7. Copies of Labs, EKG reviewed and given to patient _Labs_

8. Other pertinent information / Progress Summary

   _AA/NA Followup - TRUE_
   _Nancy Martin MD Followup - TRUE_
   _Decline OP - FALSE_

Discharge Nurse Signature: _mmc__ RN_

9. Escorted to the door by _____ Date: _1-17-16_ Time: _____

Signature: _____

Form Title: NursingDischarge Form
Revised:8/2015
File in: Progress notes/Nursing
Arrowhead Behavioral Health

GREER, LAURA    046
M# 000025465 01/12/1970
A# 10103030010 01/14/2016
ANTHEM BC/BS
DR. S. YECHOOR  F IDL

GREER 000196

*Arrowhead*
BEHAV CRAV HEALTH
*Life is Waiting...*

Date Completed ___11/7/16___ Date/Time of Scheduled Discharge_____

Reason for D/C: ☐ Successfully completed treatment ☐ Against Medical Advice ☐Medical ☐Administrative
Other_____

| Contact/Reason for Appointment | Address | Phone # | Appt. Time & Date | Releases signed | Refused Release | Appt. Refused |
|---|---|---|---|---|---|---|
| Psychiatrist: | | | | ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No |
| Therapist: | | | | ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No |
| Outpatient Program: Declines outpt AA & NA in area | | | | ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No |
| Primary Care Physician Nancy Martin Reason: PCP | 7595 C.O Rd. 236 Findlay OH 45840 | 419. 427. 1984 | | ☐ Yes ☐ No | ☐ Yes ☑ No | ☐ Yes ☑ No |
| Suboxone Support: N/A | | | | ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No |
| Additional Referral Source: | | | | ☐ Yes ☐ No | ☐ Yes ☐ No | ☐ Yes ☐ No |

Arrowhead Behavioral Health Crisis Hotline: 1-800-547-5695      Suicide Hotline: 1-800-273-TALK (8255)

www.toledoaa.com  A.A. Central Office 419-380-9862

Signature indicates discharge plans have been completed and agreed upon and acknowledgement of receipt of suicide prevention information:

_____ LSW _11/7/16_    _____ _11/7/16_
Therapist      Date      Time 1503      Patient/Guardian Signature      Date  1506

To be completed at time of Discharge:

Patient and/or POA have demonstrated understanding and knowledge of:

| | | |
|---|---|---|
| Referrals and Appointments | ☑ Yes | ☐ No |
| When and how to seek further treatment | ☑ Yes | ☐ No |
| Importance of communicating with physician regarding side effects and other concerns | ☑ Yes | ☐ No |
| Nutritional intervention or diet | ☑ Yes | ☐ No |
| Medications have been explained to patient's satisfaction (potential food/drug interactions) | ☑ Yes | ☐ No |
| Copy of labs and EKG reviewed and given to patient | ☑ Yes | ☐ No |
| Safety plan reviewed and patient provided a copy | ☑ Yes | ☐ No |

Signature of patient/guardian indicates that their questions have been satisfactorily answered and they understand and agree with the instructions.

_____ 1-17-16    _____ 1-17-16 1515
Patient/Guardian Signature and Date      Nurse Signature Date/Time

*Form Title: Discharge Plan*
*Revised: June 9, 2015*
*File In: Discharge*
*Arrowhead Behavioral Health*

GREER, LAURA   046
M# 000025465 01/12/1970
A# 10103030010 01/14/2016
ANTHEM BC/BS
DR. S. YECHOOR  F IDL

GREER 000195

__Psychiatric Evaluation
__Plus Program services in response to identified health care needs
__Vocational Rehabilitation in response to identified employment needs
__N/A No further recommendations

COPY

If symptoms do not improve or worsen, client may be referred to the following services in the future:
X Assessment: X MH __AoD
__Individual Counseling: __mental health __AoD
X Group Counseling: __Anger Management __Coping Skills __STEPPS __Survivor Group
__USG  X SIR __IOP __ BIP __CC  Other
(specify):_____
__CPST (MH)
__CM (AoD)
__Psychiatric Evaluation
__Plus Program services in response to identified health care needs
__Vocational Rehabilitation in response to identified employment needs
__N/A No further recommendations

Client is also being referred to the following external services: follow up with her EAP.

Client's response to recommendations:
__agreed
X declined the following: At the conclusion of the assessment BHP began to discuss with the client the treatment course that she would take and that we would verify IOP was covered by her insurance prior to putting her into the group to prevent a major bill. BHP discussed with the client that she would be seen individually until insurance authorized treatment. Client reports she did not want to complete treatment at Firelands and would like to go to a private practice. Client reports she does not feel comfortable in the groups and would only like to do individual therapy. BHP provided the client with referrals to three area agencies to assist her in getting treatment. BHP discussed with the client her history of treatment with her previous provider and the client reports it was a misunderstanding that led to her case being closed. BHP inquired if the client would like her case closed and the client stated yes. BHP received a call from the client's EAP and provided them the information that the client declined services and stated she would be going elsewhere and requested her case be closed. Client's EAP requested that BHP not close the client's case currently as they were going to call her and inform her that she would have to complete treatment recommendations. BHP informed EAP that we could not force someone to engage in treatment and client's EAP stated they would let the client know if she did not come in to treatment she would be terminated. BHP agreed to keep the client open temporarily until she could come in for treatment.

X Emergency services, resources and hotline number were provided to the client


Client reports the following treatment preferences:
__ Needs assistance reading forms
__ Need an interpreter for: __ language __ hearing impairment _
X Prefers appointments__before noon __afternoon X after 4 p.m. __specific day of the week: _____
__ Other (please clarify):

Preferences will be:
X honored

**Patient Chart**
GREER, LAURA
Patient ID: 10924849
DOB: 01/12/1970
Age: 46 years  Gender: F

## Progress Notes

.D: 01/26/16 : 01:36pm
.T: Therapist - Progress Note

**GREER, LAURA**
**01/12/70**

**01/26/16  START TIME: 9:05 am  END TIME: 10:15 am  LENGTH:  70 min**

**SUMMARY OF SESSION:**  Ct is a 46 year old MWF who is referred by her insurance company after getting out of an inpt program after 5 days there for opioid addiction. Ct states she hit "rock bottom". Ct tended to ramble quite a bit today and it was tough to keep her on task. She was disgruntled with the program she went to, frustrated they wanted to put her on Suboxone, she then went on the be blaming of her pain management program that they only urine tested her once in 8 years. Ct does admit that she was using more of her prescribed Percocet than what she could get from the pain management doctors and she was using about 20 pills per day of varying dosages. She came with FMLA papers but I told her I could not fill those out as I was not sure if her employer would recognize a LPCC, and also I was not sure she was ready to go back.

**GOALS WORKED ON THIS SESSION:**  tying to get information, build a therapeutic rapport

**CLIENT PROGRESS:**  Ct appeared a bit sedated. States she has not used since going to Arrowhead but this is not verified. Would want a tox screen.

**MSE:**

**Affective:**
  Predominant Mood:  Pleasant Calm  Sad Overwhelmed Tearful Frustrated
  Range of Affect:  congruent

**Behavioral:**
  Appearance:  very thin, 107 pounds.seemed slightly sedated,
  Movement/Behavior:  overelaborate speech, poor boundaries
  Speech:  Understandable
  Attention/Manner:  Attentive  Cooperative

**Cognitive:**
  Thought Process:  Coherent  Rambling  denies any S/HI at present, is future oriented about return to work.
  Orientation:  Person Place Time
  Memory:  Adequate
  Judgment/Insight:  Limited

Printed On: 07/27/2016

DEFENDANT'S
EXHIBIT
5
5/23/18
COLLINS REPORTING

Page: 12 of 20

GREER 000320

12 step mtgs

did not attend

Next appt. Wed 2/3/16
2pm

1/29/16



**Patient Chart**
GREER, LAURA
Patient ID: 10924849
DOB: 01/12/1970
Age: 46 years  Gender: F

## Discharge Summary

.D: 07/14/16 : 12:45pm
.T: DISCHARGE SUMMARY
Providers: Jayne Williams, MA, LPCC, LICDC, SAP

Date of Admission: 01/26/16 Date of Discharge: 07/14/16
Date of Last Contact: 03/14/16
Others involved in treatment: Ct's spouse attended one appt.

1. Services Provided:  Assessment. individual therapy

2. Summary of Progress:  Ct attended a few sessions and seemed to understand why she needed to be clean but underestimated what it would take to stay clean. This was evidenced by her not following through with going to support group meeting ("I forgot my proof slips at home"). Also she seemed uncomfortable talking about her use, the consequences of same. She missed two appointments and was sent the letter to notify her I was leaving and to let us know if she wanted a different provider. She did not respond.

Treatment Outcomes: Client dropped out of treatment; correspondence sent 6/21/16

3. Pertinent unresolved problems including symptoms which may indicated the need for future services:  Ct needs a higher level of care.

4. Summary of Medication Record:
Current Medications:
Rx: AMBIEN CR 12.5mg 1  AT BEDTIME – days, , Ref: 0
 Rx: B-12 INJECTION      - days, , Ref: 0
 Rx: BACLOFEN 10mg 1  TWICE DAILY - days, , Ref: 0
 Rx: CLYMOLOMYCIN    EVERY OTHER DAY - days, , Ref: 0
 Rx: IMITREX 100mg 1   - days, , Ref: 0
 Rx: TOPAMAX 50mg 1  AT BEDTIME – days, , Ref: 0
 Rx: VITAMIN D     - days, , Ref: 0
 Rx: WELLBUTRIN 300mg 1  DAILY - days, , Ref: 0

5. Client Response to Discharge/Comments:  Ct did not respond

6. Discharge Plan: Other,  Ct's EAP contacted me to say ct had been pulled off work on reasonable cause (slurring words, long delays in responding) so she most likely has relapsed. The EAP states her tx will now be mandatory and I gave her the name of Century Health as the have the most options for AoD.

Discharge Diagnosis:
Axis I F11.20 Opioid Use D/O

**Patient Chart**
GREER, LAURA
Patient ID: 10924849
DOB: 01/12/1970
Age: 46 years  Gender: F

## Progress Notes

.D: 03/15/16 : 09:39am
.T: Therapist - Progress Note

**GREER, LAURA**
**01/12/70**

**03/14/16  START TIME: 1:00 pm  END TIME:2:00 pm  LENGTH: 60 min**

**SUMMARY OF SESSION:** Ct brought to session a drug screen signed by Nancy Martin, CNP that was negative for cannabis, cocaine, opiates. She states she "forgot" again to bring her slips for AA/NA meetings. Asked her if she was really attending and she states yes but this forgetting twice seems questionable. She states she is gaining weight and does look much healthier. Her eyes are more clear. She got her son into counseling with a referral from Dunn Therapies as they are booking out until June. He goes this Friday. She is concerned about his being bullied and depression. He is aware she went to tx for drugs. Encouraged her to bring this out when she takes him as he may or may not. Ct states he is like her, "he holds a lot in". Asked if she feels she is holding things in or back. She states for years she held back how angry she was at her mom for how her mom treated them  but when mom was sick and dying, she let that go. Asked ct if she feels she is still impacted by some of these things and she said yes. We agreed to talk about this topic next time. Ct continues to deny any cravings. She polished her hardwood floor on her knees and stated next day she was in pain so used a lidocaine pain patch which she states is non narcotic.

**GOALS WORKED ON THIS SESSION:** abstinence, coping skills to stay in recovery.

**CLIENT PROGRESS:** :I don't want to go back to that. I feel so much better."

**MSE:**

**Affective:**
    Predominant Mood:  Pleasant Calm
    Range of Affect:  congruent

**Behavioral:**
    Appearance: Neat  healthier
    Movement/Behavior: Unremarkable
    Speech: Understandable
    Attention/Manner:  Attentive  Cooperative Open

**Cognitive:**
    Thought Process:  Coherent  Goal-oriented  No S/HI. CT is future oriented, and has her own faith.

Printed On: 07/27/2016

Page: 2 of 20

GREER 000310

**Patient Chart**
GREER, LAURA
Patient ID: 10924849
DOB: 01/12/1970
Age: 46 years  Gender: F

## Progress Notes

.D: 02/26/16 : 05:23pm
.T: Therapist - Progress Note

**GREER, LAURA**
01/12/70

02/26/16  START TIME: 3:05 pm  END TIME:4:00 pm  LENGTH:  55 min

**SUMMARY OF SESSION:**  Ct states she is doing okay. Had a stressful work day. She states she went to 4 of 6 12 step meetings but missed 2 due to a bad cold this week. She forgot her book with signatures. Ct states she feels more comfortable at AA. She states the people at NA have less clean time and seems a bit sketchy which she admits she should not judge but she just feels that way. She states she has not spoken yet at a meeting but she has gotten some numbers from other members. Ct states her marriage seems to be better. She feels better. She checked into drug store UA's and she found a 4 panel with opiate screen for 24.00. We discussed her taking this to her doctors office to use that there. If it is unopened and they have some security measures in place that could be something to try. Ct shared she feels her 17 year old son is being bullied. He has asked her if he can go to counseling. She asked if I know any Tricare providers. Let her know to call Dunntherapy to see.

**GOALS WORKED ON THIS SESSION:**  abstinence, building recovery networks

**CLIENT PROGRESS:**  Ct seems to look healthier. She states she will be coming up on 60 days.

**MSE:**

**Affective:**
    Predominant Mood: Pleasant  Anxious
    Range of Affect:  congruent

**Behavioral:**
    Appearance: Neat
    Movement/Behavior: Unremarkable
    Speech: Understandable
    Attention/Manner: Attentive  Cooperative

**Cognitive:**
    Thought Process: Coherent Goal-oriented  Denies S/HI. Ct states she is future oriented and does not want to go back.  Orientation: Person Place Time
    Memory: Adequate
    Judgment/Insight:  fair

## Robby Kordish

| | |
|---|---|
| **From:** | Angela Kuhlman |
| **Sent:** | Tuesday, July 12, 2016 5:20 PM |
| **To:** | Fulton-Royer, Jill; Kohlbacher, Georgene (gkohlba2) |
| **Cc:** | Robby Kordish |
| **Subject:** | RE: Screening for UH employee |
| **Attachments:** | Incidents Laura Greer.docx |

Attached is a summary written by Angela Washington, Claims Supervisor.

**From:** Fulton-Royer, Jill [mailto:Jill.Fulton@UHhospitals.org]
**Sent:** Tuesday, July 12, 2016 12:06 PM
**To:** Kohlbacher, Georgene (gkohlba2) <Georgene.Kohlbacher@UHhospitals.org>; Angela Kuhlman
<AKuhlman@hdplus.com>
**Subject:** FW: Screening for UH employee

Angela,
Thanks for the update. Can you also send us a summary of your concerns? Thanks.

Jill Fulton, LISW-S, LICDC
Employee Assistance Manager
University Hospitals Case Medical Center
MCCO 6th Floor, Mail Stop 6035 B
11100 Euclid Ave
Cleveland, Ohio 44106
Phone-216-844-1982; Fax-216-983-3038;
Pager-30788; Cell Phone-216-408-9059

 


THE OFFICIAL HEALTH CARE PARTNER OF THE
CLEVELAND BROWNS

**From:** Angela Kuhlman [mailto:AKuhlman@hdplus.com]
**Sent:** Tuesday, July 12, 2016 11:01 AM
**To:** Fulton-Royer, Jill; Robby Kordish
**Cc:** Kohlbacher, Georgene (gkohlba2); Harmon, Heather (HR); Fernandez, Laura
**Subject:** RE: Screening for UH employee



Hello All,
Robby and I just spoke with Laura Greer.  She will be waiting for Georgene's call at noon today.  Please call her at 419-424-9291.

I've had a very hard time finding a cab company that will take a credit card over the phone and uber is not available in her area.  At noon I will be having a conversation with a car service to hopefully arrange transportation.  If I am able then I will call and let Laura know that she will be picked up.  In our conversation with Laura we asked if she had someone

1

CONFIDENTIAL

DEFENDANT 001323

**6/29/2016**

LAURA SENT AN EMAIL THAT SHE WILL NEED TO GET OFF ONCE SHE IS DONE WITH A CLAIM SHE HAD FEMALE LASER SURGERY THAT SHE WOULD MAKE HER TIME UP, TO ASSURE SHE WOULD HAVE HER 8HRS, OTHERWISE THIS IS CONSIDERED A DEVIATION OF TIME, HER REPLY WAS WHAT IF I GET A NOTE FROM MY DOCTOR, IT WAS ADVISED THAT SHE TALK TO HR IF THIS WOULD BE CONSIDERED A FMLA CONDITION.  SHE WENT ON TO EXPLAIN HOW UNFAIR THIS IS AND THE EMAIL WENT ON FROM 1:03 TO 2:46.

**6/21/2016**

I SPOKE TO LAURA ON WHERE SHE EMAILED ME ON A DIFFERENT CLAIM THAT WE STILL NEED TO RESOLVE THE ABOVE MENTIONED CLAIMS THAT I HAD PROCESSED ACCORDINGLY.  SHE MAKES MENTION THAT SHE BELIEVES SHE DELETED THE CLAIMS BECAUSE THEY WERE INCORRECT.  I ADVISED HER TO PULL UP THE EMAIL ALONG WITH THE CLAIM, SO THAT SHE CAN RECREATE AND FOLLOW THE INSTRUCTIONS.  THE CONVERSATION WAS VERY BROKEN; SHE HAD WENT ON TO ANOTHER TOPIC SEVERAL TIMES.  ONCE I INTERUPTED THE CONVERSATION ASKING HOW FAR WAS SHE WITH THE HANDKEY, SHE SAID OH! YOUR CLAIMS ARE RIGHT HERE, THEY WEREN'T DELETED AND SHE BEGIN TO MODIFY THE CLAIMS, (SHE SAYS) EXPLAINING HOW SHE WAS SPLITING THE PAYMENT LIKE THEY USE TO DO.  I EXPLAINED AGAIN THAT SHE WILL NEED TO FOLLOW THE INSTRUCTIONS AS CINDI PROVIDED, AND AGAIN SHE MENTIONS HOW IT USE TO BE DONE AND SHE DOES NOT UNDERSTAND WHY SHE CAN NO LONGER DO IT THAT WAY.  I AS A FINAL POINT EXPLAINED, THAT SHE IS TO RECREATE THE CLAIMS I CREATED IF SHE DELETED THEM, FOLLOWING CINDI'S INSTRUCTION AND TO NOTIFY ME ONCE SHE HAD COMPLETED.  I REITERATED CINDI'S INSTRUCTIONS, AND ENDED THE CALL.

**6/15/2016**

PROCESSING —LAURA WAS ASKED TO PROCESS TWO CLAIMS, MANUALLY ENTERING THE CLAIMS, AND SPLITTING THE PAYMENT.  (SPECIFIC CLAIM INSTRUCTION WAS PROVIDED).  LAURA WAS UNABLE TO FOLLOW THOSE INSTRUCTIONS, SO I MANUALLY ENTERED THE CLAIMS AND PROCEED THEM AND ADVISED LAURA TO REVIEW FOR FUTURE USE. (6/16/2016) ON 6/17/2016 LAURA EMAILED ME AND CONVEYED THE CLAIMS WERE INCORRECT AND THAT WE NEED TO SETUP TIME TO REVIEW. (PHONE CALL)

**6/13/2016**

I was informed by Cindi Roberts on 6/13/2016 @ 1:07 pm that Laura Greer was experiencing issues with her Salesforce screen. Based on the "screen shot" that she sent, I immediately saw that her Salesforce screen was "maximized". I emailed Laura at that time and advised her to use her "back" button. She did not reply my assumption was that this advised worked for her, and she was able to proceed with processing. At 1:30 I received the below screen shot accompanied by an email stating  "Once I start working sales force will pop back over and Salesforce will not allow me to anything- I've logged out 3 times and signed in but Salesforce is still there?" Again I advised her to use her "back button".



Shortly before 3:00 pm Janet Goubeaux came over to my cubicle and advised she has been on the phone with Laura and has logged into her system to assist. She believes Laura's system is "dying/crashing" due to the error she is getting.  (Please see below).



DEFENDANT 001325

CONFIDENTIAL

I then advised Janet that this was an issue that Laura had earlier although the screen looks different now than before this could be a result of having too many sessions open due to her multiple attempts to log-in.

When I called Laura she was in the process of logging into her son's PC, I asked if the she believed this PC was safe and secure and she replied yes.  She then began to talk off topic and with haziness about the UH discount program and how the military does not offer competitive discounts to the Kalahari Park, and that she had chest pain and took one of her husband's Nitro pills and that it did help and that the neighbor lady helped her yesterday and she would make it through.  I interrupted and asked if she had logged into the PC successfully and she replied no, that she is getting the same screen she got on her screen, I replied then your system is not dying.



After further review of her screen Janet agreed.  I advised Laura to log out of her son's PC and go back to her PC to log back in.

She than expressed she was unsure on how to log in.  I took a picture of the remote log in instructions b and sent them to her via text message. (Please see instructions) After several unsuccessful attempts, Laura successfully logged into HealthPac.  I mentioned that should she experience issue such as this moving forward she is not to go through another processor for resolution, that she will need to alert Cindi Roberts or myself, she replied she did not know any of our numbers, that she had texted Cindi and Cindi advised her to contact Angela (me), that she called three times to the front desk and ask to be "patched" to Angela Kuhlman.  I told her that she was to call me Angela Washington in urgencies such as this.

CONFIDENTIAL

DEFENDANT 001326

We continued to discuss what she saw once she logged in, and she said that her Salesforce screen was still up. I advised her to use her Alt+tab to view the many sessions she had open and when she came to each session to "x" out of them. She could not comply. I advised her to put her thumb on the Alt button and her index finger on the tab button and slowly tap the Tab button to review each session. She could not comply, Janet advised that since we now know the issue that we go to Michaels office and he log into her system to minimize her Sales force screen. I advised Laura that we would call her right back.

Janet and I went into Michael's office he logged into her system and advised reviewed how to minimized and advised to use function key F11, I asked since he was signed in her system if he would simply do it while logged in. I came back to my cubicle and called Laura, she was logged in, I again reiterate the instruction provided earlier regarding immediate contact with Cindi or me, along with a follow up email.

CONFIDENTIAL

DEFENDANT 001327



**University Hospitals**

**Employee Assistance Program**
**Drug/Alcohol Screening Procedures**

The Employee Assistance Counselors will determine whether an employee must participate in the drug and/or alcohol screening program. Once the decision is made, all employees (mandatory and/or self-referred) must follow the guidelines as stated below.

1. Upon acceptance into the program, the employee must meet with the EAP Secretary. The EAP Secretary will provide information about the drug and/or alcohol screening program and verify the employee's information:
   Name ___Anna Greer___
   Home phone number ___X 419-434-9281 - 419-937-2459___
   Work phone number _____
   Pager number _____
   (This information must be given in order for Employee Assistance to contact employees.)

2. The employee is required to take a drug and/or alcohol screening weekly. *2 yrs effective 9/26/16 - 9/26/18*

3. The drug and/or alcohol screening is done randomly; therefore, the employee must contact the EAP Secretary at 844-4948 every Monday, Wednesday and Friday between the hours of 8:00 A.M. to 4:30 P.M. At that time, the EAP Secretary will inform the employee if the screen is due that day.  In the event the EAP Secretary is unavailable, please leave a phone mail message and she will return your call if your screening is due that day, otherwise your call-in will be documented.

4. The employee is required to call every Monday, Wednesday and Friday even when the employee has had a drug/alcohol screening for the week. This step is essential and must be adhered to because an employee may be asked to retake a drug/alcohol screening at the request of an Employee Assistance Counselor.

5. The employee is requested to show up for the screening as soon as possible that same day.  If an employee fails to fulfill that obligation the Employee Assistance Secretary must turn that employee's name over to the Employee Assistance Counselor assigned to that case.

6. The employee must contact the Employee Assistance Secretary before taking time off for vacation, etc. If he/she is to be excused from the drug and/or alcohol screening for the week.

7. The employee should contact the Counselor assigned to his/her case when the EAP Secretary is out on vacation to confirm call-in and/or whether or not to come in for screening.

___Anna Greer___                               ___X 02-26-2016___
Employee                                        Date

_____                        _____
Employee Assistance Counselor                   Date



DEFENDANT'S EXHIBIT
12
5/23/18
COLLINS REPORTING

GREER 000467

 **University Hospitals™**

**Employee Assistance Program
Conditions of Employment**

**Compliance Contract**

between

*Laura Greer*

**Employee**

and the

**Employee Assistance Program Counselor**

I understand that my supervisor referred me to the Employee Assistance Program (EAP) as a Mandatory Referral.  I understand that my EAP assessment resulted in certain recommendations and I must comply with them.

I understand that my compliance with the EAP attendance recommendation and treatment plan must be monitored as determined by the EAP counselor.  If I do not comply with the recommendation and/or treatment plan within _1_ week (s) my supervisor and /or HR will be informed.  Non-compliance may result in corrective action up to and including discharge.

The EAP recommendation/treatment plan requirements are as follows: ___per___
D/C instructions per St. Rita's
1) F/u c Dr Rala + his recommendations
2) F/u c Mike McGregor Wyandot Counseling + his recommendations
3) F/u Family Practice Nancy Williams CNP + recommendations

I understand and agree to comply with the conditions of this Contract.

*Laura Greer*
Employee

_09-26-2016_
Date

_____
EAP Counselor

_____
Date

# ATTACHMENT A

UNIVERSITY HOSPITALS HEALTH SYSTEM
EMPLOYEE ASSISTANCE PROGRAM
REFERRAL FORM

Employee: **Laura Greer**    Position: **Claims Processor**    Date: **7-12-16**    Phone: **419 424-9291**

You are being referred to the EMPLOYEE ASSISTANCE PROGRAM (EAP) because of the concerns noted below. EAP services are confidential, in compliance with the law.  Your supervisor will be told only whether you kept the appointment, and whether you complied with the EAP recommendations.  Your supervisor will not be told what was discussed unless you specifically authorize it and sign a release of information specifying the information to be released. Information from EA may be shared without a release and authorization in response to state or federal statute/regulation (e.g. Homicidal/suicidal ideation; child and elder abuse/neglect), a court ordered subpoena or an official investigation by a government agency.

- ☒ A Tier 1 Mandatory Referral has been made to EAP for the following reason:
    - ☒ Fitness for Duty
    - ☐ Violent, hostile, or reckless behavior that endangers the safety of others or that causes others to fear for their safety
    - ☐ Reasonable suspicion of drug/alcohol use including evidence of drug diversion.

Please phone EAP at 216-844-4948 to confirm your scheduled appointment on **7-12-16 @ 12 pm**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

- ☐ A Tier 2 Mandatory Referral has been made to EAP for the following job performance concern(s):
    - ☐ Attendance issues
    - ☐ Conflictive work relationship
    - ☐ Deteriorating job performance
    - ☐ Other _____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Please phone EAP at 216-844-4948 within 5 business days of today's date, to schedule an appointment.

Explanation of counseling, anecdotal, corrective actions or other concerns relative to the above-checked concerns:

My supervisor has explained the reason for this EAP referral. I understand that my supervisor will be notified whether I keep my appointment and whether I comply with the EAP recommendations.  I have been given a copy of this form.

Employee Signature: _____    Date: _____

Supervisor Signature: _Angela Kuhl_   Dept: **HR**   Phone: **330 463 1135**

EAP Counselor Signature: _____    Date: _____

☐ Employee attended EAP session        ☐ Employee did not attend EAP session
☐ Employee complied                    ☐ Employee did not comply

HR 85 – Employee Assistance Program
Owner: Human Resources Department
Revised November 2013
Page 5 of 5
Uncontrolled document - printed version only reliable for 24 hours

DEFENDANT 001316

CONFIDENTIAL

Neg to EAP
10/20/16



3949 N. Main St. Suite D
Findlay, OH 45840
Phone: 419-425-5121
Fax: 419-425-5738

Date: 10/5/2016

Re:  Laura Greer
SSN:  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

DER:  Laura Fernandez
Employer:  University Hospitals Case Med Center

This letter is in regard to the random urine drug screen collected on 9/28/2016 from Laura Greer. This test is reported as "Negative." The specimen was also Dilute.

As the Medical Review Officer for this test, I was able to confirm that there is a legitimate medical prescription in use, consistent with the chemical detected in the specimen.  Because there is a legitimate medical explanation for the presence of this substance, this drug test is declared as "Negative." I would like you to be aware that use of this medication may have side effects that could present safety-sensitive issues. The employee's personal physician may be a better judge of how the individual reacts to the medication with respect to job duties.

Please feel free to contact me if you have any further questions or concerns.

Sincerely,

Stephanie A. Matuszak MD, MRO
Well at Work

DEFENDANT'S
EXHIBIT
13
5/23 18
COLLINS REPORTING

GREER 000680

# Alcohol Testing Form (Non-DOT)

*(The instructions for completing this form are on the back of Copy 3)*

**STEP 1: TO BE COMPLETED BY ALCOHOL TECHNICIAN**

A: Employee Name *(Print)  (First, M.I., Last)*   Laura Greer

B: SSN or Employee ID No.   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

C: Employer Name   University Hospitals Case M.C.

Street   MCCO 10th Floor, 11100 Euclid Ave

Mail stop 6035B

City, State, Zip   Cleveland, OH 44106

DER Name and Telephone No.   Laura Fernandez: 216-844-4828

DER *(Area Code & Phone Number)*

D: Reason for Test:  ☐ Reasonable Susp.  ☐ Post-Accident  ☐ Return to Duty  ☐ Follow-up  ☐ Pre-employment
☑ Random (meets the job related and consistent with business necessity requirements)

**STEP 2: TO BE COMPLETED BY EMPLOYEE**

I certify that I am about to submit to alcohol testing and that the identifying information provided on the form is true and correct.

Signature of Employee _____   Date 09 Month 28 Day 2016 Year

**STEP 3: TO BE COMPLETED BY ALCOHOL TECHNICIAN**

(If the technician conducting the screening test is not the same technician who will be conducting the confirmation test, each technician must complete their own form.) I certify that I have conducted alcohol testing on the above named individual, that I am qualified to operate the testing device(s) identified, and that the results are as recorded.

TECHNICIAN: ☑ SAT  ☐ STT   DEVICE: ☐ SALIVA  ☑ BREATH*  15-Minute Wait:  ☐ Yes  ☐ No
SCREENING TEST: (For BREATH DEVICES* write in the space below only if the testing device is not designed to print.)

| Test # | Testing Device Name | Device Serial # OR Lot # & Exp. Date | Activation Time | Reading Time | Result |
|--------|---------------------|--------------------------------------|-----------------|--------------|--------|
|        |                     |                                      |                 |              |        |

CONFIRMATION TEST: Results MUST be affixed to each copy of this form or printed directly onto the form.

REMARKS: _____

_____

_____

Alcohol Technician's Company   EDITH GRINE

(PRINT) Alcohol Technician's Name (First, M.I., Last)

Signature of Alcohol Technician   Edith Grine

Well at Work

Company Street Address 3949 N. Main St.
Findlay, OH 45840
Company City, State, Zip 419-425-5121
Fax 419-425-5738
Phone Number (Area Code & Number)

Date 9 Month 28 Day 16 Year

**STEP 4: TO BE COMPLETED BY EMPLOYEE IF TEST RESULT IS POSITIVE**

I certify that I have submitted to the alcohol test, the results of which are accurately recorded on this form. I understand that I must not drive, perform safety-sensitive duties, or operate heavy equipment because the results are positive.

Signature of Employee _____   Date ___ Month ___ Day ___ Year

COPY 1 - ORIGINAL - FORWARD TO THE EMPLOYER          8363 (Rev. 2/14)

---

ALCOMONITOR CC  001224
09/28/16
TEST NO.  218

SBJ: 300603228.......

SCREENING TEST
6/210L          TIME
.000 AUTO     09:16

---

Affix Or Print Screening Results Here   ▼ Affix With Tamper Evident Tape

Affix Or Print Confirmation Results Here   ▼ Affix With Tamper Evident Tape

Affix Or Print Additional Test Results Here

▲ Affix With Tamper Evident Tape

GREER 000681

Well at Work

## MRO Analysis Form

| | | Birthdate | Phone |
|---|---|---|---|
| Name: | 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 | 01-12-1970 | 419-957-2459 |
| Laura Greer | | | |

| | Contact Name | | |
|---|---|---|---|
| Employer: University Hospitals Case M. C | Laura Fernandez | 216-844-4828 | 216-844-3990 |
| Collector: Well at Work | April Vandenberg | 419-425-5121 | 419-425-5738 |
| Lab: MEDTOX | | 800-832-3244 | |

| | Test Doc | Specimen ID | Collect Protocol |
|---|---|---|---|
| | RT | Z31611034 | COLLPROT |

Collection Date: 9/28/2016

Lab Results:

| Substance | Lab Result | Lab Level | Finding |
|---|---|---|---|
| Amp Exp | Negative | 0 | |
| Barbiturates (Urine)5620 | Negative | 0 | |
| Benzodiazepines 5630 | Positive | 232.0000 | alprazolam |
| Cocaine Metabolite 5640 | Negative | 0.208 | alpha-hydroxy alprazolam |
| Marijuana Metabolite 5671 | Negative | 0 | |
| Meperidine 5730 | Negative | 0 | |
| Methadone 5680 | Negative | 0 | |
| Opiates (Urine) 5650 | Negative | 0 | |
| Oxycodone - Urine 5653 | Negative | 0 | |
| Phencyclidine 5660 | Negative | 0 | |
| Propoxyphene 5700 | Negative | 0 | |
| TRAMADOL 5720 | Negative | 0 | |

☑ Review Chain of Custody Documents:
  ☑ Acceptable  ☐ Unacceptable  (explain:) _____

Employee Notification Phone Log:

Phone: 419-957-2459

Date/Time: 10/3/16 4:35
10/5/16 5:28

Response: *voicemail not set up*
sounds fired slowly
confused

☐ If unable to notify employee, company's Drug Test Program Coordinator
  notified. Date: __/__/__   Name: _____

*Works from home on computer*
OARRS: alprazolam 0.25 #30
9/13/2016 #65-99920
(zero zolpidem)

☑ Notify employee of positive results
☑ Review possible legitimate reasons for a positive result
  Employee's Reason(s) given for Positive Test:

Prescription Medicine(s) being taken: _____

  ☐ Waives   ☐ Requests Split

☐ Notify right to request split sample within 72 hours

Final Result:  ☐ Positive  ☑ Negative   ☐ Canceled   ☐ Dilute   ☐ Refused-Adulterated   ☐ Refused-Substituted

Signature: _Stephanie A. Matuszak, MD_

Stephanie A. Matuszak, MD
Medical Review Officer

Verified On: 10/5/2016
216-844-4828

Contact: LAURA FERNANDEZ   Phone: _____   Date: 10-6-16   Time: 9:01

☐ Notify employer of results

Comments: _____

Page

Printed on: 10/03/2016  11:21:26AM      V:\REPORTS\SCREENING\MRO ANALYSIS FORM_<b>v7.32+#0186

GREER 000682

0/03/2016  09:46:21        Medtox Laboratories  -  AG:FAXHELLAT  BT: G4194004              Page:01 of

MEDTOX LABORATORIES INC.                        Jennifer A. Collins, Ph.D.
 402 WEST COUNTY ROAD D
ST PAUL, MN 55112
651-636-7466
                                LABORATORY REPORT

Account #: 4746912              Accession #: G4197040
BLANCHARD VALLEY HEALTH SYSTEM  Specimen I.D.: Z31611034
MRO: STEPHANIE MATUSZAK, MD     Donor Name/ID: GREER, LAURA
WELL AT WORK                    SSN:           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
3949 N MAIN ST STE D            Age:    Sex:
FINDLAY, OH 45840               Reason for test: Random

                                Date         Date         Date
                                Collected    Received     Reported
General Information             09/28/2016   09/29/2016   10/03/2016
                                  10:00                     9:43AM

    TEST(S) REQUESTED           RESULTS          UNITS THERAPEUTIC RANGE

DRUGS OF ABUSE SCREEN
   DRUG TEST RESULT             POSITIVE         ng/ml
   AMPHETAMINES                 NEGATIVE         ng/ml
   BARBITURATES                 NEGATIVE         ng/ml
   BENZODIAZEPINES              +++POSITIVE+++   ng/ml
   COCAINE METABOLITE           NEGATIVE         ng/ml
   OPIATES                      NEGATIVE         ng/ml
   OXYCODONE                    NEGATIVE         ng/ml
   PHENCYCLIDINE (PCP)          NEGATIVE         ng/ml
   MARIJUANA METABOLITE (THC)   NEGATIVE         ng/ml
   METHADONE                    NEGATIVE         ng/ml
   PROPOXYPHENE                 NEGATIVE         ng/ml
   TRAMADOL                     NEGATIVE         ng/ml
   MEPERIDINE                   15.4   (L)       mg/dl        > = 20
   CREATININE                   NEGATIVE         mcg/ml       < 200
   NITRITES

THIS SPECIMEN WAS SCREENED BY IMMUNOASSAY. ANY POSITIVE RESULT
HAS BEEN CONFIRMED BY CHROMATOGRAPHY WITH MASS SPECTROMETRY.
THE FOLLOWING THRESHOLD CONCENTRATIONS WERE USED FOR THIS ANALYSIS

DRUG              SCREENING THRESHOLD      CONFIRMATION THRESHOLD
AMPHETAMINES         1000 NG/ML
  AMPHETAMINE                                500 NG/ML
  METHAMPHETAMINE                            500 NG/ML
  MDMA                                       500 NG/ML
  MDA                                        500 NG/ML
  MDEA                                       200 NG/ML
BARBITURATES          300 NG/ML             100 NG/ML
BENZODIAZEPINES       300 NG/ML
  DIAZEPAM, DESMETHYLDIAZEPAM
  OXAZEPAM, TEMAZEPAM
  ALPRAZOLAM, ALPHA-OH-ALPRAZOLAM
  LORAZEPAM, ALPHA-HYDROXYTRIAZOLAM
  HYDROXYETHYLFLURAZEPAM,
  ALPHA-HYDROXYMIDAZOLAM, 7-AMINOCLONAZEPAM   150 NG/ML
COCAINE METABOLITE    300 NG/ML
OPIATES               300 NG/ML             300 NG/ML
  CODEINE                                    300 NG/ML
  MORPHINE                                   300 NG/ML
  HYDROCODONE                                300 NG/ML
  HYDROMORPHONE                              100 NG/ML
OXYCODONE             100 NG/ML
                      REPORT CONTINUED ON NEXT FORM

GREER 000683

0/03/2016  09:45:21                    Medtox Laboratories  -  AC:FROZELLAT  BT: 64194884                    Page:02 of

CONTINUED REPORT
MEDTOX LABORATORIES INC.                          Jennifer A. Collins, Ph.D.
  402 WEST COUNTY ROAD D
  ST PAUL, MN 55112
  651-636-7466

                              LABORATORY REPORT

  Account #: 4746912                  Accession #:  G4197040
  BLANCHARD VALLEY HEALTH SYSTEM       Specimen I.D.: 231611034
  MRO: STEPHANIE MATUSZAK, MD          Donor Name/ID: GREER, LAURA
  WELL AT WORK                         SSN:          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
  3949 N MAIN ST STE D                 Age:    Sex:
  FINDLAY, OH 45840                    Reason for test: Random

                                      Date         Date        Date
                                      Collected    Received    Reported
  General Information                 09/28/2016   09/29/2016  10/03/2016
                                      10:00                    9:43AM

       TEST(S) REQUESTED          RESULTS          UNITS THERAPEUTIC RANGE
     ───────────────────        ──────────        ──────────────────────
     PHENCYCLIDINE               25 NG/ML           25 NG/ML
     MARIJUANA METABOLITE        50 NG/ML           15 NG/ML
     METHADONE                  300 NG/ML          300 NG/ML
     PROPOXYPHENE               300 NG/ML          300 NG/ML
     TRAMADOL                   200 NG/ML          100 NG/ML
     MEPERIDINE                 200 NG/ML          100 NG/ML

  ALTERNATIVE EXPLANATIONS SHOULD BE EXPLORED FOR POSITIVE RESULTS.
  THIS PANEL INCLUDES TESTING FOR SPECIMEN VALIDITY.

  **SOME COMPONENTS OF THE TEST PANEL WERE DEVELOPED AND PERFORMANCE
  CHARACTERISTICS DETERMINED BY LABCORP. THEY HAVE NOT BEEN CLEARED
  OR APPROVED BY THE FOOD AND DRUG ADMINISTRATION.

  Certified by: GREEN,LEAH
  SPECIFIC GRAVITY                     1.003      ✓

  Certified by: GREEN,LEAH
  EXPANDED BENZODIAZEPINE CONFIRM
     ALPRAZOLAM                        232     ✓        ng/ml
     ALPHA-HYDROXYALPRAZOLAM           208   ✓          ng/ml

  QUANTITATIVE BENZODIAZEPINE CONFIRMATION INCLUDES DIAZEPAM,
  DESMETHYLDIAZEPAM, OXAZEPAM, TEMAZEPAM, ALPRAZOLAM,
  ALPHA-HYDROXYALPRAZOLAM, HYDROXYETHYLFLURAZEPAM, LORAZEPAM,
  ALPHA-HYDROXYTRIAZOLAM, ALPHA-HYDROXYMIDAZOLAM, 7-AMINOCLONAZEPAM
  AT A THRESHOLD OF 100 ng/mL.
  ANALYSIS PERFORMED BY LIQUID CHROMATOGRAPHY/TANDEM MASS
  SPECTROMETRY (LC/MS/MS).

                         ** FINAL REPORT **

            Collected at 4194255121  MEDTOX collection site #607
            WELL AT WORK - FINDLAY
            FINDLAY, OH

GREER 000684



*ag nvE ne 8/28/17*

August 16, 2017

University Hospitals Case M.C
Attn: Laura Fernandez
MCCO 6th Floor, 11100 Euclid A
Mail Stop 6035B
Cleveland, OH 44106

　　　RE:　Laura Greer
　　　SSN　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

Dear Laura,

This letter is in regards to the drug screen collected by Well at Work on August 4, 2017 from Laura Greer. As the Medical Review Officer for this test, a legitimate medical prescription was found to be in use containing the compounds found in the urine specimen. This prescription has been confirmed. Because there is a legitimate medical reason for the presence of this compound, this drug test is declared negative. However, I would like you to be aware that the medication may have side effects that may represent a Safety-Sensitive issue. The employee's personal physician may be a better judge of how the individual will react to the medications.

Please feel free to contact me if you have any further questions or concerns.

Sincerely,

*Jallale Mo MP4*

Lawrence Kale, MD, MRO
Well at Work
LK/sss

3949 North Main Street, Suite D • Findlay, Ohio 45840 • 419-425-5121 • FAX 419-425-5738

DEFENDANT'S
EXHIBIT
15
5/23/18
COLLINS REPORTING

GREER 00

Page:01 of

Medtox Laboratories  -  AG:FMXWELLAT  BT: 64507089

08/12/2017  14:42:02

Jennifer A. Collins, Ph.D.

MEDTOX LABORATORIES INC.
402 WEST COUNTY ROAD D
ST PAUL, MN 55112
651-636-7466

LABORATORY REPORT

Account #: 47469
EMPLOYER:
LAWRENCE A KALE, MD
WELL AT WORK
3949 N MAIN ST STE D
FINDLAY, OH 45840

Accession #:   G6367642
Specimen I.D.: 233926002
Donor Name/ID: GREER,LAURA
               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
SSN:
Age:      Sex:
Reason for test: Random

General Information
47469

| | Date Collected | Date Received | Date Reported |
|---|---|---|---|
| | 08/04/2017 10:58 | 08/05/2017 | 08/12/2017 2:39PM |

TEST(S) REQUESTED

| | RESULTS | UNITS | THERAPEUTIC RANGE |
|---|---|---|---|
| DRUGS OF ABUSE SCREEN 96042 | POSITIVE | ng/ml | |
| DRUG TEST RESULT | NEGATIVE | ng/ml | |
| AMPHETAMINES | NEGATIVE | ng/ml | |
| BARBITURATES | +++POSITIVE+++ | ng/ml | |
| BENZODIAZEPINES | NEGATIVE | ng/ml | |
| COCAINE METABOLITE | NEGATIVE | ng/ml | |
| OPIATES | NEGATIVE | ng/ml | |
| OXYCODONE | NEGATIVE | ng/ml | |
| PHENCYCLIDINE (PCP) | NEGATIVE | ng/ml | |
| MARIJUANA METABOLITE (THC) | NEGATIVE | ng/ml | |
| METHADONE | NEGATIVE | ng/ml | |
| PROPOXYPHENE | NEGATIVE | ng/ml | |
| TRAMADOL | NEGATIVE | ng/dl | > = 20 |
| MEPERIDINE | 63.7 | mcg/ml | < 200 |
| CREATININE | NEGATIVE | | |
| NITRITES | | | |

THIS SPECIMEN WAS SCREENED BY IMMUNOASSAY. ANY POSITIVE RESULT
HAS BEEN CONFIRMED BY CHROMATOGRAPHY WITH MASS SPECTROMETRY.
THE FOLLOWING THRESHOLD CONCENTRATIONS WERE USED FOR THIS ANALYSIS

| DRUG | SCREENING THRESHOLD | CONFIRMATION THRESHOLD |
|---|---|---|
| AMPHETAMINES | 1000 NG/ML | 500 NG/ML |
| AMPHETAMINE | | 500 NG/ML |
| METHAMPHETAMINE | | 500 NG/ML |
| MDMA | | 500 NG/ML |
| MDA | | 500 NG/ML |
| MDEA | | 200 NG/ML |
| BARBITURATES | 300 NG/ML | 100 NG/ML |
| BENZODIAZEPINES | 300 NG/ML | |
| DIAZEPAM, DESMETHYLDIAZEPAM | | |
| OXAZEPAM, TEMAZEPAM | | |
| ALPRAZOLAM, ALPHA-OH-ALPRAZOLAM | | |
| LORAZEPAM, ALPHA-HYDROXYTRIAZOLAM | | |
| HYDROXYETHYLFLURAZEPAM, | 7-AMINOCLONAZEPAM | 150 NG/ML |
| ALPHA-HYDROXYMIDAZOLAM, | 300 NG/ML | |
| COCAINE METABOLITE | 300 NG/ML | 300 NG/ML |
| OPIATES | | 300 NG/ML |
| CODEINE | | 300 NG/ML |
| MORPHINE | | 300 NG/ML |
| HYDROCODONE | | 100 NG/ML |
| HYDROMORPHONE | | |
| OXYCODONE | 100 NG/ML | |

REPORT CONTINUED ON NEXT FORM

Called results _____

Entered _____

Faxed/Mailed _____

GREER 000

08/12/2017  14:42:02

Medtox Laboratories -   AG:FAXWELLAT   BT: 64507009

CONTINUED REPORT
MEDTOX LABORATORIES INC.
402 WEST COUNTY ROAD D
ST PAUL, MN 55112
651-636-7466

Jennifer A. Collins, Ph.D.

LABORATORY REPORT

Account #: 47469
EMPLOYER:_____
LAWRENCE A KALE, MD
WELL AT WORK
3949 N MAIN ST STE D
FINDLAY, OH 45840

Accession #:  G6367642
Specimen I.D.: Z33926002
Donor Name/ID: GREER,LAURA
                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
SSN:
Age:   Sex:
Reason for test: Random

General Information
47469

| | Date Collected | Date Received | Date Reported |
|---|---|---|---|
| | 08/04/2017 10:58 | 08/05/2017 | 08/12/2017 2:39PM |

| TEST(S) REQUESTED | RESULTS | UNITS THERAPEUTIC RANGE |
|---|---|---|
| PHENCYCLIDINE | 25 NG/ML | 25 NG/ML |
| MARIJUANA METABOLITE | 50 NG/ML | 15 NG/ML |
| METHADONE | 300 NG/ML | 300 NG/ML |
| PROPOXYPHENE | 300 NG/ML | 300 NG/ML |
| TRAMADOL | 200 NG/ML | 100 NG/ML |
| MEPERIDINE | 200 NG/ML | 100 NG/ML |

ALTERNATIVE EXPLANATIONS SHOULD BE EXPLORED FOR POSITIVE RESULTS.
THIS PANEL INCLUDES TESTING FOR SPECIMEN VALIDITY.

**SOME COMPONENTS OF THE TEST PANEL WERE DEVELOPED AND PERFORMANCE
CHARACTERISTICS DETERMINED BY LABCORP. THEY HAVE NOT BEEN CLEARED
OR APPROVED BY THE FOOD AND DRUG ADMINISTRATION.

Certified by: PAGEL,BECKY

| EXPANDED BENZODIAZEPINE CONFIRM | | |
|---|---|---|
| ALPRAZOLAM | 1140 | ng/ml |
| ALPHA-HYDROXYALPRAZOLAM | 2182 | ng/ml |

QUANTITATIVE BENZODIAZEPINE CONFIRMATION INCLUDES DIAZEPAM,
DESMETHYLDIAZEPAM, OXAZEPAM, TEMAZEPAM, ALPRAZOLAM,
ALPHA-HYDROXYALPRAZOLAM, HYDROXYETHYLFLURAZEPAM, LORAZEPAM,
ALPHA-HYDROXYTRIAZOLAM, ALPHA-HYDROXYMIDAZOLAM, 7-AMINOCLONAZEPAM
AT A THRESHOLD OF 100 ng/mL.
ANALYSIS PERFORMED BY LIQUID CHROMATOGRAPHY/TANDEM MASS
SPECTROMETRY (LC/MS/MS).

** FINAL REPORT **

Collected at 4194255121  MEDTOX collection site #607
WELL AT WORK - FINDLAY
FINDLAY, OH

GREER 0006

Well at Work

## MRO Analysis Form

| Name | Patient ID | Birthdate | Phone |
|---|---|---|---|
| Laura A. Greer | 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 | 01-12-1970 | 419-957-2459 |

| Contact | | Contact Name | Phone | Fax |
|---|---|---|---|---|
| Employer: University Hospitals Case M. C | | Mary ARmao | 216-844-4828 | 216-844-3990 |
| Collector: Well At Work | | Amber Young | 419-425-5121 | 419-425-5738 |
| Lab: MEDTOX | | | 800-832-3244 | |

| Collection Date | Test Number | Specimen ID | Collection Reason |
|---|---|---|---|
| 8/4/2017 | RT | Z33926002 | COLLPROT |

Lab Results:

| Substance | Lab Result | Lab Level | Finding |
|---|---|---|---|
| Amp Exp | Negative | 0 | |
| Barbiturates (Urine)5620 | Negative | 0 | |
| Benzodiazepines 5630 | Positive | 2,182.0000 | |
| Cocaine Metabolite 5640 | Negative | 0 | |
| Marijuana Metabolite 5671 | Negative | 0 | |
| Meperidine 5730 | Negative | 0 | |
| Methadone 5680 | Negative | 0 | |
| Opiates (Urine) 5650 | Negative | 0 | |
| Oxycodone - Urine 5653 | Negative | 0 | |
| Phencyclidine 5660 | Negative | 0 | |
| Propoxyphene 5700 | Negative | 0 | |
| TRAMADOL 5720 | Negative | 0 | |

☐ Review Chain of Custody Documents:
___ Acceptable   ___ Unacceptable  (explain:) _____

Employee Notification Phone Log:
Phone                         Date/Time                    Response

_____        _____        _____
_____        _____        _____
_____        _____        _____

☐ If unable to notify employee, company's Drug Test Program Coordinator
notified. Date: _/_/_        Name: _____

☐ Notify employee of positive results

☐ Review possible legitimate reasons for a positive result
Employee's Reason(s) given for Positive Test:       _DARKSE alprazlan_
Prescription Medicine(s) being taken: _____
                        ___ Waives        ___ Requests Split

☐ Notify right to request split sample within 72 hours

Final Result:   ☐ Positive   ☑ Negative   ☐ Canceled   ☐ Dilute   ☐ Refused-Adulterated   ☐ Refused-Substituted

_signature_                              Verified On: __8/15/12__

LAWRENCE KALE, MD
Medical Review Officer        Contact: _Mary_        Phone: _____   Date: _8/6/17_   Time: _____

☐ Notify employer of results

Comments:

Page:01 of

08/14/2017  14:13:11

Medtox Laboratories -  AG:FRXHELLAT  BT: 64509804

Jennifer A. Collins, Ph.D.

MEDTOX LABORATORIES INC.
  402 WEST COUNTY ROAD D
  ST PAUL, MN 55112
  651-636-7466

LABORATORY REPORT

Account #: 47469
EMPLOYER:_____
LAWRENCE A KALE, MD
WELL AT WORK
3949 N MAIN ST STE D
FINDLAY, OH 45840

Accession #:  G6302195
Specimen I.D.: 233925821
Donor Name/ID:  GREER, LAURA
                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
SSN:
Age:    Sex:
Reason for test: Random

General Information

| | Date Collected | Date Received | Date Reported |
|---|---|---|---|
| | 08/07/2017 11:18 | 08/08/2017 | 08/14/2017 2:10PM |

| TEST(S) REQUESTED | RESULTS | UNITS | THERAPEUTIC RANGE |
|---|---|---|---|
| DRUGS OF ABUSE SCREEN 96042 | POSITIVE | ng/ml | |
| DRUG TEST RESULT | NEGATIVE | ng/ml | |
| AMPHETAMINES | NEGATIVE | ng/ml | |
| BARBITURATES | +++POSITIVE+++ | ng/ml | |
| BENZODIAZEPINES | NEGATIVE | ng/ml | |
| COCAINE METABOLITE | NEGATIVE | ng/ml | |
| OPIATES | NEGATIVE | ng/ml | |
| OXYCODONE | NEGATIVE | ng/ml | |
| PHENCYCLIDINE (PCP) | NEGATIVE | ng/ml | |
| MARIJUANA METABOLITE (THC) | NEGATIVE | ng/ml | |
| METHADONE | NEGATIVE | ng/ml | |
| PROPOXYPHENE | NEGATIVE | ng/ml | |
| TRAMADOL | NEGATIVE | ng/dl | > = 20 |
| MEPERIDINE | 133.2 | mcg/ml | < 200 |
| CREATININE | NEGATIVE | | |
| NITRITES | | | |

THIS SPECIMEN WAS SCREENED BY IMMUNOASSAY. ANY POSITIVE RESULT
HAS BEEN CONFIRMED BY CHROMATOGRAPHY WITH MASS SPECTROMETRY.
THE FOLLOWING THRESHOLD CONCENTRATIONS WERE USED FOR THIS ANALYSIS

| DRUG | SCREENING THRESHOLD | CONFIRMATION THRESHOLD |
|---|---|---|
| AMPHETAMINES | 1000 NG/ML | |
| AMPHETAMINE | | 500 NG/ML |
| METHAMPHETAMINE | | 500 NG/ML |
| MDMA | | 500 NG/ML |
| MDA | | 500 NG/ML |
| MDEA | | 500 NG/ML |
| BARBITURATES | 300 NG/ML | 200 NG/ML |
| BENZODIAZEPINES | 300 NG/ML | 100 NG/ML |
| DIAZEPAM, DESMETHYLDIAZEPAM | | |
| OXAZEPAM, TEMAZEPAM | | |
| ALPRAZOLAM, ALPHA-OH-ALPRAZOLAM | | |
| LORAZEPAM, ALPHA-HYDROXYTRIAZOLAM | | |
| HYDROXYETHYLFLURAZEPAM, | | |
| ALPHA-HYDROXYMIDAZOLAM, 7-AMINOCLONAZEPAM | | 150 NG/ML |
| COCAINE METABOLITE | 300 NG/ML | |
| OPIATES | 300 NG/ML | 300 NG/ML |
| CODEINE | | 300 NG/ML |
| MORPHINE | | 300 NG/ML |
| HYDROCODONE | | 300 NG/ML |
| HYDROMORPHONE | | 100 NG/ML |
| OXYCODONE | 100 NG/ML | |

REPORT CONTINUED ON NEXT FORM

GREER 0000

Page:02 of

18/14/2017  14:13:12

Medtox Laboratories -    AG:FRO3ELLAT   BT: G4589004

Jennifer A. Collins, Ph.D.

CONTINUED REPORT
MEDTOX LABORATORIES INC.
  402 WEST COUNTY ROAD D
ST PAUL, MN 55112
651-636-7466

LABORATORY REPORT

Account #: 47469                          Accession #:  G6382185
EMPLOYER:_____        Specimen I.D.: Z33925821
LAWRENCE A KALE, MD                        Donor Name/ID:  GREER, LAURA
WELL AT WORK                                              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
3949 N MAIN ST STE D                       SSN:
FINDLAY, OH 45840                          Age:    Sex:
                                           Reason for test: Random

                                           Date          Date          Date
                                           Collected     Received      Reported
  General Information                      08/07/2017    08/08/2017    08/14/2017
                                           11:18                       2:10PM

                                           UNITS THERAPEUTIC RANGE
                              RESULTS
  TEST(S) REQUESTED                                        25 NG/ML
                              25 NG/ML                     15 NG/ML
PHENCYCLIDINE                 50 NG/ML                     300 NG/ML
MARIJUANA METABOLITE          300 NG/ML                    300 NG/ML
METHADONE                     300 NG/ML                    100 NG/ML
PROPOXYPHENE                  200 NG/ML                    100 NG/ML
TRAMADOL                      200 NG/ML
MEPERIDINE

ALTERNATIVE EXPLANATIONS SHOULD BE EXPLORED FOR POSITIVE RESULTS.
THIS PANEL INCLUDES TESTING FOR SPECIMEN VALIDITY.

**SOME COMPONENTS OF THE TEST PANEL WERE DEVELOPED AND PERFORMANCE
CHARACTERISTICS DETERMINED BY LABCORP. THEY HAVE NOT BEEN CLEARED
OR APPROVED BY THE FOOD AND DRUG ADMINISTRATION.

  Certified by: MARZITELLI,SUSULA
EXPANDED BENZODIAZEPINE CONFIRM            1621              ng/ml
  ALPRAZOLAM

QUANTITATIVE BENZODIAZEPINE CONFIRMATION INCLUDES DIAZEPAM,
DESMETHYLDIAZEPAM, OXAZEPAM, TEMAZEPAM, ALPRAZOLAM,
ALPHA-HYDROXYALPRAZOLAM, HYDROXYETHYLFLURAZEPAM, LORAZEPAM,
ALPHA-HYDROXYTRIAZOLAM, ALPHA-HYDROXYMIDAZOLAM, 7-AMINOCLONAZEPAM
AT A THRESHOLD OF 100 ng/mL.
ANALYSIS PERFORMED BY LIQUID CHROMATOGRAPHY/TANDEN MASS
SPECTROMETRY (LC/MS/MS).

                        ** FINAL REPORT **

          Collection Site Phone Number NOT PROVIDED

GREER 000

Well at Work

## MRO Analysis Form

| Name | Patient ID | BIRTHDATE | Phone |
| --- | --- | --- | --- |
| Laura A. Greer | 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 | 01-12-1970 | 419-957-2459 |

| Contacts | Contact Name | Phone | Fax |
| --- | --- | --- | --- |
| Employer: University Hospitals Case M. C | Mary ARmao | 216-844-4828 | 216-844-3990 |
| Collector: Well At Work | Amber Young | 419-425-5121 | 419-425-5738 |
| Lab: MEDTOX | | 800-832-3244 | |

| Collection Date | Positive | SpecimenID | Collection Protocol |
| --- | --- | --- | --- |
| 8/4/2017 | RT | Z33926002 | COLLPROT |

Lab Results:

| Substance | Lab Result | Lab Level | Finding |
| --- | --- | --- | --- |
| Amp Exp | Negative | 0 | |
| Barbiturates (Urine)5620 | Negative | 0 | |
| Benzodiazepines 5630 | Positive | 2,182.0000 | |
| Cocaine Metabolite 5640 | Negative | 0 | |
| Marijuana Metabolite 5671 | Negative | 0 | |
| Meperidine 5730 | Negative | 0 | |
| Methadone 5680 | Negative | 0 | |
| Opiates (Urine) 5650 | Negative | 0 | |
| Oxycodone - Urine 5653 | Negative | 0 | |
| Phencyclidine 5660 | Negative | 0 | |
| Propoxyphene 5700 | Negative | 0 | |
| TRAMADOL 5720 | Negative | | |

☐ Review Chain of Custody Documents:
___ Acceptable  ___ Unacceptable  (explain:) _____

Employee Notification Phone Log:
Phone                    Date/Time                          Response

_____    _____
_____    _____
_____    _____

☐ If unable to notify employee, company's Drug Test Program Coordinator
notified.  Date: __/__/__                    Name: _____

☐ Notify employee of positive results

☐ Review possible legitimate reasons for a positive result
Employee's Reason(s) given for Positive Test:    OArne P

Prescription Medicine(s) being taken: _____  ___ Waives  ___ Requests Split

☐ Notify right to request split sample within 72 hours

Final Result:  ☐ Positive  ☑ Negative     ☐ Canceled     ☐ Dilute     ☐ Refused-Adulterated     ☐ Refused-Substituted

[signature]                    Verified On:  KALE

LAWRENCE KALE, MD
Medical Review Officer          Contact: Mry          Phone: _____  Date 8/15/17  Time: _____

☐ Notify employer of results

Comments:

Page 1

GREER_000





3949 N. Main St. Suite D
Findlay, OH 45840
Phone: 419-425-5121
Fax: 419-425-5738

Date: 7/25/2016

Re: MRO Verification for Donor: Laura Greer   SSN: 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

Information for EAP / SAP regarding Positive Drug Screen

Dear SAP Provider:

A Reasonable Suspicion drug screen was collected at our office for Laura Greer on 7-12-2016, and I performed the MRO verification for this test. The drug levels found on the test are attached.

When Ms. Greer came to our office for collection on 7-12-2016, she appeared obviously sedated, slurring her words, sleepy, ataxic, bending forward, leaning on the walls to support herself walking, and vomited in the office while speaking to the receptionist. When I spoke to her on the phone at 12:21 pm on 7-20-2016, she sounded similarly sleepy, slurring her words and repeating herself. She reported at that time that on July 10th she had a 13 hour migraine not responsive to 2 imitrex tablets, and as she had no oxycodone left from a December 2015 prescription, she took one belonging to her sister-in-law. She stated she had taken some cough syrup and her usual prescription of sleeping medication. Then she states she was notified on July 12th that she was on administrative leave due to slurring her speech. She states she was very upset, so upset that she dug through her old travel medications and found a pill bottle into which she had put some old medications for travel, including a few old leftover alprazolam tablets, and took one because she was so upset. She states she was then notified that she had to present for a drug screen. We were able to establish the presence of several prescriptions for alprazolam 0.5 and 0.25 mg from late 2013, as late as 11/1/2013, with a weaning dosage and quantity over several months. Ms. Greer presented to the office again in person on 7-25-2016 with a note from an ENT physician stating that she has a "mild weakness of the right vocal cord due to superior laryngeal nerve palsy. This would be an effect of the previous thyroid surgery on the right side. This will cause a weak or more breathy voice." The note does not mention slurring. On presentation today, the donor appeared alert and oriented. She did have a slightly breathy or hoarse and deliberate speech pattern, but was not slurring her words, ambulated without difficulty, and did not appear to be confused. She did repeat herself a few times, but appeared to be in an attempt to make a point about the facts of her case. She produced an old pill bottle from late 2013 with several old-appearing tablets in it, including what resembles 2 different doses of alprazolam.

I explained to the donor that I need to report the oxycodone as Positive, because she took another person's medication. The alprazolam can be reported as Negative due to the identified legitimate prescription, although it is



GREER 0006





3949 N. Main St. Suite D
Findlay, OH 45840
Phone: 419-425-5121
Fax: 419-425-5738

Date: 7/25/2016

Re: Laura Greer
SSN: 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

DER: Laura Fernandez
Employer: University Hospitals Case Medical Center

This letter is in regard to the Reasonable Suspicion drug screen collected on 7/12/2016 from Laura Greer. It is my unfortunate duty to report that the test was "Positive" for Oxycodone. The donor had a prescription for oxycodone in the past, but admits that she was out of this medication, had acute pain on the day prior to her drug screen and took an oxycodone belonging to her sister-in-law. The test is "Negative" for another scheduled and potentially sedating medication, for which the donor can produce a more remote prescription.

As the Medical Review Officer for this test, I was not able to confirm the existence of a legitimate medical prescription in use for the chemical detected in the specimen based upon the donor's verbal report of using medication prescribed for someone else. The donor has been successfully contacted for notification of the results and discussion of the implications. For urine drug screens, the donor was offered an opportunity to request retesting by an alternate lab of the "split specimen" collected at the same time as the original drug test, and the donor waives this reconfirmation test.

Please keep this letter and a copy of the chain of custody record in a confidential file, separate from your employee's personnel file, to verify that the collection procedure was proper, and that your employee's specimen was secured throughout the testing and reporting process.

Please feel free to contact me if you have any further questions or concerns.

Sincerely,

Stephanie A. Matuszak, MD, MRO

Page: 02 of

08/27/2017  10:05:58                Medtox    oratories -  AG:FRXWELLAT   BT: 64522BB3

COPY

CONTINUED REPORT                                  Jennifer A. Collins, Ph.D.
MEDTOX LABORATORIES INC.
  402 WEST COUNTY ROAD D
  ST PAUL, MN 55112
  651-636-7466                      LABORATORY REPORT

  Account #: 47469                  Accession #:  G6479342
  EMPLOYER:                         Specimen I.D.: 234537225
  LAWRENCE A KALE, MD               Donor Name/ID: GREER, LAURA
  WELL AT WORK                      SSN:           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
  3949 N MAIN ST STE D              Age:      Sex:
  FINDLAY, OH 45840                 Reason for test: Random

                                    Date          Date         Date
  General Information               Collected     Received     Reported
                                    08/21/2017    08/22/2017   08/27/2017
                                    10:38                      10:03AM

                                    RESULTS       UNITS THERAPEUTIC RANGE
      TEST(S) REQUESTED             ━━━━━━━       ━━━━━━━━━━━━━━━━━━━━
      ━━━━━━━━━━━━━━━━                            25 NG/ML
  PHENCYCLIDINE            25 NG/ML               15 NG/ML
  MARIJUANA METABOLITE     50 NG/ML               300 NG/ML
  METHADONE               300 NG/ML               300 NG/ML
  PROPOXYPHENE            300 NG/ML               100 NG/ML
  TRAMADOL                200 NG/ML               100 NG/ML
  MEPERIDINE              200 NG/ML

ALTERNATIVE EXPLANATIONS SHOULD BE EXPLORED FOR POSITIVE RESULTS.
THIS PANEL INCLUDES TESTING FOR SPECIMEN VALIDITY.

**SOME COMPONENTS OF THE TEST PANEL WERE DEVELOPED AND PERFORMANCE
CHARACTERISTICS DETERMINED BY LABCORP. THEY HAVE NOT BEEN CLEARED
OR APPROVED BY THE FOOD AND DRUG ADMINISTRATION.


  Certified by: FALKOFSKE,JENNIFER
EXPANDED BENZODIAZEPINE CONFIRM
  ALPRAZOLAM                        2074          ng/ml
  ALPHA-HYDROXYALPRAZOLAM           3588          ng/ml


QUANTITATIVE BENZODIAZEPINE CONFIRMATION INCLUDES DIAZEPAM,
DESMETHYLDIAZEPAM, OXAZEPAM, TEMAZEPAM, ALPRAZOLAM,
ALPHA-HYDROXYALPRAZOLAM, HYDROXYETHYLFLURAZEPAM, LORAZEPAM,
ALPHA-HYDROXYTRIAZOLAM, ALPHA-HYDROXYMIDAZOLAM, 7-AMINOCLONAZEPAM
AT A THRESHOLD OF 100 ng/mL.
ANALYSIS PERFORMED BY LIQUID CHROMATOGRAPHY/TANDEM MASS
SPECTROMETRY (LC/MS/MS).

                        ** FINAL REPORT **

        Collected at 4194255121  MEDTOX collection site #607
        WELL AT WORK - FINDLAY
        FINDLAY, OH

10/27/2017  19:05:49          Medtox   Laboratories -  AG:FAXWELLAT  BT: 64522803

Jennifer A. Collins, Ph.D.

COPY

MEDTOX LABORATORIES INC.
   402 WEST COUNTY ROAD D
   ST PAUL, MN 55112
   651-636-7466

                                LABORATORY REPORT

   Account #: 47469
   EMPLOYER:                              Accession #:   G6479342
   LAWRENCE A KALE, MD                    Specimen I.D.: Z34537225
   WELL AT WORK                           Donor Name/ID: GREER, LAURA
   3949 N MAIN ST STE D                   SSN:           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
   FINDLAY, OH 45840                      Age:     Sex:
                                          Reason for Test: Random

                                     Date        Date        Date
                                   Collected   Received    Reported
   General Information             08/21/2017  08/22/2017  08/27/2017
                                     10:38                 10:03AM

       TEST(S)  REQUESTED           RESULTS        UNITS THERAPEUTIC RANGE

   DRUGS OF ABUSE SCREEN 96042     POSITIVE
      DRUG TEST RESULT             NEGATIVE        ng/ml
      AMPHETAMINES                 NEGATIVE        ng/ml
      BARBITURATES                 +++POSITIVE+++  ng/ml
      BENZODIAZEPINES              NEGATIVE        ng/ml
      COCAINE METABOLITE           NEGATIVE        ng/ml
      OPIATES                      NEGATIVE        ng/ml
      OXYCODONE                    NEGATIVE        ng/ml
      PHENCYCLIDINE (PCP)          NEGATIVE        ng/ml
      MARIJUANA METABOLITE (THC)   NEGATIVE        ng/ml
      METHADONE                    NEGATIVE        ng/ml
      PROPOXYPHENE                 NEGATIVE        ng/ml
      TRAMADOL                     NEGATIVE        ng/ml    > = 20
      MEPERIDINE                   82.8            ng/dl
      CREATININE                   NEGATIVE        mcg/ml   < 200
      NITRITES

   THIS SPECIMEN WAS SCREENED BY IMMUNOASSAY. ANY POSITIVE RESULT
   HAS BEEN CONFIRMED BY CHROMATOGRAPHY WITH MASS SPECTROMETRY.
   THE FOLLOWING THRESHOLD CONCENTRATIONS WERE USED FOR THIS ANALYSIS

   DRUG                  SCREENING THRESHOLD        CONFIRMATION THRESHOLD
   AMPHETAMINES              1000 NG/ML
      AMPHETAMINE                                      500 NG/ML
      METHAMPHETAMINE                                  500 NG/ML
      MDMA                                             500 NG/ML
      MDA                                              500 NG/ML
      MDEA                                             200 NG/ML
   BARBITURATES               300 NG/ML               100 NG/ML
   BENZODIAZEPINES            300 NG/ML
      DIAZEPAM, DESMETHYLDIAZEPAM
      OXAZEPAM, TEMAZEPAM
      ALPRAZOLAM, ALPHA-OH-ALPRAZOLAM
      LORAZEPAM, ALPHA-HYDROXYTRIAZOLAM
      HYDROXYETHYLFLURAZEPAM,
      ALPHA-HYDROXYMIDAZOLAM, 7-AMINOCLONAZEPAM        150 NG/ML
   COCAINE METABOLITE         300 NG/ML
   OPIATES                    300 NG/ML
      CODEINE                                          300 NG/ML
      MORPHINE                                         300 NG/ML
      HYDROCODONE                                      300 NG/ML
      HYDROMORPHONE                                    100 NG/ML
   OXYCODONE                  100 NG/ML

                           REPORT CONTINUED ON NEXT FORM

GREER 00063

7/19/2016  18:43:22          Medtox Laboratories - AG:FAXUELLAT  BT: 64118918           Page: 2 of 2

CONTINUED REPORT
MEDTOX LABORATORIES INC.                              Jennifer A. Collins, Ph.D.
   402 WEST COUNTY ROAD D
   ST PAUL, MN 55112
   651-636-7466
                              LABORATORY REPORT

   Account #: 47469                    Accession #:  G3606881
   EMPLOYER:                           Specimen I.D.: 232049168
   MRO: STEPHANIE MATUSZAK, MD         Donor Name/ID: GREER, LAURA
   WELL AT WORK                        SSN:           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
   3949 N MAIN ST STE D                Age:    Sex:
   FINDLAY, OH 45840                   Reason for test: Reasonable Suspicion/Cause

   General Information                 Date          Date          Date
   47469                               Collected     Received      Reported
                                       07/12/2016    07/14/2016    07/19/2016
                                       16:18                       6:38PM

        TEST(S) REQUESTED          RESULTS          UNITS THERAPEUTIC RANGE
        ----------------          -------          ----- -----------------
   PHENCYCLIDINE          25 NG/ML                   25 NG/ML
   MARIJUANA METABOLITE   30 NG/ML                   15 NG/ML
   METHADONE             300 NG/ML                  300 NG/ML
   PROPOXYPHENE          300 NG/ML                  300 NG/ML
   TRAMADOL              200 NG/ML                  100 NG/ML
   MEPERIDINE            200 NG/ML                  100 NG/ML

   ALTERNATIVE EXPLANATIONS SHOULD BE EXPLORED FOR POSITIVE RESULTS.
   THIS PANEL INCLUDES TESTING FOR SPECIMEN VALIDITY.


   Certified by: LANGEK, CRAIG
   EXPANDED BENZODIAZEPINE CONFIRM
   ALPRAZOLAM                      1664      ✓      ng/ml
   ALPHA-HYDROXYALPRAZOLAM         2437      ✓      ng/ml


   QUANTITATIVE BENZODIAZEPINE CONFIRMATION INCLUDES DIAZEPAM,
   DESMETHYLDIAZEPAM, OXAZEPAM, TEMAZEPAM, ALPRAZOLAM,
   ALPHA-HYDROXYALPRAZOLAM, HYDROXYETHYLFLURAZEPAM, LORAZEPAM,
   ALPHA-HYDROXYTRIAZOLAM, ALPHA-HYDROXYMIDAZOLAM, 7-AMINOCLONAZEPAM
   AT A THRESHOLD OF 100 ng/mL.
   ANALYSIS PERFORMED BY LIQUID CHROMATOGRAPHY/TANDEM MASS
   SPECTROMETRY (LC/MS/MS).

   OXYCODONE CONFIRMATION
   OXYCODONE                       2930      ✓      ng/ml
   OXYMORPHONE                      794      ✓      ng/ml

                    ** FINAL REPORT **

          Collected at 4194255121  MEDTOX collection site #607
          WELL AT WORK - FINDLAY
          FINDLAY, OH

GREER 000638

17/18/2016  18:43:22          Medtox Laboratories -   AG:FAXELLAT  BT: 64118810                    Page: 1 of 2



MEDTOX LABORATORIES INC.                        Jennifer A. Collins, Ph.D.
  402 WEST COUNTY ROAD D
  ST PAUL, MN 55112
  651-636-7466
                            LABORATORY REPORT

  Account #: 47469                  Accession #:  G3606881
  EMPLOYER:                         Specimen I.D.: Z32049168
  MRO: STEPHANIE MATUSZAK, MD       Donor Name/ID: GREER, LAURA
  WELL AT WORK                      SSN:        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
  3949 N MAIN ST STE D              Age:    Sex:
  FINDLAY, OH 45840                 Reason for test: Reasonable Suspicion/Cause

                               Date        Date        Date
                               Collected   Received    Reported
  General Information          07/12/2016  07/14/2016  07/19/2016
  47469                          16:18                   6:38PM

        TEST(S) REQUESTED            RESULTS        UNITS THERAPEUTIC RANGE
        -----------------            -------        ----- -----------------
  DRUGS OF ABUSE SCREEN
    DRUG TEST RESULT               POSITIVE
    AMPHETAMINES                   NEGATIVE           ng/ml
    BARBITURATES                   NEGATIVE           ng/ml
    BENZODIAZEPINES                +++POSITIVE+++     ng/ml
    COCAINE METABOLITE             NEGATIVE           ng/ml
    OPIATES                        NEGATIVE           ng/ml
    OXYCODONE                      +++POSITIVE+++     ng/ml
    PHENCYCLIDINE (PCP)            NEGATIVE           ng/ml
    MARIJUANA METABOLITE (THC)     NEGATIVE           ng/ml
    METHADONE                      NEGATIVE           ng/ml
    PROPOXYPHENE                   NEGATIVE           ng/ml
    TRAMADOL                       NEGATIVE           ng/ml
    MEPERIDINE                     NEGATIVE           ng/mL
    CREATININE                     172.0              ng/dl      > = 20
    NITRITES                       NEGATIVE           mcg/ml     < 200

  THIS SPECIMEN WAS SCREENED BY IMMUNOASSAY. ANY POSITIVE RESULT
  HAS BEEN CONFIRMED BY CHROMATOGRAPHY WITH MASS SPECTROMETRY.
  THE FOLLOWING THRESHOLD CONCENTRATIONS WERE USED FOR THIS ANALYSIS:

  DRUG           SCREENING THRESHOLD      CONFIRMATION THRESHOLD
  AMPHETAMINES          1000 NG/ML
    AMPHETAMINE                                  500 NG/ML
    METHAMPHETAMINE                              500 NG/ML
    MDMA                                         500 NG/ML
    MDA                                          500 NG/ML
    MDEA                                         500 NG/ML
  BARBITURATES           300 NG/ML              200 NG/ML
  BENZODIAZEPINES        300 NG/ML              100 NG/ML
    DIAZEPAM, DESMETHYLDIAZEPAM
    OXAZEPAM, TEMAZEPAM
    ALPRAZOLAM, ALPHA-OH-ALPRAZOLAM
    LORAZEPAM, ALPHA-HYDROXYTRIAZOLAM
    HYDROXYETHYLFLURAZEPAM,
    ALPHA-HYDROXYMIDAZOLAM, 7-AMINOCLONAZEPAM
  COCAINE METABOLITE     300 NG/ML              150 NG/ML
  OPIATES                300 NG/ML
    CODEINE                                      300 NG/ML
    MORPHINE                                     300 NG/ML
    HYDROCODONE                                  300 NG/ML
    HYDROMORPHONE                                300 NG/ML
  OXYCODONE              100 NG/ML              100 NG/ML
                  REPORT CONTINUED ON NEXT FORM

GREER 000639



a sedating medication. I hope Ms. Greer's case will have a successful outcome in her EAP / SAP assessment and treatment. If further information is needed, please contact our office.

Sincerely,

Stephanie A. Matuszak, MD, MRO

 **University Hospitals**

# Corrective Action

**Employees Name:** Laura Greer      **Job Title:** HDP Claims Processor I

**Department:** HDP Claims-70005      **Employee ID:** 1167786

**Purpose of Report (Check One)**

☒ **Confirmation of Counseling**      ☐ **Final Warning**

☐ **Warning**      ☐ **Discharge**

**Describe event(s) in detail:**

As you know, the UH HR-71 Attendance policy states that any employee who accumulates 6 occurrences of unscheduled absences within any consecutive 12-month period will be subject to progressive corrective action up to and including discharge.  Each occurrence after the first 6 will progress the level of action taken depending on where the employee is in the corrective action process at the time of the attendance infraction. A recent review of your attendance shows that you were absent from work on the following dates, and in violation of UH policy.

- 12/27/16 – 8 hours
- 2/3/17 – 8 hours
- 2/10/17 – 8 hours
- 3/1/17 – 8 hours
- 5/3/17, 5/4/17, 5/5/17, 5/9/17, 5/10/17, 5/11/17 & 5/12/17- 51 hours
- 6/5/17 & 6/6/17 – 16 hours
- 6/13/17 - 8 hours
- 6/14/17 – 8 hours
- 6/15/17 - 8 hours
- 6/30/17 –7.48 hours
- 7/27/17 – 8 hours
- 7/28/17 – 6 hours
- 8/2/17 – 4.5 hours
- 8/17/17 – 8 hours

As a result of your excessive absenteeism, this corrective action is warranted.

**Describe any previous action taken, and/or action needed going forward:**

Laura, as reviewed with you on July 20, 2017, attendance is a major part of your work performance and you should report to work as scheduled so that department operations are not negatively impacted.  Today, please take a moment to review HR 71 Attendance policy in detail.  All UH policies are found on the UH Intranet. Should you have any questions regarding policy, please let me know.

Confidential

Cc:  Manager, Human Resources, Employee File

DEFENDANT'S EXHIBIT
16
5/23/18
COLLINS REPORTING

Page 1 of 2
DEFENDANT 000149

CONFIDENTIAL

I am available to offer you any assistance or guidance you may need. It's important to note that I have applied for multiple leaves on your behalf in a genuine effort to help you get absences covered. As we've discussed, it is imperative that you complete and submit leave paperwork to Lisa Edgehouse in a timely manner. Going forward, I expect that you will adhere to the UH Attendance policy and work your assigned shifts. Continued failure to adhere to the Attendance policy and/or meet performance expectations will result in corrective action up to and including discharge from University Hospitals.

Supervisor Signature: _____ Title: _Claims Manager_ Date: _9-21-17_

I have read this report and have been given an opportunity to comment. My signature acknowledges that I have read and received a copy of this report. I understand that I may contact Stephanie Hodgkiss, HR Manager, to discuss questions or concerns related to this document including optional complaint resolution steps.


Employee's Signature: _____ Date: _____

Employee's Comments: _____

_____

_____

_____

_____

 **University Hospitals**

# Corrective Action

**Employees Name:** Laura Greer          **Job Title:** HDP Claims Processor I

**Department:** HDP Claims-70005          **Employee ID:** 1167786

**Purpose of Report (Check One)**

☐    **Confirmation of Counseling**      ☒    **Final Warning**

☐    **Warning**                      ☐    **Discharge**

**Describe event(s) in detail:**
As previously discussed with you, the UH HR-71 Attendance policy states that any employee who accumulates 6 occurrences of unscheduled absences within any consecutive 12-month period will be subject to progressive corrective action up to and including discharge.  Each occurrence after the first 6 will progress the level of action taken.

Laura, you failed to provide completed FMLA paperwork to cover your September absence. As a result, your FMLA request was recently denied on October 4, 2017 (see attached).
- 9-8-17 - 5 hours

You also failed to report for your scheduled EAP test on this date, which is in violation of UH EAP policy.

Laura, as reviewed with you, attendance is a major part of your work performance and you should report to work as scheduled so that department operations are not negatively impacted.  It is also imperative that you complete and submit leave paperwork to Lisa Edgehouse in a timely manner and adhere to the testing protocols that you have agreed to with EAP.

I am available to offer you any assistance or guidance you may need.  Please note that failure to adhere to the UH policy and/or meet performance expectations will result in corrective action up to and including discharge from University Hospitals.

**Supervisor Signature:** _~~signature~~_     **Title:** __Claims Manager__     **Date:** __10-31-17__

I have read this report and have been given an opportunity to comment.  My signature acknowledges that I have read and received a copy of this report.  I understand that I may contact Stephanie Hodgkiss, HR Manager, to discuss questions or concerns related to this document including optional complaint resolution steps.

**Employee's Signature:** _____     **Date:** _____

**Employee's Comments:** _____

_____

_____

_____

<center>Confidential</center>

Cc: Manager, Human Resources, Employee File

DEFENDANT'S
EXHIBIT
20 w
3/23/18
COLLINS REPORTING

GREER 000444

11/8/2017                                    Fw: Vacation 11-14-17 through 11-20-17

> **From:** Laura Greer <lgreer1308@yahoo.com>
> **To:** FLandry308 <flandry308@aol.com>
> **Subject:** Fw: Vacation 11-14-17 through 11-20-17
> **Date:** Tue, Nov 7, 2017 5:48 pm
> **Attachments:** hr-71 Attendance 2017.pdf (108K)

---

<u>Sent from Yahoo Mail on Android</u>

----- Forwarded Message -----
**From:** "David Ferko" <DFerko@hdplus.com>
**To:** "Laura Baker" <L.Baker@hdplus.com>
**Cc:** "lgreer1308@yahoo.com" <lgreer1308@yahoo.com>
**Sent:** Mon, Nov 6, 2017 at 3:01 PM
**Subject:** Vacation 11-14-17 through 11-20-17

Hi, Laura!

Tammy mentioned you contacted her on Sunday and referenced taking a vacation next week.  Please note we don't have a vacation request on file for you, and you've exhausted your PTO bank. Since you have missed so much time away from work, and claims need processing, you don't have approval to take a vacation.

At this time, you can only have off for approved FMLA occurrences.

If you have any questions about this, please let me know.

Thanks.

David Ferko

Manager -- Claims Processing

Health Design Plus | 1755 Georgetown Road, Hudson, OH 44236

330.656.1072 x249 | dferko@hdplus.com

DEFENDANT'S
EXHIBIT
21
5/23/18
COLLINS REPORTING

GREER 000412

11/8/2017                                        FW: TIME OFF

    **From:** Laura Baker <LBaker@hdplus.com>
      **To:** 'FLANDRY308@AOL.COM' <FLANDRY308@AOL.COM>
  **Subject:** FW: TIME OFF
    **Date:** Tue, Nov 7, 2017 10:30 pm

**From:** Laura Baker
**Sent:** Wednesday, October 04, 2017 8:22 AM
**To:** David Ferko
**Subject:** TIME OFF

I NEED TO HAVE NOV 14-20 2017 OFF TO TRAVEL TX SEE MY SON GRADUATE FROM AIR FORCE BOOT CAMP AND SPEND TIME WITH HIM. I WILL RETURN ON THE 21ST

THANKS
LAURA

THIS MESSAGE AND OR ANY ATTACHMENTS IS INTENDED ONLY FOR PERSONAL AND CONFIDENTIAL USE OF THE INDIVIDUAL OR ENTITY TO WHOM IT IS ADDRESSED AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL, AND EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that you have received this message in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this message in error, please notify the sender immediately by e-mail or telephone, and delete the original message immediately. Thank you.

GREER 000413

 **University Hospitals**

# Corrective Action

**Employees Name:** Laura Greer     **Job Title:** HDP Claims Processor I

**Department:** HDP Claims-70005     **Employee ID:** 1167786

**Purpose of Report** (Check One)

☐ Confirmation of Counseling     ☐ Final Warning

☐ Warning     ☒ Discharge

**Describe event(s) in detail:**

As you know, the UH HR-71 Attendance policy states that any employee who accumulates 6 occurrences of unscheduled absences within any consecutive 12-month period will be subject to progressive corrective action up to and including discharge. Each occurrence after the first 6 will progress the level of action taken depending on where the employee is in the corrective action process at the time of the attendance infraction. A recent review of your attendance shows that you were absent from work on the following dates, and in violation of UH policy:

- 11/13/17 – 4 hours
- 11/14/17 – 8 hours
- 11/15/17 – 8 hours
- 11/16/17 – 8 hours
- 11/17/17 – 8 hours
- 11/20/17 – 8 hours

**Describe any previous action taken, and/or action needed going forward:**

Laura, it was thoroughly explained up front to you that you were not approved to take a vacation from 11/14/17 – 11-20-17 since you have exhausted all of your PTO and have missed so much time away from work. You were very aware that you would be terminated if you decided to travel. Human Resources and I discussed this with you in detail. Further, it was reviewed with you on multiple occasions that attendance is a major part of your work performance and you should report to work as scheduled so that department operations are not negatively impacted. You were given progressive corrective action for absenteeism as follows:

- Counseling – 9/21/17
- Final Warning – 10/31/17

I have been extremely flexible and accommodating to your many requests for time off to address various personal issues, Laura. After careful consideration, due to your willful violation of UH policy and excessive absenteeism, your employment is being terminated effective November 21, 2017.

Manager Signature: _____     Date: 11·22·17

*Termination delivered via phone

I understand that I may contact Stephanie Hodgkiss, HR Manager, at 216.767.8475 to discuss questions or concerns related to this document including optional complaint resolution steps. Payroll can be reached at 216.983.0500. Benefits can be reached at 1.877.471.7522.

Confidential

Cc: Manager, Human Resources, Employee File

DEFENDANT'S
EXHIBIT
22
5/23/18 MC
COLLINS REPORTING

Page 1 of 1

GREER 000431

Ve[...]
Se[...] [...] LLP

APR 0 2 2018

CLEVELAND OFFICE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

LAURA GREER,                         )    CASE NO. 1:17-cv-001438
                                     )
        Plaintiff,            )    JUDGE SOLOMON OLIVER, JR.
                                     )
    v.                             )
                                     )
UNIVERSITY HOSPITALS HEALTH          )
SYSTEM, INC., et al.                 )
                                     )
        Defendants.           )

*RESPONSES To:*
## DEFENDANT HEALTH DESIGN PLUS, INC.'S FIRST SET OF
## REQUESTS FOR ADMISSION DIRECTED TO PLAINTIFF LAURA GREER

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Defendant Health Design

Plus, Inc. ("HDPI") propounds the following requests for admission (the "Discovery Requests")

to Plaintiff Laura Greer ("Plaintiff").  Plaintiff's responses to these Discovery Requests must be

provided to the undersigned counsel for HDPI within thirty (30) days of service hereof.

### DEFINITIONS

As used herein, the following words shall have the meanings indicated:

    1.    "You," "your," or "Plaintiff" mean and refer to Plaintiff Laura Greer, as well as

her agents, representatives, attorneys, and every other person acting or purporting to act on her

behalf, individually or collectively.

    2.    "Defendants" mean UHHS and Health Design Plus, Inc..

    3..    "UHHS" means Defendant University Hospitals Health Systems, Inc.

    4.    "HDPI" means Defendant Health Design Plus, Inc.

    5.    "Second Amended Complaint" means the Second Amended Complaint filed by

Plaintiff in this action on or around February 13, 2018 against Defendants in the United States

District Court, Northern District of Ohio captioned *Laura Greer v. University Hospitals Health*

1



DEFENDANT'S
EXHIBIT
23
5/23/18
COLLINS REPORTING

*System, Inc. et al.*, Case No. 1:17-CV-01438. "Second Amended Complaint" also includes Plaintiff's Complaint, which was filed on or around August 23, 2017, and Plaintiff's First Amended Complaint, which was filed on or around November 16, 2017.

6.    "Litigation" means the captioned-lawsuit that you filed against Defendants.

7.    "EAP" means Defendants' Employee Assistance Program.

8.    "EAP Time Period" means the time period during your employment with Defendants when you were required to submit to the EAP.

9.    "Drug Screen" means the EAP testing that you were required to submit to during the EAP Time Period.

10.    "Counselor" means the EAP counselor assigned to Plaintiff during the EAP Time Period.

11.    "Collection Site" means the location where Plaintiff was directed to submit to Drug Screens during the EAP Time Period.

12.    "Collection Site Employees" mean the employees and contractors who worked at the Collection Site during the EAP Time Period.

13.    "Absence or Absent" mean missing work, for any reason, on a day you were required to submit to a Drug Screen.

14.    "Deployment" or "Deployed" means the Standard AEF (Air Expeditionary Force).

15.    "Son" means Jonathon Allen Baker.

16.    "Corrective Action" means the disciplinary notices that you received from Defendants.

17.    "E-Mail" means the e-mail that you sent to all HDPI employees on November 13, 2017 that is attached hereto as Exhibit 1.

18.    Communications" means and includes any conversation or other oral or written contact, formal or informal, at any time or place, under any circumstances whatsoever, whereby information of any nature was transmitted or transferred, whether or not subsequently recorded in any document or ESI. "Communications" means and includes, without limitation, meetings, telephone conversations, discussions, memoranda, correspondence, e-mail communications, reports, executive summaries, briefings, and oral requests for information.

19.    "Describe," when referring to a document or ESI, means to provide the title, subject, or file name, date, originator, addressee, and a brief description of the substance therein.

20.    "Describe," when referring to an event or transaction, means to give the date, the names of the persons participating, the time of day, the place, and a brief description of all occurrences, statements, and conversations contiguous with and pertaining to that event.

21.    "Documents and ESI" and "documents or ESI" are intended to be as comprehensive as the meaning provided in Rules 26 and 34 of the Federal Rules of Civil Procedure, and mean, without limitation, the original and any non-identical copy of any and all written, printed, typed, recorded, graphic, computer-generated, or other matter of any kind from which information can be derived, whether produced, reproduced, or stored on paper, cards, tape, film, electronic facsimile, computer-storage device, or any other medium in your possession, custody, or control. The terms include, without limiting the generality of the foregoing, all communications, letters, memoranda (whether of visits, telephone calls, or otherwise), appointment calendars, schedules, books, indices, printed forms (whether official or unofficial), publications, press releases, notices, brochures, pamphlets, guide books, manuals, instructions,

3

minutes, summaries or abstracts, reports, files, file jackets, data-processing cards, computer tapes, printouts, information contained in, on, or retrievable from computer programs, bulletins, written questions and answers, charts, blueprints, drawings, diagrams, graphs, tables, photographs, recordings, speeches, telegraphs, cables, telex messages, e-mails, microfilm, microfiche, opinions, studies, papers, analyses, evaluations, proposals, budget materials, invoices, financial statements, contracts, specifications, applications, motions, petitions, complaints, answers, responses, replies, protests, verified statements, transcripts, exhibits, attachments, reports, filings, submissions, pleadings, contracts, agreements, and forecasts.  The terms shall include each copy that is not identical to the original or any other produced copy, as well as any preliminary drafts of any document or ESI or working paper relating thereto.

22.     "ESI" means "electronically stored information," as that term is used in Rules 26 and 34 of the Federal Rules of Civil Procedure.

23.     "Identify" or to provide the "identity of" means, with respect to any natural person, to state the full name, home address, business address, employer, and position or positions within each organization employing such person at the present time and at the time in question and, with respect to any other person (as defined in these definitions), to state its full name, address, principal place of business, and state of organization.

24.     "Identify" or to provide the "identity of" means, with respect to any document, to set forth the date thereof, the title (if any), the name of the person or persons authoring such document, the name of the person or persons to whom such document was given or transmitted, the present location and custodian of such document, and the topic dealt with therein with reasonable specificity, and to describe the relevant page or pages and line or lines thereof (or

annex a copy to the responses to these Discovery Requests with appropriate designations of such page or pages and line or lines).

25.     "Identify" or to provide the "identity of" means, with respect to any communication, to set forth the date and place thereof, the name of the person or persons making or issuing the communication, the name of the person or persons to whom and in whose presence such communication was made, and the substance thereof, and to identify each document in which such communication was recorded, described, or referenced.

26.     "Person" means a natural person, proprietorship, corporation, partnership, limited liability company, joint venture, governmental entity, and each other form of organization or association.

27.     "Pertaining to," "relating to," "pertain to," and "relate to," mean referring to, relating to, alluding to, responding to, discussing, commenting upon, showing, disclosing, analyzing, reporting about, explaining, mentioning, constituting, comprising, evidencing, setting forth, containing, summarizing, or characterizing, either directly or indirectly, in whole or in part, the given subject matter.

28.     "And" and "or" as used herein are both conjunctive and disjunctive.

29.     "Any" shall be construed to include "all," and "all" shall be construed to include "any."

30.     "Each" shall be construed to include the word "every," and "every" shall be construed to include the word "each."

31.     Where the context herein makes it appropriate, each singular word shall include its plural, and each plural word shall include its singular.

5

32.     The present tense shall be construed to include the past tense, and the past tense shall be construed to include the present tense.

<u>**REQUESTS FOR ADMISSION**</u>

**REQUEST FOR ADMISSION NO. 1:**

Admit that you were required to submit to Drug Screens during the EAP Time Period.

**RESPONSE:**

*For all responses*
*see Exhibit "A"*

**REQUEST FOR ADMISSION NO. 2:**

Admit that you were Absent from the Drug Screens from August 21, 2017 through September 11, 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 3:**

Admit that you were prescribed a Benzodiazepines in 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 4:**

Admit that your use of Benzodiazepines in 2017 exceeded your prescription.

**RESPONSE:**

6

**REQUEST FOR ADMISSION NO. 5:**

Admit that the high dose of Benzodiazepines that you were taking negatively impacted your ability to perform the essential functions of your position with HDPI.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 6:**

Admit that you did not advise the physician who prescribed you the Benzodiazepines that you were taking doses that exceeded your prescription.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 7:**

Admit that you were Absent because you did not want to fail the Drug Screen.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 8:**

Admit that you had multiple Absences during the EAP Time Period.

**RESPONSE:**

7

**REQUEST FOR ADMISSION NO. 9:**

Admit that your Son was not Deployed in 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 10:**

Admit that your Son had not received Deployment orders when you visited him in Texas in November of 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 11:**

Admit that you were Absent for all of your Drug Screens in October of 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 12:**

Admit that your Son did not receive Deployment orders in 2017.

**RESPONSE:**

8

**REQUEST FOR ADMISSION NO. 13:**

Admit that you received Corrective Actions on September 21, 2017 and October 31, 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 14:**

Admit that you were advised, prior to your Texas trip, that if you traveled to Texas in November of 2017 it would lead to your discharge.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 15:**

Admit that the Corrective Action dated October 31, 2017 was a final warning.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 16:**

Admit that following the October 31, 2017 Corrective Action that you were absent from work on November 13, 2017, November 14, 2017, November 15, 2017, November 16, 2017, November 17, 2017, and November 20, 2017.

**RESPONSE:**

9

**REQUEST FOR ADMISSION NO. 17:**

Admit that you sent the E-Mail before your November of 2017 absences.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 18:**

Admit that you did not send any communications similar to the E-Mail prior to any of your other absences in 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 19:**

Admit that you sent the E-Mail at the request of your counsel.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 20:**

Admit that you sent the E-Mail in an attempt to avoid discharge.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 21:**

Admit that you were employed by HDPI from 2001 through 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 22:**

Admit that you attended Drug Screens as required from September of 2016 through August of 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 23:**

Admit that you were Absent from 2017 Drug Screens because of your abuse of Benzodiazepines.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 24:**

Admit that you did not request any accommodations in 2016 or 2017 from HDPI.

**RESPONSE:**

11

**REQUEST FOR ADMISSION NO. 25:**

Admit that you could perform the essential functions of your Senior Clams Examiner position with HDPI in 2016 and 2017.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 26:**

Admit that you entered a rehabilitation program with Arrowhead Behavioral Health due to a Percocet addiction.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 27:**

Admit that your Percocet addiction impacted your performance with HDPI.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 28:**

Admit that you left the Arrowhead Behavioral Health rehabilitation program before you were released.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 29:**

Admit that Defendants provided you with multiple channels to complain about alleged harassment.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 30:**

Admit that you contacted the Collection Site multiple times a day during the EAP Time Period.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 31:**

Admit that you advised the Collection Site Employees of the Litigation.

**RESPONSE:**

13

**REQUEST FOR ADMISSION NO. 32:**

Admit that you advised the Counselor of the Litigation.

**RESPONSE:**

**REQUEST FOR ADMISSION NO. 33:**

Admit that you contacted your Counselor multiple times a day during the EAP Time Period.

**RESPONSE:**

Respectfully submitted,

*/s/ Donald G. Slezak*
David A. Campbell (0066494)
Gregory C. Scheiderer (0087103)
Donald G. Slezak (0092422)
Vorys, Sater, Seymour and Pease LLP
200 Public Square, Suite 1400
Cleveland, Ohio 44114
Phone: (216) 479-6100
Fax: (216) 479-6060
dacampbell@vorys.com
gcscheiderer@vorys.com
dgslezak@vorys.com

*Attorneys for Defendants*
*University Hospitals Health System, Inc.*
*and Health Design Plus, Inc.*

14

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 19th day of February, 2018, a copy of the

foregoing was served via electronic mail and regular US Mail to:

Francis J. Landry, Esq.
**WASSERMAN, BRYAN, LANDRY &**
**HONOLD, LLP**
1090 West South Boundary, Suite 500
Perrysburg, Ohio  43551
FLandry308@aol.com

/s/ *Donald G. Slezak*
Donald G. Slezak (0092422)
*One of the Attorneys for Defendants*

15

# EXHIBIT 1

**From:** Laura Baker
**Sent:** Monday, November 13, 2017 4:11 PM
**To:** ALL <ALL@hdplus.com>
**Subject:**
**Importance:** High

I WILL BE OFF FROM 11/14-11/20   TIME HAS FLOWN BY FAST AND ITS TIME TO BE THE PROUDEST
MOTHER OF 2 ACTIVE DUTY AIR FORCE GENTLEMEN☺    ATLEAST IT WILL BE 80 DEGRESS IN TEXAS

LAURA GREER

EXHIBIT "A"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **LAURA A. GREER** | * | Case No. 1:17CV1438 |
| Plaintiff | * | Judge Solomon Oliver, Jr. |
| v. | * | |
| **UNIVERSITY HOSPITAL HEALTH SYSTEM, INC. et al.,** | * | **PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST REQUESTS FOR ADMISSIONS** |
| | * | |
| Defendants. | * | Francis J. Landry |
| | * | (0006072) |
| | | **WASSERMAN, BRYAN, LANDRY** |
| | * | **& HONOLD, LLP** |
| | | 1090 W. South Boundary St |
| | * | Suite 500 |
| | | Perrysburg, Ohio 43551 |
| | * | Telephone:  (419) 243-1239 |
| | | Facsimile:  (419) 243-2719 |
| | | Attorney for Plaintiff |
| | | Laura A. Greer |

\*    \*    \*    \*    \*    \*    \*

Now comes Plaintiff, Laura A. Greer, by and through undersigned counsel, and respectfully submits her responses to Defendant's First Requests for Admissions.

REQUEST NO. 1      Admit.

REQUEST NO. 2  Admit but qualified in that Plaintiff suffered from migraines at this time and any absences were covered under intermittent Family and Medical Leave.



REQUEST NO. 3  Admit.

REQUEST NO. 4  Deny.

REQUEST NO. 5  Deny.

REQUEST NO. 6  Deny.

REQUEST NO. 7  Deny.

REQUEST NO. 8  Admit but qualified in that absences were due to major increase in migraines for which Plaintiff was covered under the FMLA.

REQUEST NO. 9  Admit but qualified in that Plaintiff's son went on active duty.



REQUEST NO. 10  Admit but qualified in that Plaintiff's son had active duty orders.





REQUEST NO. 11     Plaintiff is unable to admit or deny due to a major increase at this time in migraines. Plaintiff further states that she advised that someone could have been sent to her house to obtain urine specimens when she could not lift head off of a pillow or see or drive.

REQUEST NO. 12     Admit but qualified in that Plaintiff's son was called to active duty.

REQUEST NO. 13     Admit.

REQUEST NO. 14     Admit but qualified to the extend that Plaintiff was not advised until Friday at 4:00PM when she was leaving the following Monday after work.

REQUEST NO. 15     Admit but qualified to the extent that Plaintiff was under FMLA coverage.

REQUEST NO. 16     Admit.

REQUEST NO. 17     Admit.

REQUEST NO. 18     Admit.

REQUEST NO. 19     Objection. This Request seeks information that is subject to attorney client privilege.  Without waiving objection, Deny.

REQUEST NO. 20     Deny.

REQUEST NO. 21     Admit.

REQUEST NO. 22     Admit.

REQUEST NO. 23     Deny.

REQUEST NO. 24     Deny.

REQUEST NO. 25     Admit.

REQUEST NO. 26     Admit.

REQUEST NO. 27     Deny.

REQUEST NO. 28     Deny.

REQUEST NO. 29     Deny.

REQUEST NO. 30     Deny.

REQUEST NO. 31     Admit.

REQUEST NO. 32     Admit.


REQUEST NO. 33     Admit.


Respectfully submitted,

**WASSERMAN, BRYAN, LANDRY & HONOLD, LLP**


_/s/ Francis J. Landry_
Francis J. Landry
Attorney for Plaintiff, Laura A. Greer


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Plaintiff's Responses to Defendant's First Requests

for Admissions to Plaintiff was sent via ordinary U.S. Mail this 30th day of March, 2018 to David

A. Campbell, Gregory C. Scheiderer and Donald G. Slezak, Vorys, Sater, Seymour and Pease

LLP, 200 Public Square, Suite 1400, Cleveland, Ohio  44114 as well as electronically to

dacampbell@vorys.com, gcscheiderer@vorys.com, and dgslezak@vorys.com.


_/s/ Francis J. Landry_
Francis J. Landry